**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE ADVOCATES FOR HUMAN RIGHTS,**<br>330 Second Avenue South, #800<br>Minneapolis, MN 55401 | ) ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) | |
| **PAMELA BONDI, IN HER CAPACITY AS ATTORNEY GENERAL OF THE** | ) ) | Civil Action No. _____ |
| **UNITED STATES DEPARTMENT OF JUSTICE,**<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530 | ) ) ) ) ) | **COMPLAINT AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>8 U.S.C. § 1103(g) |
| **DAREN K. MARGOLIN, IN HIS CAPACITY AS DIRECTOR, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW OF THE DEPARTMENT OF JUSTICE,**<br>5107 Leesburg Pike<br>Falls Church, VA 22041 | ) ) ) ) ) ) ) ) | |
| **HON. TERESA L. RILEY, IN HER CAPACITY AS CHIEF IMMIGRATION JUDGE, U.S. IMMIGRATION COURT**<br>5107 Leesburg Pike<br>Falls Church, VA 22041 | ) ) ) ) ) ) | |
| And | ) ) | |
| **HON. ERIC L. DILLOW, IN HIS CAPACITY AS ASSISTANT CHIEF IMMIGRATION JUDGE U.S. IMMIGRATION COURT**<br>Bishop Henry Whipple Federal Building<br>1 Federal Drive, Suite 1850<br>Fort Snelling, MN 55111 | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

1

CORE/3515279.0007/237961516.1

**COMPLAINT**

**INTRODUCTION**

1.      Plaintiff The Advocates for Human Rights ("AHR" or "Plaintiff") brings this action against Pamela Bondi, in her official capacity as the Attorney General of the United States, United States Department of Justice ("USDOJ" or "DOJ"); Daren K. Margolin, in his capacity as Director, Executive Office for Immigration Review, the United States Department of Justice ("EOIR"); Teresa L. Riley, in her capacity as the Chief Immigration Judge of the Office of Chief Immigration Judge ("OCIJ"); and Hon. Eric L. Dillow, in his capacity as Assistant Chief Immigration Judge, United States Immigration Court at Fort Snelling in the State of Minnesota (Fort Snelling) (collectively referred to as "Defendants") under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and the Administrative Procedure Act, 5 US.C. § 551, *et seq.*, to compel Defendants to comply with DOJ regulations under the INA governing access to DOJ's immigration courts.

2.      As background, AHR has implemented a project through which AHR volunteers and staff have observed and documented removal and bond proceedings at the Fort Snelling Immigration Court since 2017. This court observation project of AHR draws on the well-established international human rights practice of monitoring legal proceedings to identify, bring visibility to, and end human rights violations arising in the context of civil immigration enforcement. The project brings observers into the Fort Snelling Immigration Court to observe and document hearings, including hearings for those facing removal while in Immigration and Customs Enforcement ("ICE") detention. Since starting the Immigration Court Observation Project, staff

and volunteers of The Advocates have regularly observed hearings on the detained, non-detained, families and children, and Institutional Hearing Program ("IHP") dockets.

3.      Until 2025, The Advocates' observers at the Fort Snelling Immigration Court enjoyed access to hearings consistent with the standards set forth in 8 C.F.R. § 1003.27 and with policy guidance posted on the EOIR website, both of which make clear that immigration court hearings are generally open to the public, subject only to limited exceptions, as specified by law.

4.      Since early 2025, however, the Fort Snelling Immigration Court has had, at times, limited or completely blocked public access to hearings, both in-person and by Webex. It has done so without prior notice to the public and without providing the public either an opportunity to comment on changed access policies before they were implemented or any explanation for the changes in the court's access policies, including any indication whether, or if, the limitations fell within the limited exceptions to USDOJ's regulations requiring that the hearings be open to the public.

5.      These access restrictions at the Fort Snelling Immigration Court are (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (b) without observance of procedure required by law, and (c) contrary to constitutional right under the Administrative Procedure Act, with the access restrictions violating the First Amendment rights of AHR and its courtroom observers.

6.      For its causes of action, Plaintiff states and alleges as follows:

## JURISDICTION AND VENUE

7.      Plaintiff incorporates the allegations of paragraphs 1 through 6 as if fully set forth in this Section.

3

8.      This action arises under the Immigration and Naturalization Act, 8 U.S.C. §§ 1101

*et seq.*, and its implementing regulations; and the Administrative Procedure Act, 5 U.S.C. § 701 *et*

*seq*. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

9.      Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706,

and as authorized in 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are United States agencies or officers sued in their official capacities and a substantial

part of the events or omissions giving rise to this Complaint occurred and are continuing to occur

within this district.

11.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331.

12.     Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B).

## PARTIES

13.     Plaintiff incorporates the allegations of paragraphs 1 through 12 as if fully set forth

in this Section.

14.     AHR is a non-profit organization headquartered in Minneapolis, Minnesota, that,

among other activities and functions, regularly monitors the operation of the U.S. Immigration

Court located in the Bishop Henry Whipple Federal Building located at Fort Snelling in the State

of Minnesota.

15.     Defendant Pamela Bondi is named in her official capacity as Attorney General of

the USDOJ. USDOJ is responsible for the administration of the U.S. immigration courts and the

implementation of regulations governing their operation, including regulations governing public

4

access to the immigration courts. It is headquartered at 950 Pennsylvania Avenue NW, Washington, DC 20530.

16.     Defendant Daren K. Margolin is named in his official capacity as Director, EOIR of the USDOJ. EOIR is an agency within USDOJ. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings. It is headquartered at 5107 Leesburg Pike, Falls Church, VA 22041.

17.     Defendant Teresa L. Riley is named in her official capacity as Chief Immigration Judge of the OCIJ. The Chief Immigration Judge is responsible for establishing operating policies and overseeing policy implementation for the immigration courts.

18.     Defendant Hon. Eric L. Dillow is named in his official capacity as Assistant Chief Immigration Judge, and he is responsible, as part of his duties, for the Fort Snelling Immigration Court located in Minnesota. Its address is Bishop Henry Whipple Federal Building, 1 Federal Drive, Suite 1850, Fort Snelling, MN 55111. The Fort Snelling Immigration Court falls under the jurisdiction of the Office of the Chief Immigration Judge (OCIJ), a component of the EOIR under the USDOJ.

19.     USDOJ and EOIR are "agenc[ies]" within the meaning of 5 U.S.C. § 552(f)(1), and the OCIJ is a component of the EOIR which, through Assistant Chief Immigration Judge Eric L. Dillow, oversees the Fort Snelling Immigration Court

## STATEMENT OF FACTS

### USDOJ Regulations governing public access to the immigration courts

20.     Pursuant to regulations implemented under 8 U.S.C. § 1103(g) and 6 U.S.C. § 521, which grant authority to USDOJ, the public and the press—with only limited exceptions—have a presumptive right to observe immigration court proceedings. 8 C.F.R. § 1003.27 ("All hearings, other than exclusion hearings, shall be open to the public" except in delineated circumstances); *accord*

5

8 C.F.R. § 1240.10(b) ("Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings *as provided in § 1003.27 of this chapter.*") (emphasis added).

21.     These regulations, which were adopted (and then readopted and renumbered) after public notice and comment,[1] provide that "[*a]ll* hearings, other than exclusion hearings, shall be open to the public," with only the following exceptions: (1) limitations on attendance based on available space, "with priority being given to the press over the general public," (2) limitations on attendance "[f]or the purpose of protecting witnesses, parties, or the public interest," (3) closing of hearings concerning an "abused alien spouse" *at the option of the abused spouse* and (4) closing of hearings to the public if "information subject to a protective order . . . may be considered." 8 C.F.R. § 1003.27(a)–(d).

22.     These regulations are consistent with the "general proposition that the First Amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *In re Search of One Device & Two Individuals under Rule 41*, 784 F. Supp. 3d 234, 252 (D.D.C. 2025)

23.     Beginning in October, 2025, clerks, guards, and immigration judges at the Fort Snelling Immigration Court began telling AHR's court observers who had been a presence in the Fort Snelling courtrooms that hearings were closed and that doors to publicly available courtrooms were locked. They did not indicate whether this was an official policy change from EOIR, the Fort Snelling Immigration Court, or no policy change at all. No prior notice of these changes had been

---

[1] 52 FR 2936, Jan. 29, 1987. Redesignated and amended at 57 FR 11571, 11572, Apr. 6, 1992; 62 FR 10334, Mar. 6, 1997; 67 FR 36802, May 28, 2002.

given to the court observers. On information and belief, similar restrictions on public access occurred across the country. *See, e.g.*, Nicolas Scibelli, *Court Observers Blocked: Immigration Hearings Face New Restrictions Across the U.S.*, Sahan Journal (Dec. 10, 2025), https://sahanjournal.com/immigration/fort-snelling-immigration-court-access-shrinks/ (noting that "Fort Snelling Immigration Court has increasingly denied access to court observers, mirroring trends across the country"; that while observers for The Advocates "have been a constant presence in courtrooms," "a change occurred" in October, with clerks telling "court observers and others that hearings were closed, and doors to publicly available courtrooms were locked"; and that at "Fort Snelling and immigration courts across the country, observers say they are increasingly being shut out and unable to observe the proceedings"); *see also* Declarations of Lyndsey Marcelino Schalkwyk, Amy Lange, Craig Hollenbeck, Kathleen Burke Scheffler, Marily Knieriemen, Megan Barker, Mark G. Rabogliatti, Patricia A. Bethke, Heidi D. Phipps, Gillian Rowland-Kain, and Emma Wilson, Exs. 6–16.

24.    As part of its ongoing immigration court observation project, AHR's volunteers and staff members have observed and documented removal proceedings at the Fort Snelling Immigration Court since 2017. This project draws on the well-established international human rights practice of monitoring legal proceedings to identify, bring visibility to, and end human rights violations arising in the context of civil immigration enforcement. The project trains and brings observers into the Fort Snelling Immigration Court to observe and document hearings, including hearings for those facing removal while in Immigration and Customs Enforcement ("ICE") detention. Since AHR started the Immigration Court Observation Project, staff and volunteers of AHR have regularly observed hearings on the detained, non-detained, families and children, and Institutional Hearing Program ("IHP") dockets.

7

25.    AHR has designed and implemented its Immigration Court Observation Project to follow best practices of court observation. It trains and oversees observers to ensure they uphold policies including non-intervention, neutrality, respect, and professionalism. Indeed, when observing nuanced processes, like juvenile dockets, AHR has gone further by limiting observers to those who have special screening and training. While not required to do so, observers confirm with counsel or respondents before observing merits hearings and consistently respect respondents' requests for hearings to remain closed to observers. For many respondents, however, AHR's request for an observer to attend has resulted in them feeling less alone in these intimidating proceedings. During the eight years of the project, AHR has generally been a strong partner with the Fort Snelling Immigration Court, even assisting in coordinating meetings with the court and sharing data or observations for improvement or operations.

26.    Until 2025, The Advocates' observers at the Fort Snelling Immigration Court enjoyed access to hearings consistent with the standards set forth in 8 C.F.R. § 1003.27 and with policy guidance posted on the EOIR website. The Fort Snelling Immigration Court routinely and consistently posted the day's docket information publicly each morning. Observers could enter any courtroom without first checking in with court staff. And consistent with USDOJ regulations and policy AHR staff and volunteers were able to observe all master calendar hearings without prior approval from the court's staff, judges, security guards, and attorneys. Prior approval from respondents was not required either. In those cases where hearings had to be held on Webex because not enough courtrooms were available, AHR would provide its observers' names to the court in advance so they could log into the proceedings.

27.    Beginning in early 2025, the Fort Snelling Immigration Court has arbitrarily and capriciously and in violation of law increasingly limited AHR's access to hearings, both in-person

8

and by Webex. The progressive deterioration of access included locked courtroom doors, ejection of observers from Webex hearings, blanket notices of closed hearings posted on courtroom doors, and obscuring of posted docket information. Even where respondents or attorneys for respondents had given permission for observers to attend merits hearings, observers were not allowed in and the doors remained locked. In the past several months, access to hearings has been arbitrary and capricious, contrary to law, and in violation of First Amendment rights, subject to constantly changing and frequently contradictory instructions from judges, court staff, and Federal Protective Services guards, often made without any prior notice, orally, and with no opportunity for public input.

28.     Starting in March 2025, one immigration judge ("IJ"), Judge Sarah Mazzie, started locking her courtroom door for master calendar dockets as soon as she went on the record, thus inhibiting access.

29.     In response, on April 2, 2025, Amy Lange, Immigration Court Observation Project Manager at AHR, wrote to then-Assistant Chief Immigration ("ACIJ") Judge Davey to address and resolve the matter. *See* Declaration of Amy Lange, Ex. 7. That communication from Ms. Lange observed, in part, that the immigration judge's "practice of locking her courtroom violates federal regulations, EOIR policy, and the right to a public hearing." "Per 8 CFR sec. 1003.27, reflected in EOIR policy," Ms. Lange emphasized, "removal and bond hearings are open to the public, except in limited circumstances as specified by law." Ms. Lange highlighted how, on March 27, 2025, the family of one respondent was even denied entry to the courtroom to hear a family member's case because the door was locked.

30.     ACIJ Judge Davey's written response to Ms. Lange that same day expressed his own concern about barriers to access to immigration court proceedings: "I share your concern

9

regarding a closed courtroom during master calendar sessions. Your associates along with others should be able to enter and exit the courtroom throughout the session. I will address this issue with Judge Mazzie to ensure the courtrooms remain open and available to the public whenever possible."

31. Although ACIJ Davey's prompt intervention resolved the identified access issue for a few weeks, AHR continued to experience escalating problems with accessing immigration courtrooms. And since that time, despite ACIJ Davey's prior instructions, doors to some, but not all, courtrooms at the Fort Snelling Immigration Court have been locked and opened only during breaks. Yet, there was no consistency or clarity as to which doors would be locked or when or why. These restrictions on access impede observers' work by making access to courtrooms complicated and random and impedes the public's access to court proceedings as prescribed by the USDOJ regulations.

32. In spite of AHR's efforts to ensure compliance with USDOJ regulations, access to hearings declined precipitously throughout 2025, including after ACIJ Davey's communication to Ms. Lange. For example, AHR's observers began to be ejected from hearings conducted via Webex in June 2025, including in cases where the hearings were held exclusively over Webex. In response to an inquiry to EOIR's Communications and Legislative Affairs Division regarding access barriers, AHR received an email stating, in part, "If you are interested in observing a hearing via Webex, you may contact the relevant immigration court at the 'General Inquiries' email address listed in the 'Contact the Court' section of each immigration court webpage." AHR's subsequent emails to "general inquiries" at the Fort Snelling Immigration Court, however, went unanswered.

10

33.    On July 2, 2025, Megan Gates, EOIR Supervisory Legal Administrative Specialist ("LAS"), informed AHR's Project Manager that despite years of public access, Webex observation would be indefinitely prohibited for members of the public, including AHR's observers. Ms. Gates provided no reference to regulatory or policy change from EOIR, but in November 2025, the Court provided on its website an amended EOIR "FACT SHEET- Observing Immigration Court" stating: "Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are for parties appearing remotely." Eliminating public and press access to Webex hearings on a blanket basis, without any case-by-case consideration of whether any provision of 8 C.F.R. § 1003.27 warrants exclusion of the press and public, violates 8 C.F.R. § 1003.27 (and 8 C.F.R. § 1240.10(b), which refers to 8 C.F.R. § 1003.27). That blanket exclusion of press and public access violates the Administrative Procedure Act, including AHR's First Amendment rights, and has resulted in countless immigration court proceedings of public interest being conducted without press or public scrutiny. *E.g.*, Jazmine Ulloa, *U.S. Seeks to Expedite Deportation of 5-Year-Old Liam Conejo Ramos*, N.Y. Times (Feb. 6, 2026) [hereinafter N.Y. Times Feb. 6 Report] (reporting on the case of Liam Conejo Ramos, and of the asylum case of his father, Adrian Conejo Arias; noting that "[t]he hearing" was "held virtually and closed to the public"; and noting the following statement of Tricia McLaughlin, a spokeswoman for the Department of Homeland Security: "These are regular removal proceedings.").

34.    The restrictions on public access to immigration court proceedings conducted over Webex has not been limited to the Fort Snelling Immigration Court located in Minnesota. EOIR's November 2025 Fact Sheet[2] states that "[v]isitors should observe in person at the courtroom in which the hearing is scheduled and held," and that "[t]he Webex links posted on EOIR's website

---

[2] EOIR Fact Sheet, *Observing Immigration Court Hearings*, https://www.justice.gov/eoir/media/1416861/dl?inline.

CORE/3515279.0007/237961516.1

are for parties appearing remotely," a limitation the immigration court judges have used to block remote access to court observers. Acacia Center for Justice, *Restrictions on Public Access Undermine Transparency in Immigration Courts* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/ [hereinafter Acacia Center Report]. The significance of the restrictions on public attendance at Webex proceedings has increased with the exponential expansion of virtual hearings from 157,000 in 2021 to 835,000 in 2025 a month before that year ended. *Id*. There are at least two immigration courts, both located in Virginia— the Falls Church Adjudication Center and the Richmond Adjudication Center—that are *only* holding virtual hearings. *Id*.

35.    Beyond access to Webex hearings, other specific access issues have arisen, with multiple immigration court observers experiencing difficulties in carrying out their volunteer work at the Fort Snelling Immigration Court. For instance, in July 2025, IJ Monte Miller stated that EOIR's policy had changed and that, going forward, observers would be required to ask permission at the window before entering master calendar hearings. IJ Miller did not provide any written documentation of this policy change and there was no other announcement, either by EOIR or the Fort Snelling Immigration Court, documenting the restriction. In fact, other judges did not require observers to ask at the window, and the court staff at the window were not responsive to observers' inquiries about the source of this newly added requirement by IJ Monte Miller. This change in EOIR policy (its November 2025 Fact Sheet, *supra*, states that "the general public do not need to notify the immigration court in advance of visiting") has occurred at other immigration courts around the country as well. Acacia Center Report, *supra*.

36.    In August 2025, Federal Protective Service guards at the Fort Snelling Immigration Court started limiting court observers and other members of the public from sitting in the lobby

CORE/3515279.0007/237961516.1

outside the courtrooms, expelling them to the hallway outside the court lobby. This had never been done previously and neither the security guards nor EOIR have provided any documentation of any policy change necessitating the change in practice. Instructions and rationale from guards have been inconsistent and unpredictable. Guards have expelled observers immediately after they sit down in the lobby, after observers have been sitting for a few minutes, or while they are looking at the posted docket. One guard instructed observers who had exited a courtroom during a single closed master calendar that they had to wait in the basement cafeteria. Some guards have called observers' presence in the lobby "loitering." Guards sometimes tell observers that court staff will come to the hallway to call them to hearings, but court staff have never done so. In September 2025, all hallway seating was removed. The expulsion of observers from the court lobby and removal of seating exacerbated access issues and disproportionately affected older volunteers by limiting the public from observing the operation of the court and entering courtrooms when breaks occurred. The Fort Snelling Immigration Court is located in a public building.

37.    In September 2025, Fort Snelling Immigration Court personnel further restricted access to removal proceedings. Clerks started making observers leave for adjudication of "no-shows" in non-detained master calendar hearings. AHR's observers and other members of the public also began to be barred regularly from what appear to be asylum pretermission hearings in removal proceedings.

38.    On September 11, 2025, a new document titled "Guidelines for Court Observers," was distributed to court observers. It had the U.S. Department of Justice ("DOJ") logo on it, but it was identified as coming from the Fort Snelling Immigration Court. The wording of this document, Ex. 1, gives court officials more leeway to bar observers and members of the general public from proceedings, but it does not contain any explanation of the legal sources for the new restrictions.

13

39.     That same month, new signage was posted on *some* court doors. On September 25, 2025, one courtroom had a sign with the DOJ seal, stating: "This courtroom is now closed for further entry. No additional entrants will be permitted. The Court will recess at 10:30 AM. Entry will not be permitted until 10:30." But, even at 10:30 a.m., the courtroom remained locked. Although immigration court proceedings are, by law, presumptively open, no explanation was offered for why the courtroom was closed for entry. Also, there was no opportunity for AHR to object to the closure of the courtroom before the closure.

40.     In October 2025, access issues experienced by AHR volunteer observers worsened further. The Supervisory LAS at the Fort Snelling Immigration Court, James Reindl, told observers that only people with lanyards would be let in. While AHR observers had traditionally worn lanyards, this was also a condition never previously placed on any public observers and neither EOIR nor the Fort Snelling Immigration Court provided any explanation of the source of the new requirement. There is no provision in the applicable USDOJ regulations requiring the wearing of lanyards by immigration court observers.

41.     Beginning in late October 2025, access to the Fort Snelling courtrooms was, on occasion, shut off entirely. For example, on October 23, 2025, a sign was seen on a door to one courtroom indicating no entrance until 2:30 p.m.; however, it remained closed despite it being a sign from the previous day. Four days later, on October 27, Jacilyn "Jacee" Duda, a clerk at the Fort Snelling Immigration Court, publicly stated that a judge had declared all non-detained master calendar hearings that day would be closed to the public—in effect, a blanket closure. On October 31, two observers for AHR were excluded from all non-detained docket hearings for IJ Brian Sardelli. Likewise, on November 3, observers were not allowed in until the Webex hearings were over. In one courtroom, observers were not allowed to attend a merits hearing despite the

14

respondent and the respondent's attorney indicating they wished to have an observer present for the hearing. On November 6, 2025, for example, the courtroom doors were locked with a sign that read: "Courtroom is closed to the Public Due to Confidentiality Issues related to the Respondent's Court Proceedings. R.C.F.R. Sec. 208.6(a); 34 U.S.C. 12291(b)(2)." *See* Declaration of Patricia Bethke, Ex. 13. But the Court did not explain how, or why, those regulations warranted the complete closure of the hearings. Those provisions relate (1) to "[i]nformation contained in or pertaining to any application for refugee admission, asylum, withholding of removal . . . or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination . . . , and records pertaining to any reasonable fear determination," information which "shall not be disclosed *without the written consent of the applicant*[,]" 8 C.F.R. § 208.6(a) (italics added), and (2) requirements for grantees, respectively. There was no indication that the applicant requested non-disclosure or that a grantee was involved. On December 16, all detained master calendar hearings and all non-detained master calendar hearings were closed to the public. According to observers present, "[o]bservers were not allowed into court for any of the afternoon master calendar hearings. We told [the] guard several times we'd like to be let in when court ready, but he later said that court was closed to public for afternoon hearings without offering a policy basis for such." *See* Ex. 2.

42.     On January 7, 2026, AHR observers were told by one judge that he was closing his court due to "security concerns" following the DHS-ICE shooting in Minneapolis. *See id.* On January 8, one observer was told at the front gate that the court was not allowing observers and was then told by a group of men in masks that court observers were not allowed that day by order of a federal court judge. *See id.* Yet, no such court order was provided, nor is AHR aware of such an order. On the same day, a guard told a separate observer in the lobby that the FBI, DHS, and

15

the court clerks had told the guards not to let any observers in that day. A guard told a third observer on January 8 that the Fort Snelling Immigration Court had ordered hearings to be closed to observers and that some hearings would be on Webex to which observers would also not be allowed. *See id.* The USDOJ regulations, which make immigration court hearings presumptively open to the press and the public, do not state that an immigration court judge can exclude the press or the public from an immigration court proceeding if it is held via Webex. Webex is a videoconferencing system owned by Cisco. Logically, the use of Webex should *increase* accessibility to observers, not *decrease* such access.

43.    The AHR detailed the foregoing facts and events in large part in a January 9, 2026 letter to the EOIR director and to the ACIJ for the Fort Snelling Immigration Court. Ex. 2. In the days following the letter, AHR's court observers have been permitted to attend court sessions in person and on Webex. As with the imposition of the restrictions, no explanation has been offered by the Fort Snelling Immigration Court officials for these changes in practice, nor was prior notice given of the changes. While AHR appreciated the partially restored access, it had no assurance that EOIR and the Fort Snelling Immigration Court will not resume their restrictions on AHR's access to immigration court proceedings without enforceable direction from this court. In fact, when EOIR did respond to AHR's letter on January 20, 2026 (Ex. 3[3]), it did not even acknowledge the unexplained nature of the restrictions about which AHR had complained, much less explain the reasons, if any, for those restrictions. Rather, it told AHR to expect future limitations on access. "Regarding the issues you raised," it forewarned, "there may be instances where hearings need to be closed or held with limited attendance for a variety of reasons, as described in the Immigration

---

[3] The  ACLU sent its own letters to the immigration court in Sacramento that were similar to the January 9, 2026 letter sent by AHR, *see* Exs. 4 and 5, but AHR's understanding is that the ACLU never received a written reply from that court.

16

and Nationality Act, the Code of Federal Regulations and EOIR Policy." Ex. 3. "Regarding locked doors or limited attendance," it added, "doors may need to be locked for security reasons or to prevent disruptions of court proceedings." And, as to hearings held remotely via Webex it said that it would be at "the discretion [of the Immigration Judge] to admit non-parties to observe a hearing that is *open to the public*." *Id.* (emphasis added).[4] Consistent with that warning—but inconsistent with EOIR regulations, and as recounted in the N.Y. Times Feb. 6 Report, *supra*, the immigration court in Fort Snelling held the removal hearings for five-year-old Liam Conejo Ramos and his father on Webex, but excluded the public. And, while the immigration judges have permitted some observers to attend some hearings in person that are also streamed on Webex, it has not informed observers when those proceedings have begun or are about to begin nor permitted observers to enter the courtrooms after those proceedings have begun. Indeed, many of the courtroom access restrictions faced by AHR court observers prior to AHR's January 9, 2026 letter to the Fort Snelling court officials have resumed. In some instances, for example, immigration judges have blocked observers who were initially admitted but had to temporarily leave the courtroom from reentering. Still others who were admitted were barred by one immigration judge from leaving until adjournment, even during courtroom recesses and even for bathroom breaks. Others were

---

[4] EOIR's January 20, 2026 letter also referred to the fact that the Federal Protective Service "is the agency responsible for access to, and securing the buildings in which immigration courts are housed." But while the letter states that access to the courtrooms *inside* the building might be limited by "Immigration Judges *or* FPS," FPS's role in access to courtrooms was never cited as a basis for the restrictions described in this complaint. On the contrary, court observers have a right to enter and exit courthouse buildings and courtrooms within courthouses without intimidation or obstruction. In fact, courts have held that the powers of federal security personnel do not extend to "tak[ing] action to disperse members of the public who are neither on nor threatening federal property." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1069 (C.D. Cal. 2025); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 832 (9th Cir. 2020) (affirming preliminary injunction prohibiting federal officers from, among other things, arresting or using physical force against a journalist or legal observer in connection with protests).

17

blocked from attending Webex-only hearings and in several instances involving several judges the signage posting dockets has been absent. Since February 25, 2026, only one immigration judge has permitted court observers to observe remote master calendar hearings docketed in Minnesota. *See* Declaration of Amy Lange, Ex. 7.

44.     Defendants have not offered, and do not offer for the future, to provide specific, on-the-record factual determinations supporting any alleged restrictions on access tied to EOIR regulations or to show that any such restrictions are narrowly tailored to any security concerns, nor have they indicated that persons excluded from a proceeding will have an opportunity to state their objections to exclusion before any decision on exclusion is made.

## COUNT I
**Defendants Restrictions on Public Access to the Immigration Courts are Arbitrary, Capricious, and Contrary to Law in Violation of the Administrative Procedure Act in hat They Conflict with USDOJ's Own Regulations Governing Public Access to the Immigration Courts.**

45.     Plaintiff incorporates the allegations of paragraphs 1 through 44 as if fully set forth in Count I.

46.     The restrictions on courtroom access described in the prior paragraphs of this complaint do not fall within (or were not announced in advance to fall within) any of the exceptions to public access contained in 8 C.F.R. § 1003.27 and neither USDOJ, EOIR, nor immigration judges at the Fort Snelling Immigration Court has claimed the applicability of such exceptions.

47.     Lawfully promulgated federal agency regulations such as 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) have the "full force of law." *Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*, 473 F.2d 1156, 1163 (D.C. Cir. 1972). By denying or restricting public access to the Fort Snelling Immigration Court proceedings, Defendants have acted arbitrarily and capriciously and

18

violated the Administrative Procedure Act proscription on agency action "not in accordance with law." 5 U.S.C. § 706(2)(A).

48.     Plaintiff is therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, including those conducted or held over Webex, a description of the applicable exception or exceptions under that regulation justifying the restriction on access and an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

## COUNT II
**Even Assuming Defendants' Restrictions on Access to the Immigration Courts Were the Result of Policy Changes, Those Changes Were Made Without Observance of Procedure Required by Law and Are in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).**

49.     Plaintiff incorporates the allegations of paragraphs 1 through 48 as if fully set forth in Count II.

50.     When an agency adopts a policy affecting the public through notice-and-comment rulemaking, it may only revise or repeal that policy through a new notice-and-comment rulemaking process. *Am. Fed'n of Gov't Employees v. NLRB*, 777 F.2d 751, 759 (D.C. Cir. 1985). Because 8 C.F.R. § 1003.27 was adopted through notice-and-comment rulemaking, 52 F.R 2931 (1987), Defendants were required by the Administrative Procedure Act, but failed, to give the public prior notice and opportunity to comment on any change in their policies governing access

19

to immigration court proceedings. Even assuming that the restrictions on court access described in the prior paragraphs of this complaint were not violations of 8 C.F.R. § 1003.27, but were changes to the policies reflected in that regulation, they were adopted "without observance of procedure required by law[,]" and thus such changes are in violation of the Administrative Procedure Act, 5 U.S.C.§ 706(2)(D).

51.    Plaintiff is therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, an explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

## COUNT III
**Even Assuming Defendants' Restrictions on Access to the Immigration Courts Were the Result of Policy Changes, And Even Assuming Such Changes Did Not Require a New Rulemaking Proceeding, Those Changes Were Made Without Acknowledging the Change in Policy and Offering Reasons for the Policy Change and Are in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

52.    Plaintiff incorporates the allegations of paragraphs 1 through 51 as if fully set forth in Count III.

53.    Whether changed via notice-and-comment rulemaking or in an adjudication, when an agency changes its policies affecting the public, it must (a) acknowledge the change in policy and (b) explain the reasons for the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502

20

(2009). Even assuming the Defendants' restrictions on courtroom access were changes in policy rather than violations thereof, and even assuming these policy changes did not require Defendants to initiate a new rulemaking proceeding, they nonetheless failed even to acknowledge the departure from 8 C.F.R. § 1003.27, much less offer reasons for the change. That failure rendered the Defendants' actions arbitrary and capricious and not in accordance with law under the Administrative Procedure Act. 5 U.S.C.§ 706(2)(A).

54.    Plaintiff is therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, an explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

## COUNT IV
**Defendants' Restrictions on Access to Immigration Court Proceedings Violated Plaintiff's First Amendment Rights and Thereby Engaged in Agency Action "Contrary to Constitutional Right, Power, Privilege, or Immunity" in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).**

55.    Plaintiff incorporates the allegations of paragraphs 1 through 54 as if fully set forth in Count IV.

56.    "The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When

CORE/3515279.0007/237961516.1

government begins closing doors, it selectively controls information rightfully belonging to the people." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). AHR's immigration court monitoring project protects the rights of the public to know that the government is following procedures and acting fairly in administering the immigration courts. By restricting access to immigration court proceedings beyond those limitations expressly authorized by the USDOJ's own regulations, Defendants have impeded AHR's First Amendment rights. In so doing, Defendants have engaged in agency action "contrary to constitutional right, power, privilege, or immunity" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

57.    Because of the Defendants' past and ongoing violations and because the Defendants' improper and unlawful restrictions on access are capable of repetition and would otherwise elude or escape review, Plaintiff is therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings a description of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

## PRAYER FOR RELIEF

For the above reasons, AHR respectfully asks this Court to enter an order directing Defendants to comply with 8 C.F.R. § 1003.27 by providing, in each instance in which it proposes

CORE/3515279.0007/237961516.1

to limit or condition public access to immigration court proceedings, an on-the-record explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exemption applies, an explanation of how the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto; for AHR's costs and reasonable attorneys' fees; and for such other relief as the Courts deems just and equitable.

Dated: March 12, 2026

Respectfully submitted,

STINSON LLP

*/s/ Brandon Nagy*
Harvey Reiter, No. 232942
Brandon Nagy, No. 1024717
Katie Parnow, No. 90041785
1775 Pennsylvania Ave, N.W., Suite 800
Washington, DC 20006
Tel. (202) 728-3016
harvey.reiter@stinson.com
brandon.nagy@stinson.com
katie.parnow@stinson.com

23