# Exhibit 1



**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of Policy*
*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

# FACT SHEET

**Contact:** Communications and Legislative Affairs Division
703-305-0289    Fax: 703-605-0365
PAO.EOIR@usdoj.gov    @DOJ_EOIR
www.justice.gov/eoir

July 2018

## Observing Immigration Court Hearings

The Executive Office for Immigration Review (EOIR) administers the nation's immigration court system. Immigration court hearings are civil administrative proceedings that involve foreign-born individuals (called respondents) whom the Department of Homeland Security (DHS) has charged with violating immigration law. In these hearings, immigration judges determine whether respondents should be ordered removed from the United States or granted relief or protection from removal (such as adjustment of status, asylum, cancellation of removal, or other remedies provided by immigration law) and permitted to remain in the country.

Immigration court hearings are open to the public, with limited exceptions, as specified in law.

**Immigration court hearings are closed when:**

- The case involves information subject to a protective order;

- The case involves an abused spouse or child, and in the case of an abused spouse, a hearing may be opened to the public with the abused respondent's consent;

- The case involves a respondent who, based on provisions of the Violence Against Women Act (VAWA), is a beneficiary of an application for relief under specific sections of the Immigration and Nationality Act, among other federal statutes (VAWA is a law that seeks to protect human trafficking victims, abused spouses, abused children, and certain other victims of violence);

- The immigration judge grants an oral or written motion a party files to close a hearing;

- The immigration judge makes a determination to close a hearing to protect witnesses, parties to the case, or the public interest;

- The immigration judge makes a determination to close a hearing, or limit the number in attendance, based on consideration of the physical facilities and space available for the hearing; or

— more —

*Communications and Legislative Affairs Division*

**Observing Immigration Court Hearings**
**Page 2**

- The respondent in an asylum case, which by regulation provides for additional privacy protections, requests that the hearing be closed.

**Before going to observe a hearing, please note:**

- You do not need to notify the immigration court in advance of your visit. You are, however, encouraged to contact EOIR's Communications and Legislative Affairs Division to coordinate your visit.

- EOIR does not control entry to the detention facilities in which immigration courts are located. As such, please contact the appropriate DHS Immigration and Customs Enforcement public affairs office (based on the location of the detention facility you want to visit) at least two business days in advance to learn of any security requirements for entry to the building. This advance notice will allow facility personnel sufficient time to process your visit request and to arrange for an escort.

- Using cameras or recording devices in courtrooms or other EOIR space is prohibited.

- When courtroom space is limited, media representatives have priority over the general public.

**More Information:**

- Listing of Immigration Courts – https://www.justice.gov/eoir/eoir-immigration-court-listing;

- Hearing Locations – https://www.justice.gov/eoir/immigration-court-administrative-control-list;

- Public Access – *Immigration Court Practice Manual*, Chapters 1.6, 4.9, and 4.14 https://www.justice.gov/eoir/office-chief-immigration-judge-0;

- EOIR: An Agency Guide – https://www.justice.gov/eoir/page/file/eoir_an_agency_guide/download

— EOIR —

*The Executive Office for Immigration Review (EOIR) is an agency within the Department of Justice. EOIR's mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the nation's immigration laws. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings. EOIR is committed to ensuring fairness in all the cases it adjudicates.*

# Exhibit 2



**VIA EMAIL & FEDERAL EXPRESS DELIVERY**

January 9, 2026

Daren K. Margolin
Director
Executive Office for Immigration Review
5107 Leesburg Pike
Falls Church, VA 22041

Hon. Eric L. Dillow
Assistant Chief Immigration Judge
U.S. Immigration Court
Executive Office for Immigration Review
Bishop Henry Whipple Federal Building       1717 Avenue H, Suite 100
1 Federal Drive, Suite 1850                 Omaha, NE 68110
Fort Snelling, MN 55111

Re: Request to Protect Access to Immigration Court Proceedings

Dear Director Margolin and Judge Dillow:

I am writing on behalf of The Advocates for Human Rights ("The Advocates"), an independent, non-partisan, 501(c)(3) non-governmental international human rights organization headquartered in the State of Minnesota and founded in 1983. The Advocates requests that, as required by law, immigration court proceedings at the Fort Snelling Immigration Court, whether held in person or via Webex, remain open to the public and to the press.

*The Need for Public Access to Immigration Court Proceedings*

For the reasons articulated in this letter, the Fort Snelling Immigration Court should uphold long-standing tradition, policy and practice, constitutional principles, human rights standards, and the general presumption of public access to immigration court proceedings set forth in governing regulations. Community members, legal observers, and journalists should be able to freely attend and observe immigration court proceedings with limited exceptions to protect individuals. These exceptions should not become the norm. This is a particularly important matter for The Advocates because of its human rights monitoring work.

Since 2017, The Advocates has coordinated an Immigration Court Observation Project with the staff and volunteers of The Advocates focusing their efforts on the Fort Snelling Immigration Court in the State of Minnesota. Despite operating for years with good relations with the Court, access to immigration court proceedings has deteriorated significantly throughout 2025. The lack

of access to immigration proceedings inhibits the ability of The Advocates to do its important court observation work, violates the U.S. Department of Justice's own regulations, and undermines rule of law principles around transparency.

As detailed in this letter, the public and the press—with only limited exceptions—have a presumptive right to observe immigration court proceedings. *E.g.*, *Stevens v. Holder*, Civil Action No. 1:12-CV-1352-ODE, 2015 WL 13691280, at*16 (N.D. Ga. July 31, 2015) ("the immigration courts are, as a matter of law, presumptively open") (citing 8 C.F.R. § 1003.27) Notwithstanding that fact, significant restrictions on access have arisen and are now occurring around the country, including at the Fort Snelling Immigration Court. *See, e.g.*, Nicolas Scibelli, "Court Observers Blocked: Immigration Hearings Face New Restrictions Across the U.S.," *Sahan Journal*, Dec. 10, 2025, https://sahanjournal.com/immigration/fort-snelling-immigration-court-access-shrinks/ (noting that "Fort Snelling Immigration Court has increasingly denied access to court observers, mirroring trends across the country"; that while observers for The Advocates "have been a constant presence in courtrooms," "a change occurred" in October, with clerks telling "court observers and others that hearings were closed, and doors to publicly available courtrooms were locked"; and that at "Fort Snelling and immigration courts across the country, observers say they are increasingly being shut out and unable to observe the proceedings").

*The Long-Standing Ability of Court Observers to Attend Hearings Without Issue*

The Advocates has observed and documented removal proceedings at the Fort Snelling Immigration Court since 2017. This project draws on the well-established international human rights practice of monitoring legal proceedings to identify, bring visibility to, and end human rights violations arising in the context of civil immigration enforcement. The project brings observers into the Fort Snelling Immigration Court to observe and document hearings, including hearings for those facing removal while in Immigration and Customs Enforcement ("ICE") detention. Since starting the Immigration Court Observation Project, staff and volunteers of The Advocates have regularly observed hearings on the detained, non-detained, families and children, and Institutional Hearing Program ("IHP") dockets.

The Advocates has designed and implemented its Immigration Court Observation Project to follow best practices of court observation. It trains and oversees observers to ensure they uphold policies including non-intervention, neutrality, respect, and professionalism. Indeed, when observing nuanced processes, like juvenile dockets, The Advocates has gone further by limiting observers to those who have special screening and training. While not required to do so, observers confirm with counsel or respondents before observing individual hearings and consistently respect respondents' requests for hearings to remain closed to observers. For many respondents, however, our request for an observer to attend has resulted in them feeling less alone in these intimidating proceedings. During the eight years of the project, The Advocates has generally been a strong partner with the court, even assisting in coordinating meetings with the court and sharing data or observations for improvement or operations.

Until 2025, The Advocates' observers at the Fort Snelling Immigration Court enjoyed access to hearings consistent with the standards set forth in 8 C.F.R. § 1003.27 and with policy guidance

posted on the Executive Office for Immigration Review ("EOIR") website, both of which make clear that immigration court hearings are generally open to the public with limited exceptions, as specified by law. The Fort Snelling Immigration Court routinely and consistently posted the day's docket information publicly each morning, most typically adjacent to the court's intake window. Observers could enter any courtroom without first checking in with court staff. Consistent with regulations and policy, The Advocates' staff and volunteers were able to freely observe all master calendar hearings without prior approval from the Immigration Court staff, judges, security guards, attorneys, or respondents. The Advocates' observers also were able to observe a significant percentage of detained and non-detained individual calendar hearings. Immigration judges would routinely state on the record that court observers were present, and if no objection was raised, observers were allowed to stay for the full proceedings. If observation was to be via Webex, a common occurrence due to insufficient courtrooms at the Fort Snelling location, The Advocates' staff would provide observer names to the court in advance so the court could provide Webex access. The court has never required permission.

*Access Issues Encountered by The Advocates and Its Staff and Volunteers Since Early 2025*

Beginning in early 2025, the Fort Snelling Immigration Court has increasingly limited The Advocates' access to hearings, both in-person and by Webex. This progressive deterioration of access includes locked courtroom doors, ejection of observers from Webex hearings, blanket notices of closed hearings posted on courtroom doors, and obscuring of posted docket information. Even where respondents or attorneys for respondents had given permission for observers to attend merits hearings, observers were not allowed in and the doors remained locked. Today, access to hearings is completely arbitrary and capricious, subject to constantly changing and frequently contradictory instructions from judges, court staff, and Federal Protective Services guards, often made without any prior notice, orally, and with no opportunity for public input.

Starting in March 2025, one immigration judge ("IJ"), Judge Sarah Mazzie, started locking her courtroom door for master calendar dockets as soon as she went on the record, thus inhibiting access. Naturally, this development raised serious and immediate concerns for The Advocates.

In response, on April 2, 2025, Amy Lange, Immigration Court Observation Project Manager at The Advocates, wrote to then-Assistant Chief Immigration Judge Davey to address and resolve the matter. That communication from Ms. Lange observed, in part, that the immigration judge's "practice of locking her courtroom violates federal regulations, EOIR policy, and the right to a public hearing." "Per 8 CFR sec. 1003.27, reflected in EOIR policy," Ms. Lange emphasized, "removal and bond hearings are open to the public, except in limited circumstances as specified by law." Ms. Lange highlighted how, on March 27, 2025, the family of one respondent was even denied entry to the courtroom to hear a family member's case because the door was locked.

In former ACIJ Davey's written response to Ms. Lange on April 2, 2025, he thoughtfully expressed his own concern about barriers to access to immigration court proceedings. As his response read in part: "I share your concern regarding a closed courtroom during master calendar sessions. Your associates along with others should be able to enter and exit the courtroom throughout the session. I will address this issue with Judge Mazzie to ensure the courtrooms remain open and available to the public whenever possible."

Although Judge Davey's prompt intervention resolved the identified access issue for a few weeks, The Advocates has continued to experience escalating problems with accessing immigration courtrooms. And today, despite Judge Davey's instructions, doors to some, but not all, courtrooms are locked and opened only during breaks. This impedes observers' work by making access to courtrooms complicated and random and impedes the public's access to court proceedings as prescribed by the regulations.

Access to hearings has precipitously declined throughout the year. For example, The Advocates' observers began to be ejected from hearings conducted via Webex in June 2025. In response to an inquiry to the Communications and Legislative Affairs Division regarding access barriers, The Advocates received an email stating, in part, "If you are interested in observing a hearing via Webex, you may contact the relevant immigration court at the 'General Inquiries' email address listed in the 'Contact the Court' section of each immigration court webpage." The Advocates' emails to "general inquirires" at the Fort Snelling Court, however, remained unanswered.

On July 2, 2025, Megan Gates, EOIR Supervisory Legal Administrative Specialist ("LAS"), informed The Advocates' Project Manager that despite years of public access, Webex observation would be indefinitely prohibited for members of the public, including The Advocates. Ms. Gates provided no reference to regulatory or policy change from EOIR, but in November 2025, the Court provided an amended EOIR "FACT SHEET- Observing Immigration Court" stating: "Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are for parties appearing remotely."

Beyond access to Webex hearings, other specific access issues have arisen, with multiple immigration court observers experiencing difficulties in carrying out their volunteer work. For instance, in July 2025, IJ Monte Miller stated that policy had changed and observers are now required to ask at the window before entering master calendar hearings. Despite this statement, no official policy change has been announced by either EOIR or the Fort Snelling Immigration Court, other judges did not require observers to ask at the window, and the court staff at the window were not responsive to observers' inquirires.

In August 2025, Federal Protective Service guards at the Fort Snelling Immigration Court started limiting court observers and other members of the public from sitting in the lobby, expelling them to the hallway outside the court lobby. Instructions and rationale from guards are inconsistent and unpredictable. Guards have expelled observers immediately after they sit down in the lobby, after observers have been sitting for a few minutes, or while they are looking at the posted docket. One guard instructed observers who had exited a courtroom during a single closed master calendar that they had to wait in the basement cafeteria. Some guards have called observers' presence in the lobby "loitering." Guards sometimes tell observers that court staff will come to the hallway to call them to hearings, but court staff have never done so. In September 2025, all hallway seating was removed. The expulsion of observers from the court lobby and removal of seating exacerbated access issues and disproportionately affected older volunteers by limiting the public from observing the operation of the court and entering courtrooms when breaks occurred. Observers at the Fort Snelling Immigration Court serve a public purpose, namely transparency and, absent any disruptive conduct, their mere presence cannot be

considered "loitering," particularly given the regulations that expressly recognize the right to public access.

In September 2025, Fort Snelling Immigration Court personnel further restricted access to removal proceedings. Clerks started making observers leave for adjudication of no-shows in non-detained master calendar hearings. Furthermore, observers for The Advocates and other members of the public have been almost systematically barred from what appear to be asylum pretermission hearings in removal proceedings.

On September 11, 2025, a new document titled "Guidelines for Court Observers," was distributed with the U.S. Department of Justice ("DOJ") logo on it, but it was identified as coming from the Fort Snelling Immigration Court. This changed wording ostensibly provides more leeway to bar observers and members of the general public from proceedings in spite of applicable federal regulations and court rules.

Signs also began to be posted on court doors. On September 25, 2025, one courtroom had a sign with the DOJ seal, stating: "This courtroom is now closed for further entry.
No additional entrants will be permitted. The Court will recess at 10:30 AM. Entry will not be permitted until 10:30." But, even at 10:30 a.m., the courtroom remained locked.

In October 2025, access issues experienced by volunteers for The Advocates worsened further. The Supervisory LAS at the Fort Snelling Immigration Court, James Reindl, told observers that only people with lanyards would be let in, even though public access—per the applicable regulations—is nowhere conditioned or so limited by law. While volunteers for The Advocates have traditionally worn lanyards to identify themselves as observers to court personnel, ICE, and respondents, there is no legal requirement for observers to do so—and members of the press and the general public have every right to observe immigration court proceedings for themselves.

In recent months, public access has been arbitrarily shut off, on occasion, entirely. For example, on October 23, 2025, a sign was seen on a door to one courtroom indicating no entrance until 2:30 p.m.; however, it remained closed despite it being a sign from the previous day. Four days later, on October 27, Jacilyn "Jacee" Duda, a clerk at the Fort Snelling Immigration Court, publicly stated that a judge had declared all non-detained master calendar hearings that day would be closed to the public—in effect, a blanket closure that is without justification or precedent at the Fort Snelling Immigration Court. On December 16, all detained master calendar hearings and all non-detained master calendar hearings were closed to the public. According to observers present, "[o]bservers were not allowed into court for any of the afternoon master calendar hearings. We told [the] guard several times we'd like to be let in when court ready, but he later said that court was closed to public for afternoon hearings without offering a policy basis for such."

Overall, the locking of courtroom doors at the Fort Snelling Immigration Court has become increasingly frequent. Access, and determining who is responsible for allowing doors to be unlocked (the judge, the clerk, the guard, etc.), is unclear, constantly changing, and impedes the ability of The Advocates to observe removal proceedings. While guards appear to be responsible for unlocking doors, they claim they cannot open doors without authorization from judges. Yet,

judges frequently fail to inform guards about when to open doors. Thus, guards are declaring hearings closed by default.

On October 29, a guard unlocked the door to a courtroom for U.S. Department of Homeland Security ("DHS") staff but said public entry would be announced, but the door was not unlocked until 10:30 a.m. On the same day, the clerk informed observers: "Judges are now communicating directly with guards on when to open the courtroom. The clerk *may* come out. But they are taking us out of the equation."

That same day, EOIR filing window staff began handing out small slips of paper stating "the courtroom doors will open when the Immigration Judge calls the Security officer on the telephone to open the Courtroom doors. Any further inquiries regarding when the courtroom door will be opened should be directed to the Security Officer." Since that time, EOIR staff have refused to answer any questions from court observers or other members of the public who wish to observe court proceedings. On October 31, two observers for The Advocates were excluded from non-detained dockets for IJ Brian Sardelli. Likewise, on November 3, observers were not allowed in until the Webex hearings were over. In one courtroom, observers were not allowed to attend a merits hearing despite the respondent and the respondent's attorney indicating they wished to have an observer present for the hearing.

In November 2025, The Advocates witnessed additional, unjustified limitations on access in contravention of applicable federal regulations and immigration court rules. On November 6, 2025, for example, the courtroom doors were locked with a sign that read: "Courtroom is closed to the Public Due to Confidentiality Issues related to the Respondent's Court Proceedings. R.C.F.R. Sec. 208.6(a); 34 U.S.C. 12291(b)(2)." However, those provisions relate (1) to "*[i]nformation* contained in or pertaining to any *application* for refugee admission, asylum, withholding of removal . . . or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, *records* pertaining to any credible fear determination . . ., and *records* pertaining to any reasonable fear determination," information which "shall not be disclosed *without the written consent of the applicant*" (8 C.F.R. § 208.6(a) (italics added), and (2) requirements for grantees, respectively.

Whether information or records are private is a separate issue entirely from the public's general access rights to immigration court proceedings and must be determined on a case-by-case basis as such issues arise. Moreover, EOIR is part of the U.S. Department of Justice and not a grantee, making 34 U.S.C. § 12291(b), titled "Grant Conditions," an improper basis to exclude the general public from immigration court proceedings. *See Brennan Center for Justice v. Department of Homeland Security*, Civil Action No. 16-1609 (ABJ), 2019 WL 280954, at *1 (D. D.C. Jan. 22, 2019) (noting ICE's acknowledgment that the EOIR is "a part of the Department of Justice"). When observers inquired about the locked doors, they were told by the clerk to ask the guard, but the guard said they were told to only open the door if an IJ instructed them to do so.

Given this trend, actions at the court since January 7 raise urgent concerns that access and transparency at court may be further—or, even, fully—restricted in violation of federal regulation and policy. On January 7, 2026, observers were told by one judge that he was closing his court due to "security concerns" following the DHS-ICE shooting in Minneapolis. Actions

on January 8 give The Advocates reason to believe that the court will be continuing to bar access following this tragedy.  On January 8, one observer was told at the front gate that the court was not allowing observers and was then told by a group of men in masks that court observers were not allowed that day by order of a federal court judge.  Yet, no such court order was provided, nor is The Advocates aware of such.  On the same day, a separate observer was met at the lobby door by a guard who told them that the FBI, DHS, and the court clerks to not let any observers in that day.  A third observer on January 8 was told by a guard that the Fort Snelling court had ordered hearings to be closed to observers and that some hearings would be on Webex to which observers would also not be allowed.  The Advocates is also not aware of a Fort Snelling Court order, nor was any notice of such provided.

Such opacity of policy and process raises serious concern. Similarly, we are deeply concerned that access is being impeded citing federal court orders that have never been issued. Both federal regulations and immigration court rules presumptively allow public and press access to immigration court proceedings with very limited exceptions, as set forth below. In direct violation of these controlling regulations, the arbitrary actions of the Fort Snelling Immigration Court judges, clerks, and guards are effectively closing the court to The Advocates' observers and the public at-large. Indeed, as of January 8, the court appears to
be fully closed to observers and the public.

*The Public and Press Access Requirements of 8 C.F.R. § 1003.27 and the Immigration Court Practice Manual*

Pursuant to the applicable federal regulations and court rules discussed below, the immigration court should be open to the public and the press. *See, e.g.*, *Stevens*, 2015 WL 13691280, at*16 (citing 8 C.F.R. § 1003.27 and emphasizing that "the immigration courts are, as a matter of law, presumptively open"); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) ("The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When government begins closing doors, it selectively controls information rightfully belonging to the people."). Indeed, both 8 C.F.R. § 1003.27 and the Immigration Court Practice Manual generally authorize public and press access to immigration court proceedings. *See* Immigration Court Practice Manual, Executive Office for Immigration Review, U.S. Department of
Justice, https://www.justice.gov/eoir/reference-materials/ic.

To begin with, a binding federal regulation, 8 C.F.R. § 1003.27, confers public access to immigration proceedings with only limited exceptions. That regulation provides:

> **§ 1003.27 Public access to hearings.**
> *All hearings, other than exclusion hearings, shall be open to the public* except that:
> **(a)** Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public;
> **(b)** For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing.

**(c)** In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.
**(d)** Proceedings before an Immigration Judge shall be closed to the public if information subject to a protective order under § 1003.46, which has been filed under seal pursuant to § 1003.31(d), may be considered. 8 C.F.R. § 1003.27 (italics added).

There are thus only limited circumstances in which an immigration proceeding can be closed to the public. For example, *a respondent* can request that a hearing be closed to the public, even though, "[i]n general, removal proceedings under § 240 of the INA are open to the public." Deborah E. Anker & Jeffrey S. Chase, Law of Asylum in the United States Appendix A § A3:18 (2025 ed.). "In such cases, the *immigration judge should ask the respondent whether he or she would like the hearing to be closed*." *Id.* (italics added).

A respondent might request a closed hearing to protect a witness or a particular person. An immigration judge may give "preference" to "the press over the general public" if the physical facilities cannot accommodate all observers. But "[b]y regulation, all hearings are required to be public" with only limited exceptions (e.g., to protect witnesses, parties, victims of abuse, or information subject to a protective order). *See, e.g.,* Shane Dizon & Pooja Dadhania, 3 Immigration Law Service 2d § 13:167 (Aug. 2025 update) (citing 8 C.F.R. § 1003.27).

In The Advocates' experience, IJ at the Fort Snelling Immigration Court have asked respondents whether they would consent to observers and if a respondent says "no," then our court observers respect that choice. That is how this exception should be enforced.

In removal or bond proceedings, information can be filed under seal for "national security" purposes, but only if a sufficient, detailed showing is made by the government (with a respondent receiving an opportunity to respond). *See* 8 C.F.R. § 1003.46(a) ("In any immigration or bond proceeding, Immigration Judges may, upon a showing by the Service of a substantial likelihood that specific information submitted under seal or to be submitted under seal will, if disclosed, harm the national security (as defined in section 219(c)(2) of the Act) or law enforcement interests of the United States, issue a protective order barring disclosure of such information."); 8 C.F.R. § 1003.46(b) ("The Service may at any time after filing a Notice to Appear, or other charging document, file with the Immigration Judge, and serve upon the respondent, a motion for an order to protect specific information it intends to submit or is submitting under seal. The motion shall describe, to the extent practical, the information that the Service seeks to protect from disclosure. The motion shall specify the relief requested in the protective order. The respondent may file a response to the motion within ten days after the motion is served.").

However, *blanket closure* of immigration proceedings—as is increasingly occurring at Fort Snelling—plainly violates 8 C.F.R. § 1003.27, and we believe an Article III judge interpreting that federal regulation would so find. Also, although removal proceedings might be closed in

individual cases if appropriate, policies and procedures that essentially amount to blanket closures are unconstitutional under the U.S. Constitution's First Amendment. *See, e.g.*, Shane Dizon & Pooja Dadhania, 3 Immigration Law Service 2d § 13:167 (Aug. 2025 update) ("The First Amendment confers a public right of access to deportation hearings. The Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the government.") (citing *Detroit Free Press v. Ashcroft*, 195 F. Supp.2d 937, 30 Media L. Rep. (BNA) 1598 (E.D. Mich. 2002), *aff'd*, 303 F.3d 681, 30 Media L. Rep. (BNA) 2313 (6th Cir. 2002)). Moreover, immigration court proceedings involve both procedural, "master calendar," hearings and full merits hearings, as well as bond hearings. The propriety of any privacy- or witness-related closures is case specific. The rules do not permit blanket closures of the immigration courts, as has been happening at Fort Snelling, even in largely procedural master calendar hearings. Court observers are entitled to attend both substantive and procedural hearings, including to observe if rules and regulations are being followed and to assess, for example, if proper translation services are being provided. There have been instances at the Fort Snelling Immigration Court where hearings took place without appropriate translation services being provided.

In addition to the DOJ regulations just discussed, chapter 1 of the Immigration Court Practice Manual contains a whole section on "Public Access." In particular, Section 1.5 of that Manual reads in part:

> **1.5 – Public Access**
> **(a) Court Locations –**
>    **(1) Office of the Chief Immigration Judge -** The Office of the Chief Immigration Judge, which oversees the administration of the immigration courts nationwide, is located at the Executive Office for Immigration Review headquarters in Falls Church, Virginia. See Appendix A (Directory).
>    **(2) Hearing locations -** There are more than 700 Immigration Judges in more than 70 immigration courts in the United States. A list of immigration courts is available in Appendix A (Directory), as well as on the Executive Office for Immigration Review website at http://www.justice.gov/eoir.
> Immigration Judges sometimes hold hearings in alternate locations, such as designated detail cities where the caseload is significant but inadequate to warrant the establishment of a permanent immigration court. Immigration Judges also conduct hearings in Department of Homeland Security detention centers nationwide, as well as many federal, state, and local correctional facilities. Documents pertaining to hearings held in these locations are filed at the appropriate administrative control court. See Chapter 3.1(a)(1) (Administrative Control Courts).
> In addition, hearings before Immigration Judges are sometimes conducted by video conference or, under certain conditions, by telephone conference. See Chapter 4.7 (Hearings by Video or Telephone Conference).
> *With certain exceptions, hearings before Immigration Judges are open to the public.* See Chapter 4.9 (Public Access). The public's access to immigration hearings is discussed in Chapter 4.14 (Access to Court). For additional information on the conduct of hearings, see Chapters

4.12 (Courtroom Decorum), 4.13 (Electronic Devices). (italics added).

Chapter 4 of the Immigration Court Practice Manual, titled "Hearings Before the Immigration Judges," is also relevant to our concern about access. Section 4.9, titled "Public Access," states in part: "Hearings in removal proceedings are generally open to the public." To be sure, the section notes two caveats: (1) that hearings involving an abused child or information subject to a protective order are "are closed to the public," and (2) that an IJ "may limit attendance or close a hearing to protect parties, witnesses, or the public interest." But the section goes on to state:

> Evidentiary hearings involving an application for asylum or withholding of removal ("restriction on removal"), or a claim brought under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, are open to the public unless *the respondent* expressly requests that the hearing be closed. In cases involving these applications or claims, the Immigration Judge inquires whether the respondent requests such closure. (emphasis added)

Another portion of Section 4.9, subsection (3), is specifically titled "Motions to close hearing." That portion of Section 4.9 provides in part:

> **(3) Motions to close hearing -** For hearings not subject to the special rules in subsection (1), above, *parties may make an oral or written motion asking that the Immigration Judge close the hearing*. See 8 C.F.R. § 1003.27(b). *The motion should set forth in detail the reason(s) for requesting that the hearing be closed*. If in writing, the motion should include a cover page labeled "MOTION FOR CLOSED HEARING" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix E (Cover Pages). (italics added).

Section 4.9 also makes clear that "[r]epresentatives of the news media may attend hearings that are open to the public."

*The Urgent Need to Protect Public and Press Access to Immigration Court Proceedings and to Comply with Applicable Federal Law and Court Rules*

There is a long tradition in the United States of public and press access to immigration proceedings. *See* 8 C.F.R. § 1003.27 ("All hearings, other than exclusion hearings, shall be open to the public" except in enumerated circumstances); *Pechter v. Lyons*, 441 F. Supp. 115, 117 (S.D.N.Y. 1977) (allowing the public to observe deportation proceedings). Indeed, any attempt to cut off public access to immigration proceedings contravenes the First Amendment, federal law, and the publicly expressed policies of this court. The U.S. Department of Justice's own website for the Fort Snelling Immigration Court implicitly makes this very point:

**Observing Immigration Court Hearings**

*Immigration court hearings are open to the public, with limited exceptions, as specified in law. You do not need to notify the immigration court in advance of your visit.* You are, however, encouraged to contact EOIR's Office of Policy at PAO.EOIR@usdoj.gov to coordinate your visit. Note, the use of cameras and recording devices in courtrooms or other EOIR spaces is prohibited. For additional information about court observations, please review EOIR's Observing Immigration Court Hearings Fact Sheet.

Fort Snelling Immigration Court, https://www.justice.gov/eoir/fort-snelling-immigration-court (last visited Dec. 8, 2025) (italics added).

The "Observing Immigration Court Hearings Fact Sheet" itself reads in part: "Immigration court hearings are generally open to the public with limited exceptions, as specified by law." *Observing Immigration Court Hearings* (Sept. 2025), https://www.justice.gov/eoir/media/1333591/di?inline (last visited Dec. 8, 2025). That "Fact Sheet" also contains these statements:

- "Members of the general public do not need to notify the immigration court in advance of visiting. The immigration court publicly posts the docket information each morning."
- "Visitors are not required to check in with court personnel before entering a courtroom to observe, although the presiding Immigration Judge may ask all visitors to identify themselves at the start of the hearing."
- "Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are for parties appearing remotely."
- "When courtroom space is limited, news media representatives have priority over the general public. 8 C.F.R. § 1003.27(a)."
- "When observing an immigration court hearing, members of the media must identify themselves to the immigration court front desk staff upon arrival. This facilitates prioritization of the press in accessing immigration court hearings with limited physical space."

*Observing Immigration Court Hearings* (Sept.2025) https://www.justice.gov/eoir/media/1333591/di?inline (last visited Dec. 8, 2025).

Immigration and deportation proceedings are of considerable public interest, and the public and the press have a right to observe these proceedings. The Advocates has many years of experience in observing and reporting on immigration matters in its reports, so the staff and volunteers of The Advocates have considerable knowledge and records of past practices and of just how few immigration proceedings were closed in the past.

The Advocates has every intention of continuing its Immigration Court Observation Project. To ensure that The Advocates can continue this important work unimpeded, The Advocates seeks a written assurance that the Fort Snelling Immigration Court and its personnel will, in the future, abide by federal law and comply with the immigration court's own rules respecting public and press access to immigration proceedings. Should the Court believe a national policy or regulatory

change allows such limits on access, The Advocates respectfully requests the Court to provide a copy of the relevant policy change referenced.

We respectfully request that your office respond to this letter no later than January 19. If we do not receive a response by that time, we may be required to assess alternative means of addressing these violations, including the federal courts.

Thank you for your prompt attention to this matter.

Sincerely,

Michele Garnett McKenzie
Executive Director

# Exhibit 3



**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of Policy*

---

Office of Policy

*5107 Leesburg Pike, Suite 1800*
*Falls Church, Virginia 22041*

January 20, 2026

Executive Director Michele Garnett McKenzie
The Advocates for Human Rights
Suite 800
330 2nd Ave S
Minneapolis, MN 55401-5500

Dear Executive Director Garnett McKenzie:

This letter responds to your correspondence dated January 9, 2026, to Executive Office for
Immigration Review (EOIR) Director Daren K. Margolin and Assistant Chief Immigration Judge
Eric L. Dillow.

We appreciate the Advocates for Human Rights longstanding commitment to observing
immigration court hearings. Regarding the issues you raised, please note that there may be
instances where hearings need to be closed or held with limited attendance for a variety of
reasons, as described in the Immigration and Nationality Act, the Code of Federal Regulations,
and EOIR Policy. *See* EOIR's Policy Manual, available at https://www.justice.gov/eoir/eoir-
policy-manual and EOIR's Observing Hearings Fact Sheet, available at
https://www.justice.gov/eoir/media/1416861/dl?inline.

Further, the Department of Homeland Security's Federal Protective Service (FPS) is the agency
responsible for access to, and securing, the buildings in which immigration courts are housed.
While FPS is the primary agency responsible for protecting government employees, including
immigration judges, FPS's direct work in our spaces is to protect the facilities through security
screening and regular patrols, all of which protects the people in the spaces. You may wish to
direct any questions regarding FPS to the Department of Homeland Security.

Regarding locked doors or limited attendance, Immigration Judges or FPS may determine that
doors need to be locked for security reasons or to prevent disruptions of court proceedings.
Immigration Judges are independent adjudicators and may determine that a hearing should be
closed or held with limited attendance. As such EOIR cannot guarantee that there will not be
instances when doors will need to be locked or attendance limited.

Observers should plan to observe immigration hearings in person at the courtroom in which a
hearing is scheduled and held. *See* EOIR's Observing Hearings Fact Sheet, available at

https://www.justice.gov/eoir/media/1416861/dl?inline. As noted on our Find An Immigration Court page, available at https://www.justice.gov/eoir/find-immigration-court-and-access-internet-based-hearings, the Webex links posted on EOIR's website are posted for *parties* appearing remotely. ("Links for *parties* to access any internet-based hearings before Immigration Judges are below."). When in-person access is not available, the Immigration Judge has the discretion to admit non-parties via Webex to observe a hearing that is open the public.

We hope this information is helpful. EOIR's Office of Policy handles all correspondence for the agency. As such, going forward, please feel free to email the Office of Policy at PAO.EOIR@usdoj.gov, for inquiries or concerns.

Sincerely,

*Kathryn Mattingly*

Kathryn Mattingly
Press Secretary

# Exhibit 4

 

VIA EMAIL & PERSONAL DELIVERY

Honorable Jonathan W. Hitesman
Assistant Chief Immigration Judge
John Moss Federal Building
650 Capitol Mall, Suite 4-200
Sacramento, CA 95814

June 13, 2025

**Re:    Request to Protect Public Access to Judicial Proceedings**

Dear Honorable Jonathan W. Hitesman:

Based on reports from legal observers that they are being denied access to observe immigration proceedings at the Sacramento Immigration Court, we write on behalf of the American Civil Liberties Union of Northern California and Public Justice to respectfully request that these court proceedings remain open to the public, including community members, legal observers, and members of the press. For the reasons set forth in this letter, we respectfully request that the Court uphold longstanding constitutional principles and the presumption of public access to immigration hearings.

Any decision by this Court to abruptly cut off public access to immigration proceedings would contravene the First Amendment, federal law, and this Court's own stated policies.[1] Such courtroom closures would also undermine confidence in our immigration court system at a time when the "government is asserting a right to stash away residents of this country in foreign prisons without [a] semblance of due process." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, *1 (4th Cir. Apr. 17, 2025). The public's interest in these proceedings is especially significant given the serious nature of these proceedings and the recent increased immigration enforcement actions throughout California, which have captured the attention of people across the country.

Under the First Amendment and common law, the public has a presumptive right to access judicial proceedings, unless a court makes "specific factual findings" that closure is necessary to serve an overriding interest and is narrowly tailored to serve that interest. *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz.*, 156 F.3d 940, 949 (9th Cir. 1998) (citing *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Oregon*, 920 F.2d 1466 (9th Cir. 1990)). Importantly, any person

---

[1] *See* Executive Office for Immigration Review (EOIR), U.S. Dep't of Justice, Sacramento Immigration Court, *Observing Immigration Court Hearings*, https://www.justice.gov/eoir/sacramento-immigration-court.

**American Civil Liberties Union Foundation of Northern California**

FRESNO • SACRAMENTO • SAN FRANCISCO
39 Drumm St. San Francisco, CA 94111
TEL (415) 621-2493 • FAX (415) 255-1478 • TTY (415) 863-7832 • WWW.ACLUNC.ORG

*Request to Protect Public Access to Judicial Proceedings*
Page 2

"excluded" from a proceeding "must be afforded a reasonable opportunity to state their objections." *United States v. Brooklier*, 685 F.2d 1162, 1167-68 (9th Cir. 1982).

Even when the government does purport to have a compelling interest in closure, that interest must be weighed against "conflicting constitutional claims" with a "presumption in favor of openness." *In re Charlotte Observer (Div. of Knight Pub. Co.)*, 882 F.2d 850, 853 (4th Cir. 1989). In this context, it is well established that generalized security concerns, absent specific factual findings, cannot overcome the public's presumptive right of access. *See, e.g., Phoenix Newspapers, Inc.*, 156 F.3d at 950; *Oregonian Pub. Co.*, 920 F.2d at 1467. And any measures aimed at protecting substantiated security concerns must still be narrowly tailored and no greater than is necessary to address that concern. A court therefore cannot terminate *all* public access for *all* proceedings for *all* time. Doing so would be impermissibly broad.

Federal immigration regulations likewise specifically protect the public's right to observe immigration court hearings, making clear that removal proceedings—including master, bond, and merits hearings—are presumptively open to the public. *See* 8 C.F.R § 1003.27; 8 C.F.R. § 1240.10(b). This foundational presumption in favor of openness is particularly important in cases involving the deportation of non-citizens where "[t]he only safeguard on this extraordinary governmental power is the public." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) (holding that national security concerns did not override the public's First Amendment access right to immigration removal proceedings).

Given the foregoing law and constitutional liberties at stake, we urge you not to strip away the safeguard of transparency. "Public scrutiny . . . enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and society as a whole." *Globe Newspaper Co. v. Superior Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 606 (1982). Simply put: a government official's actions in the immigration context must not be beyond scrutiny because "democracies die behind closed doors." *Detroit Free Press*, 303 F.3d at 683.

We respectfully request that you take immediate steps to ensure that members of the public are allowed to observe in person all further immigration hearings, unless an immigration judge meets the exacting requirements to close a proceeding established by federal law and enshrined in the U.S. Constitution. Further, because those excluded from the proceeding must be afforded a reasonable opportunity to state their objections, the undersigned request that any member of the public who is excluded from a proceeding be provided the specific factual basis for why closure of that particular proceeding might be warranted.

Sincerely,

**/s Angélica Salceda**
Angélica Salceda
Program Director
ACLU Foundation of
Northern California

**/s Chessie Thacher**
Chessie Thacher
Senior Staff Attorney
ACLU Foundation of
Northern California

**/s Jackie Aranda Osorno**
Jackie Aranda Osorno
Senior Attorney
Public Justice

cc: EOIR's Office of Policy, PAO.EOIR@usdoj.gov

**American Civil Liberties Union Foundation of Northern California**

FRESNO • SACRAMENTO • SAN FRANCISCO
39 Drumm St. San Francisco, CA 94111
TEL (415) 621-2493 • FAX (415) 255-1478 • TTY (415) 863-7832 • WWW.ACLUNC.ORG

# Exhibit 5

 

VIA EMAIL

Maya Adberg, Property Manager
U.S. General Services Administration
John Moss Federal Building
650 Capitol Mall
Sacramento, CA 95814
maya.adberg@gsa.gov

June 16, 2025

**Re:    Protecting Public Access to Judicial Proceedings**

Dear Maya Adberg:

Numerous legal observers are currently reporting that they are being denied access to the John Moss Federal Building to observe immigration proceedings. Based on these reports, we write on behalf of the American Civil Liberties Union of Northern California and Public Justice to demand that the public, including community members, legal observers, and members of the press be allowed into the building for the purpose of observing immigration hearings. The U.S. General Services Administration (GSA), like all government agencies, is legally bound to uphold longstanding constitutional principles and the presumption of public access to immigration hearings. Failure to reopen the building to the public violates such principles and subjects the GSA to civil liability.

By denying the public access to the John Moss Federal Building, the GSA is cutting off public access to immigration proceedings, in contravention of the First Amendment, federal law, and the stated policies of the Sacramento Immigration Court as promulgated by the Executive Office for Immigration Review ("EOIR").[1] The GSA's de facto courtroom closures also undermine confidence in our immigration court system at a time when the "government is asserting a right to stash away residents of this country in foreign prisons without [a] semblance of due process." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, *1 (4th Cir. Apr. 17, 2025). The public's interest in these proceedings is especially significant given the serious nature of these proceedings and the recent increased immigration enforcement actions throughout California, which have captured the attention of people across the country.

---

[1] *See* Executive Office for Immigration Review (EOIR), U.S. Dep't of Justice, Sacramento Immigration Court, *Observing Immigration Court Hearings*, https://www.justice.gov/eoir/sacramento-immigration-court.

**American Civil Liberties Union Foundation of Northern California**

FRESNO • SACRAMENTO • SAN FRANCISCO
39 Drumm St. San Francisco, CA 94111
TEL (415) 621-2493 • FAX (415) 255-1478 • TTY (415) 863-7832 • WWW.ACLUNC.ORG

Under the First Amendment and common law, the public has a presumptive right to access judicial proceedings, unless a court makes "specific factual findings" that closure is necessary to serve an overriding interest and is narrowly tailored to serve that interest. *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz.*, 156 F.3d 940, 949 (9th Cir. 1998) (citing *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Oregon*, 920 F.2d 1466 (9th Cir. 1990)). Importantly, any person "excluded" from a proceeding "must be afforded a reasonable opportunity to state their objections." *United States v. Brooklier*, 685 F.2d 1162, 1167-68 (9th Cir. 1982).

Even when the government does purport to have a compelling interest in closure, that interest must be weighed against "conflicting constitutional claims" with a "presumption in favor of openness." *In re Charlotte Observer (Div. of Knight Pub. Co.)*, 882 F.2d 850, 853 (4th Cir. 1989). In this context, it is well established that generalized security concerns, absent specific factual findings, cannot overcome the public's presumptive right of access. *See, e.g.*, *Phoenix Newspapers, Inc.*, 156 F.3d at 950; *Oregonian Pub. Co.*, 920 F.2d at 1467. And any measures aimed at protecting substantiated security concerns must still be narrowly tailored and no greater than is necessary to address that concern.

Federal immigration regulations likewise specifically protect the public's right to observe immigration court hearings, making clear that removal proceedings—including master, bond, and merits hearings—are presumptively open to the public. *See* 8 C.F.R § 1003.27; 8 C.F.R. § 1240.10(b); *see also* FN 1, *supra*. This foundational presumption in favor of openness is particularly important in cases involving the deportation of non-citizens where "[t]he only safeguard on this extraordinary governmental power is the public." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) (holding that national security concerns did not override the public's First Amendment right to access immigration removal proceedings).

The foregoing legal analysis does not change merely because the GSA administers the building in which the Sacramento Immigration Court resides. The GSA may not terminate *all* public access for *all* proceedings for *all* time. Doing so would be impermissibly broad and not narrowly tailored to any purported basis that the GSA might invoke in support of closure. Notably, under CFR 102-74.375, federal property such as the John Moss Building may be closed to the public "during working hours *only* when situations require this action to provide for the orderly conduct of Government business." *Id.* § 102-74.375(b) (emphasis added). Here, it is untenable that the building could be prophylactically and entirely closed to the public because the requisite officials do not appear to have made the requisite findings under subsection (b). And even if those prerequisites had ostensibly been satisfied, such closure would still need to proceed on an emergency and temporary basis—a finding that would be hard to sustain given that (1) the public has long been allowed to observe immigration hearings; (2) these public immigration proceedings have taken place in an orderly fashion; and (3) legal authority already exists for the GSA to utilize far more tailored tools should any substantial disruptions to immigration proceedings or other Government business arise on federal property, *see, e.g.*, *id.* § 102-74.390.

In light of the GSA's legal obligations and the constitutional liberties at stake, we urge you to safeguard transparency and take immediate steps to ensure that the public be allowed to enter the John Moss Federal Building for the purpose of observing immigration hearings. "Public scrutiny . . . enhances the quality and safeguards the integrity of the factfinding process, with benefits to

**American Civil Liberties Union Foundation of Northern California**

FRESNO • SACRAMENTO • SAN FRANCISCO
39 Drumm St. San Francisco, CA 94111
TEL (415) 621-2493 • FAX (415) 255-1478 • TTY (415) 863-7832 • WWW.ACLUNC.ORG

both the defendant and society as a whole." *Globe Newspaper Co. v. Superior Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 606 (1982). Simply put: a government official's actions in the immigration context must not be beyond scrutiny because "democracies die behind closed doors." *Detroit Free Press*, 303 F.3d at 683.

Sincerely,

| **/s Angélica Salceda** | **/s Chessie Thacher** | **/s Jackie Aranda Osorno** |
|---|---|---|
| Angélica Salceda | Chessie Thacher | Jackie Aranda Osorno |
| Program Director | Senior Staff Attorney | Senior Attorney |
| ACLU Foundation of | ACLU Foundation of | Public Justice |
| Northern California | Northern California | |

cc: EOIR's Office of Policy, PAO.EOIR@usdoj.gov

**American Civil Liberties Union Foundation of Northern California**

FRESNO • SACRAMENTO • SAN FRANCISCO
39 Drumm St. San Francisco, CA 94111
TEL (415) 621-2493 • FAX (415) 255-1478 • TTY (415) 863-7832 • WWW.ACLUNC.ORG

# Exhibit 6

CITY OF HOPKINS   )

COUNTY OF HENNEPIN   )

Declaration of
Lyndsey Marcelino Schalkwyk

I, Lyndsey Marcelino Schalkwyk, being first duly sworn, do state and affirm the following under penalty of perjury:

My name is Lyndsey Marcelino Schalkwyk. I reside at 6404 Menelssohn Lane, Hopkins, Minnesota 55343. My phone number is (858) 337-0956.

I am writing this affidavit based on my personal knowledge of my experiences at the Fort Snelling Immigration Court as a court observation project volunteer. I have volunteered with the Immigration Court Observation Project run by The Advocates for Human Rights since June 2025. I usually observe approximately three court hearings per month.

On August 11, 2025, I was sitting in the courtroom lobby observing proceedings. While seated, I noticed a court guard staring at me repeatedly and watching me for an extended period of time. Eventually, the guard approached me and told me that I needed to either enter a courtroom or leave the building. I explained that I was a court observer. The guard responded that I was "loitering." I then asked the guard, "Are you asking me to leave?" The guard responded, "Yes," and directed me to leave. I left.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 24 day of __Feb__, 20 26

_Lyndsey Marcelino Schalkwyk_
Lyndsey Marcelino Schalkwyk

**Exhibit 7**

CITY OF MINNEAPOLIS )

) Declaration of

COUNTY OF HENNEPIN ) Amy S. Lange

I, Amy Lange do state and affirm the following under penalty of perjury:

I.    My name is Amy Lange. I reside at 50 Groveland Terrace, Minneapolis MN. My phone number is 612-281-4308.

II.   I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as the Program Manager for the Immigration Court Observation Project run by The Advocates for Human Rights. I began as a volunteer with the Project in July 2017. I have been contracted to manage the project since May 2019. I attend court once or twice a month on average. I have observed well over 2000 hearings at the Fort Snelling Court. I have also observed in the Cleveland court remotely, and in the Chicago immigration court on Monroe Street.

III.  On March 27, 2025, observer Kathleen Burke Scheffler reported to me that IJ Sarah Mazzie was telling the guards to lock her door during master calendar proceedings and that no one would be allowed in or out unless she called a formal recess. Family members for a respondent were apparently locked out because they arrived late. On April 2, 2025, I emailed then ACIJ Benjamin Davey to report the locked courtroom door. One April 2, 2025, then ACIJ Davey replied, stating "I share your concern regarding a closed courtroom during master calendar sessions. Your associates along with others should be able to enter and exit the courtroom throughout the session. I will address this issue with Judge Mazzie to ensure the courtrooms remain open and available to the public whenever possible." (see Email, attached). In that communication ACIJ Davey gave me information about filing a formal complaint. I did not file a formal complaint at that time.

IV.   After the communication with Judge Davey, Judge Mazzie began leaving her door unlocked. I got complaints from observers on April 9, 2025, April 15, 2025 , April 24, 2025, and April 29, 2025, that Judge Mazzie interrupted proceedings to chastise observers for entering her courtroom and repeated that observers would not be allowed until a formal recess.

V.    On June 11, 2025, a court observer, Craig Hollenbeck reported to me that there were technology problems in Judge Mazzie's courtroom, and she could not log on to connect with the detention facility. IJ Mazzie verbally announced that she would exit the courtroom and conduct the master calendar docket via Webex from a different location. She stated orally that no observers would be allowed on Webex. I immediately notified all observers scheduled for the day and provided Webex information should they be able

to log on. I also emailed, then Supervisory LAS Megan Gates with a list of names of all scheduled volunteer court observers for the day, so that they might be admitted via Webex. Volunteer observers had been attending detained individual hearings on Webex since the Covid epidemic in 2021 as long as I provided names in advance to Megan, the supervisory LAS. At 9:15 on June 11, 2025, I logged on to Judge Mazzie's Webex courtroom. At 9:40 I was admitted to the virtual courtroom and shortly thereafter I received the following message "you've been disconnected by the host."

VI. On or about June 15, 2026, I emailed then Supervisory LAS Megan Gates to express concern about observers being denied Webex access for detained master calendar hearings. On June 16, 2025, Megan Gates replied that she is not authorized to respond to emails from the public and instructed me to contact the Communications and Legislative Affairs division at PAO.EOIR@usdoj.gov, which was copied on Megan's reply to me. On June 16, 2025, I received an email from staff with the initials jjm from the PAO.EOIR email address stating the following: "Immigration court hearings are open to the public, with some exceptions, as outlined in the EOIR Policy Manual. Each immigration court posts the day's docket information publicly each morning, most typically adjacent to the court's intake window. There is no need to check in with court staff before you enter a courtroom to observe, although the presiding judge may ask you to identify yourself at the start of the hearing. If you are interested in observing a hearing via Webex, you may contact the relevant immigration court at the 'General Inquiries' email address listed in the 'Contact the Court' section of each immigration court webpage." I understood this to mean that nothing about federal regulation on public access had changed ,and that observers were being improperly denied access.

VII. On June 26, 2025, I arrived at the Fort Snelling Court in time for my 10:00 am observation shift. I noticed that Judge Mazzie's entire master calendar docket was being heard on Webex. I assume this was because all 5 courtrooms at the Fort Snelling Court were occupied with in-person hearings. I promptly logged onto Webex from my phone but was never admitted to Judge Mazzie's virtual courtroom. I returned home, and at 10:55 am, I emailed then Supervisory LAS, Megan Gates, as well as the general Fort Snelling Court email address regarding observers on Webex. I included in my email to the court the names of the two afternoon observers (with a minor typo), and the pertinent excerpt from the previous email exchange I had with the Communication and Legislative Affairs Division (PAO) regarding court access. I did not receive a response from either Megan Gates or the general Fort Snelling Court email address. Neither of the two afternoon observers were able to observe via Webex. Both observers emailed that they had been admitted when the judge opened the virtual courtroom, but were immediately disconnected with a message saying, "The host has disconnected you from the meeting." They waited several minutes but were not readmitted to Webex.

VIII. On July 2, 2025, I was at the Fort Snelling Court to train new observers. Two of my observers were stopped by a guard and told that they were not allowed to enter for master calendar hearings unless they asked for permission at the filing window. I informed

the guard that we had previously (a couple years back) been told to not disturb court staff because hearings are open to the public. The guard refused to let the observers enter despite my comments.

IX.    On July 2, 2025, after the interaction with the guard I asked at the filing window to speak with then Supervisory LAS Megan Gates about access issues for court observers. Megan reiterated: immigration hearings are open, observers don't need permission to enter, observers should try to not enter during hearing. Observers should listen at the courtroom door; when it is quiet, open door slightly. If quiet, enter quickly, quietly, and take a seat.

X.     On July 2, 2025, then Supervisory LAS Megan Gates stated to me that no observers would be allowed on Webex going forward. This declaration was not published or posted anywhere. The 2018 Fact Sheet "observing Immigration Court hearings on the EOIR website, and posted on the wall at the Fort Snelling Court, said nothing about restricting access to remote hearings.

XI.    On August 12, 2025, I was in the court lobby reviewing the posted dockets and explaining to a newer observer how to read the docket and discern which were master calendar hearings. A new guard I hadn't seen before beckoned me over. She told me observers could not be in the court lobby and that we had to be in the hall. She said she had been given these instructions by Jacilyn "Jacee" Duda, LAS. I asked if there was a policy posted somewhere she said no, maybe there would be in future

XII.   On October 9, 2025, I was waiting for the start of a detained master calendar docket. Supervisory LAS James Reindl came into the lobby and said, "if there are observers here come in now because we are locking the door. "

XIII.  On October 14, 2025, volunteer observer Nancy Poechmann emailed me to let me know she had not been let into a merit hearing for a respondent who was represented by Kim Boche, an attorney at The Advocates for Human Rights, despite Kim and her client previously consenting to having observers present. I then emailed Attorney Kim Boche to ask why the courtroom had been closed. Attorney Kim Boche replied "We explicitly said that observer/public was fine. Judge Ivany asked and we chatted about it with my client before we let Judge Ivany know."

XIV.   On October 29, 2025, I had a meeting in the pro bono consult room with then Supervisory LAS, Megan Gates about access problems for court observers. Megan said the judges agreed that our observers are not causing any problems and thus we will still have access to the court. She said that we should take this as a big positive.  She explained that access to observers outside of our project was going to be limited. She hopes the removal of chairs from the hall is time-limited. (As of 3/5/26 the chairs were still absent from the hallway.) I expressed concern that individual merit hearings were closed to observers without even asking respondents. I explained that we reach out to counsel in advance if we have, or can find, contact information.  She asked what percent of attorneys we reach out to, what percent respond and consent. I stated 80-90% of pro se

respondents historically consented to observers being present and that it was problematic for a judge to rob a respondent of agency to decide. I stated that in an adversarial setting some respondents might feel that a witness is a safeguard. Megan said she would suggest having judges ask respondents at the preceding master if observers could be present for their individual merit hearing. I replied it would be a positive step as long as it wasn't the only ask, because judges aren't always going to remember.

XV. On November 13, 2025, I was waiting for court to commence, I inquired with the contract guard about whether the phone on the wall behind the desk could be used to call inside a court. He replied it could only receive calls from inside the courtroom. I asked if there was any recourse if a judge forgot to call the guard desk to unlock the door when proceedings were going to commence, and he stated that was not. If a judge neglects to call for the door to be unlocked there will be no public access. This confirmed my concern that the default position at the Fort Snelling Court is locked doors.

XVI. On January 26, I was present at court at 8:30 am. There were paper signs taped to the door of Courtroom # 3 and Courtroom #4. The signs said "Court is in session. Out of courtesy to the court and the parties, please do not enter until a recess. Neither court was in session, neither judge was in that day.

XVII. Since February 3, 2026, observers have informed me that they have been allowed in Judge Mazzie's courtroom when she commences court, however she is requiring them to sit in the front row, and she is announcing that no one will be able to leave until she formally adjourns. An observer reported on February 3rd, that she stood to exit at 10:30 AM, at the end of her volunteer shift. This was in between master calendar hearings, a pause before the next respondent was brought before the judge. Judge Mazzie angrily demanded that the observer sit down and not exit until she formally adjourned which didn't occur until approximately 12:00 PM. February 3, 2026, I continue to hear from observers that Judge Mazzie prohibits exit, despite any observer's need for a bathroom break or other outside obligations.

XVIII. On February 5, 2026, an observer reported to me that there was a sign on Judge Ivany's Courtroom 5 door at 8:30 am stating "Respondent requested a closed hearing. Do not enter." The observer was let into the courtroom to observe a master calendar docket. A second observer arrived at 10:00, saw the sign, and understood she was prohibited from entering. The initial observer exited at 10:30 during a recess, the sign was still on the door despite there being no closed or confidential hearings.

XIX. On February 17, 2026, at 8:30 AM, an observer notified me that there were three judges listed as doing "Webex Only Redacted-Master." There were no dockets posted, just the small "Webex Only" sign and the judges' names, the date and "redacted-Master" on small pieces of paper. I was notified at 1:30 PM by a different volunteer court observer that she inquired at the filing window about how to observe Webex hearings. The observer informed me that the clerk at the filing window said they are "out of the loop and know nothing."

XX. On February 18, 2026, I was at court and there was a "Webex Only" sign and two judges names, IJ Brisack, and IJ Caborn, the date, and "redacted-Master" on small pieces of paper. There were no dockets posted.

XXI. As Program manager, I began assigning volunteers to attempt observation via Webex when the docket case at the Fort Snelling Court showed a judge assigned for Webex-Only master calendar hearings. I instructed observers to log on with microphone muted and camera off, identifying themselves as "Court Observer", with their initials as their login name, and to identify themselves verbally as volunteers with The Advocates for Human Rights, in Minnesota, if asked.

XXII. On February 25, 2026, Judge C Brisack allowed an observer to remotely attend 5 master calendar hearings that were docketed in Minnesota. Since February 25,2026, Judge Brisack has been the only judge to allow any remote observation of master calendar hearings docketed in Minnesota. Observers, as reported directly to me, have waited up to two and a half hours in the virtual lobby and not been admitted to the Webex courtrooms for IJ Abdias Tida, IJ Nina Carbone, IJ Andrew Caborn, ACIJ Craig DeFoe and ACIJ Sherron Ashworth. Observers have reported to me seeing the number of people in the virtual lobby go up and down as they waited.

XXIII. On March 3, 2026, there were 4 judges scheduled for a total of 70 master calendar hearings for respondents in Minnesota. Observers were not admitted via Webex for any of the 70 morning or afternoon hearings.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

3-9-26
_____
Date

# Exhibit 8

CITY OF MINNEAPOLIS       )

                          )                      Declaration of

COUNTY OF HENNEPIN        )                   CRAIG HOLLENBECK

I, Craig Hollenbeck, being first duly sworn, do state and affirm the following under penalty of perjury:

I.   My name is Craig Hollenbeck. I reside at 110 1st Ave NE Unit F1003, Minneapolis, MN. My phone number is 612-471-3188.

II.  I am writing this affidavit based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer with the Immigration Court Observation Project run by The Advocates for Human Rights. I have volunteered with the Project since June 2024. I usually observe four court hearings per month.

III. On June 11, 2025, I was in the lobby with another observer awaiting entry into court for an 8:30 am hearing. After a delay, a member of the court staff announced there was a technology issue in courtroom 5, that observers would not be allowed into the courtroom, and all morning hearings would be on Webex with no observer access. The other observer and I complied and departed the Whipple building. I immediately contacted Amy Lange, who is the Program Manager at the Advocates for Human Rights, and conveyed the morning's events to her.

IV.  On August 15, 2025, at 1:25 pm I entered a courtroom with another observer and sat down prior to a 1:30 pm hearing. Shortly thereafter, a guard (J. Avery) told us we needed to leave the courtroom and wait in the hallway (as opposed to the lobby) and a clerk would then come and inform us when the courtroom was open. He also told us, "You're allowed in the lobby for 10 minutes to write down information" but then reiterated that we needed to wait in the hallway. We told him we could not enter Judge Zaske's courtroom late and if we were in the hallway there would be no way for us to know when to enter the courtroom. He again said a clerk would come and get us and that he was just following orders from the filing window clerk. We sat in the hallway for a couple of minutes and then went to the filing window to inquire about entry to the courtroom, and we were told, by Jacilyn "Jacee" Duda, that it was a closed hearing.

DECLARANT SAYETH FURTHER NAUGHT.

I swear and affirm that the foregoing is true and correct to the best of my knowledge.

_____          ___3/09/2026___

Signature                                    Date

# Exhibit 9

CITY OF MINNEAPOLIS        )

                           )                    Declaration of
COUNTY OF HENNEPIN         )              KATHLEEN BURKE SCHEFFLER


I, Kathleen Burke-Scheffler, being first duly sworn, do state and affirm the following under penalty of perjury:

I.   My name is Kathleen Burke-Scheffler. I reside at 7410 Knoll St No, Golden Valley MN. My phone number is 612-272-4023.
II.  I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer with the Immigration Court Observation Project run by The Advocates for Human Rights. I have volunteered with the Project since September 2021. I usually observe court twice a month.
III. On March 27, 2025, I experienced something I had not experienced before - at the start of the shift, the judge asked to have the courtroom door locked. The guard came and did so. The judge said no one will be allowed in or out of the room until a recess. Later I talked to another observer, Lindsay. She thought the judge had the door locked because a woman sitting in the last row of the room has been there before and does go in and out. For case #203642964, it meant his family members in the lobby were not able to enter the courtroom. They had arrived (according to the judge) at 8:45 after doors were locked."
IV.  On or about December 22, 2025 , The courtroom in which I was to observe with Judge Carr was locked at 8:30. I waited thinking perhaps it was going to be unlocked. At approximately 8:40, an attorney came hurrying to the courtroom visibly distressed and saying "I thought it was going to be on WebEx." The guard opened the door and the attorney entered the courtroom with two women. I was not able to follow them immediately and waited until they exited a short time later. When I then tried to enter, the door was locked. I asked the guard if it was possible to have the door unlocked. He said to ask at the window. I went to the window and told the employee there that I was scheduled to observe for an 8:30 shift but the door was locked. She said "And it will remain locked." I asked if she could contact the judge's clerk about opening the door. She replied "We've been told not to do that."

DECLARANT SAYETH FURTHER NAUGHT.


I swear and affirm that the foregoing is true and correct to the best of my knowledge.


_Kathleen Burke-Scheffler_    02-23-2026
Signature                     Date

**Exhibit 10**

CITY OF Saint Paul            )

                                                    Declaration of
COUNTY OF Ramsey          )                Marily K. Knieriemen


I, Marily Knieriemen do state and affirm the following under penalty of perjury:

I.    My name is Marily Kay Knieriemen.  I reside at 2285 Stewart Ave., Apt 2324, Saint Paul, MN 55116.  My phone number is (763) 415-0076.

II.   I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer for the Immigration Court Observation Project run by The Advocates for Human Rights.  I have volunteered with the Project since June 2025.  I usually observe about six court hearings per month.

III.  On September 29, 2025, I went to court to observe non-detained master calendar hearings. The door for Immigration IJ Ivany's courtroom was locked at 1:30 pm even though the guard had opened it for the interpreter and at least one other person. The guard told me that "they" wanted me to wait and would call me. There was a line of people at the window so I wasn't able to get information there. At 1:45 pm I heard a door unlock so tried the door and was able to go in. A Webex hearing was just concluding.

IV.  On September 29, 2025, I was not allowed to stay in IJ Ivany's courtroom for the discussion on no-shows. At the end of the hearings, the court clerk, Jacilyn "Jacee" Duda, held the door open and said "we're done". I asked about the discussion on no-shows and she said "we're done with in-person proceedings".

V.   On October 7, 2025, I found the courtroom where non-detained hearings were to take place closed at 1:30 pm. The clerk, who was in the lobby, told me to "have a seat and wait until the clerk opens the courtroom." She then entered the courtroom along with someone I believed to be an ICE agent. At 1:45 pm, I checked at the window and was told that perhaps there was a closed hearing so I continued to wait with respondents in the lobby. At 2:00 the clerk came out for the respondents and I was able to follow them into the courtroom. When we entered, a Webex hearing was just ending and there was then another Webex hearing before starting the in-person hearings. After the hearings, the clerk, Jacee, made it clear that the other observer present and I needed to leave the courtroom so we were not able to hear the discussion on no-shows.

VI.  On October 21, 2025, I went to court with a new volunteer I was mentoring to observe non-detained master calendar hearings. Since there were no non-detained master calendar hearings on the docket, we decided to join another observer in IJ Ivany's courtroom for an individual hearing for respondent A#190 from Honduras. The other observer had entered when the court clerk, Jacee, was in the lobby. When the guard went to open the door for the clerk to return to the courtroom, we tried to go in. Judge Ivany saw us and told the guard we could come in. The clerk, however, told the guard to lock the door and she would talk to the judge. The guard locked the door and waited with us in the hallway, saying that it was hard to know what to do when the judge said one thing and the clerk something else. The clerk eventually opened the door to have the other observer exit the courtroom and told the guard to lock the door because it was a closed hearing. This was out of the ordinary for two reasons. First, it appeared that it was at the clerk's initiative that Judge Ivany closed the hearing. Second, I learned from The Advocates' Court Observation Project Manager, Amy Lange, that the attorney for the respondent, Mr. Ndikum, had provided consent to observers.

VII. On October 27, 2025, when I arrived at court, I found a note on the wall (where the dockets are usually posted) saying that it had not been possible to post the dockets due to the early closure on the previous Friday. People who asked about the dockets at the window were

told the same thing. I approached the window and told the clerk, John, that I had come to observe the merit hearing for A#441. He looked at the dockets on the computer and confirmed it would be in Courtroom 2 (as expected) but that the judges wanted to authorize observers' entrance into the courtroom. He said he would inform IJ Miller that I was there – but I would have to wait for the judge to say when I could come in. While waiting, I overheard the guard tell John (at the window) that Jacee had said that all the merit hearings were closed. John called me up to the window (I had found a seat where I could easily be seen) and said that all of that day's merit hearings were closed. I gave him the A# for the hearing I was to have observed in the afternoon and he confirmed that it would be closed as well. I asked if this was only for that day – or from then on. He said that it was for that day – and that he didn't really know why – and then added "each day is different". John said that while the merit hearings were closed, Courtrooms 1 and 5 were open for master calendar hearings. After the clerk called respondents for Courtroom 5, another observer from our project and I tried to go in but were told that the door was locked. The guard then told John that Jacee had said that the hearing was closed.

VIII.    On November 10, 2025, when I found IJ Carr's door locked at 8:30, I went to the window and said I'd come to observe that hearing, but the door was locked. The clerk said that was a question for the guards. I approached the guard who confirmed that the door was locked and that the Judge would tell him when he could open it. A few minutes later I overheard that "Carr was running late". At 8:45 am, I talked to the guard again who said that he thought the government attorney wasn't there yet. At 9:15 am, the guard told me that his phone hadn't rung yet so there was no news. At 9:40 am, I saw a court clerk chatting with the guard. Since it is a clerk I had seen earlier in Judge Carr's courtroom, I went to the guard's table and asked again. The guard said there was no news. The clerk added "if the judge hasn't called, it's a closed hearing".

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.


Signature                                                    Date    February 18, 2027

# Exhibit 11

CITY OF EAGAN                )
                            )           Declaration of
COUNTY OF DAKOTA             )           Megan R. Barker


I, Megan R. Barker, being first duly sworn, do state and affirm the following under penalty of perjury:

I.   My name is Megan R. Barker. I reside at 692 Shelerud Dr., Eagan, MN 55123. My phone number is 630-247-1654.

II.  I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer for the Immigration Court Observation Project run by The Advocates for Human Rights. I have volunteered with the Project since September 4th, 2025. I usually observe 2-3 court hearings per month.

III. On October 15, 2025, I was at the Fort Snelling Immigration Court to observe non-detained Master Calendar hearings. I was refused re-entry to Judge Miller's courtroom after a break requested by the translator. I had been in the court room starting at or about 10 am when at 10:20 am the translator requested a break. Judge Miller asked the clerk to check the lobby for any additional respondents and that he would resume court at 10:35 am. I returned to the court lobby at 10:30am and tried the door to the courtroom which was locked. I asked the Security Officer if he would let me in and he said to check with the clerk at the counter. I asked the clerk at the counter if I could be let back into the courtroom and I was told by the clerk that if the door is locked then I was not able to go in. I stayed in the lobby for 5-10 minutes during which time the door was not unlocked and I could hear talking in the courtroom.

IV.  On November 7, 2025, I was not allowed to enter court again. I arrived early at or about 8:11am for an 8:30am Individual Merit hearing in front of Judge Sardelli. I put my hand on the doorknob to the courtroom and was told by the Security Officer that it was still locked. The Security Officer told me that I would have to talk to the clerk about getting access. I told him that I had been instructed to ask him, the Security Office about access to court. I showed him the printed note I had received the last time I was at court. He shrugged and said he didn't know then but that he couldn't let me in. I waited about 10-15 minutes near the door to the courtroom when the phone behind the security desk rang. I heard the Security Officer say, "I haven't unlocked the door yet." Then, he said, "there is no one here," at which point he hung up the phone. After waiting approximately 10 minutes longer, I could hear through the door that the hearing had started. I let the Security Officer know that if he had told the Judge that there was an observer waiting, I was quite sure he would have let me in to which he replied "oh" and shrugged his shoulders. I remained in the waiting area to see if I would be able to enter the courtroom and it remained locked.

I.   On November 7, 2025 at 10:48am I sent the following email to the EOIR office:

     To PAO Office,
     I went to immigration court yesterday [(typo – should have typed "today"] to observe master calendar hearings. I went through security screening when I entered the building. As instructed in the EOIR posted Fact Sheet on court observation, I was dressed appropriately, did not bring any food or drink and had my cell phone powered off. I

arrived just after 8:00 am in anticipation of an 8:30 start time. I checked the posted dockets as the Fact Sheet instructs and chose a courtroom holding master calendar hearings.  I tried to enter the courtroom at 8:30 but the courtroom was locked. I asked the guard and was told that the Judge would notify the guard when the courtroom could be unlocked.  I was still waiting at 8:45 and could hear through the door that court proceedings had begun. It seemed that the respondents were appearing remotely.  I was never admitted to the courtroom, although I waited until 10:00 am at which point the DHS Attorney left the courtroom and said the master calendar hearings were over. Aren't master calendar hearings open to the public?  The Fact Sheet says we shouldn't need permission to enter, can you explain why the courtrooms are locked during public hearings?

Thank you for your assistance.
Sincerely,
Megan Barker

I received the following response from EIOR on November 13, 2025:

Good afternoon,

Immigration court hearings are open to the public, with some exceptions, as outlined in the EOIR Policy Manual. Immigration courts generally post the day's docket information each morning, most typically adjacent to the court's intake window. There is no need to check in with court staff before you enter a courtroom to observe, although the presiding Judge may ask you to identify yourself at the start of the hearing.

Observers should plan to observe immigration hearings in person at the courtroom in which a hearing is scheduled and held. While immigration judges are not obligated to admit non-parties into an internet-based hearing, should they do so, the immigration judge will ask the parties to the hearing (the DHS attorney and the respondent and his or her representative, if applicable) whether there is an objection to public observation and will exercise discretion to keep the hearing open, close it, or limit attendance.

Please note, usage of cameras or any type of recording devices are prohibited in the courtroom and in EOIR space, as is recording through an internet and/or telephone connection. The posting of live updates via social media during court proceedings is similarly prohibited. See also EOIR's security directive, PM 19-10 Policy for Public Use of Electronic Devices in EOIR Space.

Finally, please note that EOIR does not control entry to detention facilities in which some immigration courts are located. You would need to work with DHS/Immigration and Customs Enforcement to learn of any security requirements for entry to these buildings.

Sincerely,

U.S. Department of Justice
Executive Office for Immigration Review
/jjm

II. Again, on November 7, 2025 I returned to court in the afternoon and was again not allowed to enter the courtroom. I arrived at or about 1:10 pm for an Individual Merit hearing scheduled on the docket for 1:30 pm. I again put my hand on the doorknob to enter and a different Security Officer than that morning told me that I had to check with the clerks. I again informed him that I was instructed to address further inquiries regarding when the Courtroom door will be opened to the Security Officer. I also told the Security Office what had taken place earlier that morning that prevented me from getting into the courtroom. This new Security Officer went himself to the clerk window and asked about the observer being let in. A male clerk told him that it was up to the judge to decide who can be let into the courtroom and that the judge will decide when the Security Officer should unlock the door. I told the clerk about the issue I had earlier that morning with the Security Officer not telling the judge that there was an observer present. A female clerk (Jacee) walked up and the male clerk told her about the door being locked and asked if observers were supposed to be allowed into court. The female clerk repeated the instruction that if the door is locked then no one can get in. I repeated my issue with not being identified by the Security Officer as a person present for the hearing this morning and that the Judge wasn't given the opportunity to say yes or no to observers because he was not told that I was there. She rolled her eyes and said she would talk to Judge Sardelli and said, "he is supposed to call and let the Security Officer know to unlock the door." At this point in the conversation the male clerk said observers are not even allowed into Individual hearings, right? Have you ever been in one? To which I replied that yes I have observed in Individual Merit hearings in the past. At this point I sat down in the lobby near the courtroom door for IJ Sardelli and waited. After approximately 10 minutes I could hear through the door that the hearing had started. I then spoke to the male clerk and said, "Just wanted to let you know the hearing has started and Judge Sardelli didn't call to unlock the door so I can't go in. Just letting you know," to which he shrugged.

III. On January 27, 2026, I was present to observe non-detained Master Calendar hearings in the courtroom of IJ Ivany. After the hearings ended for respondents on WebEx and those present in court, the clerk said to me and another observer, "you are now dismissed." As I was leaving the courtroom I asked the clerk if I could be allowed to stay to hear the no-shows to which she replied, "I cannot comment on that" and held the door open for us to leave.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Megan R. Barker                    02/18/2026
Signature                          Date

# Exhibit 12

CITY OF EDEN PRAIRIE          )
                              )          Declaration of
COUNTY OF HENNEPIN            )          MARK G. RABOGLIATTI


I, MARK G. RABOGLIATTI, do state and affirm the following under penalty of perjury:

I.   My name is Mark G. Rabogliatti. I reside at 16830 Stirrup Lane, Eden Prairie, Minnesota 55347. My telephone number is (612) 805-7676.

II.  I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer. I have volunteered with the Immigration Court Observation Project run by The Advocates for Human Rights since May 2025. I usually observe 3 to 4 court hearings per month.

III. On June 26, 2025, I was scheduled to observe detained master calendar hearings before Immigration Judge Mazzie at 1:30 p.m. Before arriving for my shift, the Observation Project supervisor emailed the observers scheduled for the 1:30 hearings to indicate that Immigration Judge Mazzie's hearings had been moved to WebEx for the day. The observation project supervisor also provided WebEx instructions for us to connect to the hearings. I connected to WebEx before the hearings began. I was initially admitted to the hearings and them immediately disconnected, receiving a message that "the host has disconnected you from the meeting." I attempted to reconnect to WebEx but was not admitted from the waiting room. I waited approximately 20 minutes in the waiting room before disconnecting.

IV.  On November 3, 2025, I was scheduled to observe non-detained master calendar hearings before Immigration Judge Miller at 8:30 a.m. Shortly before 8:30, Ms. Lisa Kumiega, counsel for the Department of Homeland Security ("DHS"), entered the courtroom. I attempted to enter the courtroom but was told it was not yet open. I could hear, however, what appeared to be a hearing via WebEx, which lasted approximately 15 minutes. After that hearing ended, an individual male, who appeared to be an enforcement officer, entered the courtroom. I attempted to enter the courtroom but was told, again, that it was not yet open. I was not admitted to the courtroom until respondents were called to enter.


I declare under penalty of perjury that that the foregoing is true and correct.



_Mark G. Rabogliatti_
Signature

Date: February 28 2026

# Exhibit 13

CITY OF LAKEVILLE  )
        )   Declaration of
COUNTY OF DAKOTA  )   Patricia A. Bethke


I, Patricia A. Bethke do state and affirm the following under penalty of perjury:

I.  My name is Patricia A Bethke. I reside at 8304 169th St W, Lakeville, MN. My phone number is 952-381-7519.

II.  I am writing this declaration based on my knowledge of experiences at the Fort Snelling Court as a court observation project volunteer for the Immigration Court Observation Project run by The Advocates for Human Rights. I have volunteered with the Project since February, 2025. I usually observe for one volunteer shift per month and will typically observe 2-7 hearings per volunteer shift.

III.  On November 6, 2025, at 8:30 AM, I attempted to observe in IJ Miller's courtroom. I could hear IJ Miller's voice but the door was locked. I went to the window and asked to get in. I was told by the clerk to ask the guard (I heard another person address the clerk as, what sounded like, Jessie) I told her that we've been instructed not to ask the guard. She repeated, no, you need to check with the guard. The guard (who I assume overheard my conversation at the window as he was right there) said he would only let me in when the Immigration Judge instructed him to do so.

IV.  On November 6, 2025, at 8:35 AM, the guard got a sign from the window and put it on the courtroom door. It read: **This courtroom is closed due to confidentiality issues related to the respondent's court proceeding. 8C.F.R. § 208.6(a); 34 U.S.C. 12291 (b) (2).**

V.  On November 6, 2025 at 8:37 AM, I called Amy Lange, the observation project manager and explained what had happened because I had never been locked out of a courtroom and I was unsure what to do. She advised me to return to the window and say that for 8 years The Advocates for Human Rights has had volunteer observers, without incident, in the courtroom.

VI.  I then returned to the filing window and relayed what Amy Lange advised me to say. I noticed that IJ Mazzie was also in the office behind the clerk at the window. Judge Mazzie stated her name, and very sharply said the clerk was correct and that opening the door was up to the judge. The clerk then said, "we're not to speak to anyone who comes to the window". I asked if she could tell me who directed that, she said, "NO!"

VII.  On November 6, 2025 at 8:46 AM, I stood by the door waiting to hear a pause in IJ Miller's cases. The guard asked me to step away from the door. I told him I was waiting to hear a pause between cases. He told me I was eavesdropping. I sat down directly across from the courtroom where I could still hear.

VIII.  On November 6, 2025 at 9:38AM, a young bald man in a suit quickly exited IJ Miller's courtroom, and exited the lobby. At 9:44 AM, the bald man returned to the courtroom, the guard unlocked the door and let him back in. At 9:52 AM the bald man exited the courtroom again. I stopped him in the hallway and asked if he was a DHS Attorney and if court was over. He said yes. I told him I was a court observer and wasn't let into the courtroom and asked if he knew the reason why as that hadn't happened to me before. He was very kind about speaking with me. He said he was unsure why that would be

and that nothing was mentioned in the courtroom about it. I asked his name, he said Justin Lee.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.


*Patricia A Bettke*
Signature

2-18-26
Date

# Exhibit 14

# DECLARATION OF HEIDI D. PHIPPS

I, Heidi D. Phipps, declare as follows:

I am the Court Watch Team Lead for NorCal Resist, observing Monday through Friday at the John E. Moss Federal Building, Sacramento Immigration Court. Located at 650 Capitol Mall, Sacramento, CA 95814. I have personal knowledge of the facts in this declaration.

On June 12th, 2025, John E. Moss was closed to public for a week. ICE agents outside the courtrooms were harassing court observers while waiting to arrest individuals as they exit their court hearings. A group of people formed in front of the building once the building went into lockdown. Barricades in front of building are still in place today.

Since that date, our court watch program has experienced the following:

June 23rd, 2025- A court clerk on 5th floor did not allow court observers and accompaniers into a scheduled Master Calendar hearing. They had all respondents enter first, then their families. This was new, prior to this clerks and Court Administrator Nichole Rodriguez would allow standing in the back of court for observers. New GSA signage posted in common areas stating no loitering also went up this day. Security guards stating obstruction rules/regulations to court observers if they are in hallways.

July 2025- Court room doors closed to us observers if the hearing was full. Prior to this the doors would remain open even if seating was at capacity. When court observers inquire about the doors being shut or the ability to go in, the answer is "it's the judge's discretion".

July 17th, 2025- All morning Master Calendar Hearings and Individual Hearings canceled. At 12:09pm court observer attempted to enter the building to verify if there was an afternoon docket posted; observer was barred from entering and told by security that only people with appointments and employees were allowed to enter.

July 23rd, 2025 - ICE Field Office clerk told court observers we are not allowed to be in waiting room to support individuals with ICE check in appointments.

July 28th, 2025- Security guard Darrin Biggers on 5th floor court room informed court observers that DHS and FPS are working on limiting the number of volunteers that can be in the waiting rooms, and that he can detain us for obstructing. Darrin Biggers threatened to detain a journalist in the hallway.

2

August 21st, 2025- First noted time that docket was posted late on 4th floor court room waiting room.

August 26th- An Individual Hearing took place without representation (court observers have been told that we can not observe Individual Hearing without approval ahead of time from Judge and respondent) that was not posted on the docket. ICE agents were waiting in the court room waiting room sitting among family members. While court observers attempted to escort the respondent down and are immediately reprimanded and threatened by an ICE agent who once again claims "no hallways, elevators, waiting rooms only." The respondent was detained.

Sept 8th, 2025- Security Guard Darrin Biggers placed orange traffic cones on court room waiting seats closest to court room 1 and court 2 doors, preventing court observers from sitting there to listen to the hearings since the court room doors are closed.

Sept 9th , 2025- Barricade in front of the entrance moved further- closer to the public sidewalk. Further distancing court observers from providing coverage for individuals in line for ICE field office appointments.

Sept 10th, 2025- Court Observers at 1pm attempted to provide coverage on 5th floor court room waiting room due to an unrepresented Individual Hearing. Security guard Darrin Biggers blocked us from entering the waiting room by standing in the doorway. Informed us that we cannot be in there, had a paper is his had that he said had all the codes us as NorCal Resist are violating, he refused to show court observers the sheet that he was referring to. Made us leave the 5th floor.

Sept 17th ,2025- IJ Loretto Geisse threatens to ban all NorCal Resist from her hearings. Court Administrator Nichole Rodriguez actively counting how many seats are filled in court waiting rooms compared to how many court observers there are.

Sept 19th, 2025- Informed by Security Guard Edgar Smith that Court Administrator Nichole Rodriguez is attempting to use room capacity regulations to block us from being present in both court room and court waiting rooms even though there is not room capacity posted in waiting rooms.

Sept 24th ,2025- IJ Loretto Geisse closed doors on both her 8:30 am Master Calendar Hearing and 9:30am Master Calendar Hearing, did not allow court observers in either hearing even though there was space available.

3

Sept 26th, 2025- Docket posted late. Usually is posted at 8am for respondents that have 8:30am Master Calendar Hearings.

Sept 29th, 2025- Docket posted late. Remote Master Calendar Hearings taking place on 5th floor court room with IJ Hitesman not posted on docket on 4th floor docket or on 5th floor docket. Remote Master Calendar Hearings with IJ Neumeister taking place on 4th floor court rooms 3 and 4 taking place not posted on docket. When court observers ask court clerk about observing Webex or remote hearings, observers are informed that we can only observer posted master calendar hearings.

Oct 2nd, 2025- Docket posted late.

Oct 8th- At 10:09am Court Watch Team lead, Attorney of the Day (AOD) and AOD volunteer went to 5th floor to verify that there were not NorCal Resist flyers in small room that is often used as pro bono room. Got off on elevator at 5th floor and Security guard Darrin Biggers told us that we had no business being there, even after the attorney stated who they were and continued down the hallway. Biggers called Federal Protective Services, threatened to detain all three of us, even pulled out hand cuffs. When FPS did not show up, he had Team lead stand in hallway then said that team lead was violating the GSA regulations by loitering and that he could detain them for resisting/ and obstructing. Finally, court administrator Nichole Rodriguez came and told us that we cannot be in the court waiting rooms if there is not a master calendar hearing, especially on the 5th floor because there is not a pro bono room, it does not make it public space therefore, we do not have access to it. We must check the docket first on the 4th floor to see if there is a hearing taking place on the 5th floor. We cannot go to the 5th floor if nothing is posted on the docket or we will be detained, which is what the security guard Darrin Biggers told us he has been instructed by FPS to do so.

Oct 15th, 2025- 8:00am Security Guards at main lobby entrance told court observers that they cannot wait in building for docket to post.

Oct 27th, 2025 -Barricade outside of John Moss building entrance moved closer to sidewalk. Was informed by Security guard on 4th floor court waiting room 4-200 that Federal Protective Services (FPS) never told security guards that court watch was not allowed to collect information on out check in sheets, it was court administrator Nichole Rodriguez.

Oct 29th, 2025- Security guard Darrin Biggers moved barricade in front of John Moss entrance blocking on portion of sidewalk and narrowing entrance, making it hard for wheelchair access.

4

Nov 4th ,2025- 1pm Remote Master Calendar hearing with IJ Hitsmen for Reno, NV location posted on 4th floor Docket bulletin board for 5th floor court room.  Court Observers are not allowed to observe. This is one of the last times that this type of remote/Webex hearings are posted on the docket.

Nov 11th , 2025- Barricade in front of John Moss building officially moved to public sidewalk directed by DHS regulations according to FPS Inspector Desilva.

Nov 19th , 2025 -Docket late going up.

Nov 20th ,2025- Security Guard John Adriano would not let court observers enter the building to check the docket court administrator was in the building.

Nov 24th ,2025- Docket posted at 8:35am, Master Calendar hearing starts at 8:30am.

Nov 25th , 2025- 8:00am Security guard John Adriano prevented entry to check the docket, stating there are no Master Calendar Hearings this week only Individual Hearings.

Dec 1st, 2025- Docket posted late.

Dec 3rd ,2025- Scheduled 8:30 am Master Calendar Hearing with IJ Susan Phan began late at 8:54am with door closed to observers.

Dec 8th , 2025- Scheduled 8:30am Master Calendar Hearing with IJ Susan Phan began without docketed posted and door closed to observers.

Dec 9th , 2025- 1pm Master Calendar Hearing with IJ Badrinath began with court clerk rushing respondents in not allowing court observers to sign them in on our check-in sheets and then closed the door to court observers.

Dec 11th , 2025- 9:30 am new court observer who is ambulatory by wheelchair went into John Moss building accompanied by other court observer to show them the building and where a wheelchair accessible bathroom was. Security guards, Steve Xiong, Matthew Martinez and John Adriano told to use the "unisex handicap" bathroom as the security guards put it, on the first floor, after the volunteer struggled using the other bathrooms due to them having double doors that they have to go through, and they are heavy to push open. The observer later went into use the "unisex handicap" bathroom with their wheelchair and the security guards put a "Employees only beyond the point" sign blocking access to the only accessible wheelchair bathroom.

5

Dec 17th -8:30am and 9:30am Master Calendar Hearings with IJ Jonathan Hitsmen both located on 5th floor court room had door closed to court observers.

Jan 5th ,2026- Docket posted at usual 8:00am time with only one Master Calendar on docket. At 8:30am Master Calendar Hearing with IJ Susan Phan began with door closed to court observers. At 1241pm a second socket was posted for a 1pm master calendar hearing.

Jan 9th , 2026- Court observer checked to see if docket was posted at 8:00am, due to respondents showing up with notices to appear from judges that have been terminated. Respondents were at the filing window getting new scheduled court dates at filing window on 4th floor court room waiting room 4-200. Court observer asked court clerk and security guard if there was anything on the docket, there was not and nothing posted to bulletin board. Observer later returned to 4th floor room 4-200 at 9:20am due to more respondents showing up with notices to appear, there was a journalist in the waiting room, and again respondents checking in at the window getting different court dates. Court observer checked to see if docket was posted, again nothing posted, clerk told observer there was not a docket. At 11:45am journalist came out of building and notified court observer that at 9:30am a Master Calendar hearing took place on 4th floor court room 2 with IJ Phan. The journalist was invited to attend and was notified earlier that week.

Jan 12th , 2026 - 1pm Master Calendar hearing with IJ Vikram Badrinath began without docket being posted.

Jan 16th , 2026 - Court observer accompanied a respondent that had a notice to appear to court but did not have a judge's name on their appearance notice. The court clerk saw court observer and told them they cannot be in the waiting room if there isn't a master calendar hearing scheduled. Court observer stated that due to the many judge firings they were there to assist the respondent if there was any additional help needed to get a new court date or change of address filed. The court clerk, then proceeded to say, "well there is a master calendar hearing but it's a special hearing, so you can't be here," as she posted the docket to the bulletin board. The court observer waited to verify the docket was posted.

Jan 29th ,2026- 8:30am Master Calendar hearing with IJ Badrinath doors closed. 9:30 am Master Calendar hearing with IJ Badrinath doors closed.

Feb 2nd ,2026- Docket never posted for the day. 8:30am Master Calendar hearing with IJ Susan Phan, door is closed. 1pm Master Calendar hearing with IJ Vikram Badrinath began with door closed.

6

Feb 3rd, 2026- Security guard Edgar Smith that works on 4th floor court room waiting room told court observers that Court Administrator Nichole Rodriguez and court clerks have been intentionally not placing the docket on the back desk for him to post or informing him of the docket schedule.

Feb 12th, 2026- At 8:00am court observers went up to provide coverage for scheduled 8:30am Master Calendar Hearing with IJ Susan Phan. 7 respondents were already in the waiting room, no docket posted. At 8:17am court clerk began checking people into court room 2 without the docket posted. Court observer announced the docket isn't up and people can't verify that they are in the right location or if they even have a hearing, the clerk was very upset with this questioning. The docket was posted at 8:21am as many of the respondents for the 8:30am Master calendar was already in the court room. There was an 8:30am Master Calendar Hearing that was not posted on the docket with IJ Susan Phan in court room 2, due to the confusion with not being on the docket and it being up late the respondents at first were in the wrong court room.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16th, 2026.

*Heidi D. Phipps*

Heidi D. Phipps

Court Watch Team Lead

NorCal Resist

# Exhibit 15

**DECLARATION OF GILLIAN ROWLAND-KAIN**
**DIRECTOR OF PROGRAMS FOR IMMIGRANT ARC**

*I, Gillian Rowland-Kain, make the following statements on behalf of Immigrant Advocates Response Collaborative (I-ARC).  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I am the Director of Programs at the Immigrant Advocates Response Collaborative ("I-ARC"), a 501(c)(3) nonprofit organization based in New York. I-ARC is a coalition of over eighty immigration legal service providers that work on increasing access to justice and legal counsel for all immigrant New Yorkers.

2. I-ARC's membership expands across New York State and requires organizations to have attorneys or Department of Justice accredited representatives on staff to join. Our members work on issues ranging from humanitarian, family-based petitions, to naturalization and adjustment of status. I-ARC facilitates coordination and communication among legal providers, responds to new enforcement trends, and challenges harmful immigration policies through collective advocacy.

3. In my capacity as Director, I oversee the Legal Access and Membership and Capacity teams. My primary responsibilities include managing the day-to-day operations of the programs team, including facilitating team meetings, serving as the primary liaison between the programs team and organizational leadership, and overseeing the execution of key initiatives. I also lead I-ARC's rapid response efforts and other legal access programs such as the Friend of the Court initiative.

4. In March 2023, I-ARC launched its Friend of the Court ("FOTC") program to provide assistance to *pro se* respondents appearing in New York immigration courts. Our volunteers help non-detained noncitizens, particularly those appearing for the first time, by explaining court procedures, facilitating communication with immigration courts, and providing legal orientations and referrals.

5. Since March 2023, we have operated our FOTC program two days a week. We operate at the immigration courts at 290 Broadway, New York, NY, on Thursday mornings, and the immigration courts at 201 Varick Street, New York, NY, on Tuesday mornings. There is a room in each of these courts where we set up and store our materials and meet privately with people to facilitate program delivery.

6. In June 2025, I-ARC also launched a Court Observation Project that operates virtually and in person every weekday at all three New York City immigration courts and the Buffalo immigration court. Since then, volunteers have systematically observed master calendar hearings and documented trends related to access issues.

7. I submit this declaration in support of Plaintiffs' litigation, to provide information about the ongoing access issues and practices in New York immigration courts and the effect those practices continue to have on immigrant New Yorkers' ability to confidently

participate in their immigration proceedings.

8. When questioned, over 70 court observers have expressed issues accessing courtrooms since June 2025.

WEBEX Issues:

9. Many observers attempting to observe over WebEx are kept in the waiting room for 10-20 minutes while the hearing goes on without them before they are forced to attempt to gain access to another Immigration Judge ("IJ")'s hearings. No explanation has been provided as to why they were not admitted. Many observers have waited longer to be admitted (upwards of 50 minutes) and still have not been admitted.

10. Some WebEx observers have been told there are alleged information technology ("IT") issues that have forced them to be stuck in the WebEx waiting room for over 50 minutes during a hearing.

11. One WebEx observer saw via a WebEx notification that the immigration judge was aware they were in the waiting room, but they were never let in and received no communication as to why that may have been.

12. Many immigration judges have told WebEx observers that they only permit in-person court observation, and WebEx observers are subsequently kicked out of WebEx proceedings.

13. One WebEx observer was asked if they had permission from the respondents to observe the hearings. When the observer replied they did not, the Judge told them to: "please step out."

14. Immigration judges have told WebEx observers that they do not allow observers via WebEx because they cannot monitor whether the observers are recording the proceedings.

15. Recently, an observer received the message, "unfortunately, there is a memo that you can only observe in person you will have to log out" when attempting to observe via WebEx.

16. Many of our observers spend over an hour trying to get into a courtroom via WebEx to observe proceedings. They are usually left to wait indefinitely in the immigration judge's Personal Lobby.

**IN PERSON Access Issues:**

17. One in-person observer was told that the judge was not allowing observers to observe pro se respondents.

18. In-person observers have been told the courtrooms are full when the courtrooms are clearly not.

19. Frequently, in-person observers have experienced locked and closed courtrooms, particularly at 26 Federal Plaza.

20. One in-person observer was told by the EOIR security guard that they were not allowed to observe detained dockets and was directed to observe a nondetained one. When the observer pushed back, the guard referred them to EOIR staff at the front desk.

21. Many observers have shared that they were only able to enter courtrooms in 26 Federal Plaza after showing their attorney secure pass.

22. One observer shared that while the IJ took a 10 min bathroom break, they escorted an individual at risk of detention out of the building, but when they returned, they were not allowed back into the courtroom.

23. Frequently, in-person observers are lectured by the EOIR security officers that they are not allowed to go in and out of the courtroom or to make any "disruption" and told they cannot be admitted. In one scenario, an observer was able to ask the judge's clerk if they could be admitted, and the clerk instantly admitted them to the proceedings.

24. Other observers have shared that initially they do not have problems observing, but as soon as an arrest takes place, the EOIR security officers stationed in the hallway tell them that observers are no longer allowed in the courtrooms. When observers objected, security escorted them to another security officer, who told them only attorneys were allowed back to observe.

25. Observers have also been told by an immigration judge's assistant that they were unable to enter courtrooms, wait in the waiting room, or stay in the adjacent hallway. One IJ assistant told an observer that the IJ does not allow in-person observers, even if they are accompanying a pro se respondent. The security guard and another court employee (not in uniform) then physically barred observers from the waiting area and said they could not be in the hallway.

26. In one scenario, an observer shared that there were 8-10 ICE agents barring entrance to a courtroom, 2 agents by the elevators, 1 undercover, and 2 more stationed by the stairs.

The observer was forced to wait in a nearby waiting room where they witnessed an arrest of a respondent by ICE agents. Once the agents blocking the courtroom door left, the observer was able to enter the courtroom. When the observer left the waiting room area an additional six agents were waiting outside the waiting room where observers were confined.

27. In another scenario, an observer was told by the IJ's assistant that five observers could be admitted. After the IJ had finished speaking to the group, an unidentified woman came and sat in the front of the room and scanned the room. She announced to the room that all the observers needed to leave and sit down at the opposite end of the hall. The security guards followed the observers out.

28. Other observers shared that they were told to stand in a far away lobby, many were standing by the entrance to try to observe what was taking place, and were told by EOIR building security that they needed to sit down. Then one security guard said that if the observers did not sit, he would call the police.

29. One observer shared that they were barred from entering the courtroom by the IJ's assistant. The assistant said that either the judge, a respondent, or the government had requested the master be closed, but she couldn't tell the observer who made the request. The observer attempted to assert their right to public access, but the assistant kicked the observer out.

30. Another observer shared the following: "I was denied access by the clerk.  Two of us, both lawyers, asked and were told the judge says no. I raised the issue of public access, she said judge says no.  I was told by another observer that he never allows access to observers.  I filed a lot of motions defending the right of public access in my prior life as a government attorney, and find his action indefensible. While there were a fairly large number of observers there, most were more focused on assisting the respondents than watching the proceedings, and [the] IJ allowed two observers under similar circumstances."

31. An observer shared that they attempted to observe proceedings in a specific IJ's courtroom on the 19th floor. At around 8:20 am, the judge emerged and stood outside the courtroom talking (with the courtroom door open) to someone he seemed to know, and then he also greeted a DHS attorney who entered the courtroom. Around 8:25 am, the IJ returned through the doorway to the courtroom, letting the door slam in the faces of the observers waiting to enter. The observers expressed that the IJ seemed annoyed, possibly even actively hostile to the presence of the observers. At that point, it was not clear to the observers whether they were being excluded from the courtroom or whether the

courtroom was not open yet. They waited around for a bit and tried knocking on the door once (around 8:35-8:40 am), with no response from inside.

32. One observer shared that they tried to access a number of courtrooms at 26 Federal Plaza. Two judges said they did not allow in-person observers. Others may or may not allow observers, but were overflowing with respondents, so observers were directed to the waiting area. The observer ended up in a waiting area where they were unable to observe the handling of any cases.

33. This is a snapshot of the access issues our observers face on a daily basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2026.

_____
Gillian Rowland-Kain

# Exhibit 16

**DECLARATION OF EMMA WILSON, PROGRAM MANAGER FOR IMMIGRATION SERVICES AND LEGAL ADVOCACY**

My name is Emma Wilson. I am the Program Manager at Immigration Services and Legal Advocacy (ISLA). ISLA is based in New Orleans, Louisiana and provides legal services to immigrants. Our mission is to defend the rights of our immigrant communities and advocate for just and humane policy.

ISLA launched our Court Watch Program in October 2025, in partnership with Acacia Center for Justice's *Witness for Justice* program. Our program seeks to promote accountability and transparency in immigration courts. Our volunteers receive training developed by Acacia Center for Justice and the American Bar Association (ABA). After receiving training and passing a background check, our volunteers can sign up to remotely observe detained dockets in Louisiana Immigration Courts via Webex.

In recent months, our volunteers have experienced widespread and serious access issues, notwithstanding Master Calendar Hearings being open to the public under 8 C.F.R. §1003.27. In one instance, our volunteer reported that Judge Maithe González said that she would not allow our observer to enter the Webex hearing because if she did so, she would then have to "let everyone in." Another time, one of our volunteers was told by Judge Kandra Robbins that she would not accept observers because it "takes up too much bandwidth" to have more people on Webex. Judge Christopher Phan stated to a volunteer that he does not allow observers over Webex. At least three other judges removed volunteers from the waiting room during their dockets without explanation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 27, 2026.

Emma Wilson
Program Manager
Immigration Services and Legal Advocacy (ISLA)
3801 Canal St. Ste. 400
New Orleans, LA 70119
504-265-0416