# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE ADVOCATES FOR HUMAN RIGHTS,** <br> 330 Second Avenue South, #800 <br> Minneapolis, MN 55401 <br><br> *Plaintiff,* <br><br> v. <br> **PAMELA BONDI, IN HER CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES DEPARTMENT OF JUSTICE,** <br> 950 Pennsylvania Avenue NW <br> Washington, DC 20530 <br><br> **DAREN K. MARGOLIN, IN HIS CAPACITY AS DIRECTOR, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW OF THE DEPARTMENT OF JUSTICE,** <br> 5107 Leesburg Pike <br> Falls Church, VA 22041 <br><br> **HON.TERESA L. RILEY, IN HER CAPACITY AS CHIEF IMMIGRATION JUDGE, U.S, IMMIGRATION COURT** <br> 5107 Leesburg Pike <br> Falls Church, VA 22041 <br><br> And <br> **HON. ERIC L. DILLOW, IN HIS CAPACITY AS ASSISTANT CHIEF IMMIGRATION JUDGE U.S. IMMIGRATION COURT** <br> Bishop Henry Whipple Federal Building <br> 1 Federal Drive, Suite 1850 <br> Fort Snelling, MN 55111 <br> *Defendants*. | Civil Action No. 1-26-cv-00865-RC <br><br><br> **MOTION FOR PRELIMINARY INJUNCTION AND STAY AND MEMORANDUM OF LAW IN SUPPORT OF THE MOTION BY THE ADVOCATES FOR HUMAN RIGHTS** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   THE COMPLAINT AND REQUESTED RELIEF ............................................................. 3

III.  FACTUAL BACKGROUND ........................................................................................... 11

IV.   DISCUSSION ............................................................................................................... 13

      A.   The Legal Standard for a Preliminary Injunction and for a Stay. .................................... 13

      B.   AHR Has Standing to Assert a Claim for Relief, and AHR's Claim for Relief Is Ripe... 16

      C.   AHR Is Entitled to a Preliminary Injunction to Protect the Right of Its Staff and Volunteers to Observe Immigration Court Proceedings ............................................................................ 21

      D.   Because This Is a Public Interest Case to Vindicate Clear Violations of Federal Law, Including Constitutional Rights, No Bond (or Only a Nominal Bond of $1.00) Should Be Required ............................................................................................................................ 38

V.    CONCLUSION ............................................................................................................. 38

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ...........................................................................................4, 19

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) .................................................................................................................4

*African Cmties Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025) .................................................................................3, 4

*Alumni Cruises, LLC v. Carnival Corp.*,
987 F. Supp. 2d 1290 (S.D. Fla. 2013) .............................................................................15, 18

*Am. Bar Assoc. v. U.S. Dep't of Just.*,
783 F. Supp. 3d 236 (D.D.C. 2025) .....................................................................................35

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ...........................................................................................35

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ...............................................................................................19

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*,
Civil Action No. 25-339(JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025) .........................20

*Angelica S. v. U.S. Dep't of Health & Hum. Servs.*,
786 F. Supp. 3d 158 (D.D.C. 2025) .....................................................................................14

*Assoc. Press v. Tewalt*,
780 F. Supp. 3d 1052 (D. Idaho 2025) ...........................................................................36, 37

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*,
924 F.3d 662 (3d Cir. 2019) .................................................................................................24

*Biden v. Nebraska*,
600 U.S. 477 (2023) ..............................................................................................................17

*Bill Johnson's Rests., Inc. v. N.L.R.B.*,
461 U.S. 731 (1983) ................................................................................................................7

*Borough v. Duryea, Pa. v. Guarnieri*,
564 U.S. 379 (2011) ................................................................................................................7

ii

CORE/3515279.0007/238674693.3

*Catholic Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
513 F. Supp. 3d 154 (D.D.C. 2021) ..................................................................................4

*In re Charlotte Observer (Div. of Knight Pub. Co.)*,
882 F.2d 850 (4th Cir. 1989) ........................................................................................25

*Colley v. James*,
254 F. Supp. 3d 45 (D.D.C. 2017) ..................................................................................5

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ........................................................................................33

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ..................................................................................................17, 32

*Detroit Free Press v. Ashcroft*,
195 F. Supp. 2d 937 (E.D. Mich. 2002), *aff'd*, 303 F.3d 681 (6th Cir. 2002) .......23, 25, 26, 27

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ........................................................6, 26, 27, 28, 29, 33, 36, 39

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ................................................................................14

*Doe v. Pub. Citizen*,
749 F.3d 246 (4th Cir. 2014) ....................................................................................18, 24

*Elec. Priv. Info. Ctr. v. FAA*,
892 F.3d 1249 (D.C. Cir. 2018) ....................................................................................19

*Elrod v. Burns*,
427 U.S. 347 (1976) ......................................................................................................35

*Equal Rts. Ctr. v. Abercrombie & Fitch Co.*,
767 F. Supp. 2d 510 (D. Md. 2010) ..............................................................................17

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ..............................................................................38

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
___ F. Supp. 3d ___, 2025 WL 3465518 (D.D.C. Dec. 2, 2025) ..............................13

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ......................................................................................................34

*Fed. Bureau of Investigation v. Fikre*,
601 U.S. 234 (2024) ......................................................................................................16

iii

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
  691 F.3d 1250 (2012)...................................................................................................17

*Gannett Co. v. DePasquale*,
  443 U.S. 368, 99 S. Ct. 2898, 61 L.Ed.2d 608 (1979)..........................................................16

*Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*,
  457 U.S. 596 (1982)................................................................................................16, 27

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) ..................................................................................13, 14

*In re Granick*,
  388 F. Supp. 3d 1107 (N.D. Cal. 2019) ..............................................................................25

*Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................................................33

*Green v. U.S. Dep't of Just.*,
  54 F.4th 738 (D.C. Cir. 2022)........................................................................................33

*Harris County, Tex. v. Kennedy*,
  786 F. Supp. 3d 194 (D.D.C. 2025) .....................................................................17, 18, 37, 38

*Hill Dermaceuticals, Inc. v. FDA*,
  709 F. 3d 44 (D.C. Cir. 2013).........................................................................................20

*Humane Soc'y of the United States v. U.S. Dep't of Agric.*,
  41 F.4th 564 (D.C. Cir. 2022)........................................................................................35

*Humane Soc'y of the United States v. Gutiererz*,
  523 F.3d 990 (D.C. Cir. 2008)........................................................................................13

*Index Newspapers LLC v. City of Portland*,
  474 F. Supp. 3d 1113 (D. Ore. 2020)..............................................................................33, 37

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ........................................................................................29

*INS v. Yueh-Shaio Yang*,
  519 U.S. 26 (1996)......................................................................................................23

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)..................................................................................................27, 39

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).........................................................................................14, 36

iv

*L.A. Press Club v. Noem*,
  799 F. Supp. 3d 1036 (C.D. Cal. 2025) ...................................................................29

*Mich. Welfare Rts. Org. v. Trump*,
  600 F. Supp. 3d 85 (D.D.C. 2022) ..........................................................................15

*Miller v. Brown*,
  462 F.3d 312 (4th Cir. 2006) ...................................................................................20

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ...............................................................................35

*Morton v. Ruiz*,
  415 U.S. 199 (1974)..................................................................................................23

*N. Mariana Island v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009)..............................................................................36

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  775 F. Supp. 3d 100 (D.D.C. 2025) ..........................................................................20

*Nat'l Treasury Employees Union v Vought*,
  149 F.4th 762 (D.C. Cir. 2025), (Pilllard, J., dissenting) *vacated and reh'g en
  banc granted*, No. 25-5091 (D.C. Cir. Dec. 17, 2025) .............................................32

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996)................................................................................20

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)..................................................................................................16

*Neguse v. U.S. Immigr. & Customs Enf't*,
  ___ F. Supp. 3d ___, 2025 WL 3653597 (D.D.C. Sept. 17, 2025)....................................32, 36

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
  496 F. Supp. 3d 31 (D.D.C. 2020) ............................................................................19

*Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Ore.*,
  920 F.2d 1466 (9th Cir. 1990) ...................................................................24, 25, 29

*Padilla v. Immigration & Customs Enf't*,
  953 F.3d 1134 (9th Cir. 2020) ..................................................................................37

*Pechter v. Lyons*,
  441 F. Supp. 115 (S.D.N.Y. 1977) ..........................................................................1, 18, 19

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)....................................................................................................34

CORE/3515279.0007/238674693.3

*PFLAG, Inc. v. Trump*,
  769 F. Supp. 3d 405 (D. Md. 2025) .................................................................................20

*Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz.*,
  156 F.3d 940 (9th Cir. 1998) ....................................................................................24, 29

*Press-Enter. Co. v. Super. Ct. of Cal.*,
  478 U.S. 1 (1986) .......................................................................................................7, 27

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  310 F. Supp. 3d 7 (D.D.C. 2018) ................................................................................5, 14

*Reuters Ltd. v. F.C.C.*,
  781 F.2d 936 (D.C. Cir. 1986) .........................................................................................33

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) (plurality opinion) ...................................................................16, 24

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .........................................................................................14

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ...........................................................................................35

*Stevens v. Osuna*,
  877 F.3d 1293 (11th Cir. 2017) .........................................................................................1

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
  600 U.S. 181 (2023) .........................................................................................................17

*Teleprompter Cable Sys. v. FCC*,
  543 F.2d 1379 (D.C. Cir.1976) ........................................................................................33

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ...........................................................................................................7

*The Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*,
  Case No. 26-cv-749(NEB/DLM) (D. Minn. Feb. 12, 2026) ...........................................31

*In re The Spokesman-Rev.*,
  569 F. Supp. 2d 1095 (D. Idaho 2008) ............................................................................25

*Thomas v. Collins*,
  323 U.S. 516 (1945) (Jackson, J., concurring) ..........................................................27, 39

*United States v. Brooklier*,
  685 F.2d 1162 (9th Cir. 1982) .........................................................................................25

CORE/3515279.0007/238674693.3

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................................................13, 14

**Statutes**

5 U.S.C. §§ 551, *et seq.* ..............................................................................................................5

5 U.S.C. § 702 ............................................................................................................................18

5 U.S.C. § 705 ....................................................................................................................1, 8, 13

5 U.S.C. § 706(2)(A)–(D) .............................................................................................................6

5 U.S.C. § 706(2)(A), (C)–(D) .....................................................................................................6

8 U.S.C. § 1003(g)(1)–(2) ............................................................................................................6

**Rules**

8 C.F.R. § 3.27 ............................................................................................................................26

8 C.F.R. § 242.16(a) ...................................................................................................................19

8 C.F.R. § 246.16(a) ...................................................................................................................18

8 C.F.R. § 1003.0(b)(1)(i) .............................................................................................................4

8 C.F.R. § 1003.0(c) .....................................................................................................................4

8 C.F.R. § 1003.9 .........................................................................................................................4

8 C.F.R. § 1003.9(a) .....................................................................................................................4

8 C.F.R. § 1003.9(b)–(c) ...............................................................................................................5

8 C.F.R. § 1003.10(a) ...............................................................................................................3, 4

8 C.F.R. § 1003.27 ...........................................1, 2, 6, 7, 8, 11, 21, 22, 23, 32, 33, 34, 38

8 C.F.R. § 1003.46(a) ..................................................................................................................22

8 C.F.R. § 1003.46(b) ..................................................................................................................22

8 C.F.R. § 1208.6 ........................................................................................................................38

8 C.F.R. § 1240.10(a)(1) .............................................................................................................37

8 C.F.R. § 1240.10(b) .................................................................1, 6, 7, 8, 23, 33, 34

CORE/3515279.0007/238674693.3

viii

CORE/3515279.0007/238674693.3

## I.     INTRODUCTION

The Advocates for Human Rights ("AHR"), an independent, non-partisan, 501(c)(3) non-governmental organization headquartered in the State of Minnesota, moves for a preliminary injunction and a stay (the latter pursuant to 5 U.S.C. § 705) to require immigration court proceedings to remain open to the public and the press.[1] There is a long tradition in the United States, codified in federal law and supported by the U.S. Constitution's First Amendment, of public and press access to immigration proceedings. *See* 8 C.F.R. § 1003.27 ("All hearings, other than exclusion hearings, shall be open to the public" except in enumerated circumstances); 8 C.F.R. § 1240.10(b) ("Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 1003.27 of this chapter."); *Stevens v. Osuna*, 877 F.3d 1293, 1312–13 (11th Cir. 2017) ("We stress—and no one disputes—that immigration hearings already are presumptively open to the public.") (citing 8 C.F.R. § 1003.27); *Pechter v. Lyons*, 441 F. Supp. 115, 117 (S.D.N.Y. 1977) (allowing the public to observe deportation proceedings); Shane Dizon & Pooja Dadhania, 3 Immigr. L. Service 2d § 13:167 – *Open Proceedings Required* (Nov. 2025 Update) ("By regulation, all hearings are required to be public with the following exceptions . . . .").

Since 2017, AHR has run an Immigration Court Observation Project, with its staff and volunteers focusing their efforts on the Fort Snelling Immigration Court in the State of Minnesota. For many years, the Court Observation Project worked smoothly. AHR staff and volunteers—at

---

[1] Pursuant to LCvR7(m), AHR sent a March 12, 2025, letter to all defendants notifying them of AHR's intention to seek a preliminary injunction and asking them to meet and confer with AHR counsel by March 18, 2026, noting that time was of the essence. The General Counsel for EOIR responded on March 17 that any meet and confer would have to wait until a DOJ attorney enters an appearance in this case but did not indicate when that would occur. He did not respond to AHR's follow-up request that, in the interim, he provide the contact information for the DOJ attorney assigned, if known.

1

times, working directly with immigration judges at Fort Snelling—were able to access immigration proceedings, whether held in person or via Webex, without issue. Beginning in 2025, however, access to immigration court matters at the Fort Snelling Immigration Court began to be arbitrarily and capriciously restricted and denied in violation of law and constitutional rights. AHR and its immigration court observers have experienced multiple violations of 8 C.F.R. § 1003.27, which guarantees open access to immigration proceedings with only limited exceptions. As a result, the legal rights, including the First Amendment rights, of AHR and its staff and volunteers have been disregarded. The restrictions and denials of access to immigration court proceedings at the Fort Snelling Immigration Court are, it appears, part of a much larger pattern of arbitrary restrictions and denials of access to immigration courts across the county.[2] The restrictions and denials of access described herein and in the attached declarations, constitute an ongoing First Amendment violation, making expedition essential. AHR accordingly requests that a hearing be set for no later than 21 days after this filing.

---

[2] One of the first government documents AHR saw hinting at these new restrictions was a September 11, 2025, document entitled "Guidelines for Court Observers." Ex. 1. The restrictions AHR observers had witnessed prompted AHR to send a January 9, 2026, letter to the Fort Snelling Immigration Court, *see* Ex. 2, to which that court provided a subsequent response. Ex. 3. Organizations other than AHR had also earlier noticed and brought attention to denials of access to immigration courts in other parts of the country. For example, on June 13, 2025, representatives of the ACLU Foundation of Northern California and Public Justice sent a letter to Judge Jonathan W. Hitesman, the Assistant Chief Immigration Judge in Sacramento, California, noting that "legal observers" had reported "being denied access to observe immigration proceedings at the Sacramento Immigration Court." Ex. 4. On June 16, 2025, representatives of those two organizations also wrote to Maya Adberg, a property manager at the U.S. General Services Administration in Sacramento, with this message: "Numerous legal observers are currently reporting that they are being denied access to the John Moss Federal Building to observe immigration proceedings. Based on these reports, we write on behalf of the American Civil Liberties Union of Northern California and Public Justice to demand that the public, including community members, legal observers, and members of the press be allowed into the building for the purpose of observing immigration hearings." Ex. 5.

2

CORE/3515279.0007/238674693.3

## II.    THE COMPLAINT AND REQUESTED RELIEF

On March 12, 2026, AHR brought this lawsuit against (1) Pamela Bondi, the Attorney General of the United States and the head of the U.S. Department of Justice ("DOJ"), in her official capacity; (2) Daren K. Margolin, in his official capacity as the Director of the Executive Office for Immigration Review ("EOIR"), a separate agency within the DOJ responsible for adjudicating immigration cases and which, under delegated authority from the Attorney General, is responsible for supervising the conduct of all immigration court proceedings, appellate reviews, and administrative hearings[3]; (3) Teresa L. Riley, the Chief Immigration Judge in the Office of the Chief Immigration Judge ("OCIJ"), the official who establishes operating policies and oversees policy implementation for the immigration courts, in her official capacity; and (4) Eric L. Dillow, the Assistant Chief Immigration Judge responsible for the Fort Snelling Immigration Court that is located at the Bishop Henry Whipple Federal Building in the State of Minnesota, in his official capacity. *See* Compl. ¶¶ 15–18.

The immigration courts operate within the executive branch of the U.S. Government, overseen by the Attorney General, the EOIR, and the OCIJ. Immigration judges are appointed by the Attorney General as administrative judges functioning within the EOIR. 8 C.F.R. § 1003.10(a) ("The immigration judges are attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings, including hearings under section 240 of the Act. Immigration judges shall act as the Attorney General's delegates in the cases that come before them."); *African Communities Together v. Lyons*, 799 F. Supp. 3d 362, 376 (S.D.N.Y. 2025) ("The Office of the Chief Immigration Judge

---

[3]    EOIR Policy Manual, Section 1.2, https://www.justice.gov/eoir/policy-manual-eoir/part-I/chapter-1-2#:~:text=EOIR%20is%20an%20office%20of,Appendix%20B%20(Organizational%20Chart)

CORE/3515279.0007/238674693.3

('OCIJ') resides within the EOIR, which . . . is part of the DOJ. Immigration Judges are appointed by the Attorney General as administrative judges functioning within the EOIR.") (citing 8 C.F.R. § 1003.10(a)).

EOIR is the agency within the DOJ that administers and oversees the immigration court system and sets policy for its operation,[4] including the OCIJ and the Board of Immigration Appeals ("BIA"), which reviews decisions of immigration judges. *Catholic Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 165 (D.D.C. 2021). The Director of the EOIR reports to the Office of the Attorney General. *Catholic Legal Immigr. Network*, 513 F. Supp. 3d at 165.

The organization of the OCIJ is described in 8 C.F.R. § 1003.9. *See* 8 C.F.R. § 1003.9(a):

(a)    **Organization**. Within the Executive Office for Immigration Review, there shall be an Office of the Chief Immigration Judge (OCIJ), consisting of the Chief Immigration Judge, the immigration judges, and such other staff as the Director deems necessary. The Attorney General shall appoint the Chief Immigration Judge. The Director may designate immigration judges to serve as Deputy and Assistant Chief Immigration Judges as may be necessary to assist the Chief Immigration Judge in the management of the OCIJ.

---

[4] *Id*. While the Director of EOIR has the authority to "issue operational instructions and policy", 8 C.F.R. § 1003.0(b)(1)(i), EOIR does not have authority (absent direction from the Attorney General) to adjudicate immigration cases or "to direct the result of an adjudication." 8 C.F.R. § 1003.0(c). Consistent with that limitation, the EOIR Policy Manual (the 'EPM') contains an Immigration Court Practice Manual that, by its express terms does not "limit the discretion of Immigration Judges *to act in accordance with law and regulation.*'" *African Cmties. Together*, 799 F. Supp. 3d at 377 (quoting ICPM 1.1(b) & (c)) (italics added). Plaintiff does not contend in its complaint that EOIR is directing the *results* of any adjudication, however. Such conduct, of course, would be more than problematic, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954). And the Justice Department's recent firing of one hundred immigration judges may raise that spectre. *See* Nate Raymond, *Trump administration names immigration judges with enforcement backgrounds amid deportation push*, Reuters (March 12, 2026), https://www.reuters.com/legal/government/trump-administration-names-42-immigration-judges-many-enforcement-backgrounds-2026-03-12/.   But, AHR's complaint addresses EOIR and immigration court actions limiting public *access* to the proceedings.

4

The powers of the Chief Immigration Judge, as well as the limits on that individual's authority, are set forth in 8 C.F.R. § 1003.9(b)–(c). *See* 8 C.F.R. § 1003.9(b)–(c):

(b)    ***Powers of the Chief Immigration Judge.*** Subject to the supervision of the Director, the **Chief** Immigration Judge shall be responsible for the supervision, direction, and scheduling of the immigration judges in the conduct of the hearings and duties assigned to them. The Chief Immigration Judge shall have the authority to:

(1)    Issue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities;

(2)    Provide for appropriate training of the immigration judges and other OCIJ staff on the conduct of their powers and duties;

(3)    Direct the conduct of all employees assigned to OCIJ to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases, to direct that the adjudication of certain cases be deferred, to regulate the assignment of immigration judges to cases, and otherwise to manage the docket of matters to be decided by the immigration judges;

(4)    Evaluate the performance of the Immigration Courts and other OCIJ activities by making appropriate reports and inspections, and take corrective action where needed;

(5)    Adjudicate cases as an immigration judge, including the authorities described in § 1003.10(b); and

(6)    Exercise such other authorities as the Director may provide.

(c)    ***Limit on the Authority of the Chief Immigration Judge.*** The Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge, provided, however, that nothing in this part shall be construed to limit the authority of the Chief Immigration Judge in paragraph (b) of this section.

AHR's lawsuit is based on the Administrative Procedure Act ("APA"), codified at 5 U.S.C. §§ 551, *et seq*. *See* Compl. ¶¶ 43–55. The APA governs the conduct of federal administrative agencies, and the APA allows judicial review of final agency actions. *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 16 (D.D.C. 2018); *see also Colley v. James*, 254 F. Supp. 3d 45, 57 (D.D.C. 2017) ("Pursuant to the APA, a court must set aside agency action that is 'arbitrary, capricious, an abuse of discretion,' 'otherwise not in accordance with law' 'in excess of statutory

5

authority,' or 'without observance of procedure[s] required by law.'") (citing 5 U.S.C. § 706(2)(A), (C)–(D)). Under the APA, the "reviewing court shall . . . (1) compel agency action unlawfully withheld or unreasonably denied; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A)–(D). "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." *Id.* § 706(2). The Attorney General has authority over immigration matters, and the Attorney General establishes regulations pertaining to immigration proceedings and is permitted to delegate authority as necessary. 8 U.S.C. § 1003(g)(1)–(2).

Immigration court proceedings are of considerable public interest and are, by law, generally open to the public and the press. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 705, 711 (6th Cir. 2002) (finding a First Amendment right of access to deportation hearings and emphasizing that "[o]pen proceedings, with a vigorous and scrutinizing press, serve to ensure the durability of our democracy"). Indeed, specific federal regulations, 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), require that, with very limited exceptions, immigration court proceedings are to be open to the public and the press. However, the public officials overseeing the DOJ, the EOIR, and the OCIJ, as well as individual immigration judges overseen by the Assistant Chief Immigration Judge for the Fort Snelling Immigration Court, have failed to comply with such federal regulations. The actions and omissions of public officials at the DOJ, the EOIR, and the OCIJ, along with the actions and omissions of the Assistant Chief Immigration Judge for the Fort

6

Snelling Immigration Court, are arbitrary and capricious, contrary to law, and against constitutional rights, and thus, in clear violation of the APA.

The applicable federal regulations, 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), that ensure presumptive public and press access to immigration court proceedings, were put in place through a federal rulemaking conducted through the notice-and-comment process.[5] Such right-of-access guarantees for the press and the public are grounded in the U.S. Constitution's First Amendment. *Press-Enter. Co. v. Super. Ct. of Cal.*, 478 U.S. 1, 13–14 (1986) ("Since a qualified First Amendment right of access attaches to preliminary hearings in California under Cal. Penal Code Ann. § 858 *et seq.* (West 1985), the proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest[.]'"); *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) ("[W]e have recognized that members of the public have a right of access to criminal proceedings secured by the First Amendment.") (citing *Press-Enter. Co.*, 478 U.S. at 8–15).[6] The staff and volunteers of AHR have nonetheless been denied access to various immigration proceedings in violation of law, and there has been no notice-and-comment rulemaking to change or repeal the applicability or requirements of 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b) or any articulation of a policy reason for abandoning the presumption of public and press access to immigration court proceedings.

---

[5] *See* 52 Fed. Reg. 2931 (Jan. 29, 1987) (Executive Office for Immigration Review final rule, to be effective March 2, 1987, setting forth "Rules of Procedure for Proceedings Before Immigration Judges," and noting: "These regulatory revisions were offered for public review in a notice of proposed rulemaking, A.G. Order No. 1113–85, published at 50 FR 51693 (December 19, 1985)."

[6] The "right of access to courts for redress of wrongs" is also "an aspect of the First Amendment right to petition the government." *Borough v. Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) (citing cases); *see also Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances.").

CORE/3515279.0007/238674693.3

The Fort Snelling Immigration Court is located at the Bishop Henry Whipple Federal Building—the site of recent protests in the State of Minnesota pertaining to immigration-related policies and practices. *See* Nicholas Bogel-Burroughs, *The Out-of-the-Way Building at the Center of Minnesota's Immigration Drama*, N.Y. Times (Jan. 23, 2026). Because of the restrictions and denial of access to immigration court proceedings, AHR and its staff and volunteers have been harmed—and are suffering irreparable harm—by virtue of the APA violations identified in AHR's Complaint, including violations of 8 C.F.R. § 1003.27 and the U.S. Constitution's First Amendment. Consequently, AHR is entitled to declaratory relief and the grant of a preliminary injunction and stay to ensure open access to immigration proceedings in a manner consistent with federal law. To ensure compliance with 8 C.F.R. § 1003.27 and AHR's rights, including under the APA and the First Amendment, and to avoid irreparable harm to Plaintiff while the litigation proceeds, the defendants should be ordered to comply with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) pending completion of the litigation.

In addition, and to ensure defendants' compliance with their own regulations,[7] if any immigration court proceeding—whether conducted in person, via Webex, or through any other means—is ordered to be closed, the applicable immigration judge, before excluding the press or any person from the immigration court proceeding, should (1) be required to state orally in open court and on the record (with such statement to be recorded on video or audio and/or documented via written transcription to be contemporaneously made), while free and open public and press access is being afforded to the proceeding, any asserted basis for closing such proceeding (or any

---

[7] Under section 705 of the Administrative Procedure Act "a reviewing court…may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings." (emphasis added). Simply directing Defendants to comply with existing regulations will not be sufficient to preserve Plaintiff's rights pending conclusion of the review proceedings.

8

portion thereof), and to be required, before any such closure or exclusion announcement, order, decision, or directive is made or takes effect, to give the press and any member of the public a meaningful opportunity to be present (whether in person, through Webex, or through any other means) and, in advance, to object on the record (and to assert any basis or grounds for any such objection on the record) before any such closure or exclusion announcement, order, decision, or directive is made or takes effect, or (2) be required to publish or post in writing the asserted basis for any such closure (or partial closure) or exclusion announcement, order, decision, or directive, with an accompanying oral statement to be made on the record by the immigration judge that references any such writing or posting (with such oral statement to be recorded on video or audio and/or via written transcription to be contemporaneously made) while free and open public and press access is being afforded to the proceeding, with any asserted basis for closing such proceeding (or any portion thereof), whether in writing or made orally, to be publicly announced by the immigration judge in advance of any closure (or partial closure) or exclusion announcement, order, decision, or directive, and with the immigration judge affording a meaningful opportunity for the press and any member of the public, before any such closure or exclusion announcement, order, decision, or directive is made or takes effect, to be present (whether in person, through Webex, or through any other means) and to object on the record (and to assert any basis or grounds for any such objection on the record) before any such closure or exclusion announcement, order, decision, or directive is made or takes effect.

In either case, the press and members of the public must be afforded effective notice, reasonably calculated to inform the press and the public of any contemplated or proposed action or contemplated or potentially forthcoming announcement, order, decision, or directive intended to deny or restrict access to the press or the public to an immigration court proceeding. In addition,

9

the press and the members of the public must be afforded a meaningful opportunity to be present to be able to object and to assert any basis or reason for opposition to any closure (or partial closure) of the proceedings or the exclusion of the press or any member of the public and to state such objection or objections on the record, before any closure or exclusion announcement, order, decision, or directive is made or takes effect. Moreover, any closure or exclusion announcement, order, decision or directive, whether made orally or in writing, must articulate a legitimate basis for the closure or exclusion that comports with the U.S. Constitution's First Amendment, the APA, and applicable federal regulations, and such closure or exclusion announcement, order, decision or directive must describe how any such exclusion, closure, or limitation on public or press access has been narrowed to ensure that it is no broader than necessary to meet the stated basis for the exclusion, closure, or limitation. Absent compliance with the above articulated procedures designed to ensure compliance with the APA, the First Amendment, and applicable federal regulations, the doors to immigration courtrooms or to any other rooms or spaces where immigration court proceedings are being conducted shall remain unlocked and open to the press and the public at all times while any such immigration court proceedings are being conducted. Unless a closure or exclusion order is well-grounded in federal law, the press and the members of the public have a presumptive right to attend and observe such proceedings and should have free and unrestricted access to enter immigration court proceedings to observe them.

AHR's Complaint asserts four causes of action. Count I alleges that defendants' restrictions on public access to immigration courts are arbitrary, capricious, and contrary to law and Constitutional rights in violation of the APA, including the DOJ's own regulations. Compl. ¶¶ 43–46. Count II alleges that even if defendants' restrictions on access to immigration courts were the result of policy changes, those changes were made without observance of procedure required by

10

law in violation of the APA. Compl. ¶¶ 47–49. Count III alleges that even assuming defendants' restrictions on access to the immigration courts were the result of policy changes, and that even assuming such changes did not require a new rulemaking procedure, those changes were made without acknowledging the change in policy and offering reasons for the policy change, in violation of the APA. Compl. ¶¶ 50–52. And Count IV alleges that defendants' restrictions on access to immigration court proceedings violated AHR's First Amendment rights and that the defendants thereby engaged in agency action "contrary to constitutional right, power, privilege, or immunity" in violation of the APA. Compl. ¶¶ 53–55.

## III.    FACTUAL BACKGROUND

On January 9, 2026, Michele Garnett McKenzie, AHR's Executive Director, sent a demand letter to Daren Margolin, the Director of EOIR and Assistant Chief Immigration Judge Eric Dillow. *See* Letter from Michele Garnett McKenzie to Daren K. Margolin and Hon. Eric L. Dillow (Jan. 9, 2026) Ex. 1. That letter requested "that, as required by law, immigration court proceedings at the Fort Snelling Immigration Court, whether held in person or via Webex, remain open to the public and to the press." *Id.* at 1. The letter described the denials of access that AHR and its staff and volunteers had experienced at the Fort Snelling Immigration Court and detailed the law requiring that immigration court proceedings be open to the public and the press with limited exceptions. *Id.* at 1–11. In particular, the letter discussed the access rights afforded by 8 C.F.R. § 1003.27 and the Immigration Court Practice Manual ("ICPM").[8] *Id.* at 7–10. AHR's January 9th letter further stated that AHR "has every intention of continuing its Immigration Court Observation Project"; sought "a written assurance that the Fort Snelling Immigration Court and its personnel

---

[8] As the letter of January 9 points out, the ICPM and public websites of the government also state that immigration proceedings shall be open to the public and the press with limited exceptions.

11

will, in the future, abide by federal law and comply with the immigration court's own rules respecting public and press access to immigration proceedings"; and included this specific request of the U.S. Immigration Court: "Should the Court believe a national policy or regulatory change allows such limits on access, The Advocates respectfully requests the Court to provide a copy of the relevant policy change referenced." *Id.* at 11–12. The January 9th letter of AHR concluded: "We respectfully request that your office respond to this letter no later than January 19. If we do not receive a response by that time, we may be required to assess alternative means of addressing these violations, including the federal courts." *Id.* at 12.

In response to AHR's January 9th letter, AHR received a letter dated January 20, 2026, from Kathryn Mattingly at EOIR, with Ms. Mattingly identified in the signature block as the Press Secretary for EOIR. The response letter (Exhibit 2) stated in part:

> Regarding the issues you raised, please note that there may be instances where hearings need to be closed or held with limited attendance for a variety of reasons, as described in the Immigration and Nationality Act, the Code of Federal Regulations, and EOIR Policy. *See* EOIR's Policy Manual, available at https://www.justice.gov/eoir/eoir-policy-manual and EOIR's Observing Hearings Fact Sheet, available at https://www.justice.gov/eoir/media/1416861/dl?inline.

> Further, the Department of Homeland Security's Federal Protective Service (FPS) is the agency responsible for access to, and securing, the buildings in which immigration courts are housed. While FPS is the primary agency responsible for protecting government employees, including immigration judges, FPS's direct work in our spaces is to protect the facilities through security screening and regular patrols, all of which protects the people in the spaces. You may wish to direct any questions regarding FPS to the Department of Homeland Security.

> Regarding locked doors or limited attendance, Immigration Judges or FPS may determine that doors need to be locked for security reasons or to prevent disruptions of court proceedings. Immigration Judges are independent adjudicators and may determine that a hearing should be closed or held with limited attendance. As such EOIR cannot guarantee that there will not be instances when doors will need to be locked or attendance limited.

> Observers should plan to observe immigration hearings in person at the courtroom in which a hearing is scheduled and held. *See* EOIR's Observing Hearings Fact Sheet, available at https://www.justice.gov/eoir/media/1416861/dl?inline. As noted

12

on our Find An Immigration Court page, available at https://www.justice.gov/eoir/find-immigration-court-and-access-internet-based-hearings, the Webex links posted on EOIR's website are posted for *parties* appearing remotely. (Links for *parties* to access any internet-based hearings before Immigration Judges are below.) When in-person access is not available, the Immigration Judge has the discretion to admit non-parties via Webex to observe a hearing that is open [to] the public.

As detailed in the Complaint and in the attached declarations discussed herein, while the restrictions complained of in AHR's January 9, 2026, letter temporarily abated somewhat following the Defendants' receipt of the letter, those arbitrary and unlawful access restrictions have largely resumed and have continued in other parts of the nation.

## IV.   DISCUSSION

### A.   The Legal Standard for a Preliminary Injunction and for a Stay.

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, 2025 WL 3465518, at \*12 (D.D.C. Dec. 2, 2025) (citations omitted).[9] "The D.C. Circuit has held that the factors to be considered in determining whether to grant a stay [under 5 U.S.C. § 705] are the same as those for a preliminary injunction." *Humane Soc'y of the United States v. Gutiererz*, 523 F.3d 990, 991 (D.C. Cir. 2008). *See also Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020) ("Requests for preliminary relief under the APA, 5 U.S.C. § 705, are also governed by the same standards."). "These 'extraordinary' remedies 'should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Id.*

A plaintiff seeking a preliminary injunction generally must show that (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of

---

[9] Motions for preliminary injunctions and TROs "are analyzed using the same standards." *Gomez v. Trump*, 485 F. Supp. 3d 145, 169 (D.D.C. 2020).

13

preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *accord Doe v. McHenry*, 763 F. Supp. 3d 81, 84–85 (D.D.C. 2025); *Angelica S. v. U.S. Dep't of Health & Hum Servs.*, 786 F. Supp. 3d 158, 169 (D.D.C. 2025); *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 17 (D.D.C. 2018) (citing *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *Gomez*, 485 F. Supp. 3d at 168; *Doe*, 783 F. Supp. 3d at 85.

For a short time following AHR's January 9, 2026, letter, the unlawful restrictions placed on observer access to immigration proceedings at the Fort Snelling Immigration Court were lifted to some extent. But most of those restrictions have since been resumed. While the immigration judges have permitted some observers to attend some hearings in person that are also streamed on Webex, it has not informed observers when those proceedings began nor permitted observers to enter the courtrooms after those proceedings have begun. Indeed, many of the courtroom access restrictions faced by AHR court observers prior to AHR's January 9, 2026, letter to the Fort Snelling court officials have resumed. In some instances, for example, immigration judges have blocked observers who were initially admitted but had to temporarily leave the courtroom from reentering. Still others who were admitted were barred by one immigration judge from leaving until adjournment, even during courtroom recesses and even for bathroom breaks. Others were blocked from attending Webex-only hearings and in multiple instances involving several judges the signage posting dockets has been absent. Since February 25, 2026, only one immigration judge has permitted court observers to observe remote master calendar hearings docketed in Minnesota.

14

And in many instances, courtroom doors continue to be locked, blocking observers from attending hearings. *See* Declaration of Amy Lange, Ex. 7. One court observer waiting in the hallway outside the courtrooms was told last fall that she was "loitering" and was ordered to leave the building. *See* Declaration of Lyndsey Marcelino Schalkwyk, Ex. 6. And, AHR is aware that similar restrictions continue to exist at other immigration courts, including at least in New York, California, Louisiana, and Virginia. *See* Declaration of Gillian Rowland-Kain, Ex. 14; Declaration of Heidi H. Phillips, Ex. 13; Declaration of Emma Wilson, Ex. 15; Acacia Center for Justice, *Restrictions on Public Access Undermine Transparency in Immigration Courts* (Dec. 2025).[10] In any event, AHR's request for injunctive relief is not moot because the violations that AHR and its staff and volunteers, as well as other immigration court observers around the country have experienced (and are experiencing), even where temporarily abated, are capable of repetition. *Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 102 (D.D.C. 2022) ("The Court concludes that Plaintiffs' claims regarding injunctive relief are not moot because they are 'capable of repetition yet evading review.'"); *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1302 (S.D. Fla. 2013) ("Voluntary cessation of challenged conduct . . . does not necessarily deprive the court of jurisdiction. When a defendant voluntarily ends the behavior that is the subject of a plaintiff's lawsuit, generally, nothing precludes that defendant from returning to its presuit ways, in the absence of a court order. As a result, a defendant 'bears a heavy burden of demonstrating that his cessation of the challenged conduct renders the controversy moot.'") (citations omitted).

---

[10] *See also* Salvador Rivera, *Court observers, volunteers cited for 'loitering' outside immigration hearings, Border Report Live* (March 2, 2026), https://www.borderreport.com/hot-topics/immigration/court-observers-volunteers-cited-for-loitering-outside-immigration-hearings/ (reporting that court observers at the San Diego immigration court may "no longer monitor hallways or be in the check in area" and that several who objected were cited for loitering).

Thus, a case involving an APA violation or any Article III injury does not automatically become moot even when a defendant suspends its challenged conduct. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 243 (2024). "In all cases, it is the defendant's 'burden to establish' that it cannot reasonably be expected to resume its challenged conduct—whether the suit happens to be new or long lingering, and whether the challenged conduct might recur immediately or at some more propitious moment." *Id.*; *see also Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 603 (1982):

> The controversy between the parties in this case is indeed "capable of repetition, yet evading review." It can reasonably be assumed that Globe, as the publisher of a newspaper serving the Boston metropolitan area, will someday be subjected to another order relying on § 16A's mandatory closure rule. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 377–378, 99 S. Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S., at 563, 100 S. Ct., at 2820 (plurality opinion). And because criminal trials are typically of "short duration," *ibid.*, such an order will likely "evade review, or at least considered plenary review in this Court." *Nebraska Press Assn. v. Stuart, supra*, 427 U.S., at 547, 96 S. Ct., at 2797. We therefore conclude that the controversy before us is not moot within the meaning of Art. III, and turn to the merits.[11]

## B.     AHR Has Standing to Assert a Claim for Relief, and AHR's Claim for Relief Is Ripe

### 1.     AHR Has Standing to Sue

To establish standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury

---

[11] The importance of this principle is illustrated by the experience of reports covering the immigration court located in Hyattsville, Maryland. Last fall, several reporters were blocked by that court from attending immigration hearings. But after they objected, the Department of Justice reversed the immigration court's actions, sent out an email reminding that immigration court hearings are "generally open to the public, including news media." Even where courtroom space is limited, it added that the media had priority access to seating. Ruby Siefken and Lillian Glaros, *Federal officials reverse Hyattsville immigration court's move to eject reporters*, Capital News Service (Nov. 3, 2025), https://marylandmatters.org/2025/11/03/federal-officials-reverse-hyattsville-immigration-courts-move-to-eject-reporters/. It seems evident that this turnaround was temporary.

16

will be redressed by a favorable decision. *Harris County, Tex. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025). AHR meets all of these requirements. As detailed herein and in the declarations submitted with its motion for a preliminary injunction, AHR has suffered an injury in fact (*i.e.*, the denial of access to immigration court proceedings in violation of federal law and the First Amendment rights of its staff and volunteers); the conduct of the named defendants, through their actions and omissions, led to AHR's injury; and a declaration and an injunction in AHR's favor will redress AHR's injury. *Dep't of Com. v. New York*, 588 U.S. 752, 766–78 (2019); *Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023) ("[W]here the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'") (citation omitted).

The conduct of the defendants has frustrated AHR's mission and forced AHR to divert its attention and resources to rectifying the violations of law. AHR has thus clearly suffered a cognizable injury, with First Amendment violations being of particular concern because AHR cannot monitor that which has already occurred in secret and which, in violation of law, it has not been permitted to see. *See, e.g.*, *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 519–20 (D. Md. 2010) ("frustration of an organization's mission" is an injury "sufficient to establish standing under Article III"); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1259–60 (2012) (citing cases and emphasizing that an organization "has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts"); *Doe v. Pub. Citizen*, 749 F.3d 246, 253 (4th Cir. 2014) ("[W]e hold that the district court's sealing order violates the public's

17

right of access under the First Amendment . . . ."); *id.* at 261 ("We conclude that the presumptive right of access to judicial documents and materials under the First Amendment and common law gives Consumers Groups an interest in the underlying litigation such that they may appeal the district court's orders disregarding their objections and depriving them of access to the information they claim a right to obtain. The district court's rejection of Consumer Groups' proffered objections to the sealing motion and pseudonymity request is tantamount to an adjudication of their rights of access."); *id.* at 263 ("The public right of access has two dimensions. First, the right protects the public's ability to oversee and monitor the workings of the Judicial Branch. . . . Second, public access to the courts promotes the institutional integrity of the Judicial Branch."). "The APA generally permits a plaintiff to sue the United States to challenge agency action to obtain 'relief other than money damages.'" *Harris County, Tex.*, 786 F. Supp. 3d at 203 (citing 5 U.S.C. § 702).

AHR's staff and volunteers are members of the public. As such, AHR, which, through these highly committed individuals, has run its Immigration Court Observation Project since 2017, has standing to assert a claim for relief. *See Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1300 (S.D. Fla. 2013) ("[W]here an organization itself has experienced an injury in fact and seeks to vindicate its own rights, it has standing to pursue claims arising out of those injuries."); *Pechter*, 441 F. Supp. at 117–18 (in a dispute pertaining to 8 C.F.R. § 246.16(a), providing that "[d]eportation hearings shall be open to the public, except that the special inquiry officer may, in his discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any special case," finding that members of the general public had standing to assert a claim for relief under that regulation; that "[t]his regulation is but one of countless manifestations of a public policy centuries old that judicial proceedings, especially those in which the life or liberty of an

18

individual is at stake, should be subject to public scrutiny, not only for the protection of the individual from unwarranted and arbitrary conviction, but also to protect the public from lax prosecution"; that "[u]nless members of the general public have standing to assert their rights under this regulation, its purpose could conceivably be defeated by a secret collusive hearing or arbitrary prosecution"; that "the office of the general counsel of INS has acknowledged in this proceeding that 'the regulation . . . in question in this case does confer an interest upon the public on which to base standing in this action'"; that "[t]he public has an independent right to be present to see that justice is fairly done"; and that "[i]t is important that our citizens be free to observe court proceedings to insure a sense of confidence in the judicial process"); *id.* at 118 ("I conclude that the plaintiffs here have standing to assert a claim for relief under 8 C.F.R. § 242.16(a).").

Because of its important, ongoing court observation work, AHR—which operates through the work of its staff and volunteers—has direct and organizational standing. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). "To establish organizational standing, Plaintiffs must make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45–46 (D.D.C. 2020) (citing *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)).

Similar to individual Article III standing, an entity seeking organizational standing must show that it suffers or will imminently suffer a concrete injury to its activities and a direct conflict between the defendant's conduct and the organization's mission. *Elec. Priv. Info. Ctr. v. FAA*, 892

19

F.3d 1249, 1255 (D.C. Cir. 2018).[12] A plaintiff must show "a predictable chain of events leading from the government action to the asserted injury" in order to establish the government action has or will cause an injury. *All. for Hippocratic Med.*, 602 U.S. at 385. That "predictable chain" is self-evident here: the restrictions on access directly interfere with AHR's ongoing Immigration Court Observation Project.

### 2. The APA Claims of AHR, Including for Violation of Federal Regulations and of the First Amendment, Are Ripe

Under the APA, to qualify for judicial review, the agency action in question must not only be final but must also be ripe for decision. The ripeness doctrine is not jurisdictional in nature, but prudential, *i.e.*, intended to preserve the court's scarce resources. "Under the ripeness doctrine, courts conduct a two-pronged inquiry that evaluates (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 775 F.Supp. 3d 100, 121 (D. D.C. 2025). If a threatened injury establishes standing because it is imminent, "the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)). "A case is fit for judicial decision [*i.e.*, ripe] when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 422 (D. Md. 2025) (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).

That ripeness test is met here. The issue presented is purely legal—do the access restrictions violate the APA? The legal nature of AHR's claims is implicit in the fact that in APA cases, the district court "acts as an appellate tribunal." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.

---

[12] *See also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, Civil Action No. 25-339 (JDB), 2025 WL 1129227, at *10–11 (D.D.C. Apr. 16, 2025).

20

3d 44, 47 (D. C Cir. 2013). And the actions at issue are, by definition, final: once access has been denied to a given hearing, the injury is immediate and irreversible.

### C.   AHR Is Entitled to a Preliminary Injunction to Protect the Right of Its Staff and Volunteers to Observe Immigration Court Proceedings

#### 1.   AHR Is Likely to Succeed on the Merits of Its Claims

##### A.   AHR Is Likely to Succeed on Count I of Its Complaint that Defendants' Restrictions on Public Access to Immigration Courts Is Arbitrary, Capricious, and Contrary to Law, Including Constitutional Right, in Violation of the APA and the DOJ's Own Regulations

A binding federal regulation—8 C.F.R. § 1003.27—expressly confers public access to immigration proceedings with only limited exceptions. That regulation, grounded in First Amendment rights, provides:

**§ 1003.27 Public access to hearings.**

*All hearings, other than exclusion hearings, shall be open to the public* except that:

(a)   Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public;

(b)   For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing.

(c)   In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

(d)   Proceedings before an Immigration Judge shall be closed to the public if information subject to a protective order under § 1003.46, which has been filed under seal pursuant to § 1003.31(d), may be considered.

8 C.F.R. § 1003.27 (italics added).

There are thus only limited circumstances in which a specific immigration court proceeding can be closed to the public. For example, *a respondent* can request that a hearing be closed to the

21

public, even though, "[i]n general, removal proceedings under § 240 of the INA are open to the public." Deborah E. Anker & Jeffrey S. Chase, Law of Asylum in the United States Appendix A § A3:18 (2025 ed.). "In such cases, the *immigration judge should ask the respondent whether he or she would like the hearing to be closed*." *Id.* (italics added). It is thus a respondent—someone facing removal from the United States—who should be consulted as to whether a removal proceeding should be closed for a specific reason where that may be authorized by law.

Under the governing federal regulation, a respondent might request a closed hearing to protect a witness or a particular person. As regards access to immigration court proceedings, the applicable regulations also provide that an immigration judge may give "preference" to "the press over the general public" if the physical facilities cannot accommodate all observers. But the immigration courtrooms at the Fort Snelling Immigration Court and around the country can accommodate both members of the press and the public, and "[b]y regulation, all hearings are required to be public" with only limited exceptions (*e.g.*, to protect witnesses, parties, victims of abuse, or information subject to a protective order). *See, e.g.,* Dizon & Dadhania, *supra* § 13:167 (Aug. 2025) (citing 8 C.F.R. § 1003.27).

In removal or bond proceedings, information can be filed under seal for "national security" purposes, but only if a sufficient, detailed showing is made by the government (with a respondent receiving an opportunity to respond). *See* 8 C.F.R. § 1003.46(a) ("In any immigration or bond proceeding, Immigration Judges may, upon a showing by the Service of a substantial likelihood that specific information submitted under seal or to be submitted under seal will, if disclosed, harm the national security (as defined in section 219(c)(2) of the Act) or law enforcement interests of the United States, issue a protective order barring disclosure of such information."); 8 C.F.R. § 1003.46(b) ("The Service may at any time after filing a Notice to Appear, or other charging

22

document, file with the Immigration Judge, and serve upon the respondent, a motion for an order to protect specific information it intends to submit or is submitting under seal. The motion shall describe, to the extent practical, the information that the Service seeks to protect from disclosure. The motion shall specify the relief requested in the protective order. The respondent may file a response to the motion within ten days after the motion is served.").

However, *blanket closure* of immigration proceedings—as has occurred at the Fort Snelling Immigration Court—plainly violates 8 C.F.R. § 1003.27 and a related regulation. *See* 8 C.F.R. § 1240.10(b) ("Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 1003.27 of this chapter."). It is a fundamental principle of administrative law that an agency is bound to follow its own lawfully promulgated regulations and apply them uniformly. *Morton v. Ruiz*, 415 U.S. 199, 231 (1974); *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

Removal proceedings might be closed in individual cases if they fall under the agency's narrow exceptions to open proceedings. But policies and procedures such as those at issue here, *i.e.*, policies that essentially amount to blanket closures, especially without an articulated basis, are both arbitrary and capricious and, as discussed *infra*, unconstitutional under the U.S. Constitution's First Amendment. *See, e.g.*, Dizon & Dadhania, *supra* § 13:167 ("The First Amendment confers a public right of access to deportation hearings. The Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the government.") (citing *Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937 (E.D. Mich. 2002), *aff'd*, 303 F.3d 681 (6th Cir. 2002)).

> **B.      AHR Is Likely to Succeed on Count IV of Its Complaint Alleging that Defendants' Restrictions on Access to Immigration Court Proceedings Violated AHR's First Amendment rights and Thus**

CORE/3515279.0007/238674693.3

**Engaged in Agency Action "Contrary to Constitutional Right, Power, Privilege, or Immunity" in Violation of the APA.**

Count IV of the Complaint alleges a violation of First Amendment rights. Compl. ¶¶ 53–55. The First Amendment—along with the common law—safeguards a presumptive right to access judicial proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577–80 (1980) (discussing the public's First Amendment right of access to judicial proceedings and observing that "the right to attend criminal trials is implicit in the guarantees of the First Amendment"); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 677–78 (3d Cir. 2019) (noting "the presumption of public accessibility" and "the common law right of access" that "begins with the presumption of access"; stating that "the strong presumption of openness inherent in the common law right of access 'disallows the routine and perfunctory closing of judicial records'"; and ruling that, on remand, the district court "should articulate 'the compelling[,] countervailing interests to be protected,' make 'specific findings on the record concerning the effects of disclosure, and provide[] an opportunity for interested third parties to be heard'").

In fact, there is a presumptive right of access unless a court makes "specific factual findings" that closure is necessary to serve an overriding interest and is narrowly tailored to serve that interest. *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz.*, 156 F.3d 940, 949 (9th Cir. 1998) (citing *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Ore.*, 920 F.2d 1466 (9th Cir. 1990)); *see also Doe v. Pub. Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014) ("[i]t is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings"; "[t]he right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny"; and "access may be restricted only if closure is 'necessitated by a compelling government interest'

24

and the denial of access is 'narrowly tailored to serve that interest'") (citations omitted).[13]

Of particular relevance, any person "excluded" from a proceeding "must be afforded a reasonable opportunity to state their objections." *United States v. Brooklier*, 685 F.2d 1162, 1167–68 (9th Cir. 1982); *see also In re The Spokesman-Rev.*, 569 F. Supp. 2d 1095, 1099 (D. Idaho 2008) ("Before the Court can order a criminal proceeding be closed: (1) those excluded from the proceeding must be afforded a reasonable opportunity to state their objections and (2) the reasons supporting closure must be articulated in findings. 'An order of closure should include a discussion of the interests at stake, the applicable constitutional principles and the reasons for rejecting alternatives, if any, to closure.'") (citing *Oregonian Pub.*, 920 F.2d at 1466).

These principles apply with equal force in the context of immigration hearings. *Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937 (E.D. Mich. 2002) is a case in point. There, members of the press and the general public brought actions against John Ashcroft, the Attorney General of the United States, seeking a declaration that the closure of removal proceedings to the press and the public violated their First Amendment right of access. After the horrific events of September 11, 2001, the U.S. Government launched an extensive investigation into the terrorist attacks and identified, questioned, and instituted removal proceedings against several non-citizens, primarily young men of Arab or Muslim background. *Id.* at 939–40. After immigration-related proceedings were closed to the press and the public, the plaintiffs in the case argued that the closure of the hearings was unconstitutional. *Id.* at 940. After the U.S. District Court found that it had jurisdiction

---

[13] Even if the government does assert an overriding interest in closure of a proceeding, that interest must be weighed against "conflicting constitutional claims" with a "presumption in favor of openness." *In re Charlotte Observer (Div. of Knight Pub. Co.)*, 882 F.2d 850, 853 (4th Cir. 1989); *see also In re Granick*, 388 F. Supp. 3d 1107, 1114 (N.D. Cal. 2019) ("If a qualified First Amendment right of access is overcome by such an 'overring interest,' the court 'must articulate this interest 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.''").

to hear the case and that "the blanket closure of the removal hearings in 'special interest' cases is unconstitutional," *id.*, the U.S. Court of Appeals for the Sixth Circuit affirmed the district court's ruling. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 711 (6th Cir. 2002).

The rulings of the U.S. District Court and the Sixth Circuit in *Detroit Free Press* are particularly instructive. First, the District Court—finding that deportation hearings "traditionally have been open to the press and public"—provided this legal analysis:

> The statutory and regulatory history of immigration law demonstrates a tradition of public and press accessibility to removal proceedings. From the start of the federal government's regulation of immigration in the last quarter of the nineteenth century, the governing statutes and regulations have expressly closed exclusion hearings (*i.e.* hearings to determine whether an alien may enter the United States), but have *never* closed deportation hearings (*i.e.* hearings to determine whether an alien already within the country may remain and, if so, under what conditions). In fact, INS regulations for almost fifty years have mandated that deportation proceedings be presumptively open. *See* 8 C.F.R. § 3.27.

*Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937, 943 (E.D. Mich. 2002) (italics in original).

The District Court then provided these reasons for ensuring openness in deportation matters:

> It is important for the public, particularly individuals who feel that they are being targeted by the Government as a result of the terrorist attacks of September 11, to know that even during these sensitive times the Government is adhering to immigration procedures and respecting individual rights. Openness is necessary for the public to maintain confidence in the value and soundness of the Government's actions, as secrecy only breeds suspicion as to why the Government is proceeding against Haddad and aliens like him. And if in fact the Government determines that Haddad is connected to terrorist activity or organizations, a decision made openly concerning his deportation may assure the public that justice has been done.

*Id.* at 944.

While finding that "[t]he press' and public's right of access to deportation proceedings, as with other types of hearings, is not absolute," the District Court stressed that courts "traditionally apply a strict scrutiny analysis." *Id.* at 944–45. The U.S. Supreme Court, the District Court emphasized, "described this analysis as follows": "'The presumption [of access] may be overcome

26

only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 945 (quoting *Press-Enter. Co.*, 478 U.S. 1, 9–10 (1986)). "Having found that the Newspaper Plaintiffs possess a First Amendment right of access to removal proceedings," the District Court emphasized, "it is clear that they will suffer irreparable injury if they are denied access to the upcoming hearings in Haddad's case." *Id.* at 947. "As the Supreme Court has held, 'even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.'" *Id.* (citations omitted).

In affirming the district court's ruling, the Sixth Circuit emphasized the importance of the First Amendment concerns at stake:

> Against non-citizens, it [the Executive Branch] seeks the power to secretly deport a class if it unilaterally calls them "special interest" cases. The Executive Branch seeks to uproot people's lives, outside the public eye, and behind a closed door. Democracies die behind closed doors. The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment "did not trust any government to separate the true from the false for us." *Kleindienst v. Mandel*, 408 U.S. 753, 773, 92 S. Ct. 2576, 33 L.E.2d 683 (1972) (quoting *Thomas v. Collins*, 323 U.S. 516, 545, 65 S. Ct. 315, 89 L.E.2d 430 (Jackson, J., concurring)). They protected the people against secret government.

*Detroit Free Press*, 303 F.3d at 683. "The Office of the Chief Immigration Judge," acting at the Attorney General's direction, it noted, had designated "certain cases to be special interest cases, conducted in secret, closed off from the public." *Id.* This, it found, was more than problematic:

> [P]ublic access helps ensure that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604, 102 S. Ct. 2613. "[A] major purpose of [the First Amendment] was to protect the free discussion of governmental affairs." *Id.* Public access to

27

deportation proceedings helps inform the public of the affairs of the government. Direct knowledge of how their government is operating enhances the public's ability to affirm or protest government's efforts. When government selectively chooses what information it allows the public to see, it can become a powerful tool for deception.

*Detroit Free Press*, 303 F.3d at 704–05; *see also id.* at 707 ("[T]he blanket closure rule mandated by the Creppy directive is not narrowly tailored. The Government offers no persuasive argument as to why the Government's concerns cannot be addressed on a case-by-case basis."); *id.* at 710 ("A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution.").

Like the directive at issue in *Detroit Free Press*, the EOIR policy changes at issue here have not been "narrowly tailored" either. On the contrary, in the government's response to AHR's January 9, 2026, letter, the government makes no assurance or guarantee of a right to access, alludes to general security concerns, and seems to suggest that immigration judges can exclude *non-party* observers from immigration matters conducted via Webex. An immigration court, however, cannot inhibit members of the press or the public from attending immigration proceedings (unless a specific exception applies and the immigration judge complies with the process for closing a particular matter), whether conducted in-person or via Webex. In fact, there is a *presumptive* right of access to those proceedings. Parties and observers, moreover, must have an opportunity to object to any closure or denial of access.

Yet, as shown by the declarations submitted by AHR, no specific factual findings have been made before restrictions such as lack of notice of proceedings and locked courtrooms and denials of access have occurred at the Fort Snelling Immigration Court or elsewhere. And when multiple respondents are appearing in succession, the decision to limit access to the proceedings beforehand means that there will be no findings specific to the individual cases. Indeed, in the court observers' experience, no explanation at all has been offered for most of the courtroom

28

closures, locked doors or bars to participation over Webex. *See* Declaration of Lyndsey Marcelino Schalkwyk, Ex. 6; Declaration of Marily Knieriemen, Ex. 9; Declaration of Amy Lange, Ex. 7; Declaration of Kathleen Burke-Scheffler, Ex. 8; Declaration of Megan Barker, Ex. 10; Declaration of Mark G. Rabogliatti, Ex. 11; Declaration of Patricia A. Bethke, Ex. 12; Declaration of Heidi D. Phipps (Sacramento immigration court), Ex. 13; Declaration of Gillian Rowland-Kain (New York immigration courts), Ex. 14; Declaration of Emma Wilson (Louisiana courts), Ex. 15. Were immigration judges allowed to restrict public access to only the parties appearing before the immigration judge, that would violate the entire purpose of the federal regulation guaranteeing *public* and *press* access to immigration proceedings.

General security concerns, absent specific factual findings, cannot overcome the public's presumptive right of access. *E.g.*, *Phoenix Newspapers, Inc.*, 156 F.3d at 950; *Oregonian Pub.*, 920 F.2d at 1467. Court observers have a right to enter and exit courthouse buildings and courtrooms within courthouses without obstruction. In fact, courts have held that the powers of federal security personnel do not extend to "tak[ing] action to disperse members of the public who are neither on nor threatening federal property." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1069 (C.D. Cal. 2025); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 832 (9th Cir. 2020) (affirming preliminary injunction prohibiting federal officers from, among other things, arresting or using physical force against a journalist or legal observer in connection with protests). The presumption of openness is especially crucial in removal or deportation cases involving non-citizens where "[t]he only safeguard on this extraordinary governmental power is the public." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) (finding that asserted national security concerns did not override the public's First Amendment access right to immigration removal proceedings). Posting signs or telling long-time court observers waiting outside

29

courtrooms that they are loitering, as has happened in Minnesota and California (see Ex. 6 and n.8) blatantly violates this principle.

In its January 20 letter responding to AHR's January 9 letter EOIR's representative stated: "[W]hen in-person access is not available, the Immigration Judge has the discretion to admit non-parties via Webex to observe a hearing that is open [to] the public." Ex. 2. But if no in-person option is available, an immigration judge has *no* discretion to pose a blanket, unexplained denial of access to all non-parties in a *public* hearing. Yet that, as the attached declarations show, is precisely what is happening. The implications of this violation are particularly acute—to give but one example—in the case of Somali nationals with pending cases in the Fort Snelling courts. As a March 12, 2026, article in the Minnesota *Star Tribune* reports (the same day AHR's complaint was filed), once the Administration's termination of Temporary Protected Status for Somali nationals became effective, the Fort Snelling court began both (1) rapidly accelerating hearings for Somali nationals with pending claims for asylum (the "rocket docket") and (2) moving all of those hearings to Webex, where "observers are rarely allowed."[14] Indeed, the article recounts, "the only public notice of these hearings is a sheet of paper pinned to a board each day in the lobby of immigration court in the Bishop Henry Whipple Federal Building." And even then, "[t]he dockets are often incomplete or inaccurate."[15] These fact-tracked, essentially secret hearings are the antithesis of the public hearings federal law requires and that AHR's court observers have a constitutional right to attend.

---

[14] Christopher Magan, *Fast-tracked asylum hearings for Somali refugees being held in secret*, Minnesota Star Tribune (March 12, 2026), https://www.startribune.com/fast-tracked-asylum-hearings-for-somali-nationals-being-held-in-secret/601595495?utm_source=gift
[15] *Id.*

Immigration court proceedings involve both procedural, "master calendar," hearings and full merits ("individual") hearings, as well as bond hearings. The propriety of any privacy- or witness-related closures is—as it should be—case specific. The applicable federal regulations simply do not permit blanket closures of the immigration courts, as has been happening at the Fort Snelling Immigration Court, even in largely procedural master calendar hearings. Court observers are entitled to attend both substantive and procedural hearings, including to observe if rules and regulations are being followed. For example, court observers are necessary to assess if proper translation services and instructions from immigration judges are being provided for those facing removal from the United States. Court observers might also become aware of instances where detainees have been denied access to counsel. This last point is more than speculation.

Denials of access to counsel by Immigration and Customs Enforcement ("ICE") were documented by AHR in another recently filed case, with a recent court order from a federal district judge in Minnesota documenting the unconstitutional denial of access to counsel for ICE detainees at the Bishop Henry Whipple Federal Building in Minnesota. *See* Order of Feb. 12, 2026 of Hon. Nancy E. Brasel, United States District Judge, *The Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, Case No. 26-CV-749(NEB/DLM), 1–2 (D. Minn. Feb. 12, 2026) ("[I]n recent weeks, ICE has isolated thousands of people—most of them detained at the Bishop Henry Whipple Federal Building—from their attorneys. Plaintiffs, who are noncitizen detainees and a nonprofit that represents noncitizens, have presented substantial, specific evidence detailing these alleged violations of the United States Constitution."). That development, which involves another violation of people's constitutional and other legal rights, only heightens the need for AHR's Court Observation Project in Minnesota and for open press and public access to immigration courtrooms

31

at Fort Snelling. Indeed, all immigration courts around the country—as required by law—must be open to the public and the press so their functioning and work can be closely monitored.

EOIR has published no notice of changes to its policies governing access to immigration courtrooms (in person or via Webex) or the hallways outside those courtrooms. But the uniform nature and timing of the restrictions on access across courtrooms in Fort Snelling and in immigration courts around the country is no coincidence. Given EOIR's direct responsibility for establishing operational policies for the nation's immigration courts, this Court may properly infer that these access restrictions—violations of the agency's own regulations—have been implemented at EOIR's direction. *See, e.g. Dept. of Commerce v. New York*, 588 U.S. 752 (2019) (rejecting as "contrived" Commerce Secretary's explanation for agency action at odds with the record). *See also Nat'l Treasury Employees Union v Vought*, 149 F.4th 762, 807 (D. C. Cir. 2025), (Pilllard, J., dissenting) *vacated and rehearing en banc granted*, No. 25-5091 (D.C. Cir. Dec. 17, 2025)  (observing that even without formal written documents final agency action is defined by the action the agency takes and that "courts may 'infer from circumstantial evidence that there's a decision.'")

The defendants have thus, collectively, violated 8 C.F.R. § 1003.27 and AHR's rights, including the constitutional rights of its staff and volunteers. The violations are clear, and these First Amendment violations demonstrate that AHR has a likelihood of success on the merits of its APA lawsuit. *E.g.*, *Neguse v. U.S. Immigr. & Customs Enf't*, ___ F. Supp. 3d ___, 2025 WL 3653597, at *11 (D.D.C. Sept. 17, 2025) (finding that "denial of access to a location to which Plaintiffs claim a right of entry upon request counts as a 'cognizable injury' for the purposes of Article III" of the Constitution, and noting—with citation to various cases—that "[t]he federal courts have historically exercised jurisdiction over disputes involving the denial of access to

32

federal property based on various claims of right"); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 710 (6th Cir. 2002) ("'When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'") (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) ("'In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis.'") (quoting *Pursing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)); *Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Ore. 2020) (finding that the plaintiffs "meet this TRO factor for their claim for right of access" claim, and ruling: "At this stage, there are at least serious questions regarding Plaintiffs' right to access, whether the government will be able to meet its burden to overcome that right to access, the federal officers' tactics directed toward journalists and other legal observers, and whether restrictions placed upon them by the Federal Defendants are narrowly tailored.").

The named defendants must enforce the applicable regulations and respect the constitutional rights of members of the press and the public. "[I]t is elementary that an agency must adhere to its own rules and regulations. Ad hoc departures from those rules, even to achieve laudable aims, cannot be sanctioned." *Reuters Ltd. v. F.C.C.*, 781 F.2d 936, 950–51 (D.C. Cir. 1986) (citing *Teleprompter Cable Sys. v. FCC*, 543 F.2d 1379, 1387 (D.C.Cir.1976)). The federal rules and regulations—as set forth above—are clear: the government must allow the public and the press to attend and observe immigration proceedings, with only limited, case-specific exceptions as specified by law.

        **C.**        **AHR Has Shown a Likelihood of Success on Counts II and III of Its Complaint to the Extent the Government Alleges That There Has Been a Change in Policy as There Has Been No Notice-and-Comment Rulemaking to Change or Repeal 8**

33

**C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b) and the Government Has Not Acknowledged or Explained Any Change in Policy**

AHR has also asserted claims in the alternative. To the extent that the government contends that there has been a change in policy and that immigration courts are no longer required to be open to the press and the public, there has been no notice-and-comment rulemaking to change or repeal the applicable regulations, *i.e.*, 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b). That itself violates the APA because the government has not observed the required procedure to change or repeal those regulations. When a rule or regulation has been adopted after prior notice and comment, as was the case with the applicable regulations here,[16] it may only be repealed, replaced or modified after affording the public the same opportunity for prior notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Consequently, AHR has shown a likelihood of success on Count II (which alleges that even if defendants' restrictions on access to immigration courts were the result of policy changes, those changes were made without observance of procedure required by law in violation of the APA). Compl. ¶¶ 47–49.

AHR has also shown a likelihood of success on Count III. Even if prior notice and comment procedures were not required to modify or repeal 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b), when an agency changes its policies, it must both (1) acknowledge the changes and (2) offer "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the government has not acknowledged the change in policy or offered reasons for the policy change, all in violation of the APA. Compl. ¶¶ 50–52.

The plainly applicable federal regulations, including 8 C.F.R. § 1003.27, have never been changed or repealed. Those regulations set forth a long-standing federal policy favoring openness

---

[16] *See* 52 F.R 2931 (1987).

34

in immigration proceedings—one grounded in First Amendment rights—that came about as a result of a notice-and-comment rulemaking many years ago. In fact, the requirement of notice and comment for federal rulemaking under the APA applies not only to the initial promulgation of a rule but also to any amendment, modification, or repeal of a rule, unless an exception applies. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). "[O]nce an agency makes a rule— that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it." *Humane Soc'y of the United States v. U.S. Dep't of Agric.*, 41 F.4th 564, 568–69 (D.C. Cir. 2022).

### 2.    AHR Is Suffering—and Is Likely to Continue to Suffer—Irreparable Harm in the Absence of Preliminary Relief

As the D.C. Circuit has stated, "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). AHR has discussed previously how the unexplained and unjustified restrictions EOIR and the immigration courts have placed on access to immigration proceedings violate AHR's First Amendment rights.

Since 2017, AHR has run its immigration court observation project, with other court observation activities also occurring around the country. This is important, labor-intensive work, and the denial of access to immigration court proceedings represents a First Amendment violation that, as a matter of law, causes irreparable harm. *See Am. Bar Assoc. v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025) ("By establishing a likelihood of success on the merits of its First Amendment claims, the ABA has established it will suffer irreparable harm in the absence of preliminary relief. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm.'") (quoting *Singh v. Berger*, 56 F.4th 88, 109 (D.C.

35

Cir. 2022)). Indeed, "[i]rreparable harm is relatively easy to establish in the context of the First Amendment because the party seeking an injunction need only demonstrate the existence of a colorable First Amendment Claim." *Assoc. Press v. Tewalt*, 780 F. Supp. 3d 1052, 1072 (D. Idaho 2025). That this principle applies in the context of immigration proceedings is plain. *See, e.g.*, *Detroit Free Press v. Ashcroft*, *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 711 (6th Cir. 2002) (noting importance under First Amendment of keeping immigration proceedings open to the public).

### 3.   The Balance of Equities Tips in Favor of AHR, as Does the Public Interest

When the government is a party, the balance of equities and the public interest factors merge. *Neguse v. U.S. Immigr. & Customs Enf't*, ___ F. Supp. 3d ___, 2025 WL 3653597, at *8 (D.D.C. Sept. 17, 2025); *Tewalt*, 780 F. Supp. 3d at 1073. Both the balance of equities and the public interest support the issuance of a preliminary injunction. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (ruling that there is "generally no public interest in the perpetuation of unlawful agency action"); *id.* (noting that there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations"); *N. Mariana Island v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations."); *Detroit Free Press*, 303 F.3d at 711 ("[T]he public's interests are best served by open proceedings. A true democracy is one that operates on faith—faith that government officials are forthcoming and honest, and faith that informed citizens will arrive at logical conclusions."); *id.* ("Today, we reflect our commitment to those democratic values by ensuring that our government is held accountable to the people and that First Amendment rights are not impermissibly compromised. Open

36

proceedings, with a vigorous and scrutinizing press, serve to ensure the durability of our democracy.").

It is, in fact, *always* in the public interest to prevent the violation of a party's constitutional rights. *Tewalt*, 780 F. Supp. 3d at 1073 (citing *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1147–48 (9th Cir. 2020)); *see also Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Ore. 2020) (same).

Much is at stake here. Not only have AHR and its staff and volunteers been unjustly deprived of their First Amendment rights, but the denials and restrictions on access to immigration court proceedings at Fort Snelling have inhibited AHR's ability to fully document the denial of access to counsel to ICE detainees and other rights violations that have been occurring in Minnesota. Under other federal regulations, individuals appearing in immigration court have the right to be informed of their right to counsel. *See* 8 C.F.R. § 1240.10(a)(1) ("In a removal proceeding, the immigration judge shall: (1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation; (2) Advise the respondent of the availability of pro bono legal services for the immigration court location at which the hearing will take place, and ascertain that the respondent has received a list of such pro bono legal services providers."). Without full access to observe immigration court proceedings, AHR cannot properly assess the treatment of ICE detainees (particularly Somali nationals whose hearings are being held largely in secret), including whether or not they have been informed of their right to retain counsel or to seek out *pro bono* legal services and—more broadly—been afforded other legal rights, including due process rights.

37

**D.     Because This Is a Public Interest Case to Vindicate Clear Violations of Federal Law, Including Constitutional Rights, No Bond (or Only a Nominal Bond of $1.00) Should Be Required**

A court has "broad discretion under Federal Rule of Civil Procedure 65(c) to decline to impose any bond" in a public interest case. *Harris County, Tex.*, 786 F. Supp. 3d at 222. Courts have found that "in public interest cases," such as this one, that either no bond or only a nominal bond may be appropriate when the risk of harm to the government is non-existent or remote. *Id.*; *see also P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (noting that the court has "the discretion to require no bond at all," and finding that where a plaintiff was "seeking to vindicate important rights under the immigration laws" that "the Court will waive the requirement for an injunction bond").

## V.     CONCLUSION

For the reasons set forth herein, the Court should grant the requested preliminary injunction and stay and order that the DOJ, the EOIR, the OCIJ (which directly oversees immigration judges immigration courts around the country), as well as the Assistant Chief Immigration Judge at the Fort Snelling Immigration Court, instruct all immigration judges to comply with 8 C.F.R. § 1003.27, 8 C.F.R. § 1240.10, and the EOIR Immigration Court Practice Manual. As part of the declaratory and injunctive relief to be granted, the Court should require that any U.S. immigration judge state on the record in any proceeding that the immigration judge contemplates closing, and before closing any such hearing to the public, the specific legal basis that is being asserted by that immigration judge for each closure of an immigration proceeding or immigration-related matter, with specific reference to any assertedly applicable legal authority. Before finalizing any decision to close an individual hearing to the public, the Immigration Judge should further offer attendees, including court observers, a meaningful opportunity to be present and to state any objections on

38

the record that they may have to closure.[17] Finally, the Court should direct immigration judges that they may not place unreasonable conditions on attendance by the public, such as conditioning access on the attendee's agreement to remain present for the entire hearing or be barred reentry or barring peacefully assembled court observers from waiting in the hallways outside courtrooms.

A blanket closure of immigration proceedings to the public as well as unreasonable conditions on attendance are contrary to law, including applicable federal regulations and the First Amendment, and a preliminary injunction should be issued to protect the right of the public and the press to observe and monitor immigration matters. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 707 (6th Cir. 2002) (finding that an immigration judge "failed to make specific findings before closing . . . deportation proceedings," and further emphasizing that a "blanket closure rule . . . is not narrowly tailored"); *id.* at 683 ("The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment 'did not trust any government to separate the true from the false for us.' They protected the people against secret government.") (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 773 (1972) (quoting *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring)).

---

[17] The importance of this protection is underscored by an incident that occurred after the filing of the complaint. On March 17, 2026, an AHR court observer was permitted to log onto a Webex asylum hearing. But the immigration judge then explained that he would close the hearing if either side objected to the presence of an observer, which the DHS attorney then did, invoking 8 C.F.R. § 1208.6, which bars EOIR from disclosing the existence of an asylum application to third parties without the applicant's written consent. Under the proposed order, however, the observer would have been able to point to subsection (c) of that regulation, which expressly exempts "the adjudication of asylum applications" from the confidentiality requirement. And, if the immigration judge still chose to close the hearing, the judge would have been required to provide an on the record explanation.

39

40

Dated: March 19, 2026

Respectfully submitted,

STINSON LLP

*/s/ Kathleen Parnow*
Harvey Reiter, No. 232942
Brandon Nagy, No. 1024717
Kathleen Parnow, No. 90041785
1775 Pennsylvania Ave, N.W., Suite 800
Washington, DC 20006
Tel. (202) 728-3016
harvey.reiter@stinson.com
brandon.nagy@stinson.com
katie.parnow@stinson.com

CORE/3515279.0007/238674693.3