**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>PAMELA BONDI, in her official capacity as )<br>Attorney General, *et al.*,  )<br><br>Defendants.  ) | Civil Action No. 1:26-00865-RC |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND STAY**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   I.   IMMIGRATION HEARINGS AND PUBLIC ACCESS ................................................. 2

   II.  PLAINTIFF AND THE FORT SNELLING IMMIGRATION COURT ........................... 4

   III. PROCEDURAL HISTORY.................................................................................... 7

LEGAL STANDARD......................................................................................................... 8

ARGUMENT ................................................................................................................... 8

   I.   PLAINTIFF DOES NOT FACE IRREPARABLE HARM ............................................. 8

   II.  PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS................................ 12

       A.    Plaintiff Lacks Standing to Obtain the Preliminary Injunction Sought ................ 12

       B.    Plaintiff's APA Claims Fail Because Plaintiff Does Not Challenge Discrete and Final Agency Action ...................................................................................... 15

           1.   Claims regarding operations at Fort Snelling................................................ 15

           2.   Claims regarding an illusory policy change .................................................. 18

       C.    Plaintiff Fails to Show Any Substantive APA Violation..................................... 20

           1.   Defendants have not acted contrary to 8 C.F.R. § 1003.27.......................... 20

           2.   Plaintiff has not been deprived of any First Amendment right ...................... 21

               a.   The First Amendment does not mandate a right of access to Executive Branch proceedings.............................................................. 22

               b.   Even if the First Amendment applies, Plaintiff has failed to show any violation of any right of access at Fort Snelling ........................... 24

   III. THE REMAINING FACTORS MILITATE AGAINST PRELIMINARY RELIEF....... 25

   IV. PLAINTIFF'S REQUESTED INJUNCTION IS OVERBROAD BECAUSE IT WOULD SWEEP NATIONWIDE .................................................................................. 26

V.  PLAINTIFF SHOULD BE REQUIRED TO GIVE SECURITY AS TO ANY
    INJUNCTION..................................................................................................... 27

CONCLUSION...................................................................................................................... 28

**TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Alsaidi v. U.S. Dep't of State*,
292 F. Supp. 3d. 320 (D.D.C. 2018) .................................................................................. 19

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ............................................................................................. 23

*\*Bark v. United States Forest Service*,
37 F. Supp. 3d 41 (D.D.C. 2014) ....................................................................................... 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ............................................................................................ 9

*\*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................................. 13, 14, 15

*City of New York v. U.S. Dep't of Defense*,
913 F.3d 423 (4th Cir. 2019) ............................................................................................. 17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................................... 13

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ...................................................................................... 18, 20

*Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ........................................................................................................... 16

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Justice*,
331 F.3d 918 (D.C. Cir. 2003) ...................................................................................... 22, 23

*Davis v. Billington*,
76 F. Supp. 3d 59 (D.D.C. 2014) ......................................................................................... 8

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ......................................................................................... 23, 25

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) ................................................................................................. 8

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ................................................................................................... 18

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir. 2019) ....................................................................................................... 8

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ................................................................................................. 15

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ..................................................................................................................... 22

*In re Guantanamo Bay Detainee Litig.*,
  624 F. Supp. 2d 27 (D.D.C. 2009) ........................................................................................... 23

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ................................................................................................. 16

*Jersey Media Grp., Inc. v. Ashcroft*,
  308 F.3d 198 (3d Cir. 2002)...................................................................................................... 25

*\*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)................................................................................................... 16, 17, 19

*Make the Rd. N.Y. v. Noem*,
  No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025).................................................... 27

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)..................................................................................................................... 8

*McBurney v. Young*,
  569 U.S. 221 (2013)................................................................................................................... 22

*McKathan v. U.S. Dep't of Homeland Sec.*,
  No. 22-CV-1865 (DLF), 2024 WL 1344434 (D.D.C. Mar. 29, 2024) ...............................22-23

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................................................. 12

*Nat'l Treasury Emps. Union v. Trump* ("*NTEU*"),
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ............................................. 27, 28

*Nat'l Treasury Emps. Union v. Yeutter*,
  918 F.2d 968 (D.C. Cir. 1990).................................................................................. 26

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) ........................................................................... 9

*Neguse v. U.S. Immigr. & Customs Enf't*,
  No. 25-CV-2463 (JMC), 2025 WL 3653597 (D.D.C. Dec. 17, 2025) ...................................... 27

*Nken v. Holder*,
  556 U.S. 418 (2009).......................................................................................... 25

*Norton v. S. Utah Wilderness All. ("SUWA")*,
  542 U.S. 55 (2004)........................................................................................... 16

*O'Shea v. Littleton*,
  414 U.S. 488 (1974).......................................................................................... 14

*Pennsylvania v. DeVos*,
  480 F. Supp. 3d 47 (D.D.C. 2020) ............................................................................. 8

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
  60 F. Supp. 3d 14 (D.D.C. 2014).............................................................................. 19

*Postsecondary Sch. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................................ 9

*Powers v. Ohio*,
  499 U.S. 400 (1991).......................................................................................... 26

*Press-Enter. Co. v. Superior Ct. of Cali. for Riverside Cty.*,
  478 U.S. 1 (1986)......................................................................................... 22, 24

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980).......................................................................................... 24

*Rizzo v. Goode*,
  423 U.S. 362 (1976).......................................................................................... 15

*Rodriguez v. U.S. Dep't of the Air Force*,
  387 F. Supp. 3d 130 (D.D.C. 2019) ........................................................................... 19

*Sierra Club v. EPA*,
  793 F. Supp. 3d 158 (D.D.C. 2025) ........................................................................... 12

*Taylor v. Resolution Tr. Corp.*,
    56 F.3d 1497 (D.C. Cir. 1995) ...................................................................... 13

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) .......................................................................... 26, 27

*W. Watersheds Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) .................................................................. 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 8, 9

## STATUTES

5 U.S.C. § 551(13) ................................................................................. 16, 19

5 U.S.C. § 704 ....................................................................................... 16

## FEDERAL RULES

Fed. R. Civ. P. 65(c) ............................................................................. 27, 28

Fed. R. Crim. P. 53 ................................................................................. 10, 14

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

8 C.F.R. § 1003.10(A) ................................................................................... 2

*8 C.F.R. § 1003.27 ............................................................................... *passim*

8 C.F.R. § 1208.6(a) .................................................................................... 3

8 C.F.R. §§ 1003.0, 1003.1(a)(1) ....................................................................... 2

## OTHER AUTHORITIES

U.S. Department of Justice, *Fort Snelling Immigration Court* (updated Feb. 27, 2026),
    https://www.justice.gov/eoir/fort-snelling-immigration-court ...................................... 4

Uniform Docketing System Manual (rev. Feb. 2021),
    https://www.justice.gov/eoir/reference-materials/UDSM122020/dl ................................... 2

EOIR, *Fact Sheet: Observing Immigration Court Hearings* (Feb. 2026),
    https://www.justice.gov/eoir/media/1416861/dl?inline ............................................ 3

**INTRODUCTION**

Plaintiff is a non-profit organization that deploys staff and volunteers to observe Executive Office for Immigration Review (EOIR) Immigration Court hearings in Fort Snelling, Minnesota. Over the past year, Plaintiff has accumulated a litany of grievances about the way particular Immigration Judges, court staff, and guards are acquitting their duties at that court. Plaintiff attempts to stitch these various incidents into a set of Administrative Procedure Act (APA) claims against the Defendant agency and officials to allege a purported pattern of denying public access to Immigration Court. Plaintiff now moves for preliminary injunctive relief and a stay pursuant to section 705 of the APA, arguing that immediate relief is necessary to forestall irreparable harm to First Amendment interests.

Plaintiff's motion for preliminary injunction should be denied, however, because Plaintiff fails to meet any aspect of the stringent preliminary injunction test. Plaintiff has not shown that it faces the imminent prospect of irreparable harm in the absence of preliminary relief; it has not shown any past action by Defendants contrary to EOIR regulation or the constitution, nor any basis to say that Plaintiff is at risk of imminent constitutional violations in the future. For similar reasons, Plaintiff lacks standing to pursue prospective relief. And on the merits, Plaintiff is unlikely to succeed because it cannot use the vehicle of an APA lawsuit to bring before the Court an expansive challenge to the way the Fort Snelling Immigration Court is being run. That is particularly true where Plaintiff fails to point to any way in which Defendants are violating the EOIR regulation on public access or the First Amendment. The APA only permits judicial review of discrete and final agency action in violation of law, not claims seeking wholesale reform of a particular institution or program. Plaintiff's APA claims—and thus its request for preliminary relief—fail. Plaintiff's Motion for Preliminary Injunction and Stay, ECF No. 6, should be denied.

## BACKGROUND

### I.    IMMIGRATION HEARINGS AND PUBLIC ACCESS

EOIR is an agency within the Department of Justice with the primary mission of adjudicating immigration cases and appeals for individuals placed in immigration proceedings. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate review, and administrative hearings.  *See* 8 C.F.R. §§ 1003.0, 1003.1(a)(1). Immigration Judges are "attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings," 8 C.F.R. § 1003.10(a), including "removal, deportation, exclusion, and other kinds of proceedings," EOIR Policy Manual Part II, Ch. 3.1 (updated Feb. 10, 2026);[1] *see also* Uniform Docketing System Manual at I-1–6 (rev. Feb. 2021)[2] (describing "twelve principal types of immigration proceedings conducted by the immigration courts").  The "vast majority of proceedings conducted by Immigration Judges are removal proceedings."  EOIR Policy Manual Part II, Ch. 6.1.

The most common types of hearings in Immigration Court are master calendar hearings, individual calendar or merits hearings, and custody redetermination or bond hearings.  A master calendar hearing is held for the purpose of entering pleadings, discussing scheduling, and resolving "other similar matters."  *Id.* Part II, Ch. 3.14(a).  The hearing also informs the respondent about the charges and factual allegations against them and advises them of various rights they possess. *Id.* Part II, Ch. 3.14(e).  Individual calendar hearings, also known as merits hearings, are "evidentiary hearings on contested matters," such as "challenges to removability and applications for relief."  *Id.* Part II, Ch. 3.15(a).  And bond hearings involve requests by respondents to have

---

[1] Available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm.
[2] Available at https://www.justice.gov/eoir/reference-materials/UDSM122020/dl.

"an immigration court . . . redetermine the bond" imposed by the Department of Homeland Security to assure the respondent's appearance at proceedings. Uniform Docketing System Manual at I-2–3.

As a general matter, immigration court hearings are open to the public. *See* 8 C.F.R. § 1003.27. Nonetheless, numerous exceptions to public access exist. *Id.* Immigration Judges have discretion to limit attendance or hold a closed hearing for the "purpose of protecting witnesses, parties, or the public interest." *Id.* § 1003.27(b). They may also "place reasonable limitations upon the number [of persons] in attendance" based on the limitations of the "physical facilities" of the court. *Id.* § 1003.27(a). Hearings "concerning an abused alien child" must be closed to the public and hearings involving an "abused alien spouse" shall be closed unless the abused individual agrees that the hearing may be open. *Id.* § 1003.27(c). Hearings are also closed where information subject to a protective order will be discussed. *Id.* § 1003.27(d). And hearings are closed in various other instances where required by law. *See, e.g.*, 8 C.F.R. § 1208.6(a), 1240.11(c)(3)(i) (describing restrictions on the disclosure of information about asylum applications and applicable procedures in evidentiary hearings regarding them).

Immigration court hearings are generally held in person but may also be conducted by video or telephone conference. *See* EOIR Policy Manual Part II, Ch. 3.6(a). Nonetheless, members of the public "should observe in person at the courtroom in which the hearing is scheduled and held." EOIR, *Fact Sheet: Observing Immigration Court Hearings* (Feb. 2026).[3] Immigration Judges have discretion to permit non-parties to attend hearings remotely, discretion that Plaintiff acknowledges has been repeatedly used to permit observers' remote attendance at hearings in the Fort Snelling Immigration Court. *See infra*.

---

[3] Available at https://www.justice.gov/eoir/media/1416861/dl?inline.

## II.    PLAINTIFF AND THE FORT SNELLING IMMIGRATION COURT

Plaintiff is a "non-profit organization headquartered in Minneapolis, Minnesota, that, among other activities and functions, regularly monitors the operation of" the Fort Snelling Immigration Court in Minnesota.  Compl. ¶ 14, ECF No. 1.  Plaintiff's "volunteers and staff have observed and documented removal and bond proceedings" at the court since 2017.  *Id.* ¶ 2.  Plaintiff alleges that "[s]ince early 2025," its access to hearings has "at times" been "limited or completely blocked."  *Id.* ¶ 4.

The Fort Snelling Immigration Court is located in the Bishop Henry Whipple Federal Building near Minneapolis–St. Paul, Minnesota.  Currently, the court is supervised by an Assistant Chief Immigration Judge and staffed by six additional Immigration Judges.  U.S. Department of Justice, *Fort Snelling Immigration Court* (updated Feb. 27, 2026), https://www.justice.gov/ eoir/fort-snelling-immigration-court.  The court has an incredibly busy docket.  Between March 1, 2025, and February 28, 2026—the period of time at issue in Plaintiffs' motion—the Fort Snelling Immigration Court conducted approximately 47,248 hearings.  Ex. A, Margolin Declaration ¶ 8.  The lowest amount in any month over this period was 2,881 (in December 2025) and the highest was 4,670 (in July 2025).  *Id.*   Additionally, as Plaintiff acknowledges, the Whipple Federal Building has been the site of significant protest activity in recent months.  Pl.'s Mot. at 8.

To support its request for preliminary relief, Plaintiff submits declarations from seven AHR volunteers and one staff member, each of whom testifies that they observe immigration court hearings at Fort Snelling on a monthly basis, generally on a handful of occasions each month.  Pl.'s Mot. Exs. 6–13, ECF No. 6-1.

Plaintiff's declarants allege a litany of purported problems with the operation of the Fort Snelling Immigration Court, which take many forms.  To begin, Plaintiff asserts that in-person

hearings were closed to observers on a small number of occasions, largely between August and December 2025, without clear explanation as to why.  Pl.'s Mot. Ex. 7, Lange Decl. ¶¶ VIII, XIII; Pl.'s. Mot. Ex. 8, Hollenbeck Decl. ¶ IV; Pl.'s Mot. Ex. 9, Scheffler Decl. ¶ IV; Pl.'s Mot. Ex. 10, Knieriemen Decl. ¶¶ III–VIII; Pl.'s Mot. Ex. 11, Barker Decl. ¶¶ II–VII; Pl.'s Mot. Ex. 12, Rabogliatti Decl. ¶ IV.  Although these allegations do involve a denial of access to hearings for the declarants on these specific occasions, Plaintiff provides no evidence to indicate that such closures were contrary to EOIR's regulation regarding hearing closures or pursuant to a change to that regulation.  At most, two declarants contend that a hearing was closed despite respondent's counsel having lodged no objection to opening.  Lange Decl. ¶ XIII; Knieriemen Decl. ¶ VI.  An immigration hearing may be closed, however, for various reasons at the court's discretion, regardless of the respondent's views.  8 C.F.R. § 1003.27(b).  In some of these instances, Plaintiff also claims that courtroom doors were locked improperly.  Plaintiff again fails to present any evidence to say that such instances involved any improper closure of an open hearing.

The remaining categories of grievances about in-person hearings do not involve any apparent denial of access at all.  Plaintiff points to various instances in which hearings were open for entry and exit only at their outset or during recesses.  Scheffler Decl. ¶ III; Lange Decl. ¶¶ XII, XVII.  Plaintiff's declarants complain that, although such instances did not prevent them from attending court, that these practices inconvenience hearing attendees or deny access to individuals arriving late.  Even further afield, one declarant merely points to hearsay of unidentified AHR members that an Immigration Judge was critical of individuals entering and exiting hearings during April 2025.  Lange Decl. ¶ IV.  Plaintiff also points to two instances in which AHR members were told to leave the courtroom lobby area by guards if they were not going to step into a hearing.  Pl.'s Mot. Ex. 6, Schalkwyk Declaration; Lange Decl. ¶ XI.  And Plaintiff criticizes the court

staff's maintenance of posted docket sheets and signage at courtrooms, contending that in a few instances observers were not provided adequate notice of hearings or were misled by outdated signs into believing that a hearing was closed.  Lange Decl. ¶¶ XVI, XVIII.

Plaintiff also raises various grievances about their ability to attend hearings remotely, including via the platform Webex.  Lange Decl. ¶¶ V, VII, X, XIX, XX, XXIII; Hollenbeck Decl. ¶ III; Rabogliatti Decl. ¶ III.  It is not clear what to make of these assertions, however, as Plaintiff often provides little detail about the circumstances of the alleged access denials.  For example, in some instances, Plaintiff's declarants do not specify whether these were virtual-only hearings or whether, instead, in-person attendance was permitted.  Lange Decl. ¶ XXIII (asserting that 70 master calendar hearings occurred on March 3, 2026, without remote observation permitted via Webex, but not specifying whether such hearings had an option for in-person attendance).  And although Plaintiff presents hearsay that one court staff person said in July 2025 that Webex hearings cannot be attended by observers, Lange Decl. ¶ X, Plaintiff's complaint admits that "immigration judges have permitted some observers to attend some hearings in person that are also streamed on Webex."  Compl. ¶ 43.  That includes their admission that remote attendance has been permitted by at least one judge in recent weeks.  Lange Decl. ¶ XXII (stating an observer attended five remote master calendar hearings on February 25, 2026).  Even where Webex hearings were inaccessible, *see* Lange Decl. ¶¶ XIX, XX (referencing "Webex only" hearings), Plaintiff's declarants provide no basis to say why they were not permitted to attend a hearing, including whether the hearing was closed pursuant to applicable regulations or whether technical limitations made admission impossible or impracticable.

Notably, Plaintiff's recitation of grievances acknowledges numerous instances where access was permitted for AHR observers and where Defendants' employees reiterated the agency's

6

policy in favor of access to immigration proceedings. The Lange Declaration, for example, quotes an EOIR employee as stating on July 2, 2025, that "immigration hearings are open" and that "observers don't need permission to enter." Lange Decl. ¶ IX. It also states that one of the Immigration Judges permitted an observer to attend five master calendar hearings remotely on February 25, 2026. Lange Decl. ¶ XXII. And Plaintiff claims that their subjective perception of access issues has ebbed and flowed over time. For example, Plaintiff contends that they perceived greater access following a January 9, 2026, letter that Plaintiff sent to EOIR, although Plaintiff alleges its access worsened to some extent thereafter. Pl.'s Mot. at 13; Compl. ¶ 43. More broadly, the scant instances of closed hearings identified by Plaintiff's declarants pales in comparison to the *tens of thousands* of immigration hearings conducted at Fort Snelling over the year that Plaintiff's declarations cover. *See* Margolin Decl. ¶ 8.

Plaintiff lastly submits certain letters and declarations regarding events at immigration courts in California, New York, and Louisiana. Pl.'s Mot. Exs. 4, 5, 14–16, ECF No. 6-1. None of these materials come from Plaintiff's volunteers or staff and Plaintiff does not articulate any connection between itself and the people and organizations that signed these materials.

### III. PROCEDURAL HISTORY

Plaintiff filed this lawsuit on March 12, 2026, alleging four claims under the Administrative Procedure Act. Counts I and IV assert that the "restrictions on courtroom access described in the prior paragraphs of this complaint" collectively violate the Administrative Procedure Act because they are purportedly inconsistent with 8 C.F.R. § 1003.27 and the First Amendment. Compl. ¶¶ 45–48, 55–57. Counts II and III raise procedural issues in the alternative. These counts assume that a new policy regarding immigration court access has been promulgated by Defendants and contend that such new policy was unlawfully issued without notice and comment rulemaking or

an adequate explanation for the change in policy.  Compl. ¶¶ 49–54.

A week later, Plaintiff filed its motion for preliminary injunction and stay under section 705 of the APA.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such a request involves the exercise of a very far-reaching power that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted); *Davis v. Billington*, 76 F. Supp. 3d 59, 63 (D.D.C. 2014). The moving party must demonstrate all of the following factors by "*a clear showing*": (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the moving party; and (4) preliminary relief serves the public interest.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). The same factors also govern Plaintiff's request for a stay under Section 705 of the APA. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

### ARGUMENT

Plaintiff's motion for preliminary injunctive relief should be denied because (1) Plaintiff has not shown that it will suffer irreparable injury, (2) Plaintiff has not shown a likelihood of success on the merits, and (3) the remaining preliminary injunction factors weigh against Plaintiff's request.  Plaintiff's requested injunction should also be denied as overbroad.

### I.    PLAINTIFF DOES NOT FACE IRREPARABLE HARM

The Court should deny Plaintiff's demand for preliminary injunctive relief first because Plaintiff has failed to establish that such relief is necessary to avoid irreparable harm.

8

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98; *see also Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512–13 (D.D.C. 2018). Plaintiff has not made this showing.

Plaintiff contends simply that it meets the irreparable injury test by alleging violation of its alleged First Amendment right of access. Pl.'s Mot. at 35–36. But "the mere assertion of a constitutional violation is not sufficient to establish irreparable injury." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 173 (D.D.C. 2018). Rather, "the Court must consider whether the movant has established that it 'is likely to suffer [that] harm'—that is, the constitutional injury—'in the absence of preliminary relief.'" *Id.* (quoting *Winter*, 555 U.S. at 20).

Plaintiff has fallen far short of satisfying this burden. Plaintiff points to a small number of instances over a year period where its staff or volunteers could not attend immigration hearings because the hearings were closed or otherwise inaccessible. *See supra* pp. 4–5. To begin, that number is a tiny proportion of the tens of thousands of hearings occurring at the Fort Snelling Immigration Court over the same timeframe, rendering the basis for sweeping injunctive relief highly suspect. *See* Margolin Decl. ¶ 8. But regardless, Plaintiff articulates no basis to say that any such closures it has identified were contrary to EOIR regulations, even though those regulations permit numerous circumstances in which immigration hearings may be closed to the public. Indeed, Plaintiff acknowledges significant unrest over the past year around the Whipple Federal Building, Pl.'s Mot. at 8, providing one obvious explanation for why certain hearings may

9

have been closed or doors locked.  8 C.F.R. § 1003.27(b) (hearing may be closed for the "purpose of protecting witnesses, parties, or the public interest").  Plaintiff necessarily concedes that EOIR's regulation on public access—8 C.F.R. § 1003.27—is consistent with the First Amendment where Plaintiff seeks relief that would specifically instruct Defendants to comply with that regulation. *See* Proposed Order at 7, ECF No. 6-2 (asking the Court to enjoin Defendants from closing proceedings "absent compliance with . . . 8 C.F.R. § 1003.27").  Plaintiff cannot show irreparable harm on the basis of court access denials where it has not demonstrated that those denials were inconsistent with the very legal rules it seeks to enforce.

Nor does Plaintiff show any unlawful denial of access to hearings by its reference to observers' inability to attend hearings remotely.  *See supra* p. 6.  Plaintiff largely fails to identify whether the remote hearings at issue were accessible by in person attendance, despite their acknowledgment that "immigration judges have permitted some observers to attend some hearings in person that are also streamed on Webex."  Compl. ¶ 43.  And it is of course entirely consistent with the First Amendment, even in federal criminal judicial proceedings, to provide in person rather than remote access.  *Cf.* Fed. R. Crim. P. 53 (generally prohibiting the "broadcasting of judicial proceedings from the courtroom" in criminal matters).  As to any fully remote hearings to which Plaintiff's representatives were denied access, Plaintiff does not provide any clear basis to say that such denial violated applicable law.

Moreover, precious few of the grievances raised by Plaintiff's declarants involve any denial of access to hearings at all or, at minimum, any denials of constitutional rights.  For example, there is no basis to say that the First Amendment is violated where court observers must arrive on time or only enter and exit during court recess.  *See* Scheffler Decl. ¶ III; Lange Decl. ¶¶ XII, XVII.  Nor does Plaintiff have a First Amendment right to occupy any particular part of the Whipple

10

Federal Building when they are not in an immigration hearing.  *See* Schalkwyk Declaration; Lange Decl. ¶ XI.  And Plaintiff has no basis to say that the First Amendment exists to micromanage the way in which immigration court staff maintain signage at the court.  *See* Lange Decl. ¶¶ XVI, XVIII.  Finally, Plaintiff's contentions about the manner in which guards have acquitted their duties—such as requests they have made for people to leave certain locations or their actions in locking doors—do little to show irreparable harm caused by *Defendants*.  The Department of Homeland Security's Federal Protective Service, "not EOIR," "controls access to the buildings where immigration courts are located, as well as security within EOIR's space."  Margolin Decl. ¶ 6.  Plaintiff has sued EOIR, not DHS.

Plaintiff also has not raised any basis to say that there is a "certain and great" risk that its First Amendment rights will be curtailed in the future.  Plaintiff's filings repeatedly acknowledge that its members continue to have access to immigration court hearings at Fort Snelling, whether in person or via remote access.  *Supra* pp. 6–7.  And the Director of EOIR has recently reaffirmed, in a message sent to all EOIR personnel, that presumptive public access remains the agency's policy. Margolin Decl. Ex. 2.  Plaintiff's smattering of alleged past incidents, occurring over many months and representing a tiny fraction of the overall total of immigration hearings at Fort Snelling, do not suffice to say that Plaintiff's members will be denied access in violation of the First Amendment moving forward.  In a striking example of the tenuous basis for irreparable harm here, Plaintiff's motion preemptively argues that its claims are not moot and recognizes that its subjective view of the state of access at Fort Snelling improved to some extent early this year. Pl.'s Mot. at 14–15.  Whatever may be said as to the mootness issue, that Plaintiff felt the need to make this point is a powerful indication that there is no imminent irreparable harm requiring preliminary relief.

11

Finally, Plaintiff's long delay in seeking relief underscores the failure to show irreparable injury.  Plaintiff filed this lawsuit in early March 2026.  The series of events at issue in the Complaint and motion, however, extend back for approximately a *year* as Plaintiff forthrightly recognizes.  Pl.'s Mot. Ex. 2 at 3 (stating that Plaintiff has encountered "access issues" "since early 2025").  Moreover, most of the specific hearing closures raised in Plaintiff's declarations occurred last summer and fall.  And Plaintiff raised its concerns in a letter sent to EOIR on January 9, 2026. *Id.*  Thus, Plaintiff waited over two months to move for a preliminary injunction from the date of its letter regarding court access and waited many months more beyond most of the events giving rise to Plaintiff's claims.  That falls far short of demonstrating the kind of urgency that ordinarily accompanies a genuine showing of irreparable harm warranting preliminary relief.  For example, this Court and others have held far more modest delays to be "inexcusable" and in "tension with the high bar [a plaintiff] must clear to establish irreparable harm." *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (finding a 100-day delay in seeking injunctive relief to cut against a showing of irreparable harm); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months "militate[d] against a finding of irreparable harm").

## II.     PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiff's motion should also be denied because Plaintiff is unlikely to succeed on the merits of its claims.  The defects presented on the face of Plaintiff's papers go to the Court's jurisdiction, the justiciability of Plaintiff's claims under the APA, and the merits.

### A.     Plaintiff Lacks Standing to Obtain the Preliminary Injunction Sought

First and foremost, the Court lacks jurisdiction to enter the requested preliminary relief because Plaintiff lacks standing to seek prospective relief.

A plaintiff seeking prospective equitable relief must establish imminent future harm to themselves, regardless of whether they suffered any past harm cognizable under Article III.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  Thus, even when a plaintiff has suffered a concrete past injury, a plaintiff must show a significant likelihood that it will be injured again in the immediate future.  *Cf. Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin.").  Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff herself will suffer it.  *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (standing requires that "threatened injury must be *certainly impending*" and not merely "*possible*").

Here, for largely the same reasons that it fails to establish irreparable injury, Plaintiff has failed to show that Plaintiff or its members face a real or immediate threat of harm sufficient to support standing for injunctive relief.

The facts and reasoning of *Lyons* are instructive here.  *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation.  In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened.  The Supreme Court held that the plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm:

> That Lyons may have been illegally choked by the police . . ., while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). *Lyons* concluded that to demonstrate a real and immediate threat of injury, the plaintiff would have to show either a consistent practice, always followed by all officers, that violated his rights, or an official policy prescribing that practice. *See Lyons*, 461 U.S. at 106 (requiring that he show "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner").

Plaintiff here has come up short in the same manner that the plaintiff did in *Lyons*. In comparison to the more than 47,000 hearings occurring in the last year at Fort Snelling, Plaintiff presents a small number of asserted one-off errors by individual Immigration Judges and court staff, not any official policy or consistent practice. Plaintiff points to no authoritative document categorically precluding access to *any* kind of immigration hearing nor any consistent practice precluding access. Perhaps the best Plaintiff can muster concerns their asserted inability to attend hearings remotely via Webex, which they claim has happened numerous times in recent months. Lange Decl. ¶¶ XXII, XXIII. But even here, Plaintiff concedes various instances where they *have* been able to attend hearings via Webex. *See* Lange Decl. ¶ XXII. And Plaintiff provides insufficient basis to say that (1) they could not have attended many of these hearings in person and (2) where they could not, that such hearings were not properly closed pursuant to section 1003.27. Of course, insofar as Plaintiff is arguing that any First Amendment right of access mandates the ability to attend hearings remotely, that argument must fail. Were it otherwise, Federal Rule of Criminal Procedure 53, which prohibits photographs and broadcasting of criminal judicial proceedings, would be unconstitutional.

14

Plaintiff also cannot support standing by the vague assertion that Plaintiff has adopted a new restrictive court access policy. Article III requires "more than a nebulous assertion of the existence of a policy"—the plaintiff must "not only demonstrate its existence but also that [he is] likely to be subjected to the policy again." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). In *Haase*, the D.C. Circuit held, based on the complaint before it, that the plaintiff lacked standing to seek declaratory relief predicated on an alleged government policy of subjecting travelers from Nicaragua to intrusive border searches. *Id.* at 903, 905. The plaintiff had produced an affidavit recounting other travelers' experiences of being searched, newspaper articles describing past searches, and his own affidavit describing his intent to travel to Nicaragua. *Id.* at 905. Nonetheless, the court of appeals described the plaintiff's allegations and evidence as "exceedingly weak," and remanded the case for the plaintiff to amend his pleadings. *Id.* at 908. The same weakness applies to Plaintiff's assertions of an unidentified court access policy. And it is not enough to say, as *Lyons* makes clear, that allegedly improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiffs' constitutional rights will be violated again. 461 U.S. at 105–06, 108; *see also Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive relief based on twenty constitutional violations "occurring at large in a city of three million inhabitants"). In sum, Plaintiff lacks standing to obtain preliminary relief.

### B. Plaintiff's APA Claims Fail Because Plaintiff Does Not Challenge Discrete and Final Agency Action

#### 1. Claims regarding operations at Fort Snelling

Plaintiff's claims, all pleaded pursuant to the APA, are premised on an array of alleged instances where individuals at the Fort Snelling Immigration Court purportedly failed to comply with 8 C.F.R. § 1003.27 and the First Amendment. Plaintiff for example complains that individual judges have closed hearings they should not have, that court staff and DHS guards have locked

15

doors and poorly maintained signage, and that individual judges and staff have curtailed remote access to various hearings.  Plaintiff's contention that these events show any deviation from the requirements of 8 C.F.R. § 1003.27 is dubious, as discussed elsewhere herein.  But as a threshold matter, this laundry list of alleged mistakes, assuming they occurred, cannot form the basis of an APA claim.

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency."  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). The APA instead permits review of only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  Identifying a reviewable action is thus "necessary . . . for stating a claim under the APA."  *Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990), which "precludes" courts from considering "broad programmatic attack[s]" on agency operations, *SUWA*, 542 U.S. at 64.  In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations

or "wholesale correction" of agency conduct. *Lujan*, 497 U.S. at 891, 893, 894, 899. Courts would otherwise be impermissibly enmeshed in pervasive oversight of an agency's "day-to-day operations," *see id.*, requiring them to "adjudicate generalized grievances" with "an agency's performance." *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019); *see also id.* ("Courts are well-suited to reviewing specific agency decisions," like "rulemakings, orders or denials." They "are woefully ill-suited, however, to adjudicate generalized grievances" that ask "to improve an agency's performance or operations."). The APA's discrete-action requirement keeps courts "from entering such a quagmire." *Id.*

Instead of challenging discrete action, Plaintiff's claims pursue a broad programmatic challenge to the administration of the Fort Snelling Immigration Court, and indeed all EOIR Immigration Courts across the country. Proposed Order at 9 (seeking relief as to "all United States Immigration Judges"). Such challenges are impermissible under the APA. The Supreme Court's decision in *Lujan* squarely forecloses Plaintiffs' request for judicial review of this laundry list. In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 875. That "program" consisted of the "continuing (and thus constantly changing) operations of the BLM" in certain matters under the Federal Land Policy and Management Act of 1976. *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890.

Plaintiff's claims suffer from the same flaw: Plaintiff attempts to aggregate numerous distinct actions by individual immigration judges and federal employees and challenge those various actions as a collective violation of the cited EOIR regulation and the First Amendment.

17

The APA does not permit such a claim for wholesale judicial supervision of the ongoing operation of the Immigration Courts. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." (citation omitted)); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (stating that agency action is "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency," and citing examples such as "conduct[ing] studies" and otherwise engaging in the "common business of managing government programs").

As in *Lujan*, Plaintiff's claims do not challenge a discrete "agency action" subject to review under the APA, which requires dismissal under Rule 12(b)(6). Therefore, Plaintiff is unlikely to succeed on any of its claims.

### 2. Claims regarding an illusory policy change

Plaintiff's APA claims, particularly Counts II and III, are also rooted in a purported policy change by EOIR regarding public access to immigration court hearings. Notably, it is not clear that Plaintiff alleges that any such policy change has actually occurred. Plaintiff instead contends that Defendants have violated the APA "[t]o the extent that the *government* contends that there has been a change in policy and that immigration courts are no longer required to be open to the press and the public." Pl.'s Mot. at 34 (emphasis added).

There is no such policy change. Margolin Decl. ¶ 5; Margolin Decl. Ex. 2. But even if the Court construes Plaintiff's complaint to allege the existence of a new court access policy, Plaintiff fails to hurdle the bar of alleging discrete and final agency action. That is because Plaintiff's complaint contains no "factual matter," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007),

18

that suggests that this imagined policy change exists, much less that it is embodied in discrete agency actions of the type listed in APA § 551(13) and capable of judicial review. For example, Plaintiff's complaint alleges that a document titled Guidelines for Court Observers was distributed by the Immigration Court at Fort Snelling and that this document "gives court officials more leeway to bar observers and members of the general public from proceedings." Compl. ¶ 38. But the cited document does no such thing. It says nothing about closing hearings and, to the contrary, reiterates that "[o]bservers are welcome in DOJ/EOIR Immigration Court proceedings which are open to the public." Ex. B. Instead, the document simply addresses basic matters of courtroom etiquette and decorum, as well as security restrictions on the use of cell phones, cameras, and recording devices. *Id.*

A complaint's "nebulous assertion of the existence of a 'policy,'" supported by "no facts," cannot plausibly establish that the policy actually exists. *Rodriguez v. U.S. Dep't of the Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (citation omitted). Nor can Plaintiff "nakedly assert" that defendants have adopted a "policy . . . to go on a fishing expedition for evidence to support" their speculations. *See People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014); *accord Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d. 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants" have a "policy that plaintiff believes exists.").

Plaintiffs' reliance on allegations regarding the purported conduct of some government employees at the Immigration Court also does not suffice to bolster any claim about a new court access policy. First, as discussed above, conduct of agency officers or employees is not itself discrete agency action. *See* 5 U.S.C. § 551(13) ("rule," "order," "license," etc.); *see also Lujan*, 497 U.S. at 899 (the APA does not permit review of an agency's "day-to-day operations").

19

Nor can one reasonably infer from Plaintiffs' allegations regarding disparate incidents involving court personnel that a new court access policy has been adopted. This Court's decision in *Bark v. United States Forest Service*, 37 F. Supp. 3d 41 (D.D.C. 2014), shows why. In *Bark*, the plaintiff challenged the "Forest Service's [policies] of (1) permitting concessioners to charge fees to visitors who do not use any facilities or services other than parking, and (2) issuing special use permits to such concessioners without undergoing [notice and comment]." *Id.* at 50. The Court rejected these claims as not sufficiently "discrete" to constitute agency action. The Court observed that "Plaintiffs point to no written rules, orders, or even guidance documents of the Forest Service that set forth the supposed policies challenged here. Instead, Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices." *Id.* The Court further held that "the Forest Service's alleged 'policy' of issuing special use permits . . . is found in no authoritative text, and is instead a 'generalized complaint about agency behavior' that gives rise to no cause of action.'" *Id.* at 51 (quoting *Cobell*, 455 F.3d at 307).

Like *Bark*, Plaintiff has, at most, "attached a policy label to their own amorphous description of [the immigration court's] practices." Rather than point to any specific "written rules, orders, or even guidance documents" containing this asserted policy, Plaintiff contends that an overarching policy may be "reflected" in various disparate datapoints. That is not sufficient to nudge Plaintiff's claim to the existence of such a policy over the line of plausibility. Plaintiff is unlikely to succeed on its claims for this reason as well.

### C.    Plaintiff Fails to Show Any Substantive APA Violation

#### 1.    Defendants have not acted contrary to 8 C.F.R. § 1003.27

Count I is also unlikely to succeed for the distinct reason that Plaintiff's array of grievances about operations at Fort Snelling do not show any violation of 8 C.F.R. § 1003.27 by Defendants,

20

even if construed to be discrete and final agency action capable of APA review. As discussed above, Plaintiff alleges various instances in which immigration court hearings were closed or where attendance was limited. But Plaintiff fails to allege any basis to say that such instances were inconsistent with section 1003.27, which specifically allows individual immigration court hearings to be closed for many different reasons. Plaintiff also alleges that this regulation was violated by various other actions at the court, such as inadequate signage or limitations on the times that persons may enter and exit the courtroom. Section 1003.27, however, says nothing about such matters and Plaintiff points to no other source of law that could support their APA claim.

Plaintiff also seems to argue that court closures are impermissible under section 1003.27 if they are not announced on the record in the presence of observers with an explanation of the basis for the closure. *See* Pl.'s Mot. at 8–9. Indeed, Plaintiff's proposed preliminary injunction requires this kind of prophylactic procedure to be implemented. Proposed Order at 7–8. But Plaintiff cites nothing in section 1003.27 that requires such procedural measures to be taken. Section 1003.27 simply acknowledges that certain hearings must be closed by law and may be closed at the *discretion* of the Immigration Judge, including to protect the parties, witnesses, or public interest. That broad grant of discretion cannot support a claim to enforce elaborate procedures for court closures as Plaintiff's proposed injunction would require.

## 2. Plaintiff has not been deprived of any First Amendment right

Count IV is similarly likely to fail on the merits because Plaintiff has not shown any final agency action in violation of the First Amendment. Any right of access under the First Amendment does not apply to Executive Branch immigration court hearings and, even if it did, Plaintiff is not likely to show that such a right has been violated here.

21

### a.    The First Amendment does not mandate a right of access to Executive Branch proceedings.

As a general matter, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality op.).  "The determination of who should have access to particular government held information and what constitutes a legitimate use of such information" belongs to the political branches of government. *See id.*  Thus, for example, although the Freedom of Information Act creates a judicially enforceable right for members of the public to obtain government information, the Supreme Court has "repeatedly made clear that there is no *constitutional* right to obtain all the information provided by [the] FOIA laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013) (emphasis added).

Plaintiff therefore pursues its First Amendment claim against a significant headwind. Plaintiff attempts to salvage the claim by invoking a line of Supreme Court precedent establishing the "experience and logic" test, which governs the "right of access to criminal proceedings."  This test asks (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co. v. Superior Ct. of Cali. for Riverside Cty.*, 478 U.S. 1, 8–9 (1986).  The existence of this First Amendment right of access is based on the fact that the "First Amendment 'was enacted against the backdrop of the long history of trials being historically open' and thus incorporated the notion of public access to *criminal trials*." *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003) (emphasis added).

The Supreme Court has thus recognized that there is a First Amendment right of access to certain Article III judicial proceedings.  But "'[n]either the Supreme Court nor the D.C. Circuit has applied' the right of access 'outside the context of criminal judicial proceedings or the

22

transcripts of such proceedings.'" *McKathan v. U.S. Dep't of Homeland Sec.*, No. 22-CV-1865 (DLF), 2024 WL 1344434, at *4 (D.D.C. Mar. 29, 2024) (quoting *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 934).[4] The D.C. Circuit has made clear, moreover, that the First Amendment right of access does not require "the government to disclose information compiled during the exercise of a quintessential executive power." *Ct. for Nat'l Sec. Stud.*, 331 F.3d at 935. Enforcement of the immigration laws is undoubtedly a quintessential executive power. *See Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (explaining that the Executive Branch is charged by law with "administration and enforcement" of immigration law and that a "principal feature of the removal system is the broad discretion exercised by immigration officials").

In arguing otherwise, Plaintiff relies heavily on *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002), in which the Sixth Circuit found a First Amendment right of access with respect to deportation hearings specifically. *Id.* at 705. But the outcome in *Detroit Free Press* was based on the Sixth Circuit's holding that the experience and logic test has "general applicability"—rather than functioning as an exception applicable to criminal judicial proceedings—and, in the alternative, that the test applies to quasi-judicial administrative proceedings. *Id.* at 694–700. The D.C. Circuit, in contrast, has expressly held that *Houchins*'s holding—that there is no First Amendment right to government information—is the "general" rule and that the experience and logic test is an "exception to that rule" applicable in the criminal judicial context. *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 936; *see also id.* (distinguishing *Detroit Free Press*). *Detroit Free Press* is, at best, in significant tension with the law of this circuit and should not be followed by this Court.

---

[4] Other judges of this District, as well as other Circuits, have also held there is a First Amendment right of access to civil judicial proceedings. *See In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 36 (D.D.C. 2009) (citing cases).

Even if the experience and logic test conceivably could apply here, Plaintiff has failed to show that the First Amendment compels the expansive injunctive relief it seeks. Plaintiff asks the Court to superintend the manner in which EOIR's immigration courts operate at Fort Snelling and, indeed, across the country. Plaintiff asks that the Court require all immigration courts to establish a mechanism, enforced by this Court, for notifying the public of all immigration court hearings and to establish a sort of notice and comment procedure, hearing-by-hearing, for any closure. There is no basis to impose such sweeping relief. To the contrary, the public has already been provided adequate notice of the kinds of hearings that may be closed in Immigration Court by virtue of the promulgation of section 1003.27. Any argument to the contrary makes little sense where section 1003.27 contains no notice requirement for closure and where Plaintiff appears to all but concede that section 1003.27 represents a constitutional public access policy in itself.

> **b.   Even if the First Amendment applies, Plaintiff has failed to show any violation of any right of access at Fort Snelling.**

Even if the experience and logic test did apply to administrative agency records, Plaintiff's complaint does not plausibly allege that the test is met here. Again, the "experience and logic" test asks (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8–9.

At minimum, Plaintiff has not shown that there is any tradition of openness in all immigration court hearings to warrant the requested injunctive relief. The Supreme Court found the "experience" prong met with respect to criminal judicial proceedings based on a tradition of openness in such proceedings extending back centuries. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). The courts of appeals that have applied the experience and logic test to administrative proceedings have, therefore, looked for historical openness in

24

considering the application of this test. But here, 8 C.F.R. § 1003.27—the very regulation that Plaintiff asks this Court to enforce—recognizes numerous instances in which immigration hearings may be closed, including where required by law and at the discretion of the Immigration Judge to protect parties, witnesses, or the public interest. Plaintiff cannot show that the kind of case-by-case discretionary closures contemplated by this regulation are ahistorical, defeating their First Amendment argument. *See N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 201 (3d Cir. 2002) (holding a First Amendment right did not attach to certain administrative proceedings where plaintiff did not show "the type of 'unbroken, uncontradicted history' that *Richmond Newspapers* and its progeny require to establish a First Amendment right of access"). In contrast, *Detroit Free Press*, the Sixth Circuit decision at the heart of Plaintiff's argument, involved a blanket closure of deportation hearings in "special interest cases," a term which the court found was not subject to a "definable standard." 303 F.3d at 683–84, 692. This blanket closure policy, the court held, was not consistent with the practice in immigration hearings over time. *See id.* at 701 (blanket closure contrary to the history of hearings being "presumptively open"). No such across-the-board closure policy has been shown here. Plaintiff is unlikely to succeed on Count IV.

## III.    THE REMAINING FACTORS MILITATE AGAINST PRELIMINARY RELIEF.

The final requirements for obtaining preliminary injunctive relief—the balance of harms and whether the requested injunction will serve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also do not favor the request for preliminary relief. As discussed at length above, Plaintiff has not shown that it is likely to face irreparable harm or, indeed, any injury at all in the absence of preliminary relief. In contrast, the requested preliminary injunction would, if literally imposed, impose massive new procedural requirements on the Immigration Courts. Immigration Judges would be forced to

25

manage their busy dockets and courtrooms with the specter of federal judicial contempt hovering nearby should they exercise their discretion to close hearings in a manner not to Plaintiff's liking. That could have significant deleterious consequences for the public interest by impairing Defendants' ability to adequately enforce immigration law. Plaintiff's requested injunction would not serve the public interest.

## IV.    PLAINTIFF'S REQUESTED INJUNCTION IS OVERBROAD BECAUSE IT WOULD SWEEP NATIONWIDE

Plaintiff also fails in all events to show that it faces irreparable harm that would warrant preliminary injunctive relief extending beyond the Fort Snelling Immigration Court. Any preliminary injunction "should be narrowly tailored to remedy the harm shown." *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 46 (D.D.C. 2020) (quoting *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990)). As the Supreme Court reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

Plaintiff here seeks an injunction sweeping nationwide that would bind "all United States Immigration Judges." *See* Proposed Order at 9. But Plaintiff has done nothing to show that it has any relationship to any immigration court other than the one at Fort Snelling. Relief anywhere else in the United States would, accordingly, have no bearing on Plaintiff's legal rights and should not issue.

Nor may Plaintiff pursue universal relief on the basis of the submissions made regarding immigration courts in California, New York, and Louisiana. None of these submissions come from the Plaintiff or its members. And Plaintiff articulates no basis to invoke any legal rights of the non-parties to whom these submissions relate. *See Powers v. Ohio*, 499 U.S. 400, 410 (1991)

26

(holding, with limited exceptions not relevant here, that "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties").

Finally, Plaintiff may not obtain universal relief by its request for a Section 705 stay. Some judges in this Circuit have recently held, notwithstanding the ordinary rule of equity that relief should be no broader than necessary to redress the plaintiff's injuries, that the presumptive operation of APA Section 705 is to accord universal relief by operating to stay the applicable agency action *in toto*. *See, e.g.*, *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.); *Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-CV-2463 (JMC), 2025 WL 3653597, at *32 (D.D.C. Dec. 17, 2025). The Government's position is that those cases are mistaken; Section 705 remedies are constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See CASA, Inc.*, 606 U.S. at 846. But at a minimum, Plaintiff has done nothing to show the existence of any nationwide EOIR policy to which APA relief could apply. At most, Plaintiff has pointed to alleged incidents occurring at different immigration courts. APA relief, even if it were available, would be distinct as between alleged acts by Defendants in, *e.g.*, Fort Snelling and New York—those acts have no common policy basis upon which Plaintiff's proposed universal APA relief could operate.

## V.    PLAINTIFF SHOULD BE REQUIRED TO GIVE SECURITY AS TO ANY INJUNCTION

Finally, if the Court orders any injunctive relief, it should also order Plaintiff to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). And the D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump* ("*NTEU*"), No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir.

27

May 16, 2025) (citing Fed. R. Civ. P. 65(c)).  So, in the event the Court issues preliminary relief, it should also require Plaintiff to post an appropriate bond, commensurate with the scope of any such order.

Plaintiff argues in response that the Court has discretion to impose no bond or a bond of nominal value in a "public interest case."  Pl.'s Mot. at 38.  But that position cannot be squared with the D.C. Circuit's recent "clarif[ication]" in *NTEU*, 2025 WL 1441563, at *3 n.4.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for preliminary injunction and stay, ECF No. 6, should be denied.

Dated:  April 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department Of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Fax: (202) 616-8460
Email: james.r.powers@usdoj.gov

*Counsel for Defendants*

28