**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE ADVOCATES FOR HUMAN RIGHTS,
330 Second Avenue South, #800
Minneapolis, MN 55401

*Plaintiff,*

v.

PAMELA BONDI, IN HER CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,
950 Pennsylvania Avenue NW
Washington, DC 20530

*Defendants.*

Civil Action No. 1-26-cv-00865-RC

**BRIEF OF *AMICUS CURIAE* REPORTERS WITHOUT BORDERS, INC. IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel certifies that *amicus curiae* Reporters Without Borders, Inc. has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..... ii

TABLE OF CONTENTS ..... iii

TABLE OF AUTHORITIES ..... iv

INTEREST OF AMICUS CURIAE ..... 1

ARGUMENT ..... 1

I. The First Amendment provides a presumptive right for the public and the press to access deportation proceedings in immigration court. ..... 2

A. The experience and logic test applies to immigration court proceedings. ..... 3

B. Experience supports the presumptive First Amendment right of access to deportation proceedings in immigration court. ..... 5

C. Logic also supports the presumptive First Amendment right of access to deportation proceedings in immigration court. ..... 7

II. The Fort Snelling Immigration Court's closure does not overcome the public and the press's presumptive right of access. ..... 10

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

## Cases

*Ardestani v. I.N.S.*,
502 U.S. 129 (1991) ........ 8

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........ 9

*Center for National Security Studies v. U.S. Department of Justice*,
331 F.3d 918 (D.C. Cir. 2003) ........ 3, 4

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) ........ 9

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ........ passim

*Dhiab v. Trump*,
852 F.3d 1087 (D.C. Cir. 2017) ........ 5

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 1, 10

*Globe Newspaper Co. v. Super. Ct.*,
457 U.S. 596 (1982) ........ 2

*Grove Fresh Distribs. v. Everfresh Juice Co.*,
24 F.3d 893 (7th Cir. 1994) ........ 10

*Haidon v. Town of Bloomfield*,
552 F. Supp. 3d 265 (D. Conn. 2021) ........ 5

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ........ 3, 4

*In re NextLevel Health Partners*,
2025 IL App (1st) 230803 ........ 5

*In re Reps. Comm. for Freedom of the Press*,
773 F.2d 1325 (D.C. Cir. 1985) ........ 5

*Lugosch v. Pyramid Co.*,
435 F.3d 110 (2d Cir. 2006) ........ 10

*N. Jersey Media Grp., Inc. v. Ashcroft*,
308 F.3d 198 (3d Cir. 2002) ........ 5, 6, 7

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ........ 8

*Nat'l Ass'n of Waterfront Emps. v. Chao*,
587 F. Supp. 2d 90 (D.D.C. 2008) ........ 5

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........ 9

*Presley v. Georgia*,
558 U.S. 209 (2010) ........ 10, 12

*Press-Enter. Co. v. Super. Ct.*,
464 U.S. 501 (1984) ........ 10

*Press-Enter. Co. v. Super. Ct.*,
478 U.S. 1 (1986) ........ passim

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ........ passim

*United States v. El-Sayegh*,
131 F.3d 158 (D.C. Cir. 1997) ........ 4

*Wash. Post v. Robinson*,
935 F.2d 282 (D.C. Cir. 1991) ........ 4, 5, 9

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
193 F.3d 177 (3d Cir. 1999) ........ 5

**Statutes**

8 U.S.C. § 1367 ........ 6

**Regulations**

8 C.F.R. § 1003.16 ........ 8

8 C.F.R. § 1003.27 ........ 6, 7, 11

**Other Authorities**

Fort Snelling Immigr. Ct., *Observing Immigration Court Hearings*, Exec. Off. For Immigr. Rev., U.S. Dep't of Just., https://www.justice.gov/eoir/fort-snelling-immigration-court (last updated Feb. 27, 2026) ........ 7

U.S. Treasury Dept., *Immigration Laws and Regulations* 4 (Washington D.C., Gov't Printing Office 1893) ........ 6

## INTEREST OF AMICUS CURIAE[1]

Reporters Without Borders, Inc. ("RSF"), a 501(c)(3) non-profit organization, is the United States affiliate of the independent, international non-profit organization Reporters Sans Frontières. RSF defends the right of everyone to access information and defends journalists working internationally and in the United States. RSF monitors press freedom violations, raises awareness, advocates for policies supporting access to information, exposes bad actors, and mobilizes the public. RSF has a significant interest in protecting the ability of journalists to gather and report news. Amicus has a strong interest in the openness of government proceedings across the country.

## ARGUMENT

As the Supreme Court once observed, "[p]eople in an open society" find it "difficult . . . to accept what they are prohibited from observing." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 572 (1980). Secret court proceedings in particular erode public confidence in government, reduce checks on the judiciary, and limit the "stock of information from which members of the public may draw." *Id.* at 576. By closing deportation proceedings to the press and public, the Fort Snelling Immigration Court has needlessly restricted reporters' First Amendment rights to gain vital information about the administration of justice in these actions. This in turn injures the public's ability to understand what happens in these proceedings. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Here, Plaintiff is entitled to a preliminary injunction to prevent this ongoing injury. *See* Pl. Mot. for Prelim. Inj. at 21–37 (ECF No. 6). Amicus writes separately to emphasize that Plaintiff

[1] Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(E), RSF states that no party's counsel authored the proposed amicus brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than RSF, its members, or its counsel contributed money that was intended to fund preparing or submitting the proposed amicus brief.

is likely to succeed on the merits of its First Amendment claim. The press and the public have a presumptive First Amendment right of access to certain legal proceedings. *See Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 13 (1986). Contrary to the government's claims, that rule is applicable to deportation proceedings in immigration court. An independent analysis of the tradition of openness and the benefits of public access confirms that the First Amendment right of access attaches to such proceedings. Moreover, the government has failed to establish the exceptional circumstances that would overcome this presumption. As such, this Court should grant Plaintiff's motion for a preliminary injunction.

## I. The First Amendment provides a presumptive right for the public and the press to access deportation proceedings in immigration court.

The Supreme Court has repeatedly recognized a presumptive right of access to proceedings whose openness is rooted in tradition and essential to public confidence in the administration of justice. *See Richmond Newspapers*, 448 U.S. at 572–73; *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 603–06 (1982); *Press-Enter.*, 478 U.S. at 8–10. While this presumption originated in criminal trials, it was never intended to be limited to that context. *See Richmond Newspapers*, 448 U.S. at 580 n.17 (suggesting right of access could attach to civil trials). Thus, to determine whether the presumption applies to specific proceedings, courts use the "experience and logic" test. *Press-Enter.*, 478 U.S. at 8. This test considers (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.*

Immigration court proceedings generally, and deportation hearings specifically, satisfy both inquiries. Deportation hearings are formal adjudications before neutral judges. Such proceedings have long been open to the public and the press, both in practice and by statutory mandate. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695–705 (6th Cir. 2002). In other

words, because immigration proceedings "walk, talk, and squawk" like Article III judicial proceedings that already enjoy a presumption of openness, they too begin with a presumption of openness. *Id.* at 702. Moreover, access to deportation proceedings serves the same purposes it serves in any courtroom: promoting accuracy, deterring arbitrariness, enhancing public confidence, and allowing the public to evaluate how judges wield the powers of government to remove undocumented residents from the country. Experience and logic therefore point in the same direction: Deportation proceedings in immigration court are presumptively open.

**A. The experience and logic test applies to immigration court proceedings.**

Defendants argue that the experience and logic test only applies to criminal trials and thus is not applicable to any executive actions, including deportation proceedings. *See* Defs.' Mem. Opp'n to Pl.'s Mot. at 22–23, ECF No. 10 ("Def.'s Opp'n"). In doing so, they claim the power to unilaterally limit access to almost any source of government information. *Id.* However, the cases they cite for this sweeping power concern access to investigative records rather than adjudicative proceedings. Contrary to Defendants' assertions, courts in this circuit and elsewhere have consistently applied the experience and logic test to determine whether a First Amendment right of access attaches to adjudicative proceedings—even where those proceedings are not part of a criminal case. Amicus urges the Court to apply the same standard to the proceedings at issue here.

Defendants try to avoid the experience and logic test by citing *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) (plurality opinion) and *Center for National Security Studies v. U.S. Department of Justice*, 331 F.3d 918 (D.C. Cir. 2003). *See* Def.'s Opp'n at 22. In doing so, Defendants overstate the holding of both cases. First, the assertion that *Houchins* established a general rule against a First Amendment right of access, Def.'s Opp'n at 23, is misguided. *Houchins* stands for the proposition that there is no "First Amendment guarantee of a right of access to *all* sources of

information within government control." 438 U.S. at 9 (emphasis added). It does not, however, suggest that there cannot be a right of access to *any* source of government information. Indeed, just two years later, the Court held that such a right of access does exist for criminal trials. *See Richmond Newspapers*, 448 U.S. at 580. At no point in *Richmond Newspapers*, or the subsequent *Press-Enterprise* line of cases, did the Court come even close to saying *Houchins* provides absolute discretion for the government to refuse access to non-criminal proceedings.

Perhaps more significantly, both *Houchins* and *Center for National Security Studies* are cases about access to information, not access to proceedings. *See Houchins*, 438 U.S. at 4 (describing request to inspect county jail); *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 922 (describing FOIA request for records about federal detainees). The D.C. Circuit itself noted "the crucial distinction between '*investigatory* information' and 'access to information relating to a governmental *adjudicative* process[.]'" *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 936 (quoting *Detroit Free Press*, 303 F.3d at 699). In doing so, the court expressly left open the possibility that non-criminal adjudicative proceedings could be covered by the First Amendment. *See id.* ("Inasmuch as plaintiffs here request investigatory—not adjudicative—information, we find *Detroit Free Press* distinguishable."). This Court confronts exactly that issue in the instant case.

Given the lack of definitive guidance from the Supreme Court or the D.C. Circuit, amicus urges the Court to apply the experience and logic test. Courts in this Circuit have already applied this test outside the scope of criminal trials. The D.C. Circuit Court has applied the experience and logic test to plea agreements, which occur outside the trial itself. *See Wash. Post v. Robinson*, 935 F.2d 282, 287–88 (D.C. Cir. 1991) (applying experience and logic test to find right of access to executed plea deals); *United States v. El-Sayegh*, 131 F.3d 158 (D.C. Cir. 1997) (applying experience and logic test to find no right of access to unexecuted plea deals). It has also applied

the test to civil proceedings. *See In re Reps. Comm. for Freedom of the Press*, 773 F.2d 1325, 1331–32 (D.C. Cir. 1985) (applying test to sealed documents in civil case); *Dhiab v. Trump*, 852 F.3d 1087, 1095 (D.C. Cir. 2017) (applying test to recording of habeas proceeding). Other courts have applied the two-prong test outside the Article III context. *See Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999) (public meetings); *Nat'l Ass'n of Waterfront Emps. v. Chao*, 587 F. Supp. 2d 90, 98 (D.D.C. 2008) (administrative hearings); *In re NextLevel Health Partners*, 2025 IL App (1st) 230803, ¶ 30, *appeal denied sub nom. People ex rel. Severinghaus v. NextLevel Health Partners*, 274 N.E.3d 77 (Ill. 2026) (bankruptcy records); *see also Haidon v. Town of Bloomfield*, 552 F. Supp. 3d 265, 268 (D. Conn. 2021) (noting First Amendment right of access to "hearings before certain administrative forums"). And, as the parties point out, at least two courts have applied this test to deportation hearings, albeit with different results. *See Detroit Free Press*, 303 F.3d at 694–705; *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 209–20 (3d Cir. 2002).

"By its terms, the experience and logic test does not limit the right of access to criminal proceedings." *Dhiab*, 852 F.3d at 1099 (Rogers, J., concurring in part and concurring in judgment). *Houchins* and *Center for National Security Studies*, both of which concern government records, do not compel the Court to read in such a limitation now. Instead, the Court should do what many others have done when faced with a similar question: conduct the two-step analysis and determine for itself whether the right of access attaches to deportation proceedings.

**B. Experience supports the presumptive First Amendment right of access to deportation proceedings in immigration court.**

The experience prong of the *Press-Enterprise* test asks whether "access has historically been available" to the proceeding at issue. *Wash. Post*, 935 F.2d at 288. More than a century of

legislative, administrative, judicial, and practical history supports a finding of openness for deportation hearings.

In the 1890s, when the Executive Branch first established federal exclusion proceedings, it left exclusion hearings explicitly "separate from the public," but nonetheless declined to close deportation hearings. U.S. Treasury Dept., *Immigration Laws and Regulations* 4 (Washington D.C., Gov't Printing Office 1893). For the next 70 years, Congress legislated against this backdrop. Although Congress identified specific situations where confidentiality is warranted, *see, e.g.,* 8 U.S.C. § 1367, it never created a blanket rule for deportation hearings. This tradition of openness is even more relevant in the last 60 years. Since the mid-1960s, federal regulations have made deportation hearings presumptively open, subject only to narrow, case-specific exceptions. *See* 8 C.F.R. § 1003.27. If Congress disagreed with the Executive's approach, it has had more than enough opportunities to say as much. But it has declined time after time. By the time *Detroit Free Press* was decided in 2002, Congress had "revised the Immigration and Nationality Act at least 53 times without indicating that the [Executive] had judged their intent incorrectly." 303 F.3d at 701. Clearly, when Congress wants secrecy, it knows how to require it. Its silence in the deportation context therefore sounds as an endorsement for openness.

As Plaintiff explains in detail, the *Detroit Free Press* court found this 130-year tradition persuasive. *See* Pl.'s Mot. at 25–28. Even the Third Circuit, in rejecting a First Amendment right of access to deportation hearings, acknowledged the long history of public access. In *North Jersey Media Grp.*, the court recognized that Congress has "never closed deportation hearings" and credited the Executive Branch with promulgating regulations to ensure public access to immigration proceedings since 1893. 308 F.3d at 211–12. The Third Circuit ultimately held that this was "not comparable" to the thousand-year history of openness of criminal trials in Anglo-

American law. *Id.* at 212–13. However, the D.C. Circuit has not demanded such extensive proof of uninterrupted tradition to satisfy the experience prong. In *Washington Post*, for example, the court found a sufficient tradition of openness for executed plea agreements, notwithstanding the comparatively modern rise of plea bargaining itself. 935 F.2d at 288–90. Likewise, the Supreme Court held that the experience prong was satisfied with *voir dire* transcripts, despite there being numerous examples of courts previously closing this information to the public. *See Press-Enter.*, 478 U.S. at 15. Deportation proceedings being open by default for over a century is more than enough to satisfy the experience prong.

Finally, there exists a history of openness at Fort Snelling Immigration Court itself as well. Despite its recent attempts to close proceedings to the public, the Executive Office for Immigration Review's ("EOIR") longstanding governing rule provides that hearings "shall be open to the public" and, when space is limited, it orders immigration courts to give "priority" to the press over the general public. 8 C.F.R. § 1003.27. Further, EIOR's own public-facing page states that "immigration court hearings are open to the public, with limited exceptions, as specified in law," and it indicates that observers do not need to notify the court in advance. Fort Snelling Immigr. Ct., *Observing Immigration Court Hearings*, Exec. Off. For Immigr. Rev., U.S. Dep't of Just., https://www.justice.gov/eoir/fort-snelling-immigration-court (last updated Feb. 27, 2026). The government cannot plausibly claim that there has not been at least some tradition of openness at Fort Snelling, given its own rules and announced standards indicating the opposite.

### C. Logic also supports the presumptive First Amendment right of access to deportation proceedings in immigration court.

The logic prong points in the same direction. This prong asks whether public access plays a "significant positive role" in the proceeding at issue. *Press-Enter.*, 478 U.S. at 8. Removal proceedings determine whether a person may remain in the United States—high stakes

proceedings that require public supervision for legitimacy. Just like in ordinary court, open proceedings in the immigration context discipline decisionmakers, deter shortcuts, counsel against arbitrariness, ward away secret biases, and allow errors in the law or in the facts to be identified when they happen. *Richmond Newspapers*, 448 U.S. at 569–71; *see also Detroit Free Press*, 303 F.3d at 703–05.

These benefits are magnified in immigration proceedings because potential deportees have no right to free counsel from the government. 8 C.F.R. § 1003.16. At the same time, the Supreme Court has recognized that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important." *Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991). In a system this consequential, public oversight provides an even greater checking function than it does in criminal and civil proceedings. For those facing deportation, then, "the press and the public may be their only guardian." *Detroit Free Press*, 303 F.3d at 704.

Further, open proceedings also perform a legitimating function for legal work that previous right-of-access cases have already emphasized. They enhance the perception and reality of fairness, assure the public that government adjudicators are acting within their legal boundaries, and provide citizens and the press with the information they need to evaluate how the government exercises one of its most serious powers. *See Richmond Newspapers*, 448 U.S. at 571–73; *Globe Newspaper*, 457 U.S. at 604; *Detroit Free Press*, 303 F.3d at 703–05; *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas, J., concurring) ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors."). These functions are especially strong in immigration court, where the government exercises profound authority over an individual's liberty, family unity, and economic security. A system that can deport people away

from public view can afford no justice at all: As the Supreme Court emphasized in *Richmond Newspapers*, "[i]t is not enough to say that results alone will satiate the natural community desire for 'satisfaction.' A result considered untoward may undermine public confidence, and . . . an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted." 448 U.S. at 571. Instead, a system that operates openly "enhances the public's ability to affirm or protest government's efforts." *Detroit Free Press*, 303 F.3d at 705.

Indeed, the logic of openness is doubly powerful when, as here, proceedings are closed to press as well. The First Amendment does not give the press a right superior to that of the public, *see Branzburg v. Hayes*, 408 U.S. 665, 684 (1972), but it does recognize the press's power to enlighten the public. As the Supreme Court has recognized, media representatives function as "surrogates for the public," *Richmond Newspapers*, 448 U.S. at 573, which "contribute to public understanding of the rule of law and to comprehension of the functioning" of government operations. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring). Now, citizens with "limited time and resources with which to observe at first hand the operations of [their] government" must rely "necessarily upon the press to bring to [them] in convenient form the facts" of governmental operations. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491 (1975). When reporters, as part of the general public, are excluded from immigration proceedings, the injury extends beyond the denied observers and interested family and hurts the entire public, depriving them of perhaps the principal means of understanding how deportations actually happen. In an arena where, as the D.C. Circuit has recognized, the press and public serve "an important function of monitoring prosecutorial or judicial misconduct," openness for the public *and* the press is indispensable. *Wash. Post*, 935 F.2d at 288.

Finally, the power of in-person observation of immigration proceedings cannot be substituted by after-the-fact summaries or released records. The right of access protects the ability to observe proceedings as they unfold, providing the public and the press with the opportunity to catch judicial abuses, recording insufficiencies and real emotions in real time. *See Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous. The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression.") (internal citations removed); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 126–27 (2d Cir. 2006) (collecting cases). By closing proceedings to observers, the Fort Snelling Immigration Court has inflicted constitutional injury already. *See Elrod*, 427 U.S. at 373. Logic, like experience, establishes that there exists a presumption of openness in deportation proceedings in immigration court, satisfying the Supreme Court's *Press-Enterprise* test.

## II. The Fort Snelling Immigration Court's closure does not overcome the public and the press's presumptive right of access.

The Supreme Court has made clear that, where the First Amendment right of access attaches, the government may close a proceeding only if it demonstrates that "denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606–07. Further, the interest must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enter.*, 478 U.S. at 10 (quoting *Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 510 (1984)); *see also Presley v. Georgia*, 558 U.S. 209, 215–16 (2010). The Fort Snelling Immigration Court did not meet any of these requirements—nor could it have.

The government has not identified a concrete, particularized interest that can overcome the strong presumption of openness in deportation proceedings in immigration court. It has not pointed to threatened witnesses, protected information, confidentiality interests, or any other circumstance contemplated by 8 C.F.R. § 1003.27 that would justify closing these proceedings. Without such an interest, any effort toward closure must fail. The First Amendment does not permit the government to close its doors to the public based on unexplained concerns. *See Globe Newspaper*, 457 U.S. at 606; *Press-Enter.*, 478 U.S. at 13–14. An immigration court that has long stayed open to the public cannot suddenly shut unless the government can say what interest the closure is needed to protect.

Even if the government could identify a legitimate or compelling interest in its blanket closure, it would fail to survive First Amendment scrutiny because the closure is not narrowly tailored toward that interest. *See Press-Enter.*, 478 U.S. at 15. Indeed, instead of taking steps to winnow its closure efforts to certain groups or cases, the Fort Snelling Immigration Court chose the broadest possible restriction—a proposal that could only survive strict scrutiny if there were no alternative means available. However, narrower alternatives *are* available to the Fort Snelling Immigration Court. If it is concerned with space, it could limit attendance while prioritizing the press, as it is required to do. 8 C.F.R. § 1003.27. If the concern is about sensitive testimony, it could close the courtroom for only that portion of a specific case. *See Richmond Newspapers*, 448 U.S. at 598 n.24 (Brennan, J., concurring) (indicating how closure could be plausible for sensitive testimony). And if the concern is about detainee privacy, it could handle this issue in a case-by-case fashion, as the Supreme Court mandates. *See Globe Newspaper Co.*, 457 U.S. at 608–09. But a blanket closure effort satisfies none of these concerns in a way that respects the public and the press's First Amendment rights. As such, the closure fails the narrow tailoring prong.

The Fort Snelling Immigration Court failed to overcome the presumption of public access for a third reason: It did not satisfy the procedural steps necessary to support closure. In addition to finding a compelling interest and narrowly tailoring a closure order, courts must also consider reasonable alternatives to closure even if no party proposes them. *Presley*, 558 U.S. at 214. Additionally, they must also make specific, on-the-record findings so that a reviewing court can determine whether closure was actually necessary. *Press-Enter.*, 478 U.S. at 13–15. Neither step happened here.

There is no indication that the Fort Snelling Immigration Court considered any alternatives to blanket closure; there are no findings explaining why closure was required at all. These failures demonstrate a profound disrespect for the First Amendment rights of the public—and they make it impossible for a reviewing court to conduct a meaningful review of the closure decision. "A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution." *Detroit Free Press*, 303 F.3d at 710. Failing every step of the test for overcoming an established presumption of public access, the Fort Snelling Immigration Court impermissibly closed its proceedings to the press and to the public.

## CONCLUSION

For the reasons stated above, Plaintiff is likely to prevail on its claim that, by pursuing a blanket closure order without complying with any of the substantive or procedural requirements for doing so, Defendants have violated the First Amendment. Accordingly, amicus respectfully urges the Court to allow Plaintiff's motion for a preliminary injunction and enjoin Defendants from further restricting the right of access to deportation hearings.

Dated: April 13, 2026

Respectfully submitted,

/s/ Mason A. Kortz

Mason A. Kortz, #MA0057
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
Tel: 858-922-1990
Email: mkortz@law.harvard.edu

*Counsel for the Amicus Curiae*