**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, <br><br> *Plaintiff*, <br><br> v. <br><br> TODD BLANCHE, *et al.*, <br><br> *Defendants*. | Case No. 1:26-cv-00865-RC |

**AMICUS CURIAE BRIEF OF DOW JONES, THE GUARDIAN, MINNESOTA PUBLIC RADIO, MINNESOTA REFORMER, MINNPOST, PROPUBLICA, SAHAN JOURNAL, STAR TRIBUNE, THE NEW YORK TIMES, AND THE WASHINGTON POST IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

BALLARD SPAHR LLP

Lauren P. Russell (#7567949)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
russelll@ballarspahr.com

Leita Walker*
Anna Kaul*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211 | Fax: (612) 371-3207
walkerl@ballardspahr.com
kaula@ballardspahr.com

Saumya K. Vaishampayan*
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200 | Fax: (212) 223-1942
vaishampayans@ballardspahr.com

*\* Of counsel*

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

CORPORATE DISCLOSURE STATEMENTS ...................................................................... iv

RULE 29(a)(4)(E) CERTIFICATION.................................................................................. vi

INTERESTS OF AMICI CURIAE....................................................................................... vii

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.     PRESS ACCESS TO IMMIGRATION COURTS ENSURES AMERICANS UNDERSTAND THEIR OPERATIONS AND SHORTCOMINGS................................2

II.    THE FIRST AMENDMENT RIGHT OF ACCESS APPLIES TO IMMIGRATION PROCEEDINGS .........................................................................8

       A.      Courts Across The Country And In This District Recognize The First Amendment Access Right Attaches To A Range Of Governmental Proceedings ...............................................................................8

       B.      This Court Should Follow Its Sister Circuits And Apply The Experience And Logic Test To Immigration Proceedings ....................................11

       C.      This Court Should Follow The Sixth Circuit And Conclude That The First Amendment Guarantees Access To Immigration Proceedings .....................12

       D.      The Constitutional Access Right Is Especially Important Now ...........................16

CONCLUSION...............................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abrego Garcia v. Noem*,
    2025 WL 1135112 (4th Cir. Apr. 17, 2025) ...........................................................................18

*Chavarria-Reyes v. Lynch*,
    845 F.3d 275 (7th Cir. 2016) ...............................................................................................17

*Cox Broad. v. Cohn*,
    420 U.S. 469 (1975)...............................................................................................................16

*Craig v. Harney*,
    331 U.S. 367 (1947).................................................................................................................9

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
    331 F.3d 918 (D.C. Cir. 2003).................................................................................10, 11, 14

*Detroit Free Press v. Ashcroft*,
    303 F.3d 681 (6th Cir. 2002) ...................................................................................... *passim*

*Dhiab v. Trump*,
    852 F.3d 1087 (D.C. Cir. 2017).............................................................................................10

*Minnesota ex rel. Ellison v. Noem*,
    --- F. Supp. 3d ----, 2026 WL 253619 (D. Minn. Jan. 31, 2026).............................................18

*Fitzgerald v. Hampton*,
    467 F.2d 755 (D.C. Cir. 1972)...............................................................................................16

*Globe Newspaper v. Super. Ct.*,
    457 U.S. 596 (1982)...............................................................................................................10

*Grosjean v. Am. Press*,
    297 U.S. 233 (1936).................................................................................................................8

*In re Guantanamo Bay Detainee Litig.*,
    624 F. Supp. 2d 27 (D.D.C. 2009)...................................................................................10, 15

*Houchins v. KQED*,
    438 U.S. 1 (1978)...................................................................................................................11

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ..........................................................................................11, 19

*N. Jersey Media Grp. v. Ashcroft*,
    308 F.3d 198 (3d Cir. 2002)........................................................................................ *passim*

*N.Y. Times v. Sullivan*,
  376 U.S. 254 (1964) .................................................................................................19, 20

*Nat'l Ass'n of Waterfront Emps. v. Chao*,
  587 F. Supp. 2d 90 (D.D.C. 2008) .........................................................................10

*NYCLU v. NYC Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) ...................................................................................11

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) .................................................................................................11, 12

*Pechter v. Lyons*,
  441 F. Supp. 115 (S.D.N.Y. 1977) .........................................................................15

*Press-Enter. Co. v. Super. Ct.*,
  464 U.S. 501 (1984) ...................................................................................................9

*Press-Enter. Co. v. Super. Ct.*,
  478 U.S. 1 (1986) .....................................................................................................9, 10

*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980) ....................................................................................... *passim*

*Stevens v. Osuna*,
  877 F.3d 1293 (11th Cir. 2017) ..............................................................................15

*United States v. El-Sayegh*,
  131 F.3d 158 (D.C. Cir. 1997) ................................................................................15, 16

*Urquilla-Ramos v. Trump*,
  --- F. Supp. 3d ----, 2026 WL 475069 (S.D. W. Va. Feb. 19, 2026) .......................20

**Other Authorities**

8 C.F.R § 1003.27 ..........................................................................................................15, 16

8 C.F.R. § 1240.10 .........................................................................................................15

Jonathan L. Hafetz, *The First Amendment and the Right of Access to Deportation
  Proceedings*, 40 CAL. W. L. REV. 265 (2004) .........................................................14

U.S. Const. amend. I ............................................................................................. *passim*

iii

## CORPORATE DISCLOSURE STATEMENTS

**Dow Jones & Company, Inc. ("Dow Jones")**, publisher of The Wall Street Journal, is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns 10% or more of the stock of Dow Jones.

**Guardian News & Media LLC ("The Guardian")** does not have any parent companies, subsidiaries, or affiliates that have outstanding securities in the hands of the public.

**Minnesota Public Radio** is a 501(c)(3) corporation, and its parent is American Public Media Group, which is also a 501(c)(3), both organized under the laws of Minnesota. It has no stock.

**Minnesota Reformer** is a 501(c)(3) corporation organized under the laws of Minnesota. Its parent is States Newsroom, a 501(c)(3) corporation organized under the laws of North Carolina. It has no stock.

**MinnPost** is an independent, 501(c)(3) nonprofit newsroom. It has no corporate affiliates, subsidiaries, or parent corporations, and has no stock.

**Pro Publica, Inc. ("ProPublica")** is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no corporate affiliates, subsidiaries, or parent corporations, and has no stock.

**Sahan Journal** has no parent corporation and issues no stock.

**Star Tribune Media Company LLC ("Star Tribune")** is wholly owned by Star Tribune Media Intermediate Holdings II LLC, a Delaware limited liability corporation that is

iv

Star Tribune's sole member. No publicly held corporation owns 10 percent or more of the stock of Star Tribune.

**The New York Times Company ("The New York Times")** is a publicly traded corporation. It has no parent company, no affiliates or subsidiaries that are publicly owned, and no publicly held corporation owns 10 percent or more of its stock.

**WP Company LLC d/b/a The Washington Post** is a wholly owned subsidiary of Nash Holdings LLC, which is privately held and does not have any outstanding securities in the hands of the public.

## <u>RULE 29(a)(4)(E) CERTIFICATION</u>

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amici certify that no counsel for a party authored this brief in whole or in part, and no person other than amici, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

**INTERESTS OF AMICI CURIAE**

Amici are ten news organizations that gather and report news in Minnesota, the District of Columbia, and across the country. Amici regularly rely on the First Amendment access right at issue in this case in their newsgathering, and they have a vital interest in its proper judicial enforcement. Because reporters "serve[] as the 'agent' of interested citizens," the press is the "chief beneficiary" of the access right. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring).

Amici routinely report on immigration proceedings and therefore have a direct interest in a ruling by this Court that upholds the presumption of access to those proceedings. Amici seek to underscore the substantial press and public interests advanced by the qualified First Amendment access right that applies here, which has long been enshrined in federal regulations opening immigration proceedings to the public. While these regulations provide ample reason to grant Plaintiff's motion, the First Amendment offers an independent—and important—ground to order the requested relief. The constitutional access right extends to immigration proceedings for the same reason it extends to other court proceedings, including criminal and civil trials to which they are closely analogous: Access promotes public confidence that proceedings are fair and proper and that justice is being afforded equally.

**<u>INTRODUCTION</u>**

Every day, immigration courts adjudicate life-altering cases for noncitizens, including whether they may remain in this country. While these courts are technically administrative, their proceedings are functionally judicial, with immigration judges presiding over trial-like deportation proceedings in which immigrants are entitled to due process.

Scrutiny of immigration courts has perhaps never been more necessary than it is today, including because those courts are straining under a heavy caseload exacerbated by the government's recent immigration enforcement push and dismissal of immigration judges deemed overly lenient—to say nothing of the fact that these courts have increasingly become chaotic scenes of arrests by masked ICE agents.

Yet, the press's ability to act as the public's watchdog and monitor how these courts are engaged in the administration of justice is at risk. Even as the government made Minnesota the face of its controversial immigration crackdown through Operation Metro Surge, the Fort Snelling Immigration Court in Minneapolis denied and restricted public access to its court proceedings, as the complaint in this case alleges. Immigration courts across the country have likewise closed their doors to journalists, conducting proceedings under a veil of secrecy.

Because of the importance of access to immigration court proceedings, ten news organizations—Dow Jones, The Guardian, Minnesota Public Radio, Minnesota Reformer, MinnPost, ProPublica, Sahan Journal, Star Tribune, The New York Times, and The Washington Post—now submit this amicus brief to highlight the critical role journalists play in documenting immigration court proceedings, and to emphasize the First Amendment right to attend those proceedings, so that their long tradition of openness can continue.

1

## ARGUMENT

**I.    PRESS ACCESS TO IMMIGRATION COURTS ENSURES AMERICANS UNDERSTAND THEIR OPERATIONS AND SHORTCOMINGS**

The press diligently attends proceedings in immigration courts, and its monitoring of those courts has resulted in news reports on issues of significant public interest and concern. In early 2025, Star Tribune published a detailed report of visits to hearings at Fort Snelling Immigration Court over the course of three months.[1] During those hearings, DHS "appeared to mix up cases amid the flurry of lockups" and at times did not know the particulars of a given case.[2] And despite the government's claims that enforcement efforts were focused on immigrants with criminal backgrounds, many of the proceedings involved immigrants "swept up in so-called 'collateral arrests' while authorities were targeting someone else."[3] Star Tribune's report noted that these collateral arrests included "an immigrant father of two American-born children who resided in the U.S. for more than 30 years" who was arrested after "[a]uthorities pulled over a speeding vehicle in which he was a passenger," as well as an Ecuadorian father who turned himself in after an ICE arrest nearby and received letters of support from community members.[4]

Based on observations at the same courthouse, another well-respected Minnesota publication, the Sahan Journal, reported last year on the consequences of rapidly changing

---

[1] Maya Rao, *Inside Minnesota's deportation court since Trump took office*, STAR TRIBUNE (Apr. 30, 2025), https://www.startribune.com/detentions-deportations-in-minnesota-during-first-100-days-of-trump-administration/601324500.

[2] *Id.*

[3] *Id.*

[4] *Id.*

policies regarding expedited removal.[5] Observers, according to the report, realized that DHS lawyers were asking judges to dismiss cases during immigration court hearings. But for those whose cases were dismissed, federal agents were waiting at the courthouse to arrest them and place them in expedited removal proceedings.[6] Even outside Minnesota, arrests at immigration courts are on the rise, a sharp departure from previous administrations' practices.[7]

   Such aggressive tactics are not limited to Minnesota. In Massachusetts, for example, a public radio station attended hearings involving children, some as young as seven years old, who often appeared alone because their parents feared being detained by immigration agents.[8] The station's resulting news report last month explained that children's cases used to be under a separate docket that included specialized services, such as pro bono representation, but the government recently dismantled that docket and cut those services.[9] While removal orders for

---

[5] Andrew Hazzard, *Fast-tracked deportations raise alarm over due process in immigration system*, SAHAN JOURNAL (July 10, 2025), https://sahanjournal.com/immigration/due-process-rights-are-being-eroded-in-immigration-court-attorneys-and-advocates-say.

[6] *Id.*

[7] *See, e.g.*, Jonathan Shorman, *ICE courthouse arrests meet resistance from Democratic states*, STATELINE (Nov. 19, 2025), https://stateline.org/2025/11/19/ice-courthouse-arrests-meet-resistance-from-democratic-states; J. David McSwane & Hannah Allam, *Unfettered and Unaccountable: How Trump Is Building a Violent, Shadowy Federal Police Force*, PROPUBLICA (Oct. 18, 2025), https://www.propublica.org/article/trump-dhs-ice-secret-police-civil-rights-unaccountable; Tim Röhn, *What I Saw at the Epicenter of Trump's War on 'Illegals'*, POLITICO (Oct. 31, 2025), https://www.politico.com/news/magazine/2025/10/31/migrants-asylum-immigration-court-00622991; Dani Anguiano & Maanvi Singh, *Ice arrests at immigration courts across the US stirring panic: 'It's terrifying'*, THE GUARDIAN (May 22, 2025), https://www.theguardian.com/us-news/2025/may/22/ice-arrests-immigration-courts.

[8] Rachell Sanchez-Smith, *Children often face deportation hearings alone—with little public scrutiny*, WBUR (Mar. 12, 2026), https://www.wbur.org/news/2026/03/12/massachusetts-children-immigration-court-deportation.

[9] *Id.*

young children are increasing under current policies, they evade public scrutiny. The station reported, for example, that clerks refused to disclose times or locations of hearings and that, for the children in those proceedings, "their fates lie in the hands of a federal judge, out of the public eye."[10]

This type of reporting—which features real people and is made possible only by virtue of journalists' personal attendance and observations—is important because it shows the human impact of immigration enforcement in ways that dry recitations of government policies and related statistics never could. To most Americans, who will never step foot in an immigration court, these reports are the only way to understand what happens behind courtroom doors. Press coverage therefore allows members of the public to oversee and participate in their government.

Press scrutiny of immigration courts is not new. Journalists have long reported on immigration proceedings, delivering crucial stories to the public that inform conversations about immigration. In 2012, for example, The New York Times published a news report after attending immigration court hearings for children in Harlingen, Texas that perhaps foreshadowed public radio's more recent findings.[11] According to the Times, at a deportation hearing for a six-year-old child who did not have a lawyer, the judge told the child and other minors in the courtroom that "[i]f you do not have a lawyer . . . you need to be ready to speak for yourselves at your next hearing."[12] The child left the courtroom holding a social worker's hand after the judge postponed

---

[10] *Id.*

[11] Julia Preston, *Young and Alone, Facing Court and Deportation*, NEW YORK TIMES (Aug. 25, 2012), https://www.nytimes.com/2012/08/26/us/more-young-illegal-immigrants-face-deportation.html.

[12] *Id.*

his proceedings.[13] For another example, in 2020, The Wall Street Journal reported on immigration court hearings held in a massive tent near the U.S.-Mexico border—hearings that opened to the public only after months of complaints about closure.[14] The reporter, who was the first member of the public to observe a hearing in the tent facility, observed that the judge and government lawyer appeared by video from a courtroom some 160 miles away and that the migrants could not even see the lawyer arguing against them. A union for immigration judges criticized the tent proceedings, noting that the physical distance between the judges and migrants made it difficult for judges to assess credibility.[15] Describing the overburdened immigration courts in 2021, one immigration judge likened the dire conditions to "holding death penalty cases in a traffic court setting."[16]

Now, as the government continues its focus on immigration enforcement, public access to immigration courts is more important than ever. Yet, despite the presumption of access to immigration proceedings, the press has increasingly encountered closed courtrooms and new

---

[13] *Id.*

[14] Alicia A. Caldwell, *Tent Court on the Border: Migrants Face a Judge on a Screen and a Lawyer They Can't See*, WALL STREET JOURNAL (Jan. 9, 2020), https://www.wsj.com/articles/tent-court-on-the-border-migrants-face-a-judge-on-a-screen-and-a-lawyer-they-cant-see-11578565802; *see also, e.g.*, Katie Brumback, Deepti Hajela & Amy Taxin, *AP visits immigration courts across US, finds nonstop chaos*, ASSOCIATED PRESS (Jan. 19, 2020), https://apnews.com/article/courts-az-state-wire-tx-state-wire-ma-state-wire-ut-state-wire-7851364613cf0afbf67cf7930949f7d3.

[15] Michelle Hackman & Alicia A. Caldwell, *Immigration Tent Courts at Borden Raise Due-Process Concerns*, WALL STREET JOURNAL (Dec. 14, 2019), https://www.wsj.com/articles/immigration-tent-courts-at-border-raise-due-process-concerns-11576332002?.

[16] Gabe Gutierrez, *Immigration judges decide who gets into the U.S. They say they're overworked and under political pressure*, NBC NEWS (June 13, 2021), https://www.nbcnews.com/politics/immigration/immigration-judges-decide-who-gets-u-s-they-say-they-n1270460.

rules that thwart access. One reporter, who had been visiting an immigration court in New York for two weeks, explained:

> What I've heard from my colleagues is that the rules are always changing for them—where they are allowed to stand, where they are not allowed to stand, where they are allowed to film, where they are not allowed to film. These are things the journalists who are going there every day have to deal with. Rules might change. You don't always know why, when, or how it will change.[17]

Echoing this experience, in December of last year, a Star Tribune reporter was told that he could not remain in the public lobby of the Fort Snelling Immigration Court for longer than ten minutes.[18] Another reporter had his phone searched for photographs of the daily court docket, despite it being a public record, available for anyone to view.[19] A reporter was even told that court staff could not answer questions—"especially from reporters."[20]

In immigration courts throughout the country, press and other members of the public have faced similar barriers to access. Security guards at an immigration court in Sacramento "barred entry to the head of a legal organization, volunteers seeking to accompany immigrants to hearings, and reporters."[21] A federal police officer told one of the reporters to contact a spokesperson for the U.S. General Services Administration, but that spokesperson did not grant

---

[17] Riddhi Setty, *Scenes from Immigration Court in New York's Federal Plaza*, COLUMBIA JOURNALISM REVIEW (Oct. 2, 2025), https://www.cjr.org/getting-the-story/till-eckert-immigration-court-ice-arrests-journalists.php.

[18] Christopher Magan, *Minnesota's immigration cases are increasingly held in secret*, STAR TRIBUNE (Dec. 29, 2025), https://www.startribune.com/minnesotas-immigration-cases-are-increasingly-held-in-secret/601542378.

[19] *Id.*

[20] *Id.*

[21] Stephen Hobbs & Sharon Bernstein, *Guards bar volunteers, reporters from Sacramento immigration court hearings*, THE BEE (June 13, 2023), https://www.sacbee.com/news/politics-government/capitol-alert/article308579985.html.

access or respond to further communications.[22] In Miami, a reporter was denied entry to an immigration court after being told: "Sorry, ICE supervisor says no."[23] And in New York, ICE refused to permit two members of Congress access to a federal building containing an immigration court.[24]

Access to virtual courtrooms has been curtailed, too. Coinciding with the elimination of a longstanding deportation protection, hearings involving Somali refugees that were to be held in person have been moved online and expedited.[25] The only way to know about these hearings are docket sheets posted in the lobby of the immigration court, which are often incomplete and inaccurate. Even then, a reporter who tried to observe one of the online proceedings was not allowed, with the judge citing internet capacity for the denial.[26] At another remote hearing, the judge commented: "This isn't Court TV."[27] Meanwhile, immigration court observers in Georgia

---

[22] *Id.*

[23] C.J. Ciaramella, *ICE Denies* Reason *Access to Immigration Court in Miami Detention Center*, REASON (Apr. 1, 2025), https://reason.com/2025/04/01/ice-denies-reason-access-to-immigration-court-in-miami-detention-center.

[24] Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, NEW YORK TIMES (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html.

[25] Christopher Magan, *Fast-tracked asylum hearings for Somali refugees being held in secret*, STAR TRIBUNE (Mar. 12, 2026), https://www.startribune.com/fast-tracked-asylum-hearings-for-somali-nationals-being-held-in-secret/601595495.

[26] *Id.*

[27] *Id.*

reported being barred from virtual hearings after they "shared information with a federal court about a sudden increase in negative outcomes for immigrants."[28]

## II.    THE FIRST AMENDMENT RIGHT OF ACCESS APPLIES TO IMMIGRATION PROCEEDINGS

For decades, the U.S. Supreme Court has recognized that the First Amendment guarantees the press and the general public a presumptive right of access to criminal proceedings, whether in person or online. Meanwhile, courts across the country—including in this District—have extended the Supreme Court's recognition of this crucial right to a wide range of other judicial and government proceedings. And more than twenty years ago, the Sixth Circuit recognized the First Amendment right of access to immigration court proceedings. This Court should adopt the Sixth Circuit's approach and uphold the right of access to immigration courts at a time when controversial immigration measures necessitate the need for heightened public scrutiny.

### A.    Courts Across The Country And In This District Recognize The First Amendment Access Right Attaches To A Range Of Governmental Proceedings

As the Supreme Court recognized almost a century ago, "informed public opinion is the most potent of all restraints upon misgovernment." *Grosjean v. Am. Press*, 297 U.S. 233, 250 (1936). The First Amendment is essential to ensuring the public is properly informed and that the government remains accountable to the public. *See Richmond Newspapers*, 448 U.S. at 572. Beyond serving, like sunshine, as a "disinfectant," transparency fosters trust and confidence:

---

[28] Emily Wu Pearson, *Program to virtually monitor Georgia's immigration courts loses online access*, WABE (Apr. 7, 2026), https://www.wabe.org/program-to-virtually-monitor-georgias-immigration-courts-loses-online-access.

"People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.*

These core principles have fueled the Supreme Court's decades-long recognition that the First Amendment ensures public access to a wide range of criminal proceedings, trials being the quintessential and seminal example. *See id.* at 575-80 ("We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment . . . ."); *see also Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property."). As the Supreme Court has explained:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*").

In cases following *Richmond Newspapers*, the Supreme Court emphasized that "the First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise," *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 7 (1986) ("*Press-Enterprise II*"), and deemed the constitutional right of access to extend, for example, to preliminary hearings, *id.*, and voir dire, *Press-Enterprise I*, 464 U.S. at 504-05. These cases recognize that the First Amendment has an important "*structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers*, 448 U.S. at 587, 589 (Brennan, J., concurring).

To determine whether the First Amendment access right attaches to a particular proceeding, courts consider whether a proceeding has traditionally been open and whether openness supports its proper functioning—a two-part inquiry known as the experience and logic

9

test. *See Press-Enterprise II*, 478 U.S. at 8-9; *see also Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003) (describing test). If the First Amendment access right does attach, then to overcome it, the government must show that denial of access "is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 705 (6th Cir. 2002) (quoting *Globe Newspaper v. Super. Ct.*, 457 U.S. 596, 606-07 (1982)). To close the courtroom, the judge must make "specific findings on the record so that a reviewing court can determine whether closure was proper and whether less restrictive alternatives exist." *Id.* at 707 (citing *Press-Enterprise II*, 478 U.S. at 13). Thus, blanket closures, like those alleged here, violate the public's access rights.

The Supreme Court has not directly addressed whether the First Amendment right of access applies outside of criminal judicial proceedings, including to immigration court proceedings. But the Court has left open the possibility, and appellate courts have applied the right broadly. *See Richmond Newspapers*, 448 U.S. at 580 n.17 ("historically both civil and criminal trials have been presumptively open"); *see also In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 36 (D.D.C. 2009) ("While the D.C. Circuit has been silent on the issue, other Circuits have opined and uniformly held that the public has a First Amendment right of access to civil proceedings and records."). Although the D.C. Circuit has not decided the issue, "many other circuits have concluded that such a right exists in civil and even administrative matters," *Dhiab v. Trump*, 852 F.3d 1087, 1104 (D.C. Cir. 2017) (Williams, J., concurring in part), as have courts in this District, *see In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d at 38 (right applies to certain filings in civil habeas proceedings); *Nat'l Ass'n of Waterfront Emps. v. Chao*, 587 F. Supp. 2d 90, 98 (D.D.C. 2008) ("Like the right of public access in civil cases, public policy favors public access to administrative proceedings.").

10

**B.    This Court Should Follow Its Sister Circuits And Apply The Experience And Logic Test To Immigration Proceedings**

Despite conceding the test's broad applicability in footnote 4 of its brief, the government tries to paint the experience and logic test of *Richmond Newspapers* as an "exception" applicable only in criminal proceedings, citing an outdated "rule" from *Houchins v. KQED*, 438 U.S. 1 (1978). Courts have repeatedly rejected that narrow view of the test. Specifically, the Sixth, Third, Second, and Ninth Circuits have all applied the experience and logic test to administrative activities—and the Sixth and Third Circuits have applied the test to the sort of immigration proceedings at issue here. *See Detroit Free Press*, 303 F.3d at 695 (collecting cases; applying experience and logic test to deportation hearings); *N. Jersey Media Grp. v. Ashcroft*, 308 F.3d 198, 208-09 (3d Cir. 2002) (the experience and logic test is "broadly applicable to issues of access to government proceedings, including removal"); *see also NYCLU v. NYC Transit Auth.*, 684 F.3d 286, 300 (2d Cir. 2012) (applying test to administrative proceeding and noting that "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process"); *Leigh v. Salazar*, 677 F.3d 892, 899 (9th Cir. 2012) (applying test to Bureau of Land Management horse roundups and noting that test applies to "a wide range of civil and administrative government activities").

In the face of this uniform authority, the government relies on the D.C. Circuit's decision in *Center for National Security Studies*. But that case arose from a request made under the federal Freedom of Information Act ("FOIA") and did not involve anything resembling a judicial or administrative proceeding, much less an immigration proceeding that involves detention and potential deportation. *See Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal

11

process." (cleaned up)). The government does not cite a single case rejecting application of the experience and logic test to administrative adjudicatory proceedings like those at issue here.

Because no branch of government is "completely immune from the First Amendment guarantee of access," *Detroit Free Press*, 303 F.3d at 695, this Court should follow its sister circuits and apply the experience and logic test.

### C.       This Court Should Follow The Sixth Circuit And Conclude That The First Amendment Guarantees Access To Immigration Proceedings

Both experience and logic support access to immigration proceedings. In *Detroit Free Press*, the Sixth Circuit held that "there is a First Amendment right of access to deportation proceedings," which "bear a strong resemblance to judicial trials." 303 F.3d at 698, 700. There, members of the press and public challenged a directive issued ten days after the September 11 attacks closing deportation hearings in "special interest" cases. *Detroit Free Press*, 303 F.3d at 683. Applying the two-part experience and logic test, the court first held that "deportation proceedings historically have been open." *Id.* at 701. The court cited the longstanding "general policy" of "openness" to those proceedings, including federal regulations that for decades "explicitly required deportation proceedings to be presumptively open." *Id.*

The court next held that logic prong was satisfied, as "[p]ublic access undoubtedly enhances the quality of deportation proceedings." *Id.* at 703. It explained that public access (1) "acts as a check" on the government "by assuring us that proceedings are conducted fairly and properly"; (2) helps ensure the government "does not make mistakes"; (3) offers a "cathartic" outlet for "community concern, hostility, and emotions"; (4) "enhances the perception of integrity and fairness"; and (5) ensures that individuals "can effectively participate in and contribute to our republican system of self-government." *Id.* at 703-05. The court found these factors especially compelling in the immigration context, where "the government has nearly

12

unlimited authority," and the press and public thus "serve as perhaps the only check on abusive government practices." *Id.* at 704.

While the Third Circuit came out differently in its application of the *Richmond Newspapers* test in addressing the same "special interest" directive as the Sixth Circuit, that decision is distinguishable. *N. Jersey Media Grp.*, 308 F.3d at 220. The court agreed that "deportation proceedings look very much like judicial trials" and that opening the proceedings "performs each of the[] salutary functions" identified in *Richmond Newspapers*. *Id.* at 216-17. The court, however, was concerned about the "substantial evidence" presented in the case "that open deportation hearings would threaten national security," including that hearings would "provide valuable clues" to terrorist networks and "accelerate the timing of a planned attack." *Id.* at 217-18.

In refusing to recognize a First Amendment right of access to "special interest deportation hearings," the Third Circuit emphasized the limited reach of its decision. *See id.* at 220 ("We do not decide that there is no right to attend administrative proceedings, or even that there is no right to attend any immigration proceeding."). That decision was fueled by the unprecedented nature of the September 11 attacks, which presented threats of "profound and unknown dimension." *Id.* The Third Circuit therefore "confined" its judgment "to the extremely narrow class of deportation cases that are determined by the Attorney General to present significant national security concerns" in the wake of the attacks. *Id.*

Still, the Third Circuit's narrow decision has been criticized, including by its dissent, which noted that "deference" to the government's national security concerns "is not a basis for abdicating our responsibilities under the First Amendment." *See id.* at 226 (Scirica, J.,

13

dissenting).[29] Those concerns seemingly motivated the court's conflation of the analysis for whether the First Amendment access right applied in the first instance with the strict scrutiny analysis for whether compelling interests overcame that right. *See id.* 217 n.13 (acknowledging "overlap" in analysis). The dissent also took issue with the court's holding that the century-long history of open proceedings was "too recent and inconsistent," *id.* at 211, explaining that "Congress has provided for presumptively open deportation proceedings from the moment that it first enacted an immigration statutory framework," *id.* at 224 (Scirica, J., dissenting).

This Court should adopt the Sixth Circuit's reasoning and conclude that the First Amendment's experience and logic test requires public access to immigration court proceedings. At least three reasons compel this result.

*First*, although the government relies on *Center for National Security Studies* in arguing against recognition of a First Amendment right to immigration proceedings, that case actually instructs that the Sixth Circuit's conclusion is the proper one here. *See* 331 F.3d at 935-36. As noted above, *Center for National Security Studies* involved access under FOIA to *investigatory* information about detainees following the September 11 attacks, *not* to their immigration court proceedings, as in *Detroit Free Press*. *See id.* at 920, 935-36. That factual difference was dispositive, as the court acknowledged the "crucial distinction between '*investigatory* information' and 'access to information relating to a governmental *adjudicative* process." *Id.* at 936 (emphasis in original) (quoting *Detroit Free Press*, 303 F.3d at 699). Accordingly, the D.C. Circuit concluded that it would "not expand the First Amendment right of public access to

---

[29] *See also, e.g.*, Jonathan L. Hafetz, *The First Amendment and the Right of Access to Deportation Proceedings*, 40 Cal. W. L. Rev. 265, 297 (2004) ("*North Jersey Media Group* undercuts the important structural role of access that lies at the heart of *Richmond Newspapers* and the First Amendment").

require disclosure of information compiled during the government's *investigation* of terrorist acts." *Id.* (emphasis added). But as this case seeks access to immigration court proceedings, "governmental adjudicative process[es]," no basis exists to distinguish *Detroit Free Press* here. *See id.*

*Second*, the Third Circuit's limited decision in *North Jersey Media Group* cannot by its terms apply here, as this case does not involve "the extremely narrow class of deportation cases that are determined by the Attorney General to present significant national security concerns" in the wake of the September 11 attacks. 308 F.3d at 220.

*Third*, setting aside the very recent restrictions imposed by the government that are the impetus for this lawsuit—the "unbroken openness" of immigration proceedings has continued, *id.* at 224 (Scirica, J., dissenting), with federal regulations requiring public immigration proceedings except when narrow considerations demand otherwise. *See* 8 C.F.R § 1003.27; 8 C.F.R. § 1240.10(b); *see also Stevens v. Osuna*, 877 F.3d 1293, 1312-13 (11th Cir. 2017) ("We stress—and no one disputes—that immigration hearings already are presumptively open to the public."). These regulations reflect a longstanding commitment to transparency and the First Amendment values underlying it. *See Pechter v. Lyons*, 441 F. Supp. 115, 117-18 (S.D.N.Y. 1977) (regulation requiring public deportation proceedings "is but one of countless manifestations of a public policy centuries old that judicial proceedings, especially those in which the life or liberty of an individual is at stake, should be subject to public scrutiny, not only for the protection of the individual from unwarranted and arbitrary conviction, but also to protect the public from lax prosecution").[30]

---

[30] These regulations reflect not only First Amendment principles but also common law access principles, which apply where "access provides a significant positive role in the functioning of the proceedings," *In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d at 39 (citing *United*

15

Those regulations do not just enshrine the First Amendment's qualified right—they also adopt the constitutional principle that journalists often act as "surrogates for the public." *Richmond Newspapers*, 448 U.S. at 573; *see also Cox Broad. v. Cohn,* 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). "While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard." *Richmond Newspapers*, 448 U.S. at 573. Likewise, the regulations provide that immigration courts may "place reasonable limitations upon the number in attendance," but priority must be "given to the press over the general public." 8 C.F.R. § 1003.27(a).

### D.    The Constitutional Access Right Is Especially Important Now

In its opposition to plaintiff's preliminary injunction motion, the government does not deny the logic of access to immigration proceedings, nor does it point to anything on what the Third Circuit called "the flip side"—*i.e.*, "the extent to which openness impairs the public good." *N. Jersey Media Grp.*, 308 F.3d at 217. In fact, the benefits of access, recognized by both the Sixth and Third Circuits, have only increased since the September 11-era decisions discussed *supra*. Meanwhile, the national security concerns expressed by the Third Circuit at that fragile moment 20-some years ago have dissipated and, in any event, administrative judges—like Article III judges—can appropriately resolve such concerns through redaction and sealing on a case-by-case basis.

---

*States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997)), and due process principles, which require certain administrative hearings to be "open to the press and public," *Fitzgerald v. Hampton*, 467 F.2d 755, 766 (D.C. Cir. 1972).

16

Ten years ago, then-appellate judge Richard Posner described the Immigration Court as "the least competent federal agency," citing "severe underfunding" that has "resulted in a shortage of immigration judges" and "crushing workloads." *Chavarria-Reyes v. Lynch*, 845 F.3d 275, 280 (7th Cir. 2016) (Posner, J., dissenting). Those issues persist. Operation Metro Surge resulted in the arrest of more than 4,000 people in Minneapolis alone.[31] At Fort Snelling, just one of about 70 immigration courts across the United States, there is a backlog of roughly 60,000 cases.[32] Despite this backlog, the government dismissed 98 of the 700 immigration judges in 2025, with one dismissed judge commenting: "We all felt like you can't do more damage than you already have to the immigration courts and to justice and to due process. Yet it's like, 'Hold my beer, watch this.'"[33] The government has vowed to replace these immigration judges with "deportation judges."[34]

Policies are also shifting rapidly. Immigration judges have received dozens of memos from the Executive Office for Immigration Review "announcing the undoing of policies put in

---

[31] Maria Sacchetti & N. Kirkpatrick, *How ICE officers defied court orders as immigrant arrests soared in Minneapolis*, WASHINGTON POST (Mar. 9, 2026), https://www.washingtonpost.com/immigration/2026/03/10/trump-immigration-detention-minneapolis-courts/.

[32] Magan, *supra* n.18; *see also* Ximena Bustillo, *Inside one of the most understaffed immigration courts in the country*, NPR (Aug. 13, 2025), https://www.npr.org/2025/08/13/nx-s1-5482883/trump-immigration-court-firings-chelmsford.

[33] Emily Ngo, *Immigration courts thrown into chaos as Trump administration purges dozens of judges*, POLITICO (Dec. 6, 2025), https://www.politico.com/news/2025/12/06/trump-immigration-court-judge-purges-00679376; *see also* Anusha Mathur & Ximena Bustillo, *U.S. has a quarter fewer immigration judges than it did a year ago. Here's why*, NPR (Feb. 23, 2026), https://www.npr.org/2026/02/23/g-s1-110911/trump-immigration-judges-dismissals-numbers.

[34] Nicholas Nehamas, Allison McCann, Steven Rich, Jazmine Ulloa & Hamed Aleaziz, *How Trump Purged Immigration Judges to Speed Up Deportations*, NEW YORK TIMES (Apr. 9, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

place by the Biden administration" and "dictating the president's immigration agenda."[35] Those

policies, according to some judges, "have turned immigration courts across the U.S. into fast

tracks to removal."[36] As one former judge lamented: "Due process is dead in immigration

courts."[37]

The increased burden on immigration courts dovetails with zealous—and controversial—

enforcement of immigration laws. *See, e.g.*, *Abrego Garcia v. Noem*, 2025 WL 1135112, at *1

(4th Cir. Apr. 17, 2025) (the government's assertion of the "right to stash away residents of this

country in foreign prisons without [a] semblance of due process" should "be shocking not only to

judges, but to the intuitive sense of liberty that Americans far removed from courthouses still

hold dear"). Heightened enforcement has had dramatic consequences, including the deaths of

two Minnesotans at the hands of federal agents. *See, e.g.*, *Minnesota ex rel. Ellison v. Noem*, ---

F. Supp. 3d ----, 2026 WL 253619, at *12 (D. Minn. Jan. 31, 2026) (it "would be difficult to

overstate the effect [Operation Metro Surge] is having on the citizens of Minnesota"). The

government's enforcement methods have thus ignited significant debate.[38] *See Richmond*

*Newspapers*, 448 U.S. at 587 (Brennan, J., concurring) ("valuable public debate—as well as

other civic behavior—must be informed").

---

[35] Marco Poggio, *Judges See An Immigration Court Gutted From Inside*, LAW360 (Oct. 31, 2025), https://www.law360.com/access-to-justice/articles/2381003/judges-see-an-immigration-court-gutted-from-inside.

[36] *Id.*

[37] *Id.*

[38] *See, e.g.*, Brad Brooks, Daniel Trotta & Andrew Goudsward, *Thousands demonstrate in Minnesota and across US to protest ICE*, REUTERS (Jan. 30, 2026), https://www.reuters.com/world/us/nationwide-protests-walkouts-planned-over-fatal-ice-shootings-minneapolis-2026-01-30.

Public federal court proceedings have helped shed light on these enforcement methods. Courts, for example, have openly rebuked the government for failing to comply with court orders in immigration cases.[39] In one such proceeding, an ICE attorney, who was detailed to the Department of Justice, told the court that trying to fix the agency's issues was like "pulling teeth."[40] But outside these public proceedings, immigration policies and practices can be opaque. In immigration courts, some judges are allowing ICE attorneys to withhold their names.[41] And as alleged in this case, some immigration judges have closed their courtrooms altogether. These closures allow the government to "selectively choose[] what information it allows the public to see," which "can become a powerful tool for deception." *Detroit Free Press*, 303 F.3d at 705.

"When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900. Closing proceedings does nothing to dispel fears of wrongdoing. On the contrary, secrecy "breed[s] suspicion of prejudice and arbitrariness." *Richmond Newspapers*, 448 U.S. at 595 (Brennan, J., concurring). It is instead, in the words of Justice Brandeis, "sunlight" that is the "most powerful of all disinfectants." *N.Y.*

---

[39] *See, e.g.*, Matt Sepic & Jon Collins, *Two federal judges rebuke Minnesota U.S. Attorney after ICE fails to follow court orders*, MPR NEWS (Feb. 26, 2026), https://www.mprnews.org/story/2026/02/26/judge-summons-minn-us-attorney-to-court-threatens-contempt; Mattathias Schwartz, Zach Montague & Luis Ferré-Sadurní, *A senior Justice Dept. official described dozens of violations of court orders in New Jersey as accidental*, NEW YORK TIMES (Feb. 18, 2026), https://www.nytimes.com/live/2026/02/18/us/trump-news#court-orders-new-jersey-immigrants; Max Nesterak, *Chief Judge Schiltz: 'One way or another, ICE will comply with this court's orders'*, MINNESOTA REFORMER (Feb. 27, 2026), https://minnesotareformer.com/2026/02/27/chief-judge-schiltz-one-way-or-another-ice-will-comply-with-this-courts-orders.

[40] *See* Kit Maher & Aleen Fayaz, *ICE chief counsel in Minnesota retires amid growing number of immigration cases*, CNN (Feb. 7, 2026), https://www.cnn.com/2026/02/07/politics/ice-top-lawyer-minnesota-jim-stolley-retires.

[41] Debbie Nathan, *ICE Lawyers Are Hiding Their Names in Immigration Court*, THE INTERCEPT (July 15, 2025), https://theintercept.com/2025/07/15/ice-lawyers-hiding-names-court.

*Times v. Sullivan*, 376 U.S. 254, 305 (1964) (Goldberg, J., concurring). Public immigration proceedings thus not only encourage officials to act with "conspicuous respect for the rule of law" but also ensure the public trusts that they are doing so. *Richmond Newspapers*, 448 U.S. at 595 (Brennan, J., concurring). An anonymous government "cannot be held accountable" and is therefore "no government at all." *Urquilla-Ramos v. Trump*, --- F. Supp. 3d ----, 2026 WL 475069, at \*18 (S.D. W. Va. Feb. 19, 2026).

<u>**CONCLUSION**</u>

For the reasons stated above, amici respectfully submit that the Court should grant Plaintiff's Motion for Preliminary Injunction and Stay.

Dated:  April 13, 2026                            Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Lauren P. Russell*
Lauren P. Russell (#7567949)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
russelll@ballarspahr.com

Leita Walker*
Anna Kaul*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211 | Fax: (612) 371-3207
walkerl@ballardspahr.com
kaula@ballardspahr.com

Saumya K. Vaishampayan*
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200 | Fax: (212) 223-1942
vaishampayans@ballardspahr.com

*\* Of counsel*

*Counsel for Amici Curiae*

20