**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 26-865 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 6, 12, 13 |
| | : | | |
| TODD BLANCHE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

**I.  INTRODUCTION**

This case concerns the purportedly unlawful closure of immigration hearings at the Fort Snelling Immigration Center in Minnesota.  Plaintiff The Advocates for Human Rights ("AHR") reports that its volunteer observers have been repeatedly denied access to immigration hearings in Fort Snelling, which AHR argues contravenes 8 C.F.R. § 1003.27 and the First Amendment. Based on these purported past closures, AHR asks this Court to enter a universal, preliminary injunction or stay under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 705–06.

Specifically, AHR asks the Court to enjoin a host of federal officers from closing immigration court proceedings unless the presiding immigration judge (1) "state[s] orally in open court and on the record . . . any asserted basis for closing such proceeding[s]" and (2) gives the public and press an opportunity to object to the closure.  Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot.") at 8–9, ECF No. 6.  AHR seeks this injunction against Acting Attorney General Todd Blanche, Director of the Executive Office for Immigration Review ("EOIR") Daren K. Margolin, Chief

Immigration Judge Hon. Teresa L. Riley, and Assistant Chief Immigration Judge Hon. Eric. L. Dillow (collectively, the "Government").[1]

The Court denies AHR's motion for a preliminary injunction and stay because the Court concludes that AHR lacks standing. AHR asks the Court to enjoin a series of federal officials before reaching a final determination of whether those officials have done anything unlawful and based on an incomplete record. That is an "extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11 Wright & Miller's Federal Practice & Procedure § 2948 (2d ed. 1995)). The standard for attaining this extraordinary relief—including establishing standing—is correspondingly high. AHR must carry the burden of persuasion by "*a clear showing*." *Id.* (quoting same). The Court finds that AHR has not met that high standard at this preliminary juncture.

## II.  FACTUAL BACKGROUND

The factual background provided below is based on the evidence provided by the parties, the allegations in AHR's Complaint, the parties' representations in their briefs and at argument, and publicly accessible government documents. It does not reflect findings of fact made by the Court.

### A.  EOIR and Immigration Proceedings

The Fort Snelling Immigration Court is an immigration court located in the Bishop Henry Whipple Federal Building in Minnesota. Compl. ¶ 14, ECF No. 1. According to the Government, it "is supervised by an Assistant Chief Immigration Judge and staffed by six additional Immigration Judges." Defs.' Mem. in Opp'n ("Defs.' Opp'n") at 4, ECF No. 10.

---

[1] AHR initially sued then Attorney General Pamela Bondi but has since substituted her for Acting Attorney General Todd Blanche.

These immigration judges, and the Chief Immigration Judge, are part of EOIR.  *See* 8 C.F.R. §§ 1003.0, 1003.9.  EOIR, which sits within the Department of Justice, "conducts immigration court proceedings, appellate reviews, and administrative hearings."  Defs.' Ex. A, Decl. of Daren K. Margolin ("Margolin Decl.") ¶ 2, ECF No. 10-1.  As spelled out in an EOIR Policy Manual, these immigration proceedings include "removal, deportation, exclusion," and other hearings, with deportation proceedings comprising "the vast majority of proceedings conducted by Immigration Judges."  EOIR Policy Manual Part II, Chs. 3.1, 6.1.[2]

The Government represents that "[t]he most common types of hearings in Immigration Court are master calendar hearings, individual calendar or merits hearings, and custody redetermination or bond hearings."  Defs.' Opp'n. at 2.  "Master Calendar hearings are held for pleadings, scheduling, and other similar matters."  EOIR Policy Manual Part II, Ch. 3.14(a).[3] This includes, among other things, advising the respondent of their right to counsel and the availability of pro bono legal services as well as informing the respondent of the charges against them.  *Id.* Part II, Ch. 3.14(e).  If a case requires an evidentiary hearing, such as for "challenges to removability and applications for relief," the matter is set for an "individual calendar hearing[ ] or merits hearing[ ]."  *Id.* Part II, Ch. 3.15(a).[4]  Finally, although the Department of

---

[2] Chapter 3.1 of Part II of the EOIR Policy Manual is available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-3-1 [https://perma.cc/X9CX-VETZ].  Chapter 6.1 of Part II of the Manual is available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-6-1 [https://perma.cc/X74X-S8AB].  Part II of the Manualwas last updated on February 10, 2026.

[3] Chapter 3.14 of Part II of the EOIR Policy Manual is available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-3-14 [https://perma.cc/GB9Y-4D3Z].

[4] Chapter 3.15 of Part II of the EOIR Policy Manual is available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-3-15 [https://perma.cc/W5LQ-5QLF].

Homeland Security initially sets the bond for all respondents, a respondent may request a "bond hearing" at which an immigration judge may "redetermine the amount of bond set by" the Department. *Id.* Part II, Ch. 8.3(a).[5]

According to EOIR Executive Director Daren K. Margolin, an EOIR analysis found that between March 1, 2025 and February 28, 2026—the period at issue in AHR's Complaint—the Fort Snelling Immigration Court held 47,248 immigration hearings. Margolin Decl. ¶ 8. During this period, the number of hearings ranged from roughly 2,800 to 4,600 a month. *Id.*[6]

### B. AHR and Its Declarations

AHR is a 501(c)(3) international human rights organization headquartered in Minnesota that has run an Immigration Court Observation Project since 2017. Pl.'s Ex. 2, Jan. 9 Letter at 1, ECF No. 6-1. The project involves volunteers observing immigration proceedings, primarily at the Fort Snelling Immigration Court. *Id.* at 2. AHR trains its observers to "follow best practices of court observation," including "non-intervention, neutrality, respect, and professionalism." *Id.* According to AHR, over the last eight years it has "generally been a strong partner with the court" and has "enjoyed access to hearings" consistent with applicable regulatory requirements. *Id.* Observers were able to "freely observe all master calendar hearings without prior approval"

---

[5] Chapter 8.3 of Part II of the EOIR Policy Manual is available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-8-3 [https://perma.cc/NP8D-TBHG].

[6] Although immigration judges and EOIR conduct immigration proceedings, according to Director Margolin, they do not control the federal buildings in which the immigration courts sit—in this case the Bishop Henry Whipple Federal Building. Margolin Decl. ¶¶ 5–6. Control over the federal building lies with the Federal Protective Service, an arm of the Department of Homeland Security. Thus, "[a]lthough an immigration judge generally controls who may remain inside a courtroom during a hearing pursuant to regulation and by issuing orders, the immigration judge cannot execute the orders." *Id.* ¶ 6

and "also were able to observe a significant percentage of detained and non-detained individual calendar hearings." *Id.* at 3.

As AHR tells it, that began to change in March 2025. *See id.* AHR's volunteer observers began experiencing limitations on their ability to observe immigration proceedings at Fort Snelling. *See id.* To attest to these limitations, AHR provides a series of declarations from its volunteers and one employee outlining their experiences. The declarations describe five broad categories of limitations on access to immigration hearings.

First, many of the limitations described in these declarations reflect practices by immigration judges or other staff that, while perhaps new, fall short of a complete closure of the immigration hearing. For example, Amy Lange, the Program Manager for the Immigration Court Observation Project, tells that one immigration judge was instructing guards to lock the courtroom doors during master calendar hearings, preventing observers from entering or exiting except during formal recesses. Pl.'s Ex. 7, Decl. of Amy S. Lange ("Lange Decl.") ¶¶ III–IV, XVII, ECF No. 6-1; *see also* Pl.'s Ex. 9, Decl. of Kathleen Burke Scheffler ("Scheffler Decl.") ¶ III, ECF No. 6-1; Pl.'s Ex. 11, Decl. of Megan R. Barker ("Barker Decl.") ¶ III, ECF No. 6-1 .[7] Other observers report being warned that they could not wait for hearings to start in the lobby outside the courtroom but rather must wait in the hallway or that they could not wait in the building at all. *See* Pl.'s Ex. 8, Decl. of Craig Hollenbeck ("Hollenbeck Decl.") ¶ IV, ECF No. 6-1; Pl.'s Ex. 6, Decl. of Lyndsey Marcelino Schalkwyk ("Schalkwyk Decl."), ECF No. 6-1.

Second, the declarations describe apparent confusion and disorganization among court staff regarding existing practices. For example, when a clerk was asked about the process for

---

[7] Megan Barker's declaration restarts its paragraph numbering after paragraph IV. To avoid confusion, the Court refers to the paragraph numbers using a sequential renumbering starting with I and ending with VII so that no two paragraphs have the same number.

attending remote hearings, the clerk answered that they were "out of the loop and know nothing."  Lange Decl. ¶ XIX.  Another declaration describes uncertainty between a security officer and the clerk's office about the process for admitting observers.  *See* Barker Decl. ¶ VI.  Similarly, in June 2025, EOIR's communications division informed Ms. Lange that observers did not need to check in before observing hearings, Lange Decl. ¶ VI, but other observers were informed they would not be admitted without permission, Pl.'s Ex. 13, Decl. of Patricia A. Bethke ("Bethke Decl.") ¶ III, ECF No. 6-1; Lange Decl. ¶ VIII.  And in October 2025, when an observer asked a court staff member why all merits hearings were closed that day, the staff member did not know and stated only that "each day is different."  Pl.'s Ex. 10, Decl. of Marily K. Knieriemen ("Knieriemen Decl.") ¶ VII, ECF No. 6-1.

Third, the declarations emphasize the difficulty AHR's observers experienced in attending hearings remotely.  Many observers report that they were not allowed to attend hearings remotely.  *See, e.g.*, Pl.'s Ex. 12, Decl. of Mark G. Rabogliatti ("Rabogliatti Decl.") ¶ III, ECF No. 6-1; Hollenbeck Decl. ¶ III; Lange Decl. ¶ VII.  Ms. Lange elaborates that since February 25, 2026, only a single immigration judge at Fort Snelling has allowed observers to remotely observe master calendar hearings, and on one day in March, no immigration judges allowed observers to watch the hearings remotely.  Lange Decl. ¶¶ XXII–XXIII.

But although the declarations describe some hearings that could only be attended remotely, *see, e.g.*, *id.* ¶ XIX, Ms. Lange and the volunteer observers largely do not specify whether the hearings to which they were denied remote access could only have been observed remotely.  According to an EOIR factsheet quoted in a letter AHR sent to EOIR, the agency specifies that "[v]isitors should observe in person," and remote-access "links posted on EOIR's website are for parties appearing remotely," not observers.  Jan. 9 Letter at 11.

Fourth, declarations submitted by members of NorCal Resist, the Immigrant Advocates Response Collaborative, and Immigration Services and Legal Advocacy describe restrictions on observing immigration hearings in California, New York, and Louisiana. *See generally* Pl.'s Exs. 14–16, ECF No. 6-1. According to these declarations, observers have been excluded from hearings and barred from accessing immigration courts without prior appointments, among other limitations. *See, e.g.*, Pl.'s Ex. 14, Decl. of Heidi D. Phipps at 1–2; Pl.'s Ex. 15, Decl. of Gillian Rowland-Kain ("Rowland-Kain Decl.") ¶¶ 17–33. Some of these declarations suggest that courts have limited remote access to hearings to the parties and attorneys because of bandwidth constraints or because they cannot ensure that remote observers are not recording the hearings. *See* Rowland-Kain Decl. ¶¶ 9–16; Pl.'s Ex. 16, Decl. of Emma Wilson.[8]

Finally, the declarations from AHR's volunteers describe a number of instances where hearings at Fort Snelling were entirely closed to observers. One observer reports that on October 27, 2025, all merits hearings were closed to observers. *See* Knieriemen Decl. ¶ VII. Another observer recounts an immigration judge experiencing technical difficulties in her courtroom and deciding to join the hearing from a different location without allowing observers to do so as well. Hollenbeck Decl. ¶ III. On one occasion, an observer encountered a sign indicating that a hearing was confidential. Bethke Decl. ¶ IV.[9] Other observers were simply excluded from specific hearings without explanation. *See, e.g.*, Rabogliatti Decl. ¶ IV; Knieriemen Decl. ¶ VI.

For most of these closed hearings, AHR does not provide evidence from lawyers or parties that attended the hearing, but on three occasions lawyers present at the hearings could not

---

[8] AHR also attaches letters sent by the American Civil Liberties Union Foundation of Northern California and Public Justice describing concerns about public access to immigration proceedings in California. *See generally* Pl.'s Exs. 4–5, ECF No. 6-1.

[9] On another occasion, observers were met with a similar sign, but when an observer tried to enter, they were let in anyway. *See* Lange Decl. XVIII.

identify any basis for the closure.  For two of those hearings, the attorney for the respondent had been asked by the immigration judge about observers and had expressly consented to observers attending.  *See* Knieriemen Decl. ¶ VI; Lange Decl. ¶ XIII.  For the third hearing, an attorney exiting the courtroom was "unsure why" the hearing would have been closed.  Bethke Decl. ¶ VIII.

Although the declarations recount various closed hearings, AHR does not provide any figure or estimate for the number of hearings from which its volunteers and staff were excluded.  Nor does AHR indicate what percentage of hearings its observers were excluded from relative to the total number of hearings they tried to observe.

### C.  AHR's Communications with EOIR

In response to these limitations and restrictions, AHR reached out to government officials at Fort Snelling.  On April 2, 2025, Ms. Lange sent an email to the then Asisstant Chief Immigration Judge expressing concern about an immigration judge locking courtroom doors during hearings.  Lange Decl. ¶ III.  This practice had resulted in a respondent's family being excluded from a hearing.  *Id.*  According to Ms. Lange, the Assistant Chief Immigration Judge responded that he shared her "concern regarding a closed courtroom during master calendar sessions."  *Id.*  He reiterated that AHR observers "along with others should be able to enter and exit the courtroom throughout the session," and he stated that he would "address this issue" with the relevant immigration judge.  *Id.*  Ms. Lange reports that, after this email, the courtroom doors were left unlocked, but the immigration judge began "to chastise observers for entering her courtroom" during hearings.  *Id.* ¶ IV.

Around June 15, 2025, Ms. Lange emailed EOIR regarding observers' inability to access hearings remotely.  Lange Decl. ¶ VI.  A member of EOIR's Communication and Legislative

Affairs division responded via email that "[i]mmigration court hearings are open to the public, with some exceptions, as outlined in the EOIR Policy Manual." *Id.*  The email also gave instructions for where to find Webex links to join hearings remotely. *Id.*

On January 9, 2026, AHR Executive Director Michele Garnett McKenzie sent a letter to Defendants Daren K. Margolin and the Hon. Eric L. Dillow detailing the limitations and burdens the organization's volunteers had faced. *See* Jan. 9 Letter at 3–6.  Executive Director McKenzie requested that "immigration court proceedings at the Fort Snelling Immigration Court, whether held in person or via Webex, remain open to the public and to the press." *Id.* at 1.  She also asked for copies of any relevant policy changes. *Id.* at 11–12.

EOIR Press Secretary Kathryn Mattingly responded to Executive Director McKenzie on January 20, 2026.  *See* Pl.'s Ex. 3, Jan. 20 Letter, ECF No. 6-1.  Press Secretary Mattingly noted that "there may be instances where hearings need to be closed or held with limited attendance for a variety of reasons, as described in the Immigration and Nationality Act, the Code of Federal Regulations, and EOIR Policy." *Id.* at 1.  She also explained that the Federal Protective Service, a part of the Department of Homeland Security, "is responsible for access to, and securing, the buildings." *Id.*  "Immigration Judges or [the Federal Protective Service] may determine that doors need to be locked for security reasons or to prevent disruptions of court proceedings." *Id.*  Finally, regarding remote access, Press Secretary Mattingly wrote that "[o]bservers should plan to observe immigration hearings in person at the courtroom" and clarified that "Webex links posted on EOIR's website are posted for *parties* appearing remotely." *Id.* at 1–2.  She further stated that "[w]hen in-person access is not available, the Immigration Judge has the discretion to admit non-parties via Webex to observe a hearing that is open to the public." *Id.* at 2.  AHR represents that, after its January 9 Letter, the access restrictions "temporarily abated somewhat"

but have since "largely resumed and have continued in other parts of the nation."  Pl.'s Mot. at 13.  After AHR filed suit, EOIR Director Daren K Margolin sent an email to all EOIR staff reiterating that "immigration courts are open daily to the public," that "[v]isitors do not need permission to visit or to observe an open hearing," and that only "[l]imited exceptions apply." Margolin Decl. Ex. 2 at 1, ECF No. 10-1 (emphasis removed).

### D.  Legal Proceedings

AHR brough this action on March 12, 2026. *See* Compl.  One week later, AHR moved for a preliminary injunction and stay.  Pl.'s Mot. at 1.  After the parties fully briefed the motion, two *amici curiae* sought leave to file briefs in support of AHR's motion—Reporters Without Borders and Dow Jones *et al.*—leave which the Court now grants.  ECF Nos. 12–13.  The Court held a motions hearing on April 16, 2026, after which it took AHR's motion under advisement.[10]

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The "familiar standard" for a preliminary injunction "requires a plaintiff to make a *clear showing* that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (emphasis added) (quoting *Winter*, 555 U.S. at 22).

---

[10] After the motions hearing, AHR submitted a Notice of Supplemental Evidence with two additional declarations, ECF No. 14, which the Government asks the Court to strike as untimely, ECF No. 15.  Because the Court's standing analysis, which is dispositive for AHR's motion, does not implicate the information raised in the supplemental declarations, the Court need not decide whether to strike the additional declarations.

The D.C. Circuit has traditionally applied a sliding-scale approach to these factors, meaning that a strong showing on one factor, such as irreparable harm, may compensate for a meager showing on another factor, such as likely success on the merits. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). Courts in this Circuit have questioned that approach for the last eighteen years without resolving whether it remains good law. *See Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025). *But cf. Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors."). Today is once again not the day to resolve that question because neither party mentions the sliding-scale approach, and the D.C. Circuit has held that its application may be waived. *See Clevinger*, 134 F.4th at 1236.

AHR also moves for a stay under 5 U.S.C. § 705. Pl.'s Mot. at 1. Both parties agree that the preliminary-injunction factors also govern the analysis for a stay under Section 705. Pl.'s Mot. at 13; Def.s' Opp'n. at 8; *see also Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012). The parties do not address, however, whether the same "clear showing" requirement from the preliminary-injunction context carries over to a Section 705 stay as well, although AHR quotes language from a case suggesting that they are the same. *See* Pl.'s Mot. at 13; *Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020) ("Requests for preliminary relief under the APA, 5 U.S.C. § 705, are also governed by the same standards."). *But cf. Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (saying nothing about a clear-showing requirement and applying the sliding-scale approach). Because the parties do not argue for a different standard, and both parties analyze the preliminary injunction and stay together, the Court deems any argument for a different burden of persuasion waived. *See Carducci v. Regan*,

11

714 F.2d 171, 177 (D.C. Cir. 1983).  The Court therefore collapses the analysis of the preliminary injunction and stay into one.

## IV.  ANALYSIS

AHR presses two claims in its motion. First, it argues that the Government's closure of immigration hearings violates 8 C.F.R. § 1003.27.  *See* Pl.'s Mot. at 21.  The regulation provides that "[a]ll hearings, other than exclusion hearings, shall be open to the public . . . ."  8 C.F.R. § 1003.27.  It also enumerates, however, a series of exceptions.  Immigration judges "may place reasonable limitations upon the number [of people] in attendance," with priority given "to the press," "[d]epending upon physical facilities."  *Id.* § 1003.27(a).  Immigration judges may also "limit attendance or hold a closed hearing" to "protect[ ] witnesses, parties, or the public interest."  *Id.* § 1003.27(b).  And immigration judges "shall" close proceedings in certain cases concerning "abused alien spouse[s]," "abused alien child[ren]," and "information subject to a protective order under § 1003.46."  *Id.* §§ 1003.27(c)–(d).  Second, AHR contends that, independent of Section 1003.27, the First Amendment precludes the closure of immigration hearings unless the closures serve a compelling governmental interest and reflect the least restrictive means of achieving that interest.  Pl.'s Mot. at 24–25.  For the reasons explained below, the Court concludes that AHR lacks standing for both claims.[11]

---

[11] AHR initially pressed two other claims, arguing in the alternative that if the Government had changed its policy regarding opening immigration hearings to the public, any such change violated applicable procedural requirements.  *See* Pl.'s Mot. at 33–34.  After the Government disavowed any change in policy, AHR relinquished those claims for purposes of this motion, so the Court need not address them.  *See* Pl.'s Reply to Defs.' Mem. in Opp'n ("Pl.'s Reply") at 5, ECF No. 11.

## A.  Preliminary Discussion

The parties' briefs raise many important and difficult questions regarding both procedural barriers and the merits, some of which the Court raised with the parties at the April 16 motions hearing.  To start, the Government questions whether AHR challenges a discrete, final agency action, suggesting that the suit mounts a "broad programmatic attack" against the immigration court of the kind not countenanced by the APA.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* Defs.' Opp'n. at 15–19.  AHR answers that it challenges, in aggregate, a series of individually discrete, final agency actions because each order closing a hearing constitutes a final agency action.  Pl.'s Reply at 4–5.  A similar question is at issue in a pending case before the *en banc* D.C. Circuit.  *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 784 (D.C. Cir. 2025) ("Rather than seeking to challenge any of these discrete decisions that may have caused them harm, the plaintiffs seek to dress up these 'many individual actions' as a single decision in order to challenge all of them at once, which is exactly what *National Wildlife* prevents."), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) (en banc) (per curiam); *see also New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").  Relatedly, the parties do not address whether the analysis would change if the Court entertained a narrower injunction—one targeting a more specific practice at Fort Snelling, such as purportedly excluding observers from remote-only hearings.

Turning to the merits, AHR appears to argue that, to comply with Section 1003.27 and the APA, immigration judges must make on-the-record findings and provide an opportunity for observers to be heard before closing any non-expulsion immigration hearings.  *See* Pl.'s Reply

at 3–4; *see also* Compl. ¶ 48.  As the Government notes, the text of Section 1003.27 does not expressly require such on-the-record findings or an opportunity to be heard.  Defs.' Opp'n at 24. In response, AHR points to cases involving arbitrary-and-capricious challenges to agency adjudications and rulemakings.  *See City of Holyoke Gas & Elec. Dep't v. F.E.R.C.*, 954 F.2d 740, 743 (D.C. Cir. 1992); *Action for Children's Television v. F.C.C.*, 821 F.2d 741, 746 (D.C. Cir. 1987).  Neither party has developed arguments about whether these requirements apply to an immigration judge's decision to close a hearing.

Finally, the parties dispute whether the First Amendment guarantees nonparties a right to access immigration proceedings.  That question has divided at least two Circuits.  *Compare N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 202 (3d Cir. 2002) (holding the First Amendment does not guarantee access to all immigration proceedings), *and Ashcroft v. N. Jersey Media Grp., Inc.*, 536 U.S. 954 (2002) (granting stay pending appeal from preliminary injunction that found the First Amendment protected access to immigration proceeding), *with Detroit Free Press v. Ashcroft*, 303 F.3d 681, 681 (6th Cir. 2002) (holding the First Amendment "confers a public right of access to deportation hearings").  On this question, the parties and *amici curiae* thoughtfully dispute whether the so-called "experience and logic" test from *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), controls the analysis and, if so, whether immigration proceedings satisfy that test.

Still, other questions linger.  For example, neither the parties nor *amici* answer whether AHR must show immigration proceedings satisfy *both* the experience *and* logic prongs of the *Richmond Newspaper* test, and, if so, whether one prong weighs heavier in the analysis than the other.  *See Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 9 (1986) ("If the particular proceeding in question passes these tests of experience and logic, a qualified First

14

Amendment right of public access attaches."). *Compare Detroit Free Press*, 303 F.3d at 701 ("Therefore, although historical context is important, a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted."), *with N. Jersey Media Grp.*, 308 F.3d at 216 ("Even if we could find a right of access under the *Richmond Newspapers* logic prong, absent a strong showing of openness under the experience prong, a proposition we do not embrace, we would find no such right here."). Nor do the parties or *amici* advise the Court on what to make of the history of closed exclusion hearings contrasted with the history of open deportation proceedings or how to understand evidence that at least some deportation hearings have historically been held in places where it may have been difficult for the public to access, such as prisons and private homes. *Compare Detroit Free Press*, 303 F.3d at 701–03, *with N. Jersey Media Grp.*, 308 F.3d at 211–12. And neither the parties nor *amici* analyze whether the result might be different for master calendar hearings, merits hearings, or bond hearings.

Perhaps most importantly, the parties do not address whether it matters that the openness of deportation hearings has long been qualified by a series of exceptions. *See* 8 C.F.R. § 1003.27(a)–(d). Does the "experience and logic" test require a history of unqualified access? If the "experience and logic" test is met, does the First Amendment ossify only this qualified level of access—such that an immigration judge may close a hearing subject to the enumerated exceptions in Section 1003.27 without meeting strict scrutiny? Or, once the First Amendment attaches, does it raise the level of protection such that even for these historical exceptions an immigration judge must make sufficient findings to survive strict scrutiny? Neither the parties nor *amici* suggest any answers.

## B. Standing

The Court need not address these questions today, however, because it concludes that

AHR has not established standing for its motion for a preliminary injunction. Without standing,

AHR cannot obtain a preliminary injunction. *See Murthy v. Missouri*, 603 U.S. 43, 56 (2024).[12]

### 1. AHR must make a clear showing of imminent future harm

To establish standing, AHR must show that it suffers an injury that is "concrete,

particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Because AHR seeks

"forward-looking relief," it must "face 'a real and *immediate* threat of repeated injury.'" *Murthy*,

603 U.S. at 58 (emphasis added) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). There

---

[12] There is some uncertainty about whether, in the context of a preliminary injunction, the Court must decide standing first. Generally, if a party lacks standing, the Court lacks jurisdiction and thus cannot reach the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). But, in the context of preliminary injunctions, the D.C. Circuit has evaluated standing and other jurisdictional questions as part of the likelihood of success on the merits prong. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). In keeping with this approach, some courts in this District have decided other prongs of the preliminary-injunction analysis (or temporary-restraining-order analysis), such as irreparable harm, without first considering standing. *See, e.g.*, *New Mexico v. Musk*, 770 F. Supp. 3d 192, 203 n.2 (D.D.C. 2025); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20 n.3 (D.D.C. 2025). *But see, e.g.*, *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 497–98 (D.D.C. 2018). The Supreme Court, however, has suggested recently that even in the context of a preliminary injunction, if the plaintiff cannot establish jurisdiction, the Court cannot "reach the merits of the dispute" and has "no business deciding [the case], or expounding the law in the course of doing so." *Murthy*, 603 U.S. at 56–57 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). The Supreme Court did not frame its standing analysis as part of evaluating the plaintiffs' likelihood of success on the merits. *See id.* at 50 (concluding no plaintiff had "standing to seek a preliminary injunction"). It did not even mention the four preliminary-injunction factors. This could be interpreted to require courts to analyze standing as an issue antecedent to the four preliminary-injunction factors. This would presumably also mean that the D.C. Circuit's sliding-scale approach, to the extent it remains good law, would not apply to jurisdictional determinations like standing. Rather than wade into this uncertainty, the Court addresses standing first, without deciding whether it is bound to do so.

must be "a 'substantial risk that the harm will occur,'" if not evidence that "the threatened injury is 'certainly impending.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409). "'[A]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The standard of proof for this imminent injury varies "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing," including the substantial risk of imminent harm. *Murthy*, 603 U.S. at 58 (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "[T]he plaintiff cannot 'rest on . . . mere allegations, but must'" establish standing through "affidavit[s] or other evidence." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*PACEI*"), 878 F.3d 371, 377, 380 (D.C. Cir. 2017) (omission in original) (quoting *Lujan*, 504 U.S. at 561).[13]

### 2. AHR's evidence regarding past closures of immigration hearings does not clearly establish that further unlawful closures are imminent.

At this stage, AHR's evidence of imminent future harm falls short. AHR argues that it has suffered a concrete injury *in the past* due to the previous closures of immigration hearings. *See, e.g.*, Pl.'s Mot. at 17 ("AHR *has suffered* an injury in fact . . . ." (emphasis added)).

---

[13] The D.C. Circuit has described this standard as requiring the plaintiff to be "likely to be able to demonstrate standing at the summary judgment stage." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1224 (D.C. Cir. 2026) (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019)). Although potentially diverging from the standard articulated in *Murthy*, the D.C. Circuit appears to apply this standard with an understanding that it requires not just a possibility that a reasonable juror could find standing (or, alternatively that no reasonable juror could not find standing) but rather a "substantial likelihood of standing," with references to the summary-judgment standard referring to the requirement that a plaintiff put forth evidence and affidavits rather than relying on mere allegations. *See Elec. Privacy Info. Ctr.*, 928 F.3d at 104 (quoting *PACEI*, 878 F.3d at 377, 380).

Evidence of prior unlawful conduct, however, does not necessarily establish standing for a

preliminary injunction, which requires an imminent *future* injury.  For a preliminary injunction,

"past injuries are relevant only for their predictive value" about whether harm is likely to reoccur

in the immediate future.  *Murthy*, 603 U.S. at 59.

In terms of past injuries, AHR identifies roughly a dozen days with purportedly closed

hearings since June 2025:[14]

- On two days in June 2025, observers were denied access to remote-only hearings—in one

  case due to a technical difficulty, Lange Decl. ¶ V; Hollenbeck Decl. ¶ III, and with no

  explanation for the other, Rabogliatti Decl. ¶ III.

- On July 2, 2025, observers were denied entrance to a master calendar hearing because the

  immigration judge had not granted them permission.  Lange Decl. ¶ VIII.

- On August 15, 2025, an observer was told a hearing he sought to attend was closed.

  Hollenbeck Decl. ¶ IV.

---

[14] It is difficult for the Court to discern the exact number of purportedly closed hearings during this period based on the record before it.  AHR does not specify the number of hearings or even the number of days its observers faced closed hearings.  Moreover, some of the declarations are unclear regarding whether the hearings were truly closed.  For example, Ms. Barker reports that on January 27, 2026, she was asked to leave the courtroom after certain master calendar hearings ended.  Barker Decl. ¶ VII.  She asked the clerk whether she could stay to observe the no-show hearings, to which the clerk replied, "I cannot comment on that."  *Id.*  Ms. Barker does not reveal whether she subsequently tried to re-enter once the no-show hearings began.  *See id.* In other instances, it is unclear whether the observers could have attended via alternative means. *See, e.g.*, Rabogliatti Decl. ¶ IV.  And in yet others, it is unclear whether an observer showing up at exactly the time a hearing was scheduled to start, or after the hearing started, was excluded because that courtroom followed a practice of locking the doors when hearings were supposed to start and unlocking them only after all hearings completed.  *See, e.g.*, Scheffler Decl. ¶ IV. Considering this uncertainty, the Court has done its best to aggregate the days on which observers reasonably describe a denial of access but excluding those with potentially apparent other explanations—mindful that AHR bears the burden of persuasion.

- On September 29, 2025, an observer was prevented from attending "no show" hearings and non-detained master calendar hearings.  Knieriemen Decl. ¶¶ III–IV.

- On four days in October 2025, observers were prevented from attending hearings. Knieriemen Decl. ¶ V–VII; Lange Decl. ¶ XIII.  This includes situations where respondent's counsel did not object to the observers' presence, Lange Decl. ¶ XIII, and where the immigration judge initially welcomed the observers in before a clerk spoke with the immigration judge and all observers were excluded, Knieriemen Decl. ¶ VI.

- Observers were excluded from hearings on three days in November 2025, including on November 6, when an observer was excluded from a courtroom "due to confidentiality issues," but an attorney exiting the proceeding stated that nothing confidential was discussed.  Bethke Decl. ¶¶ III–IV, VIII; Rabogliatti Decl. ¶ IV; Barker Decl. ¶¶ IV, VI; Knieriemen Decl. ¶ VIII.

For three reasons, the Court finds that these twelve incidents, spread across almost as many months, with no violations identified in the three months preceding the motion, do not amount to a "clear showing" that AHR is "likely" to face additional unlawful closures in the "immediate" future. *Murthy*, 603 U.S. at 58 (first quoting *Winter*, 555 U.S. at 22; and then quoting *O'Shea*, 414 U.S. at 496).  First, as the Government points out, these closures—even if each closure encompassed multiple hearings—represent a tiny fraction of the more than 47,000 immigration hearings held at the Fort Snelling Immigration Court between March 2025 and February 2026—the time period covered by AHR's complaint.  Margolin Decl. ¶ 8.  By comparison, AHR provides no indication of the proportion of closed hearings to the total hearings it sought to observe.

19

Second, these past incidents do not evince a "pattern" of conduct, which courts often expect when a party seeks "anticipatory relief." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1068 (D.C. Cir. 1978).  Closures appear to range from *ad hoc* technical difficulties, *see* Lange Decl. ¶ V, to potential confidentiality concerns, *see* Bethke Decl. ¶¶ III–IV, to a misstatement by a security guard, *see* Barker Decl. ¶ IV.  Although a clear pattern may not be necessary to obtain a preliminary injunction, the one-off nature of some of AHR's evidence undermines its claim to imminent harm.

Third, by AHR's own admission, the closures subsided in the months leading up to its lawsuit.  As AHR explains, "the restrictions complained of in AHR's January 9, 2026, letter temporarily abated somewhat following [the Government's] receipt of the letter."  Pl.'s Mot. at 13.  Although AHR claims that the "restrictions have largely resumed" since then, *id.*, as explained below, AHR does not provide *evidence* of unlawful conduct since its letter.  Indeed, AHR does not identify any purportedly unlawful closures in 2026 despite filing its motion on March 19, 2026.[15]  The lack of recent unlawful closures further undermines AHR's claim of imminent future injury.  *Cf. Murthy*, 603 U.S. at 71–72 (explaining that because the purportedly unlawful conduct had "considerably subsided" leading up to the lawsuit, it would be "very difficult" for the plaintiff "to show that she faces future harm").

AHR's counterarguments do not surmount the high standard AHR faces in establishing standing for a preliminary injunction.  AHR starts by suggesting that even one improper closure constitutes irreparable harm.  Pl.'s Reply at 1.  That may be so—although, as the Government

---

[15] As discussed in note 14 *supra*, although Ms. Barker's declaration suggests she may have been excluded from a hearing in January 2026, Barker Decl. ¶ VII, the Court finds there is insufficient information in the declaration to determine whether she was actually excluded as opposed to being temporarily excused from the courtroom between hearings.

argues, even the hearings AHR identifies may have been closed for lawful reasons, and AHR provides little evidence from attorneys or parties inside the courtroom that could shed light as to whether these purported closures were unlawful. But even assuming, without deciding, that these past hearings were closed improperly, AHR must persuade the Court that it is likely to experience additional improper closures in the immediate future. It has not.

AHR also contends that evidence of closures and limitations at other immigration centers across the country bolsters its claim of impending future harm in Minnesota. Pl.'s Mot. at 15. For example, at the April 16 hearing, counsel for AHR represented that an immigration court in Virginia conducts all its hearings remotely and is denying all public access. Although AHR acknowledges that it suffers no harm from these practices in other states, AHR suggests that the experiences elsewhere indicate that immigration judges in Fort Snelling are likely to continue unlawfully closing hearings. The difficulty with AHR's argument is that AHR provides no reason to believe that Fort Snelling will follow the lead of other immigration facilities in the imminent future—assuming, without deciding, that the procedures at other facilities are unlawful. AHR provides no evidence that Fort Snelling is likely to end in-person hearings anytime soon. AHR's declarations even concede that at least some immigration judges at Fort Snelling continue to allow remote observation, Lange Decl. ¶ XXII, indicating that Fort Snelling's practice is different. Nor does AHR press, as part of its motion, that the Government maintains a national policy that would connect events at other immigration courts to Fort Snelling.

### 3. AHR's evidence regarding other purported limitations on public observation of immigration hearings does not clearly establish that future harm is imminent.

Besides evidence of unlawful closures, AHR identifies other evidence of limitations on public access to immigration hearings as well. This evidence of limitations, particularly

21

regarding remote hearings, seems to represent the bulk of AHR's access concerns in 2026. But this evidence does not aid AHR's quest for standing because AHR does not meaningfully argue in its present motion that these limitations are unlawful.

First, AHR provides evidence of limitations on in-person attendance. According to the declarations, some immigration judges at Fort Snelling have closed their courtrooms during hearings. *See* Lange Decl. ¶¶ III–IV, XVII; Barker Decl. ¶ III. Apparently, some immigration judges locked courtroom doors at the start of hearings and required observers to remain for the duration of the hearing or calendar, rather than entering and exiting during the proceedings. *See, e.g.*, Lange Decl. ¶¶ XII, XVII; Scheffler Decl. ¶ III. Similarly, the declarations reference limitations on waiting in the courtroom lobby and being accused of "loitering," Schalkwyk Decl. at 1, and inaccurate signage, *see, e.g.*, Lange Decl. ¶ XVIII, among other impediments.

Although the Court does not diminish the burden these limitations place on volunteer observers dedicating their time to attend immigration hearings, AHR develops no argument that these limitations are unlawful. AHR vaguely suggests in its brief that "unreasonable restrictions on attendance are contrary to law," Pl.'s Mot. at 39, but it never explains how these purported limitations violate either 8 C.F.R. § 1003.27 or the First Amendment, and it provides no supporting authority for either proposition. "[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." *McNeil v. District of Columbia*, 233 F. Supp. 3d 150, 157 n.11 (D.D.C. 2017) (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)); *see also Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). Absent a developed argument as to why these limitations were unlawful, they cannot support AHR's claim of future unlawful conduct. To the extent AHR seeks to use these purported limitations as evidence of a general atmosphere of restrictions on attendance, making

future unlawful closures more likely, the Court is reluctant to infer future *unlawful* conduct from past potentially *lawful* conduct.

Second, AHR points to evidence of limitations on remote attendance; but here too, AHR advances no argument that denying observers remote access violates any applicable regulations or the First Amendment.  According to evidence provided by AHR, the Fort Snelling Immigration Court prefers for observers to watch hearings in the courtroom, even when the parties and counsel appear remotely.  *See* Jan. 20 Letter at 2 ("[T]he Webex links posted on EOIR's website are for *parties* appearing remotely."); *see also* Compl. ¶ 43.  If observers may attend in person, their ability to observe is little different than if the parties appeared in person too.

Although, at the April 16 hearing, counsel for AHR began to argue that barring remote access was unlawful regardless of in-person access because remote access was more convenient for observers, counsel later acknowledged that allowing in-person observation of the remote proceeding in the courtroom was a reasonable accommodation.  Thus, AHR does not appear to argue in the present motion that denying remote access where an in-person option is available constitutes an unlawful closure.[16]

The result might be different if immigration judges were routinely blocking both in-person and remote access to remote-only hearings, but AHR has not presented sufficient

---

[16] AHR states, without citing any support, that immigration courts "cannot inhibit members of the press or the public from attending immigration proceedings . . . whether conducted in-person or via Webex."  Pl.'s Mot. at 28; *see also* Compl. ¶ 33.  To the extent this is an argument that requiring observers to watch remote hearings from the courtroom is unlawful, AHR has not *developed* this argument under the applicable legal authority, so the argument is waived for purposes of this motion.  *See McNeil*, 233 F. Supp. 3d at 157 n.11.  And the Court is mindful that in the post-COVID era it conducted many criminal hearings in which the parties and counsel appeared remotely but members of the public and press had to come to the courtroom to observe the hearing.

evidence of such complete closures.  For their part, *amici curiae* Dow Jones *et al.* indicate these remote-only hearings focus on Somali refugees, whose hearings have been "moved online and expedited."  *Amicus Curiae* Br. of Dow Jones *et al.* at 7, ECF No. 13-1.  *Amici* further cite to news reports describing how, on at least a couple of occasions, reporters have been completely shut out of these online hearings.  *Id.*  AHR makes similar representations in its brief and cites a single news article.  *See* Pl.'s Mot. at 30 & n.14.  Such a blanket closure practice targeting a specific class of refugees might demonstrate a substantial likelihood of future injury.  But, although these reports may be insightful, they do not substitute for sworn affidavits or declarations and thus do not provide this Court with a sufficient evidentiary basis from which to find a likely future injury at this stage.  *See Eisenstadt v. Cent. Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (holding that newspaper articles are hearsay and observing that, unlike sworn affidavits, "[t]here is no similar dispensation for newspaper or magazine articles, which not being attested are considered less reliable than affidavits or depositions").  Assuming, without deciding, that these news reports may be considered as *some* evidence, at a minimum, they carry less evidentiary value than sworn statements.  Moreover, because both sets of *amici* filed their briefs after the Government's opposition brief—indeed, after AHR's reply brief—and the Court did not hold an evidentiary hearing, the Government has had no opportunity to provide counterevidence.

Turning, then, to AHR's sworn declarations, the Court finds that they do not clearly demonstrate that immigration judges at Fort Snelling will close access to remote hearings in the imminent future.  To start, Ms. Lange states that, on February 18, 2026, two immigration judges at Fort Snelling held "Webex Only" hearings and that no dockets were posted.  Lange Decl. ¶ XX.  She does not specify, however, if she tried to attend remotely and was denied.  *See id.* Similarly, Ms. Lange explains that since February 25, 2026, only one judge has "allow[ed] any

remote observation of master calendar hearings docketed in Minesota." *Id.* ¶ XXII.  Further, on March 3, 2026, no observers were "admitted via Webex for any of the 70 morning or afternoon hearings." *Id.* ¶ XXIII.  Ms. Lange does not address whether these hearings could have been viewed in-person in a courtroom and, if any could not, how many.  This nuance matters because, as discussed above, even if all the parties and attorneys attend remotely, AHR does not argue it is unlawful to require observers to attend in person.[17]  The declarations do indicate that on June 26, 2025, observers were denied access to a remote-only hearing—which the Court also discussed above.  *See* Rabogliatti Decl. ¶ III; Lange Decl. ¶ VII.  The Court finds that this single instance of closing a remote-only hearing eight months before AHR filed its motion—assuming the closure was unlawful—does not amount to a clear showing that immigration judges at Fort Snelling are likely to close hearings again in the imminent future.

Finally, AHR points to a statement by a press secretary to AHR regarding attendance at remote hearings as evidence of an unlawful policy regarding remote attendance.  In response to a letter from AHR, EOIR Press Secretary Kathryn Mattingly wrote that "[w]hen in-person access is not available, the Immigration Judge has the discretion to admit non-parties via Webex to observe a hearing that is open to the public."  Jan. 20 Letter at 2. Another email from EOIR states that "immigration judges are not obligated to admit non-parties into an internet-based

---

[17] To the extent Ms. Lange's declaration, read holistically, could be understood to imply that these hearings could only be accessed remotely, the Court notes that AHR has not characterized them that way.  The Government's brief pointed out that AHR "largely fails to identify whether the remote hearings at issue were accessible by in person attendance."  Defs.' Opp'n at 10.  Yet AHR offered no clarification, or any response whatsoever, in its reply brief. *See* Pl.'s Reply 8.  In addition, when the Court inquired about this lack of clarity at the April 16 hearing, counsel for AHR did not clarify the statements in the sworn declarations or provide any concrete figures regarding how frequent these closures were.  He merely represented that in the case of Somali refugees there has been no in-person access.  Such a representation by counsel is not evidence. *See Wood ex rel. U.S. v. Am. Inst. in Taiwan*, 286 F.3d 526, 534 (D.C. Cir. 2002) ("Statements by counsel, of course, are not evidence.").

hearing" but that the judges "will exercise discretion to keep the hearing open, close it, or limit attendance."  Barker Decl. ¶ V.  As AHR sees it, this "discretion" is inconsistent with 8 C.F.R. § 1003.27 and therefore indicates that immigration judges will continue to unlawfully close remote hearings.

Such discretionary decisions, to be made in the future, will rarely establish the imminent harm necessary for a plaintiff to maintain standing.  *See Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021).  In *Union of Concerned Scientists*, the plaintiff challenged an agency rule defining critical electric infrastructure information—a category of information exempt from disclosure requirements.  *Id.* at 927–28.  The plaintiff claimed it would be injured because, among other things, the agency would, in the future, use the rule to deny it access to information designated as critical electric infrastructure information.  *Id.* at 929.  The D.C. Circuit held that the plaintiff lacked standing to assert this claim because it could not establish a future injury.  *Id.* at 931.  The court explained that the agency "exercises discretion" when deciding to designate and provide access under the regulation.  *Id.* at 930. "And this court has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings."  *Id.*  The court concluded that the plaintiff lacked standing because "the discretion [the agency] has in making designation and access decisions takes the denial of access to [critical electric infrastructure information] from the decidedly likely to the speculative."  *Id.*

For similar reasons to those articulated in *Union of Concerned Scientists*, Press Secretary Mattingly's statement, and similar statements from EOIR, cannot confer standing here.  For AHR to suffer a concrete injury in the future based on this purported policy, two things must happen: (1) an immigration judge must exercise its discretion to close a hearing, and (2) that

decision must be unlawful.  AHR therefore asks this Court to predict how the immigration judges "will exercise discretion in future proceedings," which the D.C. Circuit has counseled this Court not to do.  *Id.* at 931.  Further complicating matters, these decisions will be made by a variety of individual immigration judges on a case-by-case basis.  Absent compelling evidence that immigration judges are in fact exercising their discretion to deny remote access to hearings where in-person access is not available, and when layered atop the possibility that any exercise of that discretion may be lawful in a particular case, AHR's anticipated future injury is too speculative to confer standing.

## V.  CONCLUSION

All told, although AHR has provided *some* evidence of past closures of immigration hearings that may have been unlawful and that may presage future unlawful closures, the Court is not convinced that they have made a *clear* showing of such impending harm.  A preliminary injunction is a dramatic remedy, so it requires a robust showing by the moving party of an imminent injury.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  Because AHR has not demonstrated an imminent injury, it has not established standing, and the Court must deny its motion for preliminary injunction and for a stay.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 29, 2026                                    RUDOLPH CONTRERAS
                                                          United States District Judge

27