**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE ADVOCATES FOR HUMAN RIGHTS,** 330 Second Avenue South, #800 Minneapolis, MN 55401 | ) ) ) ) ) | |
| **MORGAN JENKINS,** 16709 Kamalin Ct., Clermont, FL 34715 | ) ) ) ) | |
| **CARMEN MARIA REY CALDAS**, 9 Vose Ave. Apt. 211 South Orange, NJ 07079 | ) ) ) ) | |
| **BONNIE BYLAND,** 2040 Bayou Paul Lane St. Gabriel, LA 70776 | ) ) ) ) | Civil Action No. 1:26-00865-RC **AMENDED COMPLAINT AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **NANCY GRUSH,** 1951 Wisteria Street Baton Rouge, LA 70806 | ) ) ) ) | 8 U.S.C. § 1103(g) |
| **MAGGIE BERRY,** 6006 25th St Cir. N, Oakdale MN, 55128 | ) ) ) ) | |
| **BRYANNA SIGUENZA,** 465 Rose Ave., Apt. 5 Long Beach, CA 90802 | ) ) ) ) | |
| **JOHN LLOYD** 1035 Scoville Ave. Oak Park, IL 60304 | ) ) ) ) | |
| *Plaintiffs*, | ) | |
| v. | ) ) | |
| **TODD BLANCHE, IN HIS CAPACITY AS ACTING ATTORNEY GENERAL OF THE** | ) ) ) ) | |

1

CORE/3515279.0007/239840525.8

UNITED STATES DEPARTMENT OF )
JUSTICE, )
950 Pennsylvania Avenue NW )
Washington, DC 20530 )
 )
DAREN K. MARGOLIN, IN HIS )
CAPACITY AS DIRECTOR, )
EXECUTIVE OFFICE FOR )
IMMIGRATION REVIEW OF THE )
DEPARTMENT OF JUSTICE, )
5107 Leesburg Pike )
Falls Church, VA 22041 )
 )
HON. TERESA L. RILEY, IN HER )
CAPACITY AS CHIEF IMMIGRATION )
JUDGE, U.S. IMMIGRATION COURT )
5107 Leesburg Pike )
Falls Church, VA 22041 )
 )
And )
 )
HON. ERIC L. DILLOW, IN HIS )
CAPACITY AS ASSISTANT CHIEF )
IMMIGRATION JUDGE )
U.S. IMMIGRATION COURT )
Bishop Henry Whipple Federal Building )
1 Federal Drive, Suite 1850 )
Fort Snelling, MN 55111 )
 )
                  *Defendants*. )

## AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiffs The Advocates for Human Rights ("AHR"), Maggie Berry (a Minnesota

resident and trained volunteer for AHR who has experienced denials of access to immigration

court hearings), Morgan Jenkins (a Florida resident and trained volunteer court observer who

regularly observes or attempts to observe immigration court matters and proceedings and who also

2

has experienced denials of access to immigration court hearings), Carmen Maria Rey Caldas (an attorney and former immigration judge in New York who resides in New Jersey and who has experienced denials of access to immigration court as an immigration court observer since being fired from her position as an immigration judge), Bonnie Byland and Nancy Grush (court observers in Louisiana, who have experienced denials of access to immigration court proceedings at the Baton Rouge Immigration Court),  Bryanna Siguenza (a California resident overseeing Court Watch LA, a court watch project which trains volunteers to observe immigration court hearings who have also experienced various denials of access to immigration court hearings since 2025), and John "Jack" Lloyd (an Illinois resident and volunteer court observer with ICIRR Court Watch since 2016 who has seen denials of immigration court access) bring this action against Todd Blanche, in his official capacity as the Acting Attorney General of the United States, United States Department of Justice ("USDOJ" or "DOJ"); Daren K. Margolin, in his capacity as Director, Executive Office for Immigration Review, the United States Department of Justice ("EOIR"); Teresa L. Riley, in her capacity as the Chief Immigration Judge of the Office of Chief Immigration Judge ("OCIJ"); and Hon. Eric L. Dillow, in his capacity as Assistant Chief Immigration Judge, United States Immigration Court at Fort Snelling in the State of Minnesota (Fort Snelling) (collectively referred to as "Defendants") under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, to compel Defendants to comply with DOJ regulations under the INA governing public and press access to DOJ's immigration courts.[1]

---

[1] Through this Amended Complaint, Plaintiffs incorporate the exhibits that were filed with its previous pleadings in this case. *See* Compl. (Mar. 12, 2026) [ECF No. 1]; Mot. for Prelim. Inj. & Stay (Mar. 19, 2026) [ECF No. 6]; Notice of Errata (Apr. 6, 2026) [ECF No. 9]; Notice of Suppl. Evid., Ex. 1 (Apr. 20, 2026), ECF No. 14-1 (Declaration of Amy Lange); Notice of Suppl. Evid. (Apr. 20, 2026), ECF No. 14-2 (Declaration of Ryan Wood).

CORE/3515279.0007/239840525.8

2.    AHR and its staff and trained volunteers, including Maggie Berry and AHR's many other volunteers, wish to exercise their legal rights to attend immigration court matters and proceedings, whether those matters and proceedings are held in person, via video teleconferences (e.g., via Webex), or telephonically. For many years, AHR has run and coordinated a court observation project at the Fort Snelling Immigration Court in the State of Minnesota, with Amy Lange currently serving as the Program Manager for the Immigration Court Observation Project at the Fort Snelling Immigration Court. *See* Declaration of Amy Lange, Ex. 19 ¶¶ 3–4. Maggie Berry is one of many individuals who have received training from AHR to observe immigration court proceedings. In Maggie Berry's case, she participated in a three-part training with AHR and completed the final part of that training on February 3, 2026. *See* Declaration of Maggie Berry, Ex. 30 ¶ 2.

3.    Each of the other named plaintiffs—individuals around the country who regularly observe or attempt to observe immigration hearings or who train, coordinate, and collect information from volunteer immigration court observers—also seek to exercise their legal rights to observe and monitor immigration court matters and proceedings, whether those matters and proceedings are held in person, via video teleconferences (e.g., via Webex), or telephonically. The staff and volunteers for immigration court observation projects and individual court observers have a presumptive right, grounded in the U.S. Constitution's First Amendment and in binding federal regulations, to attend and observe immigration court matters and proceedings (with only limited, specifically delineated exceptions). In spite of their legal rights, the named plaintiffs have been unlawfully deprived of their rights—and the deprivation and violation of those rights is ongoing and continuing and likely to recur.

4

4.      Morgan Jenkins lives in Florida and is a volunteer immigration court observer, serving as a volunteer for the American Bar Association Commission on Immigration Court Observation Project, the Jesuit Refugee Service USA Migrant Court Observation Project, and the Acacia Center for Justice Witness for Justice Program. *See* Declaration of Morgan Jenkins, Ex. 31 ¶ 2. Morgan Jenkins has been unlawfully denied access to immigration court hearings conducted on Webex on multiple occasions. *Id.* ¶¶ 4–10.

5.      Carmen Maria Rey Caldas, a New Jersey resident, is an attorney admitted to practice in the State of New York. She has more than 20 years of immigration law experience, and she served as an Immigration Judge for EOIR in the USDOJ from February 28, 2022, to August 22, 2025, during which time she heard cases at a number of immigration courts across the United States. After being terminated from her position as an Immigration Judge in August 2025 without explanation, Carmen Maria Rey Caldas has sought to observe immigration court hearings and has experienced unlawful denials of access to immigration court proceedings. *See* Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶¶ 1 –6, 22 –30. During her time as an Immigration Judge, she and other immigration judges "were routinely reminded that 8 CFR 1240.10(b) and 8 CFR 1003.27 require that immigration hearings be open to the public except for limited outlined exceptions." *Id.* ¶ 8.

6.      Bonnie Byland (a retired public school teacher) and Nancy Grush (a journalist before becoming an attorney) have sought to observe immigration court matters and proceedings at the Baton Rouge Immigration Court that opened in the fall of 2025. They have both experienced repeated and unlawful denials of access to immigration court hearings but—in spite of those denials—still seek to attend immigration court hearings. *See* Declaration of Bonnie Byland, Ex. 33 ¶¶ 1–11; Declaration of Nancy Grush, Ex. 34. ¶¶ 1–15.

7.      Bryanna Siguenza, a resident of Los Angeles, California, oversees the Court Watch LA program. She has observed proceedings and trains and coordinates community members to observe court proceedings, including immigration court hearings. In that role, Bryanna Siguenza recruits, trains, and supervises court observers. Bryanna Siguenza has supervised numerous trained volunteers who regularly attempt to observe immigration hearings, both remotely through Webex and, when available, in person. Beginning in 2025 and continuing through the present, Bryanna Siguenza became aware of a recurring pattern in which trained Court Watch LA volunteers experienced barriers to accessing immigration court hearings through Webex. The consistency of the reports about denials of access, involving different observers and different hearings, has led Bryanna Siguenza to expect that, without legal intervention, observers may continue to encounter similar barriers when attempting to access immigration court proceedings. The ongoing restrictions have made it more difficult for her to consistently monitor immigration court proceedings and to carry out her job of promoting transparency and accountability. *See* Declaration of Bryanna Siguenza, Ex. 35 ¶¶ 1–14.

8.      John L. "Jack" Lloyd, an Illinois resident, has been a volunteer court observer with ICIRR Court Watch since 2016 and has been trained to observe hearings using best practices. He has seen denials of immigration court access that did not used to occur. In 2025, a change in EOIR's "Fact Sheet" about immigration court observation was made. He later noticed that some immigration judges were denying immigration court watchers access to immigration court hearings on Webex. After tracking attempts by court watchers to observe on Webex, it was established that various immigration court judges at the Chicago Immigration Court were not admitting court watchers to Webex hearings. *See* Declaration of Jack Lloyd, Ex. 52 ¶¶ 1–13.

9.      AHR (and all of its staff and volunteers) and all of the individuals named as plaintiffs in the above-captioned lawsuit have a legal right to attend and observe immigration court matters and proceedings to the maximum extent allowed by law, in full compliance with law, and without obstruction, intimidation, or hinderance of their legal rights. AHR (and all of its staff and volunteers) and all of the individuals named as plaintiffs in the above-captioned lawsuit also have a right to be free from arbitrary and capricious government action, and are entitled to an injunction and stay under the APA to vindicate, and ensure compliance with, their legal rights, including to prevent the ongoing and recurring violation of their legal rights under the U.S. Constitution's First Amendment and applicable federal regulations.

10.     As Defendants have already acknowledged, immigration courts are, with only limited, specifically delineated exceptions set forth in federal regulations, presumptively open to the public and members of the press. Def. Opp. at 3 [ECF No. 10]; *id.*, Ex. A-1 [ECF No. 10-A-1]; *id.*, Ex. A-2 [10-A-2]; s*ee also* 8 C.F.R. § 1003.27 (providing for press and public access to immigration court with only specified exceptions); 8 C.F.R. § 1240.10(b) ("*Removal hearings shall be open to the public*, except that the immigration judge may, in his or her discretion, close proceedings *as provided in § 1003.27 of this chapter.*") (italics added); *compare* 8 C.F.R. § 1240.11(c)(3)(i) ("Evidentiary hearings or applications for asylum or withholding of removal *will be open to the public unless the alien expressly requests that the hearing be closed pursuant to § 3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.*") (italics added), *with* 8 C.F.R. § 1240.32(a) ("Exclusion hearings shall be closed to the public, *unless the alien at his or own instance requests that the public, including the press, be permitted to attend*; *in that event, the hearing shall be open*, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public. *When the hearing is to be open*, depending upon physical facilities, reasonable limitation may be placed upon the number in

7

attendance at any one time, with priority being given to the press over the general public.") (italics added).

11.     Under Section 240(b)(2)(A)–(B) of the INA, immigration hearings may be held in person, through video conference, or (in limited circumstances) telephonically. *See* 8 U.S.C. § 1229a(b)(2) ("Form of proceeding" for removal proceedings). The text of 8 U.S.C. § 1229a(b)(2)(A) provides that a removal proceeding "may take place—(i) in person, (ii) where agreed to by the parties, in the absence of the alien, (iii) through video conference, or (iv) subject to subparagraph (B), through telephone conference." The text of 8 U.S.C. § 1229a(b)(2)(B), titled "Consent in certain cases," reads: "An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference." Section 240(b)(2)(A)–(B) of the INA draws no distinction between the modality of the hearing and the right of the public to observe the immigration court matter or proceeding.

12.     The text of the applicable regulation (8 C.F.R. § 1003.27), also referenced in 8 C.F.R. § 1240.10(b), establishing that immigration court matters and proceedings are, subject to only limited, specifically delineated exceptions, presumptively open, draws no distinction between attendance or participation by observers in-person or over video teleconferencing.

13.     Prior to 2025, when public and press access issues to immigration courts first arose, the policy of EOIR—and the conforming practice of immigration court judges—was that immigration court hearings were, with only limited exceptions, open the public and the press, whether those hearings were conducted in person or through other means (e.g., via Webex). The prior availability of presumptive open public access to immigration court matters and proceedings is attested to by former immigration judges/EOIR representatives as well as by practicing immigration law attorneys and AHR's project manager for AHR's Immigration Court Observation

8

Project. *See, e.g.*, Supplemental Declaration of Ryan Wood, Ex. 38 ¶¶ 4–6; Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶ 8; Declaration of Gail Montenegro, Ex. 56 ¶¶ 2–8; Declaration of Zachary A. Albun, Ex. 59 ¶¶ 4–6; Declaration of Amy Lange, Ex. 19 ¶¶ 18–23.

14.    In another pending lawsuit, *Arias v. U.S. Immigration and Customs Enf't*, Case No. 1:26-cv-02130-CM (S.D.N.Y.), DOJ/EOIR representatives have already publicly acknowledged in sworn declarations (filed in the U.S. District Court for the Southern District of New York) the applicability of federal regulations in terms of public access to immigration court matters and proceedings, including hearings conducted remotely. As the sitting Acting Assistant Chief Immigration Judge in New York's immigration court at 25 Federal Plaza in New York City acknowledged in a sworn declaration filed on May 12, 2026, "Subject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing. Each judge's internet-based hearing link is posted on EOIR's public website." *See* Declaration of Acting Assistant Chief Immigration Judge John Burns, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 75 ¶ 7. Likewise, as the Assistant Chief Immigration Judge in New York's Bridgeway Immigration Court who has also served as the Acting ACIJ of the New York Varick Immigration Court, has similarly acknowledged in a sworn declaration filed on May 12, 2026, "Subject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing. Each judge's internet-based hearing link is posted on EOIR's public website." *See* Declaration of Assistant Chief Immigration Judge Khalilah Taylor, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 74 ¶ 6.

15.    On a webpage titled "Find an Immigration Court and Access Internet-Based Hearings," members of the general public can find a list of immigration courts around the country

9

and judge-specific Webex links for individual immigration court judges. On that webpage, it states: "**Note:** Photographing or recording through the internet to capture any part of the hearing is **strictly prohibited** and subject to possible penalties. See 8 C.F.R. § 1003.28." (bold in original)

16.    Immigration hearings include master calendar, bond, and individual merit hearings. Master calendar hearings are preliminary proceedings where non-citizens are informed of charges against them and advised of their legal rights. *See, e.g.*, 8 C.F.R. § 1240.17(b) ("Removal proceedings conducted under this section shall commence when DHS files a Notice to Appear (NTA) pursuant to 8 CFR part 1239 and schedules the master calendar hearing . . . ."); 8 C.F.R. § 1240.10 (setting forth various rights that those in removal proceedings have by law). In bond hearings, non-citizens may seek release from custody or reconsideration of the bond amount. At individual merit hearings, non-citizens present evidence supporting asylum claims and/or claims for withholding of removal. Any denial of rights to someone in immigration court proceedings or any failure to inform someone in immigration court proceedings of their legal rights is of particular concern to AHR, which regularly observes, monitors, and reports on immigration court proceedings as part of its human rights and advocacy work.

17.    Individuals in immigration court have a right to obtain counsel at their own expense and a right to be informed of that right to retain counsel and of the availability of a list of *pro bono* legal services. *See* 8 U.S.C. § 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."); 8 C.F.R. § 1240.10(a)(1) ("In a removal proceeding, the immigration judge shall . . . [a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own

choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation."); 8 C.F.R. § 1240.10(a)(2) ("In a removal proceedings, the immigration judge shall . . . [a]dvise the respondent of the availability of pro bono legal services for the immigration court location at which the hearing will take place, and ascertain that the respondent has received a list of such pro bono legal services providers."). The Director of the EOIR has an obligation to regularly update the list of *pro bono* counsel for immigration matters. *See* 8 C.F.R. § 1003.61(b) ("The Director shall maintain a list, known as the List of Pro Bono Legal Service Providers (List), of organizations, pro bono referral services, and attorneys qualified under this subpart to provide pro bono services in immigration proceedings. The List, which shall be updated not less than quarterly, shall be provided to individuals in removal and other proceedings before an immigration court.").

18.     Immigrants who are represented by counsel have a better chance of success in immigration proceedings than those who do not secure counsel, making it extremely important for immigration court observers to monitor whether individuals in the U.S. immigration system are being told of their right to retain counsel and of the potential availability of *pro bono* services. *See, e.g.*, American Immigration Council, *Where Can You Win in Immigration Court?: The Impact of Lawyers, Detention, Geography, and Policy* (Nov. 20, 2025), https://www.americanimmigrationcouncil.org/report/immigration-court/ (noting that between "FY 2019 and FY 2024, **only 26.9 percent** of respondents with legal representation—regardless of custody status—were ordered removed, compared to **61.8 percent** of unrepresented respondents"; that "[a]mong non-detained respondents, those without legal representation were **over 2.5 times more likely** to be ordered removed than their represented counterparts"; and

11

that "[d]etained respondents who were unrepresented were **10.5 percentage points more likely** to be ordered removed than detained respondents with legal representation") (bold in original)

19.    In spite of the fact that immigration courts and immigration matters and proceedings (with only limited, specifically delineated exceptions) are presumptively open to the public and members of the press, and in spite of the U.S. Constitution's First Amendment and the plain language and dictates of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) and the longstanding tradition of open access to immigration court hearings, immigration judges ("IJs") around the country have, since 2025 and continuing to present, been frequently, without justification in law, and arbitrarily and capriciously excluding the press and the public from various immigration court matters and proceedings, including in the State of Minnesota and in other immigration courts across the country. *See e.g.*, Declaration of Amy Lange, Ex. 19 ¶¶ 44–95; Declaration of Zachary A. Albun, Ex. 59 ¶¶ 6–10; Supplemental Declaration of Ryan R. Wood, Ex. 38 ¶¶ 7–24, 28; Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶¶ 22–30; Declaration of Ishanee DeVasGunawardhane, Ex. 51 ¶¶ 6–8; *see also* Christopher Magan, Susan Du, & Jeff Hargarten, *Hope Fades in Minnesota Immigration Court*, Minn. Star Tribune (May 23, 2026), https://www.startribune.com/hope-fades-in-minnesota-immigration-court.601659252    ("Federal law says immigration court is open to the public in all but 'limited exceptions.' But over the past fourteen months, Fort Snelling judges and staff locked courtroom doors and routinely barred observers—including journalists from the Star Tribune.").

20.    Across the country, members of the public and the press attempting to observe immigration court matters and proceedings have been frequently—and arbitrarily and capriciously, and without justification in law, and in violation of their First Amendment rights and their rights under 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b)—been excluded from attending immigration

12

court matters and proceedings, including on the basis of unlawful guidance provided by DOJ, EOIR and their officials, including IJs, that Webex was available only to parties and that the IJs have discretion whether to admit observers. That guidance runs contrary to the longstanding historic practice that immigration courts are presumptively open to the press and the public, and that guidance has been directly contradicted by the Defendants' own admissions, including sworn declarations in a related case. *See, e.g.*, Declaration of Acting Assistant Chief Immigration Judge John Burns, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 75 ¶ 7; Declaration of Assistant Chief Immigration Judge Khalilah Taylor, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 74 ¶ 6; Declaration of Carmen Maria Rey Caldas, Ex. 32. ¶ 11; Supplemental Declaration of Ryan R. Wood, Ex. 38 ¶¶ 4. These violations are recurring and continuing, and DOJ and EOIR and its officials, including IJs, have failed to ensure compliance with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) and court observers' First Amendment rights, leading to frequent denials of access to immigration court matters and proceedings and the violation of legal rights. *See, e.g.*, Declaration of Amy Lange, Ex. 19 ¶¶ 65–81, 89–92; Declaration of Ishanee DeVasGunawardhane, Ex. 51 ¶¶ 6–8; Declaration of Kathryn Curtin, Ex. 69 ¶¶ 6–10 ("volunteers have been inappropriately denied access to observe via Webex over 300 times since late February"); Declaration of Jenny Beverly, Ex. 47 ¶¶ 14–20 ("there have been off-the-record announcements by the Department of Homeland Security ("DHS") counsel as well as multiple Immigration Judges that the public WebEx access may be revoked altogether, and that parties themselves could be barred from remote appearances unless they file a motion."); Declaration of Charles Shane Ellison, Ex. 50 ¶¶ 7–11 ("the DIRP Court Observation Project came to an abrupt end at the beginning of March 2026 given EOIR's refusal to continue to allow non-parties to appear via Webex to observe

13

court hearings."); Declaration of Chloe Breyer, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 73 ¶¶ 6–13. *See also* Acacia Ctr. for Just., *Restrictions on Public Access Undermine Transparency in Immigration Courts: Why Public Access to Immigration Courts Matters More than Ever* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/ ("Judges and court administrators have exercised broad discretion to close hearings, beyond the limited exceptions outlined in the regulations, sometimes citing vague or overbroad reasons (e.g., 'protecting the process' 'security reasons' or 'bandwidth concerns' for remote access). Sometimes no reason is provided at all."; "Access to immigration court hearings varies across the country. It does not appear that judges and/or court administrators are abiding by a consistent set of rules. Even courts in the same state have different levels of public access.").

21.    Millions of immigration cases are pending before U.S. immigration courts, making public and press access to immigration court a matter of public concern, of public interest, and of considerable urgency. *See* Executive Office for Immigration Review Adjudication Statistics: Pending Cases, New Cases, and Total Completions, https://www.justice.gov/eoir/media/1344791/dl?inline (last visited May 27, 2026) (listing 3,723,932 "Pending Cases" in 2025; 3,570,145 "Pending Cases" as of "2026 (Second Quarter)"; 798,014 "Total Completions" in 2025; and 402,714 "Total Completions" as of "2026 (Second Quarter)").

22.    Former Immigration Judge Jenny Beverly resigned after refusing an order from the Assistant Chief Immigration Judge in Chelmsford, Massachusetts to make an unannounced change in the start of a "high profile case" in order to limit public observers. Ex. 47 ¶¶ 13- 18. Her experience is not isolated. While there are millions of pending immigration cases, a large number

14

of IJs have been fired or forced to resign in recent months, even as other IJs have faced enormous pressure to handle or decide immigration cases (including bond hearings and asylum and removal hearings, which impact the life and/or liberty of respondents) in certain or particular ways. *E.g.*, Freda Ross, *Immigration Judges Speak Out after Mass Firings*, MSN (May 27, 2026), https://www.msn.com/en-us/news/us/immigration-judges-speak-out-after-mass-firings/ar-AA24f3Fi?ocid=BingNewsSerp ("Former immigration judges are speaking out after more than 200 were fired or forced out of their jobs under the Trump administration. . . . Holly D'Andrea, president of the National Association of Immigration Judges, said some officials have been given ultimatums over the past year to rule in favor of the administration's policies. . . . The Department of Justice is hiring what it calls 'deportation judges' instead of immigration judges. More than 80 new hires started this week. Association vice president Jeremiah Johnson, who was appointed as an immigration judge during the first Trump administration, was fired last year without notice. 'To call an immigration judge a 'deportation judge' kind of suggests that the outcome has already been predetermined,' Johnson said. 'It also is noticeable coming from the Department of Homeland Security, which is a party in the proceedings before the immigration judge.'"); Isabelle Taft, *Trump Administration Fires Two More New York City Immigration Judges as New Hires Take the Bench*, New York Focus (May 23, 2026), https://nysfocus.com/2026/05/23/trump-fires-two-nyc-immigration-judges-sponzo-dandelet ("The firings [of "two experienced New York City immigration judges on Thursday"] add to a growing tally of more than 100 immigration judges terminated since Trump took office last year and began a sweeping effort to remake the country's immigration courts. . . . Before Thursday, the Trump administration had fired at least 14 New York City immigration judges. Jeremiah Johnson, who was fired from his position as an immigration judge in San Francisco last November and still serves as executive vice president of the National

15

Association of Immigration Judges, said the historic wave of firings has enabled the administration to install more pliant judges. The Department of Justice hasn't told judges why they're being fired, he said, leaving those still on the bench to wonder if they might be next.").

23.     Many immigration court hearings that, in prior years, would have been held in person have been conducted virtually/remotely or moved to Webex hearings since the COVID-19 pandemic, with numerous individuals across the United States regularly seeking to observe Webex hearings (including some held on a fast-track or an expedited basis) but being excluded from them. *See* Declaration of Ryan R. Wood, Ex. 38; Declaration of Gail Montenegro, Ex. 56; Declaration of Carmen Maria Rey Caldas, Ex. 32; *see also* Anshu Patel and Nicholas Scibelli, *'We Just Want a Fair Trial': How the 'Somali Rocket Docket' Is Upending the Asylum Process*, Sahan J. (Mar. 19, 2026), https://sahanjournal.com/immigration/somali-asylum-seekers-expedited-cases/ ("In recent weeks, immigration attorneys in Minnesota and other states say scores of Somali asylum clients have had their hearings expedited, creating concerns over due process and access to attorneys, a phenomenon colloquially referred to as the 'Somali rocket docket.'"); *id.* ("Advocates also say that the majority of the hearings have been presided over by out-of-state judges in virtual courtrooms, raising questions about observer access to court proceedings."); *id.* ("In an email to Sahan Journal, Kathryn Mattingly, spokeswoman for the Executive Office of Immigration Review, said that any immigration judge can hear any case at any time throughout the country to assist with caseloads."); *id.* ("The Advocates for Human Rights, an immigrant rights organization tracking cases at Fort Snelling Immigration Court, has been monitoring the influx of Somali cases which began appearing as Webex-only hearings on Feb. 17 and on court dockets a week later. According to Amy Lange, director of The Advocates' court observation project, from Feb. 27 to Mar. 11 there were around 170 hearings held for Somali nationals. She said every hearing was held virtually

16

with out-of-state judges."); *id.* ("The Advocates have documented seven judges assigned to these cases: Craig Defoe (Illinois), Sherron Ashworth (Louisiana), Chris Brisack (Texas), Andrew Caborn (Texas), Nina Carbone (Colorado), Philip Taylor (Georgia) and Abdias Tida (Texas). According to data from TRAC, from 2020 to November 2025, the judges had an approval rate of 23.3% with two — Ashworth and Taylor — having approval rates at or under 10%. Data on Judge Tida is unavailable because TRAC only reports on judges who have decided at least 100 asylum cases in the given period."); Declaration of Amy Lange, Ex. 19 ¶¶ 63, 68.

24.     Certain immigration courts have seen multiple IJs fired or even have been closed altogether, forcing immigration court respondents—in those locales—to have to travel farther distances to appear in person in immigration court, if the IJ chooses to conduct immigration court hearings in person at all. *E.g.*, Olga R. Rodriguez, *San Francisco Immigration Court Shuts Down after Purge of Judges, Leaving Asylum Cases in Chaos*, Associated Press (May 22, 2026), https://apnews.com/article/san-francisco-immigration-court-closed-asylum-8a0946a7cd4bcc9bd925d075cabef44a ("There are no immigrants waiting for rulings anymore at San Francisco's main immigration court, no lawyers making arguments. The court, which had 21 judges when President Donald Trump was sworn in last year, had only two left when it closed May 1. The rest had been fired, retired or resigned amid a White House purge of federal immigration judges. The closing is one more reflection of the turmoil that has upended the immigration court system as the administration looks for ways to churn through its massive backlog of 3.8 million asylum cases and deport as many people as possible. Asylum denial rates have soared as the administration has fired almost 100 judges seen as too liberal, and approved using hundreds of military lawyers to replace them. Immigrants have been arrested when they arrive at courthouses or government offices for scheduled appearances."); *id.* ("Most of the court's 117,000 immigration

17

cases have been moved to a courthouse in Concord, a city about 30 miles (48 kilometers) away that opened two years ago to help with San Francisco's backlog of cases. But turmoil has also reached that city. A courthouse that had 11 judges at the start of 2025 is down to five after a series of firings. It had a caseload of 60,000 cases even before the San Francisco cases were shifted over."): *id.* ("San Francisco's immigration court, which had the third-highest number of asylum cases in the nation, was long considered one of the most favorable to people seeking asylum. From 2019 to 2024, almost 75% of petitioners received some form of relief, compared to 43% nationwide, according to data compiled by the Transactional Records Access Clearinghouse, a nonprofit data research center based at Syracuse University. That's partly because San Francisco, with its vast network of pro-immigrant organizations and pro bono or low-cost legal services, had one of the country's highest rates of legal representation for immigrants."); *id.* ("The Executive Office of Immigration Review, the Department of Justice branch that oversees immigration courts, announced in March that it would close the San Francisco courthouse in 2027 as a cost-saving measure and move its cases to Concord. But the end came early after nearly all the San Francisco judges left or were fired. The Executive Office provided no detailed explanation for the changes, saying in a statement only that it had decided not to renew its lease for the court, and doesn't comment on personnel matters."); *id.* ("Judah Lakin, an immigration attorney based in Oakland who also teaches at UC Berkeley School of Law, said the closure of the San Francisco court has made cases more time consuming since it's harder for his clients, who often travel from hours away, to reach Concord on public transportation. One recent 10-minute hearing in Concord took him more than two hours of travel, he said."); *id.* ("There were 754 immigration judges across the country at the start of Trump's second term. Now, there are about 600, including some temporary judges, according to data collected by the judges' union. Widespread courthouse arrests of

18

immigrants have caused hundreds of people not to even show up for hearings, leading to deportation orders in absentia.").

25. Some American states lack physical immigration court locations, while some states have one immigration court (e.g., Minnesota's Fort Snelling Immigration Court) or more than one immigration court location. Because of geographic distances between some immigration courts and where interested immigration court observers live and work, immigration court observation is, in many cases, impossible or impracticable without an easily accessible video teleconferencing/Webex option, including for situations in which an immigration judge is in one location and interested immigration court observers are in a different location or where there is too much geographic distance between where an immigration judge is hearing a case and where a interested court observer lives and works. *See, e.g.*, Declaration of Johnny Sinodis, Ex. 54 ¶¶ 4–7; Declaration of Maggie Berry, Ex. 30 ¶ 9 ("There is also a new Fort Snelling Judge, IJ Nathan Hansen, who has been conducting hearings from his chambers, so the only way to observe him is on Webex."); Declaration of Rebecca Hillstrom, Ex. 53 ¶¶ 6–10 (having to drive five hours to observe a hearing at the nearest immigration detention center); Declaration of John H. (Jack) Lloyd, Ex. 52 ¶¶ 6–10; Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶ 20; Declaration of Ishanee DeVasGunawardhane, Ex. 51 ¶ 5.

26. Every year, hundreds of thousands of immigration court hearings are conducted both in person and via Webex, with a much smaller number conducted telephonically. *See* Executive Office for Immigration Review Adjudication Statistics: Hearing Adjournments by Medium and Fiscal Year, https://www.justice.gov/eoir/media/1344966/dl?inline (providing statistics for the number of immigration court hearings held "In Person," via the "Internet/VTC," and via "Telephonic" means by year, from 2017 to 2025 and for the first portion of 2026). Yet, in

spite of the plain language and dictates of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), and in spite of the long-standing and historic practice of presumptively open immigration court hearings, the DOJ and the EOIR and their officials, including IJs, are not enforcing compliance with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b). Among other things, the Defendants are unlawfully permitting IJs to exclude members of the public and the press from immigration hearings, including, without limitation, where IJs are either holding hearings exclusively via Webex or where interested immigration court observers are or may be in a different physical locale or locations than the presiding IJ. IJs throughout the country are frequently choosing to conduct hearings remotely, and it is apparent that IJs using video teleconferencing/Webex technology are—in reliance on DOJ/EOIR guidance or under the guise of such guidance (if they offer any explanation at all)— frequently but improperly granting Webex access only to *the parties* and their counsel. The Defendants' actions and inactions have excluded members of the public and the press from these video teleconferencing/Webex hearings, contrary to the Defendant's own acknowledgement that immigration court matters and proceedings are presumptively open to the public and in spite of sworn admissions in a related New York case that existing federal regulations, including 8 C.F.R. § 1003.27's limited exceptions, allow IJs to bar public observation in only limited, specifically delineated circumstances, irrespective of whether that attendance is in person or online. *See* Declaration of Acting Assistant Chief Immigration Judge John Burns, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 75 ¶ 7; Declaration of Assistant Chief Immigration Judge Khalilah Taylor, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 74 ¶ 6; *See e.g.*, Supplemental Declaration of Ryan R. Wood, Ex. 38; Declaration of Charles Shane Ellison, Ex. 50; Declaration of Morgan Jenkins, Ex. 31; Declaration of Jenny Beverly, Ex. 47; Declaration of Johnny Sinodis,

Ex. 54. The conduct of the Defendants violates the APA and the legal and constitutional rights of interested immigration court observers, including the U.S. Constitution's First Amendment, and the legal requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b). Members of the public and the press must have viable and realistic options to observe and monitor immigration court matters and proceedings. If hearings are held via Webex, the immigration courts cannot bar individuals wishing to observe those proceedings.

27.     Numerous immigration court observers and multiple court observation projects around the United States have been adversely impacted and irreparably harmed by the Defendants' conduct, actions, and inactions. Adversely affected immigration court observation projects include, without limitation, AHR's own court observation project, the Acacia Center for Justice Witness for Justice program, the American Bar Association Commission on Immigration Court Observation Protect, Court Watch and Court Watch LA and, Immigrant ARC, among others, as well as a court observation program at the Duke University School of Law. Immigration court observers have experienced frequent and arbitrary and capricious unlawful denials of access or improper restrictions on access to immigration court hearings, so the unlawful conduct is national—and not limited or isolated—in scope. *See e.g.*, Declaration of Zoe Martens, Ex. 20; Declaration of Anne Klueh, Ex. 21; Declaration of Leslie MacKenzie, Ex. 22; Declaration of Kimberly Boche, Ex. 28; Declaration of Morgan Jenkins, Ex. 31; Declaration of Bonnie Byland, Ex. 33; Supplemental Declaration of Ryan R. Wood, Ex. 38; Declaration of Alla Holmes, Ex. 40; Declaration of Gillian Rowland-Kain, Ex. 44; Declaration of Cary LaCheen, Ex. 45; Declaration of Charles Shane Ellison, Ex. 50; Declaration of Bryanna Siguenza, Ex. 35; Declaration of Carmen Maria Rey Caldas, Ex. 32; Declaration of Kathryn Curtin, Ex. 69.

21

28. Because immigration court matters and proceedings around the country are frequently being closed to the press and the public in violation of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) and in disregard of immigration court observers long-standing legal and constitutional rights, the conduct of the Defendants in not enforcing or ensuring compliance with such binding federal regulations violates the APA, is arbitrary and capricious, and is in violation of individual's constitutional rights, including the First Amendment. Defendants' conduct, actions and inactions are ongoing and continuing—as documented by numerous people who have tried, and failed, to gain access to immigration courts for the purpose of observing them. *See e.g.*, Declaration of Stephen Kelly, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 72 ¶ 10; Declaration of Paul Wickham Schmidt, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 71 ¶¶ 15–20; Declaration of Kathryn Curtin, Ex. 69; Declaration of Michele Cantara, Ex. 48; Declaration of Gillian Rowland-Kain, Ex. 44; Declaration of Jill Fordyce, Ex. 43; Declaration of Doann Nguyen, Ex. 42; Declaration of William Quigley, Ex. 39; Declaration of Bryanna Siguenza, Ex. 35; Declaration of Morgan Jenkins, Ex. 31; Declaration of Amy Lange, Ex. 19; *see also* Acacia Ctr. for Just., *Restrictions on Public Access Undermine Transparency in Immigration Courts: Why Public Access to Immigration Courts Matters More than Ever* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/ (describing denials of public access the immigration courts); Caroline Kubzansky, *Immigration Court Observers—and Their Oversight—Routinely Locked Out of Process*, Chi. Trib. (Mar. 30, 2026), https://www.chicagotribune.com/2026/03/30/immigration-court-observers/ ("Post-pandemic, the number of immigration court hearings conducted on a virtual platform called Webex has skyrocketed. But over the last few months, court watchers trying to observe on that platform

increasingly have found themselves shut out of those hearings."; Of the 17 permanent and temporary judges staffing the city's immigration court, observers from [Ruth] Abramson's group have not been able to access virtual proceedings run by four judges since January. Another two appeared to stop allowing virtual access in February."; Court Watch Los Angeles, *Canary in the Coal Mine* 2025, Court Watch LA Year in Review: Immigration Courts 18–19 (Spring 2026), https://courtwatchla.org/wp-content/uploads/2026/04/Canary-in-the-Coalmine-Court-Watch-LA-2025.pdf (noting, among other things, in Section 1 ["Closed Doors: How Courts Block the Public from Watching"] of the report: "Generally, volunteers experienced resistance, hostility, and difficulty accessing the immigration courts in person. Often, volunteers seeking to observe court in person faced staff and clerks who were unaccustomed to seeing lay observers without personal business in the day's proceedings. Some volunteers were turned away from entering hearings and told by the clerk that the judge would not give permission for them to observe."; "Access was worse via Webex. Courtwatchers reported that accessing the Webex felt '*like the start of a computer game*,' given the uncertainty of whether they would be let in. Observers reported being left in virtual waiting rooms indefinitely and never being let in by the clerk of the court."; "Even when observers called the clerk to coordinate which hearings they could observe, they were given the run around or unexpectedly ejected from the virtual hearing. If they did gain access, courtwatchers received a mixed welcome from the immigration court judges they encountered. Sometimes, they were welcomed . . . . Other times, observers were met with questions from the IJs about their purpose, told they needed to inform the court that they would be observing, asked for their full name, required to turn their camera on, or even berated and told to leave."); *see also* Declaration of Maggie Berry, Ex. 30 ¶ 11–12 ("I had never seen or heard of an observer being told to state their name on the record or being questioned about what they do."); Declaration of Katrina Bleckley, Ex. 27 ¶ 3; Declaration of Allie Zenwirth, Ex. 36 ¶ 5–9 ("the IJ paused the court proceedings and

23

demanded to know who I was, what I was doing there, and who gave me the impression that I could join the proceedings.").

29.    The exclusion of members of the public and the press from immigration court proceedings is happening at a time of enormous public controversy and debate surrounding immigration law and policy and whether IJs are doing their work impartially and in accordance with governing federal standards, independent judgment, and applicable regulations. *Compare* 8 C.F.R. § 1003.10(a) ("The immigration judges are attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings, including hearings under section 240 of the Act. Immigration judges shall act as the Attorney General's delegates in the cases that come before them."); 8 C.F.R. § 1003.10(b) (noting as regards the "Powers and duties" of IJs, that they "shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation," and that "[i]n deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section," they "shall exercise their *independent judgment* and discretion and *may take any action consistent with their authorities under the Act and regulations* that is necessary or appropriate for the disposition or alternative resolution of such cases.") (italics added); 8 C.F.R. § 1003.10(d) (providing under the heading of "Governing standards": "Immigration judges shall be governed by the provisions and limitations prescribed by this Act and this chapter, by the decisions of the Board [of Immigration Appeals], and by the Attorney General . . . ."), *with* Christopher Magan, Susan Du, & Jeff Hargarten, *Hope Fades in Minnesota Immigration Court*, Minn. Star Trib. (May 23, 2026), https://www.startribune.com/hope-fades-in-minnesota-immigration-court.601659252 ("In the first two months of this year, judges at the state's immigration court granted asylum in just two out of 982 cases, according to a Minnesota

24

Star Tribune analysis of data from Mobile Pathways, a nonprofit that analyzes court decisions."); *id*. (noting that "[i]n January and February 2024 . . . 362 asylum cases came before judges at Minnesota's immigration court" and that "[i]n those 362 cases, asylum was granted 13% of the time," but that "[i]n January and February 2026 . . . 982 asylum cases were heard in Minnesota" and that "[j]udges granted asylum in only 0.2% of those cases"); *id*. ("In public, the Justice Department has said it's recruiting 'deportation judges.' In private, the administration is pressuring judges to explain decisions that favored immigrants, according to the national immigration judges union."); Shadi Bushra, *Asylum Approvals Plummet at Fort Snelling Immigration Court as Case Numbers Soar*, MinnPost (May 26, 2026), https://www.minnpost.com/metro/2026/05/asylum-approvals-plummet-at-fort-snelling-immigration-court-as-case-numbers-soar/ ("While getting an application for asylum [granted] has always been exceedingly difficult, new priorities and procedures at the federal level have trickled down to the nation's 60 regional immigration courts, including Fort Snelling, which administers cases from Minnesota, North Dakota, and South Dakota. Changes over the last 16 months have made it even harder for applicants to have their full case heard on the merits . . . . At the same time, judges are under pressure to clear a backlog of cases by making quick rulings, often issuing summary judgments even before the full evidentiary hearings in which applicants and lawyers traditionally bring out their strongest arguments."); *see also* Declaration of Jenny Beverly, Ex. 47 ¶ 14 (former IJ describing pressure to hold hearing out of public eye and to falsely claim "technical difficulties" to justify excluding the public).

30.    DOJ and EOIR and their officials are, in fact, actively facilitating the denials of public and press access to immigration courts by virtue of the inaccurate and confusing guidance they are giving to IJs. IJs have been given (or perceive to have been given) vast, untrammeled discretion by the DOJ, EOIR and their officials—in direct violation of the plain text and dictates

25

of binding legal regulations, 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b)—to close immigration hearings, including remotely conducted hearings held via Webex. Many IJs, for example, are restricting public access to immigration court matters and proceedings, including by only allowing *parties and their counsel* to attend hearings held on Webex. *See* Declaration of Charles Shane Ellison, Ex. 50 ¶¶ 8–9 (IJ citing "new EOIR policy" requiring in-person observation); Declaration of Michele Cantara, Ex. 48 ¶¶ 9–11 (multiple Chelmsford IJs citing EOIR guidance as basis for barring Webex observers); Declaration of Amy Lange, Ex. 19, ¶ 80 (Judge Taylor stating "WebEx is reserved for parties of the case"). Yet, the public must be given the right to observe any immigration court hearing, including on Webex, unless a specific and legitimate finding is made that a hearing should be closed to the public for a reason that is specifically delineated by the applicable federal regulations. Indeed, in another lawsuit filed in New York (*Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-2130-CM, discussed *infra*) over the improper denial of access and restrictions on access to immigration court hearings, Acting Assistant Chief Immigration Judge John Burns and Assistant Chief Immigration Judge Khalilah Taylor, in declarations filed as part of a motion to dismiss that lawsuit, made this telling admission after noting that "[p]ublic access to immigration hearings is governed by regulation, principally 8 C.F.R. §§ 1003.27, 1240.10(b), and 1240.11(c)(3)(i)": "Subject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing. Each judge's internet-based hearing link is posted on EOIR's public website." *See* Declaration of Acting Assistant Chief Immigration Judge John Burns, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 75 ¶ 7; Declaration of Assistant Chief Immigration Judge Khalilah Taylor, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 74 ¶ 6. AHR and its staff and volunteers, as well as

26

individual court observers around the country, have a clear and public interest in attending and observing both in-person immigration hearings, as well as hearings held through other means, including via video teleconferencing (e.g., Webex).

31. The Defendants have improperly facilitated denials of public access to immigration court matters and proceedings through their conduct, actions, and inactions. For example, a DOJ/EOIR "Fact Sheet," titled "Observing Immigration Court Hearings" and dated "November 2025" stated in part:

> Immigration court hearings are closed when:
>
> - The Immigration Judge grants a party's oral or written motion to close a hearing;
> - The Immigration Judge makes a determination to limit attendance at or to close a hearing; or
> - The immigration court hearing is required by law to be a closed hearing. *See* 8 C.F.R. §§ 1003.27, 1003.31(d), 1003.46, 1208.6, 1240.10(b), 1240.11(c)(3)(i).

The first two bullet points cite no legal authority whatsoever, but appear to provide guidance to IJs—in direct violation of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b)—that they have discretion to "close a hearing" without satisfying the necessary requirements or criteria for the closure of a hearing, with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) making hearings presumptive open. That November 2025 "Fact Sheet" further states in part: "Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are *for parties* appearing remotely." (italics added). The November 2025 Fact Sheet did not make the required and necessary provision (including in terms of adequate notice and logistics of access for non-parties) for compliance with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) and to ensure public and press access to immigration court hearings where the immigration court hearing is conducted remotely, by Webex, or is conducted in person but where the immigration judge is appearing in a secure or non-public location or in an inaccessible or distant location or where

parties, their counsel and witnesses are permitted to participate via Webex and interested observers are located in another location. Under the Defendants' own interpretation of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), the general public and the press must be permitted to observe via Webex, too, subject only to the limited exceptions for closure in those regulations. This openness requirement for immigration hearings Defendants choose to hold over Webex applies to observers irrespective of, but especially where it is impossible or impracticable for public observers to attend in person or access the facility in question.

32.    The Defendants' conduct and the Defendants' actions and inactions are continuing. Thus, a DOJ/EOIR "Fact Sheet," titled "Observing Immigration Court Hearings" and dated "February 2026" (and which IJs have been relying upon in doing their work) states in part:

> Immigration court hearings are closed when:
>
> - The Immigration Judge grants a party's oral or written motion to close a hearing;
> - The Immigration Judge makes a determination to limit attendance at or to close a hearing; or
> - The immigration court hearing is required by law to be a closed hearing. *See* 8 C.F.R. §§ 1003.27, 1003.31(d), 1003.46, 1208.6, 1240.10(b), 1240.11(c)(3)(i).

Again, the first two bullet points cite no legal authority whatsoever, but appear to provide guidance to IJs—in direct violation of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b)—that they have discretion to "close a hearing" without satisfying the necessary requirements or criteria for the closure of a hearing, with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) making hearings presumptive open. That February 2026 "Fact Sheet," like the earlier November 2025 Fact Sheet, further states in part: "Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are *for parties* appearing remotely." (italics added). Various IJs around the country are thus frequently excluding the press and members of the public from various immigration court matters and proceedings and where

28

they've offered any explanation at all it has been on the basis of the DOJ/EOIR "Fact Sheet" that has been released from time to time by DOJ/EOIR. However, IJs have no discretion to close immigration court hearings, whether conducted in person, on Webex, or telephonically, without complying with federal regulations—and those federal regulations make immigration court hearings presumptively open to the public. *See* Declaration of Gail Montenegro, former Public Information Officer for EOIR, Ex. 56 ¶ 8 ("a Webex hearing is a hearing." "Without public access to the immigration court hearings . . . there's no independent way to ensure fairness, consistency or accountability." "Some cases may be heard in a place that isn't open to the public at all, like one of the handful of immigration adjudication centers scattered around the country. Or detainees could be held in locations where in-person observation is technically an option, but are practically inaccessible to ordinary people."); Supplemental Declaration of Ryan R. Wood, Ex. 38 ¶ 10–12.

33.    An Amended Complaint in *Arias v. U.S. Immigration and Customs Enf't* was filed on April 29, 2026. *See* Amended Complaint, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed Apr. 29, 2026). The Amended Complaint again cites the First Amendment, 8 C.F.R. § 1003.27, and the APA. The affidavits in that case document frequent (and not simply isolated) denials of access to immigration court hearings. *See, e.g.*, Affidavit of Debbie Nathan (a journalist reporting on immigration and the immigration court system since the late 1980s and asserting that "[u]ntil mid-2025" immigration court "[p]roceedings were open" but that "restrictions are now" routine, and they have effectively closed off an essential area of public reporting); Affidavit of Dr. Zoey Phillips (dated Apr. 26, 2026) (describing denials of access to immigration courtrooms and that the examples of denials of access "are not isolated" but "reflect a consistent pattern and practice" that he has "repeatedly experienced and witnessed"); Declaration of Sarah Glacel, Ex. 70; Declaration of Paul Wickham Schmidt, Ex. 71; Declaration of Stephen

Kelly, Ex. 72; Declaration of Rev. Chloe Breyer, Ex. 73. Attached to this Amended Complaint are similar declarations from Gillian Rowland-Kain, Cary LaCheen, Diane Barnhard and former immigration judge Carmen Maria Rey Caldas involving restrictions on access to public observers in the immigration courts in New York City and Buffalo, New York, showing that immigration judges have continued denying access to observers even after the *Arias* Complaint. *See* Ex. 44, 45, 46, 32.

34.    Denials of access to immigration courts have also occurred in places such as Chelmsford, Massachusetts; Miami, Florida; Houston, Texas; Los Angeles and San Diego, California; Georgia; Chicago, Illinois; Baton Rouge, Louisiana; North Carolina; Washington State; and Laredo, Texas. *See, e.g.*, Declaration of Michele Cantara, Ex. 48; Declaration of Jenny Beverly, Ex. 47; Declaration of Bryanna Siguenza, Ex. 35; Declaration of Alizeh Sheikh, Ex. 58; Declaration of Carmen Maria Rey Caldas, Ex. 32; Declaration of Kathryn Curtin, Ex. 69; Declaration of Ishanee DeVasGunawardhane, Ex. 51; Declaration of William Quigley, Ex. 39; Declaration of Nancy Grush, Ex. 34; Declaration of Charles Shane Ellison, Ex. 50; Declaration of Rebecca Hillstrom, Ex. 53; Declaration of Morgan Jenkins, Ex. 31. In San Diego, immigration court observers have been intimidated—even cited for "loitering"—as they have attempted to engage in their observation work. *See, e.g.*, Gustavo Solis, *Federal Agents Detain Immigration Court Observers in Downtown San Diego*, KPBS (Mar. 3, 2026), https://www.kpbs.org/news/border-immigration/2026/02/26/federal-agents-detain-immigration-court-observers-in-downtown-san-diego; Kelly Hessedal, *Volunteer Legal Observer Detained and Ticketed at Federal Building in Downtown San Diego*, CBS8 (Feb. 26, 2026), https://www.cbs8.com/article/news/local/volunteer-legal-observer-detained-federal-building-

downtown-san-diego/509-9f58a90f-5aa0-4b3a-8629-00aabc74abf1; *see also* Declaration of Kenneth M. Nollett, Ex. 57.

35.    AHR and its staff and volunteers, as well as other immigration court observers, including the other named plaintiffs, have an interest and a legal right, including a First Amendment interest and right, to observe immigration matters and proceedings wherever they occur throughout the United States, subject only to limited exceptions set forth in the Defendants' regulations, regardless of whether an immigration hearing takes place in person, through video teleconferencing (e.g., Webex), or telephonically.

36.    To do its human rights work and advocacy, AHR and its staff and volunteers, as well as the named plaintiffs and others who do immigration court observation work, must get adequate notice of immigration court hearings and then be able to observe those hearings. AHR is an international human rights organization that advocates for the promotion and respect of human rights around the world, including in the United States, and immigration court observers around the country, including the plaintiffs, have dedicated their time and effort to observe immigration court proceedings as part of court observation programs and volunteer activity. Unless a legitimate reason (i.e., one supported in fact and law by 8 C.F.R. § 1003.27) exists and is articulated in advance of the closure of an immigration court hearing, AHR and its staff and volunteers, as well as plaintiffs and other immigration court observers whose declarants are attached, Ex. 19–31, 59–60, have an interest in observing and monitoring, and a legal right to observe and monitor, immigration court hearings throughout the United States. AHR and its staff and volunteers have observed numerous immigration court hearings since AHR started its immigration court observation project many years ago, and the plaintiffs and other declarants (whose declarations are attached hereto, Ex. 19–31, 59–60), have been volunteers for multiple court observation projects

and plan to continue to engage in immigration court observation work. AHR's staff and volunteers seek to continue their court observation project and work, both by observing in-person immigration court hearings at the Fort Snelling Immigration Court and by observing video teleconferencing/Webex hearings and telephonic hearings throughout the United States, just as the other plaintiffs and many other individuals throughout the country seek to continue doing court observation work.

37.    The DOJ and the EOIR, through its official actions and the actions of its officers, agents, representatives and employees, are allowing IJs to preside over immigration hearings where the respondent and the respondent's attorney is in one place and the immigration judge is in another, but without ensuring that such hearings are accessible to the public and the press. *See, e.g.*, Anshu Patel & Nicholas Scibelli, *'We Just Want a Fair Trial': How the 'Somali Rocket Docket' Is Upending the Asylum Process*, Sahan J. (Mar. 19, 2026), https://sahanjournal.com/immigration/somali-asylum-seekers-expedited-cases/ ("In recent weeks, immigration attorneys in Minnesota and other states say scores of Somali asylum clients have had their hearings expedited, creating concerns over due process and access to attorneys, a phenomenon colloquially referred to as the 'Somali rocket docket.' Advocates also say that the majority of the hearings have been presided over by out-of-state judges in virtual courtrooms, raising questions about observer access to court proceedings."); *id.* ("In an email to Sahan Journal, Kathryn Mattingly, spokeswoman for the Executive Office of Immigration Review, said that any immigration judge can hear any case at any time throughout the country to assist with caseloads.").

38.    The immigration court observation and advocacy work of AHR and its staff and volunteers, as well as the court observation work of the named plaintiffs and other court observers, depends on public access to immigration court hearings. In spite of the plain language and

32

requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), and in spite of the First Amendment rights at stake in the public's right to observe immigration court hearings, DOJ, EOIR, and their officers, agents, representatives and employees are denying and restricting access to immigration court hearings around the country, with immigration court observers for Webex hearings frequently excluded from Webex hearings or forced to wait in virtual waiting rooms for Webex hearings and then never granted access or, if initially granted access, removed by IJs from the Webex hearings. This has happened frequently to AHR staff and volunteers and to other court observers. *See e.g.*, Declaration of Amy Lange, Ex. 19 ¶¶ 67–81; Declaration of Kimberly Boche, Ex. 28 ¶¶ 5–8; Declaration of Christina O'Connell, Ex. 62 ¶¶ 3–6; Declaration of Morgan Jenkins, Ex. 31; Declaration of Katie Fleming, Ex. 41; Declaration of Jill Fordyce, Ex. 43; Declaration of Gillian Rowland-Kain, Ex. 44; Declaration of Kathryn Curtin, Ex. 69 ¶¶ 7–10 ("ICIRR court watch volunteers have been inappropriately denied access to observe via Webex over 300 times since late February."); Declaration of Marissa Porter, Ex. 67. Public reports show it is also happening at other places around the country. *See, e.g.*, Martín Macías, Jr., *LA Immigration Court Observers Sound Alarm over Lack of Due Process in Legal Proceedings*, L.A. Pub. Press (May 11, 2026), https://lapublicpress.org/2026/05/la-immigration-court-ice/ ("Numerous times over the last year, Orange County resident Sara volunteered online to livestream an element of the Trump administration's deportation apparatus that few bear witness to: immigration court. Sara, who is using a pseudonym for fear of retaliation, told *LA Public Press* she regularly observed immigrants appearing in immigration court in Los Angeles County without legal representation or interpretation services."; "Sara's experience reflects what other volunteer observers witnessed in immigration proceedings in LA County, according to a report released last month by Court Watch LA."; "Though the hearings are public, volunteer court watchers like Sara said they are routinely

33

turned away from or kicked out of proceedings were immigrants' fates are decided."; "Sara said he regularly experience hostility from judges or clerks denying her entry to virtual immigration court hearings . . . ."; "Observers at both in-person and virtual hearings, faced access barriers, according to the report. Observers noted that in-person hearings at detention centers were difficult to access due to generally being in remote locations with strict security, the report said."; "'Observers were turned away by clerks, left indefinitely in virtual waiting rooms, ejected mid-hearing, and questioned about their organizational affiliations,' the report said."; "In November, The Guardian reported the FBI spied on private, encrypted group chats for New York immigrant rights activists who organized court watch efforts.").

39.     In recent weeks alone, AHR and its court observers have been blocked from hundreds of Webex-only hearings on the docket for immigration matters at the Fort Snelling Immigration Court. *See* Declarations of Amy Lange, Ex. 19; Declaration of Zoe Martens, Ex. 20. AHR has documented the difficulties and denials of access that it and its staff and volunteers have experienced through AHR statements and AHR advocacy, reported on by the media. Anshu Patel & Nicholas Scibelli, *'We Just Want a Fair Trial': How the 'Somali Rocket Docket' Is Upending the Asylum Process*, Sahan J. (Mar. 19, 2026), https://sahanjournal.com/immigration/somali-asylum-seekers-expedited-cases/ ("The Advocates for Human Rights, an immigrant rights organization tracking cases at Fort Snelling Immigration Court, has been monitoring the influx of Somali cases which began as Webex-only hearings on Feb. 17 and on court dockets a week later. According to Amy Lange, director of The Advocates' court observation project, from Feb. 27 to Mar. 11 there were around 170 hearings held for Somali nationals. She said every hearing was held virtually with out-of-state judges. The Advocates have documented seven judges assigned to

CORE/3515279.0007/239840525.8

these cases: Craig Defoe (Illinois), Sherron Ashworth (Louisiana), Chris Brisack (Texas), Andrew Caborn (Texas), Nina Carbone (Colorado), Philip Taylor (Georgia) and Abdias Tida (Texas).").

40.    The plain language of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) makes clear that there are only limited, specified reasons to close an immigration matter or proceeding. Neither the DOJ nor the EOIR (or any of their officials, representatives, agents, or employees) has the discretion or the authority to give discretion to IJs to disregard the legal requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), IJs do not possess the legal authority to disregard the legal requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), and immigration hearings are presumptively open to the public and the press.

41.    The use of virtual/Internet-based hearings has increased exponentially since the onset of the COVID-19 pandemic. *See, e.g.*, Acacia Ctr. for Just., *Restrictions on Public Access Undermine Transparency in Immigration Courts: Why Public Access to Immigration Courts Matters More than Ever* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/ ("The use of virtual courtrooms has increased exponentially. According to government data, there were just over 157,000 virtual hearings in 2021 . . . ."). Adjudication statistics from the EOIR show that, in 2025, there were 1,759,285 immigration hearings conducted in person, 850,009 immigration hearings conducted over the Internet/video teleconferencing ("VTC") technology, and 11,491 immigration hearings conducted telephonically. In 2026, in-person hearings and Internet/VTC hearings continue to be the dominant means by which immigration court hearings are conducted. Exec. Off. for Immigr. Rev., *Executive Office for Immigration Review Adjudication Statistics: Hearing Adjournments by Medium and Fiscal Year*, https://www.justice.gov/eoir/media/1344966/dl?inline (providing statistics for the number of immigration court hearings held "In Person," via the "Internet/VTC," and via "Telephonic" means by year, from 2017 to 2025 and for the first portion of 2026).

35

42.    Upon information and belief and the estimates of the Acacia Center for Justice, EOIR—through its unlawful guidance to immigration court judges and improper training and supervision of immigration court judges—has, since early 2025, rendered tens of thousands, if not hundreds of thousands, of immigration court hearings around the United States inaccessible to the press and members of the public. *See, e.g.*, Acacia Ctr. for Just., *Restrictions on Public Access Undermine Transparency in Immigration Courts: Why Public Access to Immigration Courts Matters More than Ever* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/ ("Immigration court hearings are, by law, open to the public. Yet in practice, court observer groups are being shut out."; "Although 8 C.F.R. § 1003.27 establishes openness as the default, recent EOIR guidance and facility-specific rules have stretched restrictions beyond the enumerated exceptions. Judges and court administrators increasingly exercise broad discretion to close proceedings, often without clear, case-specific justification. Additionally, physical obstacles like locked courtrooms and signage declaring 'all hearings closed' block entry to some courtrooms at the door."; "In many locations, bans on notetaking and prohibitions on communication with respondents suppress basic documentation, precluding the very oversight the law envisions. Most troubling, policies that exclude observers from remote dockets ensure that **hundreds of thousands of virtual hearings** will unfold out of public view. These transparency gaps are even more severe in detention facilities and remote adjudication centers, where DHS and facility rules sharply restrict in-person access. **Because virtual hearings dominate in these settings, entire dockets can become effectively unobservable.**"; "Remote observation via Webex is increasingly restricted, with some judges citing 'bandwidth issues' to deny observers, others citing the November 2025 EOIR Fact Sheet, and others simply saying that they do not allow

36

CORE/3515279.0007/239840525.8

observers into hearing."; "Observers may be arbitrarily removed from remote dockets or never admitted into the hearing without justification.") (bold in original).

43.     The Defendants' unlawful conduct and their unlawful actions and inactions have been adversely affecting court observation programs and court observers around the country. For example, the Duke University School of Law has operated a virtual court observation program for its law students, in which law students in that program were tasked with watching immigration court hearings remotely in North Carolina and Georgia. Because of the actions of DOJ, EOIR, and their officials and representatives, including IJs, the Duke University law students have been unable to observe immigration court matters and proceedings on Webex, and thus deprived of that opportunity as part of their legal education, with in person observation too impractical or impossible given the expense and physical distances involved. *See* Declaration of Chales Shane Ellison, Ex. 50.

44.     In short, Defendants have violated the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* by acting arbitrarily and capriciously—and in violation of the First Amendment—in failing to ensure compliance with 8 C.F.R. § 1003.27, which provides that "[a]ll hearings, other than exclusion hearings, shall be open to the public" with only limited exceptions, and the related federal regulation that references 8 C.F.R. § 1003.27. AHR and other court observation projects have frequently been denied access to observe immigration court matters and proceedings, including in person and through Webex hearings, and a preliminary injunction and stay is necessary and warranted to ensure compliance with applicable federal regulations and the First Amendment.

45.     As background, AHR has implemented a project through which AHR volunteers and staff have observed and documented removal and bond proceedings at the Fort Snelling

Immigration Court since 2017. This court observation project of AHR draws on the well-established international human rights practice of monitoring legal proceedings to identify, bring visibility to, and end human rights violations arising in the context of civil immigration enforcement. The project brings observers into the Fort Snelling Immigration Court to observe and document hearings, including hearings for those facing removal while in Immigration and Customs Enforcement ("ICE") detention. Since starting the Immigration Court Observation Project, AHR staff and volunteers have regularly observed hearings on the detained, non-detained, families and children, and Institutional Hearing Program ("IHP") dockets. AHR trains its immigration court observation volunteers, but AHR—along with other organizations and individuals across the country, including the named plaintiffs—have been unable to freely observe various immigration court matters and proceedings in the last several months due to the actions and omissions of the Defendants. *See, e.g.*, Declaration of Amy Lange, Ex. 19; Declaration of Morgan Jenkins, Ex. 31; Declaration of Bonnie Byland, Declaration of Nancy Grush, Ex. 34; Ex. 33; Declaration of Katie Fleming, Ex. 41; Declaration of Alla Holmes, Ex. 40; Declaration of Gillian Rowland-Kain, Ex. 44; Declaration of Cary LaCheen, Ex. 45; Declaration of Charles Shane Ellison, Ex. 50; Declaration of Bryanna Siguenza, Ex. 35; Declaration of Kathryn Curtin, Ex. 69; Declaration of Diane Barnhart, Ex. 46; Declaration of Michele Cantara, Ex. 48; Declaration of Jack Lloyd, Ex. 52; Declaration of Alizeh Sheikh, Ex. 58.

46.     IJs are bound to apply the law. IJs "are attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings, including hearings under section 240 of the Act [INA]." 8 C.F.R. § 1003.10(a). IJs "shall act as the Attorney General's delegates in the cases that come before them." *Id.* IJs must act in accordance with law and abide by governing regulations, including 8

38

C.F.R. § 1003.27. As 8 C.F.R. § 1003.10 states: "In conducting hearings under section 240 of the Act and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation. In deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases. 8 C.F.R. § 1003.10(b). Paragraph (d) reads: "*Governing standards*. Immigration judges shall be governed by the provisions and limitations prescribed by the Act and this chapter, by the decisions of the Board [of Immigration Appeals], and by the Attorney Geneal (through review of a decision of the Board, by written order, or by determination and ruling pursuant to section 103 of the Act)." 8 C.F.R. § 1003.10(b).

47.    Until 2025, AHR's observers at the Fort Snelling Immigration Court enjoyed access to hearings consistent with the standards set forth in 8 C.F.R. § 1003.27 and with policy guidance posted on the EOIR website, both of which make clear that immigration court hearings are generally open to the public, subject only to limited exceptions, as specified by law. Through its immigration court observation volunteers, AHR regularly collects information on immigration court matters and proceedings. As part of its human rights work, AHR also regularly drafts and prepares reports that are disseminated to the public, including in the area of the rights of immigrants. For example, in 2026, AHR used information gathered by immigration court observers for a report about medical neglect in immigration detention.

48.    Immigration court observation projects, individual immigration court observers, and reporting on immigration court matters and proceedings are more important than ever,

39

especially in light of the recent IJ resignations and firing of more than 100 IJs, the loss of the impartiality and independence of IJs, and the increased cost and general futility of respondents lodging appeals from rulings of IJs before the Board of Immigration Appeals. *See, e.g*., Ali Rogin, Jonah Anderson, & Ali Schmitz, *Fired Immigration Judge Gives Inside Look at Trump's Deportation Agenda*, PBS News (Apr. 30, 2006), https://www.pbs.org/newshour/show/fired-immigration-judge-gives-inside-look-at-trumps-deportation-agenda. the denial of counsel in such matters and proceedings ("The Justice Department has . . . fired more than 100 sitting immigration judges and is now advertising to hire so-called 'deportation judges' in their place."); Nicholas Nehamas, Allison McCann, Steven Rich, Jazmine Ulloa, & Hamed Aleaziz, *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026) (updated Apr. 13, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html ("The Trump administration has systematically pressured the nation's immigration judges, threatening them with disciplinary action if they do not deport more people and firing those seen as insufficiently supportive of the president's aggressive enforcement agency, a New York Times investigation has found."; "Although they wear robes and are required by law to exercise 'independent judgment,' immigration judges are not part of the judicial branch. Instead they work for the Justice Department, under Mr. Trump's ultimate command, and can be fired. One of their main duties is deciding whether undocumented immigrants should be deported or granted a form of legal status like asylum and be allowed to remain in the country."; "So far, the Trump administration has dismissed more than 100 immigration judges out of about 750 in place when Mr. Trump returned to power, an unprecedented purge."; "The number of people being ordered deported has risen sharply, while judges have approved asylum claims in fewer than 10 percent of cases this year, the lowest rate for which data is available, The Times found."; "In interviews, more

40

than two dozen immigration judges who have served under the second Trump administration described feeling a consistent sense of pressure to deport immigrants or risk losing their jobs."; "During Mr. Trump's second term, White House and Justice Department officials have carefully monitored judges' rulings, examining statistics showing how often they have granted asylum, according to two federal government employees with knowledge of the activity who spoke on condition of anonymity for fear of retaliation."; "There are more than 70 courts around the country, some located in detention centers, others in modest federal office buildings. Some are entirely virtual."; "Teresa Riley, the chief immigration judge, has received daily reports about bond rulings, according to a Justice Department official. Her office has sometimes emailed judges asking for an explanation about their decisions to grant bond, three people said. Ms. Riley declined to comment."; "One current judge said the 'pressure to deny bond is overt.' The judge said that there was a requirement to inform a supervisor every time bond was granted, underscoring how closely the administration was monitoring decisions."); Lok Darjee, *"Everyone Has a Breaking Point": The Immigration Judges at the Sharp End of Trump's Deportation Drive*, The Guardian (May 9, 2026), https://www.theguardian.com/us-news/2026/may/09/trump-administration-immigration-judges ("The Guardian spoke with a dozen judges who had been fired or accepted buyouts, and others still on the bench to understand what is unfolding inside the immigration courts and what it may signal for the broader American justice system. Many said the purge was not just about immigration. It reflects a growing effort to exert political control over the courts, pressuring judges to align with enforcement goals."; "The firing of judges in the San Francisco area came as the administration moved to shutter the San Francisco immigration court, which went from 21 judges at the start of 2025 to just four early this year, according to NPR."; "Rey Caldas, who remains in contact with judges still on the bench, described more intimidation. 'They're going into meetings

41

and being told directly that if they grant a bond in certain cases, they will be taken off the bench,' she said. Supervisory judges, she said, were entering judges' offices to demand explanations for routine continuances."); Margy O'Herron, *The Empty Promise of the Board of Immigration Appeals*, Brennan Ctr. for Just. (Apr. 10, 2026), https://www.brennancenter.org/our-work/research-reports/empty-promise-board-immigration-appeals (noting of the Board of Immigration Appeals: "The board operates largely out of the public eye, yet its published opinions bind the country's 600 immigration judges as well as immigration officers. It has historically considered all appeals it has received, deciding tens of thousands of cases each year."; "Like immigration courts, the board is a part of the Deport of Justice (DOJ). In theory, it is separated from the immigration enforcement apparatus at the Department of Homeland Security (DHS) so that it can be an impartial tribunal. Yet like DHS staff, board members answer to political appointees aligned with the administration's priorities."; "Multiple changes at the board since Trump's return to office have restricted immigrants' ability to appeal immigration court rulings. In February 2025, the attorney general reduced the board's size from 28 to 15 members, firing or pushing out all of those appointed by the Biden administration despite a ballooning backlog of appeals."; "In addition, a statutory change in July 2025 led the cost of filing of appeal to skyrocket from $110 per person to $1,010 (later increased to $1,030). The change creates a pay-to-play system in which only those who can afford the high fee can plead their case before the board."; "Since Trump returned to office, the board has issued numerous decisions that significantly curtail immigrants' substantive and procedural rights. All but one of the 87 decisions narrow the rights of immigrations (the one exception involved a case in which DHS didn't even show up for the hearing) . . . .").

42

49. Immigration court observers are critical to the work and advocacy of AHR and other human rights organizations. Since early 2025, however, the Fort Snelling Immigration Court has had, at times, limited or completely blocked public access to hearings, both in-person and by Webex. It has done so without prior notice to the public and without providing the public either an opportunity to comment on changed access policies before they were implemented or any explanation for the changes in the court's access policies, including any indication whether, or if, the limitations fell within the limited exceptions to USDOJ's regulations requiring that the hearings be open to the public. Violations of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) have recurred, not only at Fort Snelling but around the country, and they continue to occur despite the filing of the above-captioned lawsuit seeking to ensure compliance with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), in spite of the filing of another lawsuit in New York City that cites 8 C.F.R. § 1003.27, and in spite of sworn admissions made in the federal district court in New York by sitting IJs.

50. These access restrictions at the Fort Snelling Immigration Court and at immigration courts across the country are (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (b) without observance of procedure required by law, and (c) contrary to constitutional right under the Administrative Procedure Act, with the access restrictions violating the First Amendment rights of AHR and its courtroom observers.

51. For its causes of action, Plaintiffs state and allege as follows:

**JURISDICTION AND VENUE**

52. Plaintiffs incorporate the allegations of paragraphs 1 through 51 as if fully set forth in this Section.

53. This action arises under the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, and its implementing regulations; and the Administrative Procedure Act ("APA"),

43

5 U.S.C. § 701 *et seq.* The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

54.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

55.     The APA authorizes district courts to review "final agency action," 5 U.S.C. § 704, by which Congress "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). For agency action to be final, it must satisfy "two conditions." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (internal quotation marks omitted) (quoting *Bennett*, 520 U.S. at 177–78).

56.     Both conditions for final agency action are satisfied by the conduct, actions and/or omissions of Defendants. Any unjustified exclusion of a member of the public or the press from an immigration matter or proceeding constitutes final agency action. Furthermore, DOJ, EOIR and their officials, representatives, employees, and agents, by declaring, contrary to their own regulations, that Webex hearings are only for parties and directing IJs to exercise non-existent discretion to exclude the press and members of the public from immigration court hearings held over Webex without adhering to the dictates and requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), marks the culmination of agency decisionmaking (as does, more generally, any improper exclusion of a member of the public or the press from an immigration hearing) from which legal consequences flow and determines rights or obligations—namely, that court

44

observation volunteers have been blocked from observing immigration proceedings via Webex on that basis. The decisions of IJs to unlawfully deny or restrict access to immigration court matters and proceedings, whether such denials or restrictions are made explicit or amount to constructive denials. Nothing suggests that the actions of DOJ, EOIR, or the IJs in excluding members of the public and the press from immigration court hearings are "tentative, open to further consideration, or conditional on future agency action." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007).

57.    Agency action is any "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). An agency decision that eliminates a right or a program constitutes final agency action. *Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (memorandum constituted final agency action where it marked the consummation of the agency decisionmaking process and resulted in rights and obligations being determined); *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 20 (2020) (elimination of DACA program constitutes final agency action). Agency action need not be in writing to be reviewable. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008); *see also Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("Agency action generally need not be committed to writing to be final and judicially reviewable."); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. 2018) (relying on "multiple declarations" and "extensive evidence" to identify a "de facto" policy that constituted final agency action).

58.    Giving immigration judges the discretion to deny or restrict access to immigration court hearings without insisting on compliance with the requirements of 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) constitutes final agency action and denies rights afforded by 8 C.F.R. § 1003.27, 8 C.F.R. § 1240.10(b), the APA, and the U.S. Constitution's First Amendment. The

decisions of IJs to exclude the public and members of the press from immigration court hearings also constitutes final agency action and denies rights afforded by 8 C.F.R. § 1003.27, 8 C.F.R. § 1240.10(b), the APA, and the U.S. Constitution's First Amendment.

59.    The case of *Pechter v. Lyons*, 441 F. Supp. 115 (S.D.N.Y. 1977), supports the conclusion that the actions of DOJ, EOIR, and their officials (including IJs) constitute final agency action that is reviewable in this U.S. District Court. *Id.* at 117–20 (in a case where the plaintiffs were members of the general public and defendant Francis Lyons was an immigration judge, the federal district court, in considering a legal challenge to the IJ's ruling denying access to the general public, cited 8 C.F.R. § 246.16(a) (1965), a predecessor regulation to 8 C.F.R. § 1003.27, found that plaintiffs had standing to sue under the regulation and concluded:

> Next, it is necessary to briefly consider whether the plaintiffs may have an administrative remedy that should be pursued before resorting to the district court. Upon security, it appears that they do not. They cannot intervene in the deportation proceeding, since they assert no interest in its outcome their interest is solely in monitoring the process by which the outcome is determined. Indeed the hearing structure of INS is designed only to deal with questions that arise in the context of regular administrative proceedings. Its regulations provide no mechanism whatsoever for dealing with claims of strangers to a proceeding. Moreover, there appears to be no procedure for interlocutory appeals within the agency for the regulations provide for appeals from 'decisions,' not from interlocutory orders, of the hearing officer. *See* 8 C.F.R. §§ 3.1(b), 242.21. Obviously, by the time agency review of the order closing the hearing could be obtained, the issue would be moot. *See Oliver v. Postel,* 30 N.Y.2d 171, 282 N.E.2d 306 (1972). Thus, the plaintiffs having no administrative remedy, it is entirely proper for them to address their claim to this court. *Cf. Lemon v. United States*, 387 F. Supp. 561 (S.D.N.Y. 1975).

60.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within this district.

61.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

46

62.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B).

## **PARTIES**

63.    Plaintiffs incorporate the allegations of paragraphs 1 through 62 as if fully set forth in this Section.

64.    AHR is a non-profit organization headquartered in Minneapolis, Minnesota, that, among other activities and functions, regularly monitors the operation of the U.S. Immigration Court located in the Bishop Henry Whipple Federal Building located at Fort Snelling in the State of Minnesota. AHR regularly gathers and disseminates information and reports on human rights topics, and it is attempting to monitor and observe immigration cases where, among other scenarios, respondents in immigration courts are appearing in one location (e.g., the Fort Snelling Immigration Court) and the IJs are conducting the hearing via Webex from another state/physical location.

65.    Plaintiff Morgan Jenkins resides at 16709 Kamalin Ct, Clermont, FL, 34715.  Morgan Jenkins has been a volunteer court observer with the American Bar Association Commission on Immigration Court Observation Project and the Jesuit Refugee Service USA Migrant Court Observation Project since January 2026 and with the Acacia Center for Justice Witness for Justice program since May 2026. Morgan Jenkins has been trained by the American Bar Association Commission on Immigration's Immigration Court Observation and Awareness Project to observe hearings using best practices.  During court observations, both in person and by Webex, Morgan Jenkins never intervenes and follows EOIR's conditions and guidelines, providing identification by name when asked, following all bailiffs' and judges' instructions, and refraining from all recording other than by personal written notes taken quietly. *See* Declaration of Morgan Jenkins, Ex. 31. ¶¶ 1–2

47

66.    Plaintiff Carmen Maria Rey Caldas resides at 9 Vose Ave. Apt. 211, South Orange, NJ 07079. She is a former immigration judge who heard immigration cases in the Buffalo and New York City immigration courts and who was terminated from her position without cause in August, 2025. She has since attempted to attend Webex immigration court proceedings as an observer along with her students and has been blocked from attending in Laredo, Texas and Imperial, California. *See* Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶¶ 1, 4–6, 22–27.

67.    Plaintiff Bonnie Byland resides at 2040 Bayou Paul Lane, St. Gabriel, Louisiana. 70776. She is a volunteer immigration court observer with Mision Migrante and has been barred every time she has tried from attending induvial immigration proceedings at the Immigration Court in Baton Rouge, Louisiana since it opened in 2025, including four times in May 2026, but has continued to go to that court to try and observe immigration proceedings. *See* Declaration of Bonnie Byland, Ex. 33.

68.    Plaintiff Nancy Grush resides at 1951 Wisteria Street, Baton Rouge, LA 70806. She is a volunteer immigration court observer with Mision Migrante and has been barred repeatedly and without explanation, from attending immigration proceedings at the Immigration Court in Baton Rouge, Louisiana since it opened in 2025, but has continued to go to that court to try and observe immigration proceedings. *See* Declaration of Nancy Grush, Ex. 34.

69.    Plaintiff Maggie Berry resides at 6006 25th St Cir., N, Oakdale, MN, 55128. Maggie Berry is a trained volunteer immigration court observer for AHR. She has experienced denials of access to immigration court hearings, including ones held via Webex in recent months. *See* Declaration of Maggie Berry (dated June 3, 2026), Ex. 30.

70.    Plaintiff Bryanna Siguenza resides at 465 Rose Ave., Apt. 5, Long Beach, CA 90802. Bryanna Siguenza is the Judicial Accountability Lead at La Defensa. She also oversees the

48

Court Watch LA program, has observed and been denied access to immigration proceedings, and recruits, trains and supervises court observers who have also been denied access to immigration proceedings via Webex—usually without explanation—and as part of a recurring pattern. *See* Declaration of Bryanna Siguenza, Ex. 35.

71.     Plaintiff John H. "Jack" Lloyd, an Illinois resident, resides at 1035 S. Scoville Ave., in Oak Park, Illinois. He has been a volunteer court observer since 2016, and he has experienced denials of access to immigration courts, including via Webex. *See* Declaration of Jack Lloyd, Ex. 52.

72.     Defendant Todd Blanche is named in his official capacity as the Acting Attorney General of the USDOJ. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Attorney General Todd Blache was automatically substituted for Pamela Bondi, who had been named in her official capacity as Attorney General of the USDOJ in the original Complaint of AHR. USDOJ is responsible for the administration of the U.S. immigration courts and the implementation of regulations governing their operation, including regulations governing public access to the immigration courts. USDOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, DC 20530.

73.     Defendant Daren K. Margolin is named in his official capacity as Director, EOIR of the USDOJ. EOIR is an agency within USDOJ. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings. It is headquartered at 5107 Leesburg Pike, Falls Church, VA 22041.

74.     Defendant Teresa L. Riley is named in her official capacity as Chief Immigration Judge of the OCIJ. The Chief Immigration Judge is responsible for establishing operating policies and overseeing policy implementation for the immigration courts.

CORE/3515279.0007/239840525.8

75.     Defendant Hon. Eric L. Dillow is named in his official capacity as Assistant Chief Immigration Judge, and he is responsible, as part of his duties, for the Fort Snelling Immigration Court located in Minnesota. Its address is Bishop Henry Whipple Federal Building, 1 Federal Drive, Suite 1850, Fort Snelling, MN 55111. The Fort Snelling Immigration Court falls under the jurisdiction of the Office of the Chief Immigration Judge (OCIJ), a component of the EOIR under the USDOJ.

76.     USDOJ and EOIR are "agenc[ies]" within the meaning of 5 U.S.C. § 552(f)(1), and the OCIJ is a component of the EOIR which, through Assistant Chief Immigration Judge Eric L. Dillow, oversees the Fort Snelling Immigration Court.

### STATEMENT OF FACTS

### USDOJ Regulations governing public access to the immigration courts

77.     Pursuant to regulations implemented under 8 U.S.C. § 1103(g) and 6 U.S.C. § 521, which grant authority to USDOJ, the public and the press—with only limited exceptions—have a presumptive right to observe immigration court proceedings. 8 C.F.R. § 1003.27 ("All hearings, other than exclusion hearings, shall be open to the public" except in delineated circumstances); *accord* 8 C.F.R. § 1240.10(b) ("Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings *as provided in § 1003.27 of this chapter*." (emphasis added)).

78.     These regulations, which were adopted (and then readopted and renumbered) after public notice and comment,[2] provide that "[*a]ll* hearings, other than exclusion hearings, shall be open to the public," with only the following exceptions: (1) limitations on attendance based on

---

[2] 52 Fed. Reg. 2936, Jan. 29, 1987, redesignated and amended at 57 Fed. Reg. 11571, 11572, Apr. 6, 1992; 62 Fed. Reg. 10334, Mar. 6, 1997; 67 Fed. Reg. 36802, May 28, 2002.

CORE/3515279.0007/239840525.8

available space, "with priority being given to the press over the general public," (2) limitations on attendance "[f]or the purpose of protecting witnesses, parties, or the public interest," (3) closing of hearings concerning an "abused alien spouse" *at the option of the abused spouse* and (4) closing of hearings to the public if "information subject to a protective order . . . may be considered." 8 C.F.R. § 1003.27(a)–(d).

79.     Exclusion hearings are extremely rare. Prior to the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), EOIR conducted separate "exclusion" and "deportation" proceedings. IIRAIRA replaced these distinct proceedings with a single procedure: "removal proceedings." As of April 1997, the immigration system no longer initiates exclusion proceedings. All hearings adjudicating the admissibility or removability of an alleged noncitizen are considered "removal" proceedings unless they involve a case arising before April 1, 1997. *See* Notice of Suppl. Evid. (Apr. 20, 2026), ECF No. 14-2 (Declaration of Ryan Wood); Notice of Suppl. Evid., Ex. 1 (Apr. 20, 2026), ECF No. 14-1 (Declaration of Amy Lange); Declaration of Zachary A. Albun, Ex. 59 ¶¶ 7–9.

80.     The applicable federal regulations ensuring public and press access to immigration court matters, including 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), are consistent with the "general proposition that the First Amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *In re Search of One Device & Two Individuals under Rule 41*, 784 F. Supp. 3d 234, 252 (D.D.C. 2025).

81.     There is, in fact, a long history and tradition of public and press access to immigration courts. *See* 8 C.F.R. § 246.16(a) (1965) ("Deportation hearings shall be open to the public, except that the special inquiry officer may, in his discretion and for the purpose of

protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.") (quoted in *The Imperial Presidency and the Consequences of 9/11: Lawyers React to the Global War on Terrorism* 242 n.10 (James R. Silkenat & Mark R. Shulman, eds. 2007)); Ass'n of the Bar of the City of N.Y., *Dangerous Doctrine: The Attorney General's Unfounded Claim of Unlimited Authority to Arrest and Deport Aliens in Secret (a Joint Report by Committee on Immigration & Nationality Law and Committee on Communications & Media Law)* 5 (May 25, 2004) ("Guidelines previously issued by the Attorney General have long mandated that deportation hearings conducted by the Immigration and Naturalization Service ('INS') are to be open to the public, in almost all cases. These guidelines reflect the long-standing practice of conducting such proceedings in public."); *id*. at 5 n.10 ("Before the Homeland Security Act was adopted late in 2002, the INS was an agency within the Department of Justice, and guidelines promulgated by the Attorney General created a presumption of openness.") (quoting 8.C.F.R. § 246.16(a)(1965) and citing 8 C.F.R. § 3.27 (1997))

82.    The centuries-old history of public access to judicial proceedings was recognized in the immigration context decades ago. *See Pechter v. Lyons*, 441 F. Supp. 115, 117–18 (S.D.N.Y. 1977) (in a case where the plaintiffs were members of the general public and defendant Francis Lyons was an immigration judge, the federal district court cited 8 C.F.R. § 246.16(a) (1965), a predecessor regulation to 8 C.F.R. 1003.27, and stated: "This regulation is but one of countless manifestations of a public policy centuries old that judicial proceedings, especially those in which the life or liberty of an individual is at stake, should be subject to public scrutiny, not only for the protection of the individual from unwarranted and arbitrary conviction, but also to protect the

public from lax prosecution. Unless members of the general public have standing to assert their rights under this regulation, its purpose could conceivably be defeated by a secret collusive hearing or arbitrary prosecution. I note that the office of the general counsel of INS has acknowledged in this proceeding that 'the regulation . . . in question in this case does confer an interest upon the public on which to base standing in this action.'"); *id.* at 118–19 ("In this case, Judge Lyons has taken the position that the public's right to know is adequately protected if the press is free to enter. However, in the ordinary case, just as the general public should not be required to rely upon the representations of the government that a trial was fully and fairly prosecuted, so, too, it should not have to rely upon the representations of the press. The public should be able to see for itself that justice is being done."); *id.* at 119 ("Given the foregoing, I conclude that the plaintiffs have standing to assert a claim for relief under 8 C.F.R. § 242.16(a)."); *id.* at 119–20 (finding that the immigration judge abused his discretion in excluding members of the general public from a deportation hearing and granting "[t]he preliminary injunction sought by the plaintiffs" to open the hearing to the public; stating that "it is well established that a judge may take only the most limited action necessary to sufficiently protect the interest perceived to be paramount to the interest of the public in an open hearing" and that "I cannot but conclude that it is possible to assure appropriate security within the courtroom itself"; and ruling that "there is no rational basis for concluding that closing the hearing room to the public will offer significant additional protection to the respondent" and that "[i]t necessary follows that Judge Lyons, in barring the public from the courtroom under these circumstances, abused his discretion").

83.    Immigration court proceedings take place in person, telephonically, or through Webex, a web conferencing/videoconferencing system operated by Webex by Cisco. *See* 8 U.S.C. § 1229a(b)(2)(A) ("The proceeding may take place—(i) in person, (ii) where agreed to by the

parties, in the absence of the alien, (iii) through video conference, or (iv) subject to subparagraph (B), through telephone conference."); 8 U.S.C. § 1229a(b)(2)(B) ("An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference."). A "complete record" is to be kept of immigration proceedings. Indeed, under the INA, immigration judges must maintain and preserve a thorough and complete record of the proceedings. *See* 8 U.S.C. § 1229a(b)(4)(C) ("In proceedings under this section, under regulations of the Attorney General . . . a complete record shall be kept of all testimony and evidence produced at the proceeding."). Even "off-the-record" discussions are to be summarized the immigration judge upon a return to the record. *See* 8 C.F.R. § 1240.9 ("The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge."); Policy Memorandum ("PM") 25-44, *Procedures for Going Off-the-Record During Immigration Court Proceedings* (effective Sept. 5, 2025) (memo from Sirce E. Owen to "All of EOIR" dated Sept. 5, 2025, that states in part: "Immigration Judges should limit all off-the-record dialogue. On rare occasions, an Immigration Judge may permit off-the-record dialogue during Immigration Court proceedings when necessary to the appropriate consideration of the relevant case. . . . When an off-the-record discussion is allowed by the Immigration Judge, the contents of the off-the-record discussion must be summarized by the Immigration Judge immediately upon return to the record. . . . The Immigration Judge shall provide the parties with a summary of the off-the-record discussion and then ask the parties if the summary is true and complete."); PM 25-38, *Cancellation*

CORE/3515279.0007/239840525.8

*of Operating Policies and Procedures Memoranda 84-9 and 98-2* (effective Aug. 8, 2025) (memo from Sirce E. Owen, Acting Director of EOIR to "All of EOIR" that reads in part: "[T]his PM does not alter the Immigration Court's requirement to maintain the record of proceeding in individual cases, which includes the requirement to record all hearings verbatim. *See* 8 C.F.R. §§ 1003.36, 1240.9. Hearings are presently recorded utilizing the Digital Audio Recording (DAR) system.").

84.     In recent years, especially with the onset of the COVID-19 pandemic, the number of immigration matters heard via video teleconferencing ("VTC" or "VC"), including Webex, has increased exponentially. Immigration judges receive training from EOIR, including on applicable law. *See* Declaration of Ryan Wood, Ex. 38 ¶¶ 3, 7; *see also* Exec. Off. for Immigr. Rev., *Fact Sheet – Executive Office for Immigration Review Immigration Judge Training* (June 2022) ("The Executive Office for Immigration Review . . . operates a dynamic training program for immigration judges . . . The training plan includes six weeks of initial training for new immigration judges, and the agency provides ongoing education for all sitting immigration judges."). On January 27, 2025, however, the EOIR emphasized that "[t]he national public health emergency relating to COVID-19 was terminated on April 10, 2023." *See* PM 25-03, *Cancellation of Director's Memorandum 22-02* (issued by Sirce Owen, Acting Director of EOIR, to "All of EOIR," dated January 27, 2025 and effective January 27, 2025) ("This Policy Memorandum (PM) rescinds and cancels Director's Memorandum (DM) 22-02, *Updated Guidance on EOIR's Response to the COVID-19 Outbreak*, issued November 8, 2021. The national public health emergency related to COVID-19 was terminated on April 10, 2023. *See* National Emergencies Act, Pub. L. 118-3 (2023). Accordingly, there is no longer a need for any particular EOIR COVID-19-related guidance at this time, including on its website."). Accordingly, immigration courts should be functioning as they normally would, with presumptive public and press access to immigration courts.

85.    DOJ and EOIR have issued prior guidance on Internet-based hearings, but 8 C.F.R. § 1003.27 and related regulations about public access to immigration courts have remained in effect. On November 6, 2020, for example, James R. McHenry III, the Director of the EOIR, issued PM 21-03, titled "Immigration Court Hearings Conducted by Telephone and Video Teleconferencing," to "All of EOIR." The stated "Purpose" of PM 21-03, invoking the "Authority" of 8 C.F.R. § 1003.0(b), was to "Memorialize[] EOIR policies regarding the use of the telephone and video teleconferencing to conduct hearings." The cited regulation, 8 C.F.R. § 1003.0, titled "Executive Office for Immigration Review," relates to the organization of the EOIR (8 C.F.R. § 1003.0(a)) and states in part in subparagraph (b), titled "*Powers of the Director*": "The Director [of the EOIR] shall manage EOIR and its employees and shall be responsible for the direction and supervision of each EOIR component in the execution of its respective duties pursuant to the Act and the provisions of this chapter." The Director of EOIR "shall have the authority to . . . issue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities," to "[p]rovide for comprehensive training and support for Board [of Immigration Appeals] members, immigration judges, and EOIR staff in order to promote the quality and consistency of adjudications," and to "[i]mplement a process for receiving, evaluating, and responding to complaints of inappropriate conduct by EOIR adjudicators . . . ." 8 C.F.R. § 1003.0(b). According to the first two sentences of PM 21-03: "This Policy Memorandum (PM) cancels and replaces OPPM 04-06. It memorializes EOIR policies regarding the use of the telephone and video teleconferencing (VTC or VC) to conduct hearings in proceedings before an immigration judge." Operating Policies and Procedures Memorandum ("OPPM") No. 04-06, issued on August 18, 2004, had a subject line of "Hearings Conducted through Telephone and Video Conference."

86.     Likewise, on August 11, 2022, David L. Neal, then the Director of EOIR, issued DM 22-07, titled "INTERNET-BASED HEARINGS." The stated purpose of DM 22-07, "Effective: Immediately," was to "Provide guidance to immigration judges on internet-based video hearings[.]" Issued based on the authority of 8 C.F.R. § 1003.0(b), DM 22-07 stated in part: "Hearings before immigration judges can be held both in-person, and with one or more participants appearing by video or telephone from different locations outside the court. Traditionally, the Executive Office for Immigration Review (EOIR) has used a closed video teleconferencing system when a participant appears by video. EOIR is currently allowing participants to appear through the platform Webex by Cisco. EOIR anticipates that hearings using Webex or other, similar platforms will remain important to EOIR's operations in the future." The DM 22-07 memorandum set out guidelines to apply to internet-based hearings "across the immigration courts going forward." The DM 22-07 memorandum contemplated several situations for internet-based hearings, discussed why EOIR began routinely using Webex during the COVID-10 pandemic, and concluded that internet-based hearings were authorized by law, with the memorandum reading in part as follows:

> Several configurations for internet-based hearings are possible. The immigration judge can conduct a hearing in person, with one or both parties appearing by video from outside the court. Or one or both parties can appear in court and the immigration judge can conduct a hearing by video from outside the court. Each of these scenarios can be described as an "internet-based hearing" as each involves at least one participant appearing by video over an internet-based platform. Each is distinguished from a traditional, in-person hearing where the immigration judge and all other participants appear in a courtroom.
>
> EOIR is authorized by law to hold internet-based hearings. Under the Immigration and Nationality Act (Act), hearings in removal proceedings can take place by video conference. *See* section 240(b)(2)(A), (B) of the Act. An immigration judge is permitted to "conduct hearings through video conference to the same extent as he or she may conduct hearings in person." 8 C.F.R. § 1003.25(c); see also section 240(b)(2)(B) of the Act. EOIR accordingly has wide latitude by statute and regulations to hold internet-based hearings since internet-based platforms provide video conference capabilities that are equivalent to, or better than, the closed video teleconference systems traditionally used by EOIR.

57

EOIR began routinely holding internet-based hearings through Webex during the COVID-19 pandemic, and all immigration courts now have the capacity to hold such hearings. Internet-based hearings have proven a valuable safety measure during the pandemic, as immigration judges can conduct such hearings without requiring groups of people to congregate in a courtroom. EOIR anticipates that, going forward, internet-based hearings will remain essential to EOIR's operations. For example, holding internet-based hearings can assist EOIR in moving its docket in a locale with limited courtroom space. Parties—both respondents and the Department of Homeland Security—can benefit from internet-based hearings, such as when courts can schedule individual calendar hearings sooner if held by video. Respondents and counsel appearing remotely are relieved from traveling to court. Internet-based hearings make it easier for parties to present witnesses, including expert witnesses, as parties can avoid the costs and complications of witness travel.

87.    EOIR Policy Memoranda, which represent "the policy of the agency as a whole," have called, among other things, for EOIR to follow "the Rule of Law" and for its adjudicators to remain impartial and independent in their decisionmaking. *See* PM 25-02, *EOIR's Core Policy Values* at 1 (Policy Memorandum issued by Sirce E. Owen, Acting Director for EOIR, to "All of EOIR," dated January 27, 2025, and effective January 27, 2025) (observing under the heading "EOIR's Core Values and Commitment to the Rule of Law": "EOIR's values at the core of its mission are rooted in three 'I's': integrity, impartiality, and the decisional independence. These values are essential to any adjudicatory system, and they have been fundamental to EOIR's identity since it was established within the Department of Justice (DOJ) in 1983."); *id.* ("EOIR policy is that all adjudicators are required to follow applicable law. EOIR's integrity, the impartiality of its adjudicators, and respect for the decisional independence of those adjudicators fundamentally depend on EOIR's commitment to adhere to applicable law in its adjudications."); *id.* at 2 ("Although EOIR has multiple components with vital roles and responsibilities, there is only one EOIR as a whole, and it has only one primary mission: 'to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws.'"); *id.* at 3 ("Although EOIR PMs are issued in the names of individuals, they represent the policy of the

58

agency as a whole."); *id.* at 5 ("All EOIR employees are expected to comport themselves always in an ethical and professional matter, to follow the law, and to faithfully carry out the policies of DOJ and the Executive Branch.").

88.    Prior Policy Memoranda of the EOIR addressed the subject of telephonic and video teleconferencing on more than one occasion, but those memoranda have failed to ensure compliance with 8 C.F.R. § 1003.27 and related regulations ensuring presumptive public access to immigration courts. PM 21-03, effective November 6, 2020, stated in part: "EOIR has used VTC to conduct immigration hearings since the early 1990s, and Congress statutorily authorized the use of VTC in immigration proceedings in 1996. In 2004, EOIR established a Headquarters Immigration Court to hear cases by VTC in order to assist other courts with their dockets and provided flexibility in addressing resource needs." PM 21-03 at 2 (citations omitted); *id.* at 3–4 ("All EOIR courtrooms are equipped with VTC capability, and all immigration judges may conduct any hearing by VTC if feasible.") (citing 8 C.F.R. § 1003.25(c)) ("An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person."); PM 21-03 at 4 ("Currently, the use of VTC is determined principally by operational need—*e.g.*, to reach locations where no permanent immigration court is located; to increase convenience and accessibility for respondents; to reduce travel costs; to consolidate and manage dockets; to ensure timely adjudication of cases, especially detained cases or cases subject to statutory or regulatory deadlines; to reduce 'dark' unused courtrooms in order to help ensure that an alien receives an opportunity to be heard in a timely manner; and, more recently, to allow for increased social distancing in response to the outbreak of COVID-19. Thus, consistent with INA § 240(b)(2)(A)(iii) and 8 C.F.R. § 1003.25(c). EOIR's policy remains that VTC may be used for any immigration court hearing, particularly when operational need calls for its usage."); *id.*

59

("Recently, in response to requests from stakeholders, EOIR has begun to increase its ability to conduct hearings by VTC through the use of the Webex platform which is compatible with EOIR's existing VTC system and allows a respondent or a representative for either party to appear by VTC from a location outside an immigration court. Once Webex compatibility is available at an immigration court, for the duration of the declared national emergency related to COVID-19, either party may file a motion for the alien or the representative for either party to appear at a hearing by VTC through Webex rather than in person. Further, consistent with PM 20-09, immigration judges may issue standing orders and immigration courts may adopt local operating procedures addressing appearances by VTC. Thus, like appearances by telephone, appearances by VTC at a hearing by an alien or by a representative for either party based on a motion are generally subject to the discretion of the immigration judge, *any applicable law*, and any applicable requirements of the ICPM, a standing order, or a local operating procedure.") (italics added).

89.    PM 21-03 requires that IJs follow "applicable law" and put on the record any decision relating to any motion for a VTC appearance. PM 21-03 at 4 ("Nothing in this PM requires immigration judges to decide any motion for a VTC appearance in any particular way, though the record should reflect a clear decision on any such motion filed. As in all cases, immigration judges 'exercise their independent judgment and discretion,' *subject to applicable law*, when deciding motions to appear by VTC. 8 C.F.R. § 1003.10(b).") (italics added).

90.    On March 14, 2025, Sirce E. Owen—the Acting Director of EOIR—issued a new Policy Memorandum, PM 25-25, titled "Cancellation of Director's Memorandum 22-07," with an effective date of March 14, 2025. The stated purpose of PM 25-25: "Rescind and Cancel Director's Memorandum 22-07." PM 25-25 reads in part: "On August 11, 2022, the EOIR Director issued Director's Memorandum (DM) 22-07 purporting to provide 'guidance' to EOIR Immigration

Judges regarding 'internet-based video hearings.' The need for such 'guidance' was unclear. EOIR has successfully used video conferencing (VC) to conduct immigration hearings since the early 1990s, and 'internet-based video hearings' are simply a subset of hearings conducted by VC. Further, EOIR already had established guidance on VC hearings, Policy Memorandum (PM) 21-03, *Immigration Court Hearings Conducted by Telephone and Video Teleconferencing* (Nov. 6, 2020), which DM 22-07 did not purport to withdraw or cancel. Consequently, DM 22-07 appeared, at best, pointless and unhelpful." PM 25-25 states that "[m]ost Immigration Judges strongly support the use of VC for immigration court hearings because it increases efficiency and flexibility, allows the adjudication of cases from multiple settings without being tethered to a particular courtroom, and does not compromise the fairness of the hearing." PM 25-25 at 1 n.1. However, PM 25-25 neither references the requirements of 8 C.F.R. § 1003.27 nor sets forth any mechanism or procedure to ensure press and public access to immigration court matters and proceedings when telephonic or video teleconferencing modalities are used to conduct immigration court hearings.

91.    Beginning in October, 2025, clerks, guards, and immigration judges at the Fort Snelling Immigration Court began telling AHR's court observers who had been a presence in the Fort Snelling courtrooms that hearings were closed and that doors to publicly available courtrooms were locked. They did not indicate whether this was an official policy change from EOIR, the Fort Snelling Immigration Court, or no policy change at all. No prior notice of these changes had been given to the court observers. On information and belief, similar restrictions on public access occurred across the country. *See, e.g.*, Nicolas Scibelli, *Court Observers Blocked: Immigration Hearings Face New Restrictions Across the U.S.*, Sahan J. (Dec. 10, 2025), https://sahanjournal.com/immigration/fort-snelling-immigration-court-access-shrinks/    (noting that "Fort Snelling Immigration Court has increasingly denied access to court observers, mirroring trends across the country"; that while observers for The Advocates "have been a constant presence

in courtrooms," "a change occurred" in October, with clerks telling "court observers and others that hearings were closed, and doors to publicly available courtrooms were locked"; and that at "Fort Snelling and immigration courts across the country, observers say they are increasingly being shut out and unable to observe the proceedings"); *see also* Declarations of Lyndsey Marcelino Schalkwyk, Amy Lange, Craig Hollenbeck, Kathleen Burke Scheffler, Marily Knieriemen, Megan Barker, Mark G. Rabogliatti, Patricia A. Bethke, Heidi D. Phipps, Gillian Rowland-Kain, and Emma Wilson, Exs. 6–16.

92.    As part of its ongoing immigration court observation project, AHR's volunteers and staff members have observed and documented removal proceedings at the Fort Snelling Immigration Court since 2017. This project draws on the well-established international human rights practice of monitoring legal proceedings to identify, bring visibility to, and end human rights violations arising in the context of civil immigration enforcement. The project trains and brings observers into the Fort Snelling Immigration Court to observe and document hearings, including hearings for those facing removal while in Immigration and Customs Enforcement ("ICE") detention. Since AHR started the Immigration Court Observation Project, staff and volunteers of AHR have regularly observed hearings on the detained, non-detained, families and children, and Institutional Hearing Program ("IHP") dockets. Many other immigration court observation projects exist around the country, with many volunteers doing court observation work for such groups.

93.    AHR has designed and implemented its Immigration Court Observation Project to follow best practices of court observation. It trains and oversees observers to ensure they uphold policies including non-intervention, neutrality, respect, and professionalism. Indeed, when observing nuanced processes, like juvenile dockets, AHR has gone further by limiting observers

62

to those who have special screening and training. While not required to do so, observers confirm with counsel or respondents before observing merits hearings and consistently respect respondents' requests for hearings to remain closed to observers. For many respondents, however, AHR's request for an observer to attend has resulted in them feeling less alone in these intimidating proceedings. During the eight years of the project, AHR has generally been a strong partner with the Fort Snelling Immigration Court, even assisting in coordinating meetings with the court and sharing data or observations for improvement or operations.

94.    Until 2025, AHR's observers at the Fort Snelling Immigration Court enjoyed access to hearings consistent with the standards set forth in 8 C.F.R. § 1003.27 and with policy guidance posted on the EOIR website. The Fort Snelling Immigration Court routinely and consistently posted the day's docket information publicly each morning. Observers could enter any courtroom without first checking in with court staff. And consistent with USDOJ regulations and policy AHR staff and volunteers were able to observe all master calendar hearings without prior approval from the court's staff, judges, security guards, and attorneys. Prior approval from respondents was not required either. In those cases where hearings had to be held on Webex because not enough courtrooms were available, AHR would provide its observers' names to the court in advance so they could log into the proceedings.

95.    Beginning in early 2025, the Fort Snelling Immigration Court has arbitrarily and capriciously and in violation of law increasingly limited AHR's access to hearings, both in-person and by Webex. The progressive deterioration of access included locked courtroom doors, ejection of observers from Webex hearings, blanket notices of closed hearings posted on courtroom doors, and obscuring of posted docket information. Even where respondents or attorneys for respondents had given permission for observers to attend merits hearings, observers were not allowed in and

63

the doors remained locked. In the past several months, access to hearings has been arbitrary and capricious, contrary to law, and in violation of First Amendment rights, subject to constantly changing and frequently contradictory instructions from judges, court staff, and Federal Protective Services guards, often made without any prior notice, orally, and with no opportunity for public input.

96.    Starting in March 2025, one immigration judge ("IJ"), Judge Sarah Mazzie, started locking her courtroom door for master calendar dockets as soon as she went on the record, thus inhibiting access.

97.    In response, on April 2, 2025, Amy Lange, Immigration Court Observation Project Manager at AHR, wrote to then-Assistant Chief Immigration ("ACIJ") Judge Davey to address and resolve the matter. *See* Declaration of Amy Lange, Ex. 7 ¶ 3. That communication from Ms. Lange observed, in part, that the immigration judge's "practice of locking her courtroom violates federal regulations, EOIR policy, and the right to a public hearing." "Per 8 CFR sec. 1003.27, reflected in EOIR policy," Ms. Lange emphasized, "removal and bond hearings are open to the public, except in limited circumstances as specified by law." Ms. Lange highlighted how, on March 27, 2025, the family of one respondent was even denied entry to the courtroom to hear a family member's case because the door was locked.

98.    ACIJ Judge Davey's written response to Ms. Lange that same day expressed his own concern about barriers to access to immigration court proceedings: "I share your concern regarding a closed courtroom during master calendar sessions. Your associates along with others should be able to enter and exit the courtroom throughout the session. I will address this issue with Judge Mazzie to ensure the courtrooms remain open and available to the public whenever possible."

CORE/3515279.0007/239840525.8

99.    Although ACIJ Davey's prompt intervention resolved the identified access issue for a few weeks, AHR continued to experience escalating problems with accessing immigration courtrooms. And since that time, despite ACIJ Davey's prior instructions, doors to some, but not all, courtrooms at the Fort Snelling Immigration Court have been locked and opened only during breaks. Yet, there was no consistency or clarity as to which doors would be locked or when or why. These restrictions on access impede observers' work by making access to courtrooms complicated and random and impedes the public's access to court proceedings as prescribed by the USDOJ regulations.

100.    In spite of AHR's efforts to ensure compliance with USDOJ regulations, access to hearings declined precipitously throughout 2025, including after ACIJ Davey's communication to Ms. Lange. For example, AHR's observers began to be ejected from hearings conducted via Webex in June 2025, including in cases where the hearings were held exclusively over Webex. In response to an inquiry to EOIR's Communications and Legislative Affairs Division regarding access barriers, AHR received an email stating, in part, "If you are interested in observing a hearing via Webex, you may contact the relevant immigration court at the 'General Inquiries' email address listed in the 'Contact the Court' section of each immigration court webpage." AHR's subsequent emails to "general inquiries" at the Fort Snelling Immigration Court, however, went unanswered.

101.    On July 2, 2025, Megan Gates, EOIR Supervisory Legal Administrative Specialist ("LAS"), informed AHR's Project Manager that despite years of public access, Webex observation would be indefinitely prohibited for members of the public, including AHR's observers. Ms. Gates provided no reference to regulatory or policy change from EOIR, but in November 2025, the Court provided on its website an amended EOIR "FACT SHEET- Observing Immigration Court" stating:

CORE/3515279.0007/239840525.8

"Visitors should observe in person at the courtroom in which the hearing is scheduled and held. The Webex links posted on EOIR's website are for parties appearing remotely." Eliminating public and press access to Webex hearings on a blanket basis, without any case-by-case consideration of whether any provision of 8 C.F.R. § 1003.27 warrants exclusion of the press and public, violates 8 C.F.R. § 1003.27 (and 8 C.F.R. § 1240.10(b), which refers to 8 C.F.R. § 1003.27). That blanket exclusion of press and public access violates the Administrative Procedure Act, including AHR's First Amendment rights, and has resulted in countless immigration court proceedings of public interest being conducted without press or public scrutiny. *E.g.*, Jazmine Ulloa, *U.S. Seeks to Expedite Deportation of 5-Year-Old Liam Conejo Ramos*, N.Y. Times (Feb. 6, 2026) [hereinafter N.Y. Times Feb. 6 Report] (reporting on the case of Liam Conejo Ramos, and of the asylum case of his father, Adrian Conejo Arias; noting that "[t]he hearing" was "held virtually and closed to the public"; and noting the following statement of Tricia McLaughlin, a spokeswoman for the Department of Homeland Security: "These are regular removal proceedings.").

102.   The restrictions on public access to immigration court proceedings conducted over Webex has not been limited to the Fort Snelling Immigration Court located in Minnesota. EOIR's November 2025 Fact Sheet[3] states that "[v]isitors should observe in person at the courtroom in which the hearing is scheduled and held," and that "[t]he Webex links posted on EOIR's website are for parties appearing remotely," a limitation IJs have used to block remote access to court observers at many immigration courts. *See, e.g.*, Declaration of Johnny Sinodis, Ex. 54 ¶ 7–11 ("The Webex platform is not going to be open for people that are not parties to the case to just watch."); Declaration of Marissa Porter Ex. 67 ¶ 6; Declaration of Alizeh Sheikh, Ex. 58; Declaration of Gillian Rowland-Kain, Ex. 44; *see also*, Acacia Ctr. for Just., *Restrictions on Public*

---

[3] EOIR Fact Sheet, *Observing Immigration Court Hearings*, https://www.justice.gov/eoir/media/1416861/dl?inline.

*Access    Undermine    Transparency    in    Immigration    Courts*    (Dec.    2025),

https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/

[hereinafter Acacia Center Report]. The significance of the restrictions on public attendance at

Webex proceedings has increased with the exponential expansion of virtual hearings from 157,000

in 2021 to 835,000 in 2025 a month before that year ended. *Id*. There are at least two immigration

courts, both located in Virginia—the Falls Church Adjudication Center and the Richmond

Adjudication Center—that are *only* holding virtual hearings. *Id*.

103.    Beyond access to Webex hearings, other specific access issues have arisen, with

multiple immigration court observers experiencing difficulties in carrying out their volunteer work

at the Fort Snelling Immigration Court. For instance, in July 2025, IJ Monte Miller stated that

EOIR's policy had changed and that, going forward, observers would be required to ask permission

at the window before entering master calendar hearings. IJ Miller did not provide any written

documentation of this policy change and there was no other announcement, either by EOIR or the

Fort Snelling Immigration Court, documenting the restriction. In fact, other judges did not require

observers to ask at the window, and the court staff at the window were not responsive to observers'

inquiries about the source of this newly added requirement by IJ Monte Miller. This change in

EOIR policy (its November 2025 Fact Sheet, *supra*, states that "the general public do not need to

notify the immigration court in advance of visiting") has occurred at other immigration courts

around the country as well. Acacia Center Report, *supra*.

104.    In August 2025, Federal Protective Service guards at the Fort Snelling Immigration

Court started limiting court observers and other members of the public from sitting in the lobby

outside the courtrooms, expelling them to the hallway outside the court lobby. This had never been

done previously and neither the security guards nor EOIR have provided any documentation of

CORE/3515279.0007/239840525.8

any policy change necessitating the change in practice. Instructions and rationale from guards have been inconsistent and unpredictable. Guards have expelled observers immediately after they sit down in the lobby, after observers have been sitting for a few minutes, or while they are looking at the posted docket. One guard instructed observers who had exited a courtroom during a single closed master calendar that they had to wait in the basement cafeteria. Some guards have called observers' presence in the lobby "loitering." Guards sometimes tell observers that court staff will come to the hallway to call them to hearings, but court staff have never done so. In September 2025, all hallway seating was removed. The expulsion of observers from the court lobby and removal of seating exacerbated access issues and disproportionately affected older volunteers by limiting the public from observing the operation of the court and entering courtrooms when breaks occurred. The Fort Snelling Immigration Court is located in a public building.

105.   In September 2025, Fort Snelling Immigration Court personnel further restricted access to removal proceedings. Clerks started making observers leave for adjudication of "no-shows" in non-detained master calendar hearings. AHR's observers and other members of the public also began to be barred regularly from what appear to be asylum pretermission hearings in removal proceedings.

106.   On September 11, 2025, a new document titled "Guidelines for Court Observers," was distributed to court observers. It had the U.S. Department of Justice ("DOJ") logo on it, but it was identified as coming from the Fort Snelling Immigration Court. The wording of this document, corrected at Notice of Errata, Ex. 1 (Apr. 6, 2026) [ECF No. 9-1], gives court officials more leeway to bar observers and members of the general public from proceedings, but it does not contain any explanation of the legal sources for the new restrictions.

107.    That same month, new signage was posted on *some* court doors. On September 25, 2025, one courtroom had a sign with the DOJ seal, stating: "This courtroom is now closed for further entry. No additional entrants will be permitted. The Court will recess at 10:30 AM. Entry will not be permitted until 10:30." But, even at 10:30 a.m., the courtroom remained locked. Although immigration court proceedings are, by law, presumptively open, no explanation was offered for why the courtroom was closed for entry. Also, there was no opportunity for AHR to object to the closure of the courtroom before the closure.

108.    In October 2025, access issues experienced by AHR volunteer observers worsened further. The Supervisory LAS at the Fort Snelling Immigration Court, James Reindl, told observers that only people with lanyards would be let in. While AHR observers had traditionally worn lanyards, this was also a condition never previously placed on any public observers and neither EOIR nor the Fort Snelling Immigration Court provided any explanation of the source of the new requirement. There is no provision in the applicable USDOJ regulations requiring the wearing of lanyards by immigration court observers.

109.    Beginning in late October 2025, access to the Fort Snelling courtrooms was, on occasion, shut off entirely. For example, on October 23, 2025, a sign was seen on a door to one courtroom indicating no entrance until 2:30 p.m.; however, it remained closed despite it being a sign from the previous day. Four days later, on October 27, Jacilyn "Jacee" Duda, a clerk at the Fort Snelling Immigration Court, publicly stated that a judge had declared all non-detained master calendar hearings that day would be closed to the public—in effect, a blanket closure. On October 31, two observers for AHR were excluded from all non-detained docket hearings for IJ Brian Sardelli. Likewise, on November 3, observers were not allowed in until the Webex hearings were over. In one courtroom, observers were not allowed to attend a merits hearing despite the

respondent and the respondent's attorney indicating they wished to have an observer present for the hearing. On November 6, 2025, for example, the courtroom doors were locked with a sign that read: "Courtroom is closed to the Public Due to Confidentiality Issues related to the Respondent's Court Proceedings. R.C.F.R. Sec. 208.6(a); 34 U.S.C. 12291(b)(2)." *See* Declaration of Patricia Bethke, Ex. 13. But the Court did not explain how, or why, those regulations warranted the complete closure of the hearings. Those provisions relate (1) to "[i]nformation contained in or pertaining to any application for refugee admission, asylum, withholding of removal . . . or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination . . . , and records pertaining to any reasonable fear determination," information which "shall not be disclosed *without the written consent of the applicant*[,]" 8 C.F.R. § 208.6(a) (italics added), and (2) requirements for grantees, respectively. There was no indication that the applicant requested non-disclosure or that a grantee was involved. On December 16, all detained master calendar hearings and all non-detained master calendar hearings were closed to the public. According to observers present, "[o]bservers were not allowed into court for any of the afternoon master calendar hearings. We told [the] guard several times we'd like to be let in when court ready, but he later said that court was closed to public for afternoon hearings without offering a policy basis for such." *See* Ex. 2.

110.    In November 2025, the U.S. Department of Justice issued a "Fact Sheet" titled "Observing Immigration Court Hearings." The contents of that "Fact Sheet" are described, in part, earlier in this Amended Complaint. *See supra*. It is apparent that many IJs relied upon the contents of this "Fact Sheet" in doing their work and in making decisions about public access to immigration court hearings held via Webex. *See, e.g.*, Declaration of Ryan R. Wood, Ex. 38; Declaration of Jenny Beverly, Ex. 47 ¶¶ 14–20; Declaration of Sheila McNulty, Ex. 55.

CORE/3515279.0007/239840525.8

111.    On January 7, 2026, AHR observers were told by one judge that he was closing his court due to "security concerns" following the DHS-ICE shooting in Minneapolis. *See id.* On January 8, one observer was told at the front gate that the court was not allowing observers and was then told by a group of men in masks that court observers were not allowed that day by order of a federal court judge. *See id.* Yet, no such court order was provided, nor is AHR aware of such an order. On the same day, a guard told a separate observer in the lobby that the FBI, DHS, and the court clerks had told the guards not to let any observers in that day. A guard told a third observer on January 8 that the Fort Snelling Immigration Court had ordered hearings to be closed to observers and that some hearings would be on Webex to which observers would also not be allowed. *See id.* The USDOJ regulations, which make immigration court hearings presumptively open to the press and the public, do not state that an immigration court judge can exclude the press or the public from an immigration court proceeding if it is held via Webex. Webex is a videoconferencing system owned by Cisco. Logically, the use of Webex should *increase* accessibility to observers, not *decrease* such access.

112.    The AHR detailed the foregoing facts and events in large part in a January 9, 2026 letter to the EOIR director and to the ACIJ for the Fort Snelling Immigration Court. Ex. 2. In the days following the letter, AHR's court observers have been permitted to attend court sessions in person and on Webex. As with the imposition of the restrictions, no explanation has been offered by the Fort Snelling Immigration Court officials for these changes in practice, nor was prior notice given of the changes. While AHR appreciated the partially restored access, it had no assurance that EOIR and the Fort Snelling Immigration Court will not resume their restrictions on AHR's access to immigration court proceedings without enforceable direction from this court. In fact,

71

when EOIR did respond to AHR's letter on January 20, 2026 (Ex. 3[4]), it did not even acknowledge the unexplained nature of the restrictions about which AHR had complained, much less explain the reasons, if any, for those restrictions. Rather, it told AHR to expect future limitations on access. "Regarding the issues you raised," it forewarned, "there may be instances where hearings need to be closed or held with limited attendance for a variety of reasons, as described in the Immigration and Nationality Act, the Code of Federal Regulations and EOIR Policy." Ex. 3. "Regarding locked doors or limited attendance," it added, "doors may need to be locked for security reasons or to prevent disruptions of court proceedings." And, as to hearings held remotely via Webex it said that it would be at "the discretion [of the Immigration Judge] to admit non-parties to observe a hearing that is *open to the public*." *Id.* (emphasis added).[5] Consistent with that warning—but inconsistent with EOIR regulations, and as recounted in the N.Y. Times Feb. 6 Report, *supra*, the immigration court in Fort Snelling held the removal hearings for five-year-old Liam Conejo Ramos and his father on Webex, but excluded the public. And, while the immigration judges have permitted some observers to attend some hearings in person that are also streamed on Webex, it has not informed

---

[4] The ACLU sent its own letters to the immigration court in Sacramento that were similar to the January 9, 2026 letter sent by AHR, *see* Ex. 4 and 5, but AHR's understanding is that the ACLU never received a written reply from that court.

[5] EOIR's January 20, 2026 letter also referred to the fact that the Federal Protective Service "is the agency responsible for access to, and securing the buildings in which immigration courts are housed." But while the letter states that access to the courtrooms *inside* the building might be limited by "Immigration Judges *or* FPS," FPS's role in access to courtrooms was never cited as a basis for the restrictions described in this complaint. On the contrary, court observers have a right to enter and exit courthouse buildings and courtrooms within courthouses without intimidation or obstruction. In fact, courts have held that the powers of federal security personnel do not extend to "tak[ing] action to disperse members of the public who are neither on nor threatening federal property." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1069 (C.D. Cal. 2025) (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 832 (9th Cir. 2020)); *see also Index Newspapers LLC*, 977 F.3d at 832 (affirming preliminary injunction prohibiting federal officers from, among other things, arresting or using physical force against a journalist or legal observer in connection with protests).

CORE/3515279.0007/239840525.8

observers when those proceedings have begun or are about to begin nor permitted observers to enter the courtrooms after those proceedings have begun. Indeed, many of the courtroom access restrictions faced by AHR court observers prior to AHR's January 9, 2026 letter to the Fort Snelling court officials have resumed. In some instances, for example, immigration judges have blocked observers who were initially admitted but had to temporarily leave the courtroom from reentering. Still others who were admitted were barred by one immigration judge from leaving until adjournment, even during courtroom recesses and even for bathroom breaks. Others were blocked from attending Webex-only hearings and in several instances involving several judges the signage posting dockets has been absent. *See* Declaration of Amy Lange, Ex. 7.

113.    In February 2026, the U.S. Department of Justice issued a "Fact Sheet" titled "Observing Immigration Court Hearings." The contents of that "Fact Sheet" are described, in part, earlier in this Amended Complaint and repeat what was included in the earlier November 2025 Fact Sheet. *See supra*. Again, it is apparent that many IJs have erroneously and unlawfully relied upon this "Fact Sheet" to exclude court observers from immigration court matters and proceedings held via Webex. This "Fact Sheet" is cited in the Declaration of Acting Assistant Chief Immigration Judge John Burns, discussed *supra*, making clear that IJs are, in fact, relying on the "Fact Sheet" in doing their work. Declaration of Acting Assistant Chief Immigration Judge John Burns, Ex. 75 ¶ 7, n.1. In his declaration, Acting Assistant Chief Immigration Judge John Burns also states in part:

> On March 25, 2026, I sent an email to all Immigration Judges and administrative staff at the Federal Plaza Immigration Court in which I reminded them that all immigration courtroom doors should remain unlocked during hearings, except those that are not open to the public. Because the doors in the building sometimes lock automatically when closed, I suggested that court staff ensure that doors are unlocked before closing them. I recommended to the Immigration Judges that they should make clear on the record at the beginning of each hearing whether the hearing is or is not open to the public, including by seeking the views of the respondent or their counsel on that topic. A copy of my email is

attached hereto as Exhibit 3." *Id*. ¶ 14. That email, dated March 25, 2026, and sent at "2:31 PM," and forwarded by "Burns, John (EOIR)" to "Acosta, Miguel R. (EOIR)" on May 11, 2026, stated in part that "To maintain clarity and consistency, please follow these guidelines": "**(1) Courtroom Doors During Hearings** When hearings are in session, courtroom doors must remain unlocked. After you enter the chamber, allow the parties to enter, and begin the hearing, ensure the door is left unlocked. This is important for both public access and your own safety."; . . . "**(3) Hearings That May Be Closed to the Public** Not every hearing is required to be open to the public. I am resending the factsheet titled 'Observing Immigration Court Hearings.' Please review it and reply to this email to confirm that you have done so."; . . . . "**(4) Best Practice – On-the-Record Confirmation** At the start of each hearing, I recommend that you confirm on the record with the respondent (or their attorney) whether they wish to proceed with an open or closed hearing." (bold in original).

His declaration further recited:

> On April 29, 2026, Mr. Fernandez wrote another email to the Immigration Judges and administrative staff at the Federal Plaza Immigration Court. He reminded them to ensure that courtroom doors are not locked during in-person hearings (unless they are closed to the public), and to ensure that courtroom doors are unlocked during virtual hearings to enable members of the public to observe such hearings in the courtrooms.

The American Immigration Lawyers Association ("AILA"), which has more than 18,000 members who practice and teach immigration law, took note of the EOIR's action on its website. *See* AILA, "EOIR Releases Fact Sheet on Observing Immigration Court Hearings," AILA Doc. No. 26030600 (dated Feb. 17, 2026) ("EOIR'S Office of Policy released a fact sheet on observing immigration court hearings. The fact sheet outlines restrictions on court observers, including a ban on all virtual observations."); *see also About AILA*, AILA, https://www.aila.org/about (noting the organization's founding in 1946 and describing the organization as "a nonpartisan, nonprofit, voluntary bar association that provides continuing legal education, professional services, information, and expertise to more than 18,000 attorneys who practice and teach immigration law").

114.   Regarding the closure of courtroom doors for whole sessions or to prevent exit and reentry, a declaration of Acting Assistant Chief Immigration Judge John Burns, sent to all immigration judges in New York City's Federal Plaza immigration court, reminded them that "all

74

immigration courtroom doors should remain unlocked during hearings, except those that are not open to the public" and that they "make clear on the record at the beginning of each hearing whether the hearing is or is not open to the public, including by seeking the views of the respondent or their counsel on that topic." *See* Declaration of Acting Assistant Chief Immigration Judge John Burns, *Arias v. U.S. Immigr. & Customs Enf't*, Civil Action No. 1:26-cv-02130-CM (filed May 12, 2026), Ex. 75 ¶ 14.

115.    Defendants have not offered, and do not offer for the future, to provide specific, on-the-record factual determinations supporting any alleged restrictions on access tied to EOIR regulations or to show that any such restrictions are narrowly tailored to any security concerns, nor have they indicated that persons excluded from a proceeding will have an opportunity to state their objections to exclusion before any decision on exclusion is made. Plaintiff AHR has filed a related lawsuit, based on the Freedom of Information Act ("FOIA"), seeking records and communications relating to Defendants' conduct and directives and their actions and inactions with respect to public access to immigration proceedings. *The Advocates for Human Rights v. Blanche*, No. 1:26-cv-01858-RC (D. D.C.)

116.    The limitations on public access to the Fort Snelling Immigration Court and its courtrooms, both in person and via Webex, have continued since the filing of AHR's original complaint and can be expected to continue absent a stay or injunctive relief from this Court, as detailed, *inter alia*, in the declarations of Amy Lange and Zoe Martens, *supra*. Similar denials of access and restrictions continue to take place around the country as detailed in the declarations attached to this Amended Complaint and described in prior paragraphs of this Amended Complaint and can be expected to continue absent a stay or injunctive relief from this Court.

75

## COUNT I
**Defendants Restrictions on Public Access to the Immigration Courts are Arbitrary, Capricious, and Contrary to Law in Violation of the Administrative Procedure Act in that They Conflict with USDOJ's Own Regulations Governing Public Access to the Immigration Courts.**

117.    Plaintiffs incorporate the allegations of paragraphs 1 through 116 as if fully set forth in Count I.

118.    8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) provide for presumptive public and press access to immigration courts, with only limited, specifically delineated exceptions. The restrictions on courtroom access described in the prior paragraphs of this complaint do not fall within (or were not announced in advance to fall within) any of the exceptions to public access contained in 8 C.F.R. § 1003.27. Neither USDOJ, EOIR, nor immigration judges at the Fort Snelling Immigration Court has claimed the applicability of such exceptions, and unlawful denials and restrictions on access to immigration courts have occurred throughout the country.

119.    Lawfully promulgated federal agency regulations such as 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) have the "full force of law." *Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*, 473 F.2d 1156, 1163 (D.C. Cir. 1972). By denying or restricting public access to the Fort Snelling Immigration Court proceedings and to other immigration courts across the country, Defendants have acted arbitrarily and capriciously and violated the Administrative Procedure Act proscription on agency action "not in accordance with law." 5 U.S.C. § 706(2)(A). AHR's staff and volunteers, as well as the other named plaintiffs, have a constitutional right to attend and observe immigration court hearings and proceedings, whether held in person, via video teleconferencing/Webex, or telephonically, as well as a right to attend such hearings and proceedings under 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), whether held in person, via video

76

teleconferencing/Webex, or telephonically, unless a legitimate and specific, delineated exception listed in 8 C.F.R. § 1003.27 is articulated, shown, and proven to apply in any given circumstance.

120.    Public and press access is required for all immigration hearings, whether held in person, via video teleconferencing/Webex, or telephonically, unless a legitimate and specific, delineated exception listed in 8 C.F.R. § 1003.27 is articulated, shown, and proven to apply in any given circumstance. 8 C.F.R. § 1003.27 makes immigration court hearings and proceedings presumptively open, as Defendants themselves have admitted in responding the AHR's motion for preliminary injunction and stay, and immigration hearings and proceedings conducted via video teleconferencing/Webex or telephonically must be conducted in a manner that fully complies with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), *See* 8 C.F.R. § 1003.25(c) (with 8 C.F.R. § 1003.25 titled "Form of the proceeding," subsection (c) of that regulation, subtitled "Telephonic or video hearings," provides in relevant part: "*An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person.* An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference . . . .") (italics added). An immigration judge is not permitted to hold a non-public immigration hearing, whether in person, via video teleconferencing/Webex, or telephonically unless authorized by law, but Defendants have been excluding the public and the press from immigration hearings without any basis in law. They have either offered no explanation for excluding public observers or, in the rare instances where they have offered any reason to observers, the reasons are illegitimate, unsupported, implausible or facially invalid in violation of the Administrative Procedure Act.

121.    Plaintiffs are therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief and a stay ordering Defendants to comply with 8 C.F.R. § 1003.27 and any related regulation about public and press access to immigration court proceedings by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, including those conducted or held over Webex, a description of the applicable exception or exceptions under that regulation justifying the restriction on access and an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto. At a minimum, Plaintiffs are entitled to such relief with respect to the immigration courts in which Plaintiffs have been denied the right to observe proceedings arbitrarily or and in contravention of 8 C.F.R. § 1003.27, 8 C.F.R. § 1240.10(b), and their First Amendment rights (New York City and Buffalo, New York; Los Angeles and San Diego, California; Miami, Florida; Houston and Laredo, Texas; Fort Snelling, Minnesota; and Baton Rouge and LaSalle, Louisiana).

## COUNT II
**Even Assuming Defendants' Restrictions on Access to the Immigration Courts Were the Result of Policy Changes, Those Changes Were Made Without Observance of Procedure Required by Law and Are in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).**

122.    Plaintiffs incorporate the allegations of paragraphs 1 through 121 as if fully set forth in Count II.

123.    When an agency adopts a policy affecting the public through notice-and-comment rulemaking, it may only revise or repeal that policy through a new notice-and-comment

78

rulemaking process. *Am. Fed'n of Gov't Employees v. NLRB*, 777 F.2d 751, 759 (D.C. Cir. 1985). Because 8 C.F.R. § 1003.27 was adopted through notice-and-comment rulemaking, 52 F.R 2931 (1987), Defendants were required by the Administrative Procedure Act, but failed, to give the public prior notice and opportunity to comment on any change in their policies governing access to immigration court proceedings. Even assuming that the restrictions on court access described in the prior paragraphs of this complaint were not violations of 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b), but were changes to the policies reflected in that regulation, they were adopted "without observance of procedure required by law[,]" and thus such changes are in violation of the Administrative Procedure Act, 5 U.S.C.§ 706(2)(D).

124.    Plaintiffs are therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 and any related regulation about public and press access to immigration court proceedings by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, an explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto and are barred from implementing any change in agency policy regarding public access to immigration proceedings without first submitting any proposed rule change to prior public notice and opportunity to comment.

79

125.    Defendants, through counsel, have represented that there has been no change in DOJ/EOIR policy as regards public and press access to immigration court. To the extent that there has been a change in policy (e.g., by denying public and press access to internet-based hearings, including hearings conducted remotely and/or via Webex), however, Defendants have failed to comply with the APA and required notice and comment procedures and Plaintiffs are entitled to a stay of any change in EOIR policy regarding public access to immigration proceedings implemented without prior notice and an opportunity for public comment.

## COUNT III
**Even Assuming Defendants' Restrictions on Access to the Immigration Courts Were the Result of Policy Changes, And Even Assuming Such Changes Did Not Require a New Rulemaking Proceeding, Those Changes Were Made Without Acknowledging the Change in Policy and Offering Reasons for the Policy Change and Are in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

126.    Plaintiffs incorporate the allegations of paragraphs 1 through 125 as if fully set forth in Count III.

127.    Whether changed via notice-and-comment rulemaking or in an adjudication, when an agency changes its policies affecting the public, it must (a) acknowledge the change in policy and (b) explain the reasons for the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). Even assuming the Defendants' restrictions on courtroom access were changes in policy rather than violations thereof, and even assuming these policy changes did not require Defendants to initiate a new rulemaking proceeding, they nonetheless failed even to acknowledge the departure from 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b), much less offer reasons for the change. That failure rendered the Defendants' actions arbitrary and capricious and not in accordance with law under the Administrative Procedure Act. 5 U.S.C.§ 706(2)(A).

128.    Plaintiffs are therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive/stay relief ordering Defendants to comply with 8

C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings, an explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

129.    Defendants, through counsel, have represented that there has been no change in DOJ/EOIR policy as regards public and press access to immigration court. To the extent that there has been a change in policy (e.g., by denying public and press access to internet-based hearings, including hearings conducted remotely and/or via Webex), however, Defendants have failed to comply with the APA by failing to acknowledge the policy change, provide an adequate explanation or reason for the policy change or take reliance interests into account. Accordingly, Plaintiffs are entitled to a stay of any changed policy undertaken to limit public access to immigration proceedings.

## COUNT IV
**Defendants' Restrictions on Access to Immigration Court Proceedings Violated Plaintiffs' First Amendment Rights and Thereby Engaged in Agency Action "Contrary to Constitutional Right, Power, Privilege, or Immunity" in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).**

130.    Plaintiffs incorporate the allegations of paragraphs 1 through 129 as if fully set forth in Count IV.

131.    "The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When

81

government begins closing doors, it selectively controls information rightfully belonging to the people." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). AHR's immigration court monitoring project protects the rights of the public to know that the government is following procedures and acting fairly in administering the immigration courts. By restricting access to immigration court proceedings beyond those limitations expressly authorized by the USDOJ's own regulations, Defendants have impeded AHR's First Amendment rights. In so doing, Defendants have engaged in agency action "contrary to constitutional right, power, privilege, or immunity" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

132.    Because of the Defendants' past and ongoing violations and because the Defendants' improper and unlawful restrictions on access are capable of repetition and would otherwise elude or escape review, Plaintiffs are therefore entitled to a declaration that Defendants have violated the Administrative Procedure Act and for injunctive relief ordering Defendants to comply with 8 C.F.R. § 1003.27 and any related regulation about public and press access to immigration court proceedings by providing on the record, in each instance in which it proposes to limit or condition public access to immigration court proceedings a description of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exception applies, an explanation for why the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto.

82

## PRAYER FOR RELIEF

For the above reasons, Plaintiff AHR and the other named plaintiffs respectfully ask this Court to enter an order, including an injunction and stay, directing Defendants to comply with 8 C.F.R. § 1003.27 and 8 C.F.R. § 1240.10(b) by providing, in each instance in which it proposes to limit or condition public access to immigration court proceedings, an on-the-record explanation of the applicable exception or exceptions under that regulation justifying the restriction on access, an explanation of how any such exemption applies, an explanation of how the restriction is narrowly tailored to address security or other concerns, and what opportunity was offered for any interested respondent or party, any member of the press, or any member of the public to object in advance to the closure of the proceeding (whether held in person or via Webex or through any other means) and any response thereto; for AHR's costs and reasonable attorneys' fees; and for such other relief as the Courts deems just and equitable.

Dated: June 9, 2026

Respectfully submitted,

STINSON LLP

/s/      Kathleen Parnow
Harvey Reiter, No. 232942
John Bessler, No. 433163
Brandon Nagy, No. 1024717
Katie Parnow, No. 90041785
1775 Pennsylvania Ave, N.W., Suite 800
Washington, DC 20006
Tel. (202) 728-3016
harvey.reiter@stinson.com
john.bessler@stinson.com
brandon.nagy@stinson.com
katie.parnow@stinson.com

CORE/3515279.0007/239840525.8