## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ADVOCATES FOR HUMAN )
RIGHTS, )
330 Second Avenue South, #800 )
Minneapolis, MN 55401 )
 )
MORGAN JENKINS, )
16709 Kamalin Ct., )
Clermont, FL 34715 )
 )   Civil Action No. 1-26-cv-00865-RC
CARMEN MARIA REY CALDAS, )
9 Vose Ave., Apt. 11 )   **RENEWED MOTION FOR**
South Orange, NJ )   **PRELIMINARY INJUNCTION OR**
 )   **STAY AND MEMORANDUM OF LAW**
BONNIE BYLAND, )   **IN SUPPORT OF RENEWED MOTION**
2040 Bayou Paul Lane )
St. Gabriel, Louisiana. 70776 )
 )
NANCY GRUSH, )
1951 Wisteria Street )
Baton Rouge, LA )
 )
BRYANNA SIGUENZA, )
465 Rose Ave., Apt. 5 )
Long Beach, CA 90802 )
 )
MAGGIE BERRY, )
6006 25th St Cir. N. )
Oakdale MN, 55128 )
 )
JOHN LLOYD, )
1035 Scoville Ave. )
Oak Park, IL 60304 )
 )
                    *Plaintiffs,* )
 )
v. )
 )
TODD BLANCHE, IN HIS CAPACITY )
AS ACTING ATTORNEY GENERAL )
OF THE UNITED STATES )
DEPARTMENT OF JUSTICE, )
950 Pennsylvania Avenue NW )
Washington, DC 20530 )

CORE/3515279.0007/244003126.2

|  | ) |
| --- | --- |
| **DAREN K. MARGOLIN, IN HIS** | ) |
| **CAPACITY AS DIRECTOR,** | ) |
| **EXECUTIVE OFFICE FOR** | ) |
| **IMMIGRATION REVIEW OF THE** | ) |
| **DEPARTMENT OF JUSTICE**, | ) |
| 5107 Leesburg Pike | ) |
| Falls Church, VA 22041 | ) |
|  | ) |
| **HON.TERESA L. RILEY, IN HER** | ) |
| **CAPACITY AS CHIEF** | ) |
| **IMMIGRATION JUDGE, U.S,** | ) |
| **IMMIGRATION COURT**, | ) |
| 5107 Leesburg Pike | ) |
| Falls Church, VA 22041 | ) |
|  | ) |
| And | ) |
| **HON. ERIC L. DILLOW, IN HIS** | ) |
| **CAPACITY AS ASSISTANT CHIEF** | ) |
| **IMMIGRATION JUDGE** | ) |
| **U.S. IMMIGRATION COURT**, | ) |
| Bishop Henry Whipple Federal Building | ) |
| 1 Federal Drive, Suite 1850 | ) |
| Fort Snelling, MN 55111 | ) |
|  | ) |
| *Defendants* | ) |

CORE/3515279.0007/244003126.2

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................................................... iii

I.    Plaintiffs Have Standing ...................................................................................................... 5

    A.    Each Closure of an Immigration Proceeding to the Public, Whether in Person or
        Online, Constitutes Final Agency Action.................................................................... 5

    B.    EOIR's Directive that Webex Hearings are Only for Parties is also Final Agency
        Action. ........................................................................................................................ 7

    C.    The Frequency and Recurring Nature of Closed Hearings Demonstrate "Imminent,
        Future Harm" to Plaintiffs. ...................................................................................... 12

II.   Having Established Standing, Plaintiffs are Likely to Succeed on the Merits of Counts I and
    IV of Their Complaints that Defendants have (1) Violated Their Own Regulations
    Governing Public Access to Immigration Court Proceedings and (2) Plaintiffs' First
    Amendment Rights to Attend Immigration Court Proceedings........................................... 15

    A.    Defendants Have Arbitrarily Repeatedly Denied the Public Access to Immigration
        Court Proceedings with Either No or Implausible Explanations. ............................... 16

        1.   Agencies Must Offer a Reasoned, On-The-Record Explanation for Final Agency
            Action. ............................................................................................................... 18

        2.   There is no Immigration Judge Exception to the APA's requirement that final
            agency action be supported on the record by reasoned decisionmaking. Where, as
            here, immigration hearings are "presumptively open", IJs choosing to close a
            hearing to the public have an obligation to rebut the presumption. ....................... 19

        3.   In those few instances where immigration judges have offered explanations for
            closure to court observers their explanations have been arbitrary or plainly
            unlawful............................................................................................................. 20

    B.    Locking Courtroom doors, Making Unannounced Changes in the time and location of
        Hearings, Consistent failure to post information about the parties, dates, times and
        locations of pending cases constitutes *de facto* closure of hearings to the public. They
        are arbitrary and capricious if not undertaken with a reasoned explanation of how they
        fall within 8 C.F.R. § 1003.27's exceptions to the presumption of open hearings. ..... 22

    C.    Plaintiffs' First Amendment Rights Have Likely Been Violated by Defendants. ....... 29

        1.   Immigration proceedings satisfy both the experience and logic prongs of the
            *Richmond Newspaper* test irrespective of the weights given to either prong. ....... 29

        2.   Plaintiffs do not contest that if an applicable exception to open hearings applies, it
            would satisfy the requirement that such closure serves a compelling governmental
            interest provided that the Immigration Judge reasonably explains on the record in
            advance of closure why closure reflects the least restrictive means of achieving that
            interest. ............................................................................................................. 34

III.  Having Established Standing, Plaintiffs are Likely to Succeed on the Merits of Their
    Argument EOIR's Directive that Webex Access is Limited to Parties Connects the

CORE/3515279.0007/244003126.2

Unlawful Closures of Webex Access at Fort Snelling to Similar Closures Around the Country. .......................................................................................................................... 36

IV.  Having Established Standing, Plaintiffs are Likely to Succeed on the Merits of Their Alternative Complaint Counts II and III that Defendants have (1) Changed Their Policy Governing Public Participation Via Webex without Required Prior Notice and Comment and (2) Changed Their Policy Governing Public Participation Via Webex without Acknowledging or Explaining The Change or Taking Reliance Interests Into Account. ... 38

    A.  Defendants' Change in Policy Confining Webex Access to Parties Was Unlawfully Adopted Without Providing for Prior Notice and Comment. ..................................... 38

    B.  Defendants Acted Arbitrarily By Changing Policy and Confining Webex Access to Parties Without Acknowledging the Policy Change, Explaining the Reasons for that Change or Taking Reliance Interests Into Account....................................................... 39

    C.  The Balance of Equities Tips in Favor of AHR, as Does the Public Interest .............. 40

CONCLUSION............................................................................................................................ 40

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pub. Health Ass'n v. Nat'l Inst. of Health*,
  786 F. Supp. 3d 237 (D. Mass. 2025) ...................................................................................27

*Arias v. U.S. Immigr. & Customs Enforcement*,
  No. 1:26-2130-CM (S.D.N.Y. 2026) ...................................................................3, 4, 8, 23

*Bell v. Evatt*,
  72 F.3d 421 (4th Cir.1995) ..................................................................................................25

*Bennett v. Spear*,
  520 U.S. 154 (1977) ...............................................................................................................6

*Braun v. Powell*,
  227 F.3d 908 (7th Cir. 2000) ..............................................................................................25

*Byrd v. Haas*,
  17 F.4th 692 (6th Cir. 2021) ...............................................................................................24

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
  631 F.3d 939 (9th Cir. 2011) ..............................................................................................24

*City of Holyoke Gas & Elec. Dept. v. FERC*,
  954 F. 2d 740 (D.C. Cir. 1992) .....................................................................................17, 19

*Farmers Union Central Exchange, Inc v. FERC*,
  734 F.2d 1486 (D.C. Cir. 1984) ..........................................................................................34

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................................................9, 17, 39

*FCC v. Schreiber*,
  381 U.S. 279 293 (1965) ......................................................................................................29

*Gibbons v. Savage*,
  555 F.3d 112 (2d Cir. 2009) ..........................................................................................25, 26

*Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*,
  457 U.S. 596 (1982) .............................................................................................................32

*Gulf States Utils. v. FPC*,
  411 U.S. 747 (1973) .............................................................................................................34

iii

*Hernandez v. Dart*,
  No. 23 CV 16970, 2026 WL 296425 (N.D. Ill. Feb. 4, 2026)...............................................24

*Herring v. Meachum*,
  11 F.3d 374 (2d Cir. 1993)...................................................................................25, 26, 34

*Holmes v. Knodell*,
  733 F. Supp. 3d 775 (W.D. Mo. 2024) ...............................................................24, 26

*In re Knight Pub. Co.*,
  743 F.2d 231 (4th Cir. 1984) ........................................................................................27

*Legille v. Dann*,
  544 F. 2d 1 (D.C. Cir. 1976)..........................................................................................19

*Loder v. McKinney*,
  896 F. Supp. 2d 1116 (M.D. Ala. 2012) ...................................................................24

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)..........................................................................................................27

*Murthy v. Missouri*,
  603 U.S. 43 (2024)..........................................................................................................11

*NAACP v. Federal Power Commission*,
  425 U.S. 662 (1976)........................................................................................................34

*Nat'l Treasury Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025).................................................................................6, 36

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025)............................................................................................6

*Pechter v. Lyons*,
  441 F. Supp. 115 (S.D.N.Y 1977) ............................................................... *passim*

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)....................................................................................................37, 39

*Peterson v. Williams*,
  85 F.3d 39 (2d Cir. 1996)...............................................................................................25

*Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.*,
  464 U.S. 501 (1984)........................................................................................................29

*Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cnty.*,
  478 U.S. 1 (1986)......................................................................................................28, 32

iv

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947)............................................................................................17

*Simon v. Gov't of Virgin Islands*,
 116 F. Supp. 3d 529 (D.V.I. 2015) .....................................................................25

*The Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*,
 Case No. 26-CV-749(NEB/DLM), 1–2 (D. Minn. Feb. 12, 2026)........................32

*United States v. Anderson*,
 747 F.3d 51 (2d Cir. 2014)..................................................................................36

*United States v. Brooklier*,
 685 F.2d 1162 (9th Cir. 1982) ............................................................................17

*United States v. Rodriguez*,
 No. CR 2004-0105, 2023 WL 4582618 (D.V.I. July 18, 2023) .............................25

*Waller v. Georgia*,
 467 U.S. 39, ----, 104 S.Ct. 2210, 2212, 81 L.Ed.2d 31 (1984). ..........................27

*Wash. Post v. Robinson*,
 935 F.2d 282 (D.C. Cir. 1991) .......................................................................27, 30

*In re Washington Post Co.*,
 807 F.2d 383 (4th Cir. 1986) ......................................................................27, 30, 31

*Western Resources, Inc. v. FERC*,
 9 F.3d 1568 (D.C. Cir. 1993)...............................................................................19

**Statutes**

 5 U.S.C. §§ 551–559, Administrative Procedure Act...................................................20

8 U.S.C. §§ 1101- 1537, Immigration and Nationality Act............................................7

16 U.S.C. §§ 791-825r (1940), Federal Power Act .....................................................34

42 USC 12101 *et seq.*, Americans with Disabilities Act ..............................................24

INA § 235(b)(1)(B)(iii)(III) ........................................................................................7

INA § 240(b)(2)(A)(iii)...............................................................................................7

**Other Authorities**

8 C.F.R. § 246.16(a) (1965)........................................................................................29

8 C.F.R. § 1003.0......................................................................................................36

8 C.F.R. § 1003.1(b) ...................................................................................................................6

8 C.F.R. § 1003.27 ............................................................................................................ *passim*

8 C.F.R. § 1003.27(a)–(d) ..........................................................................................................28

8 C.F.R. § 1003.27(c) .................................................................................................................15

8 C.F.R. § 1003.27(d) ................................................................................................................15

8 C.F.R. § 1003.46 .....................................................................................................................15

8 C.F.R. § 1208.6 .......................................................................................................................17

8 C.F.R. § 1208.30(g)(2)(iii) ......................................................................................................15

8 C.F.R. § 1240.10(b) ...........................................................................................................38, 39

8 C.F.R. § 1240.11(c)(3)(i) ........................................................................................................17

Basic Naturalization Act of 1906, H.R. 15442, 59th .................................................................29

Fed. R. Civ. Proc. 1 .....................................................................................................................7

Fed. R. Evid. 301 .......................................................................................................................19

U.S. Const., amend. 1 ....................................................................................................... *passim*

U.S. Const., amend. 6 .................................................................................................................25

On April 29, 2026, this Court issued an order denying the motion of Advocates for Human Rights (AHR) for a preliminary injunction or stay in the above-captioned case. AHR, the Court found, had failed to make the required "clear showing" needed to establish standing. Mem. Op. at 2 [ECF No. 17]. AHR has now amended its original complaint to address the deficiencies in its showing of standing identified in the Court's April 29, 2026 order. *Id.* And, concurrent with the filing of its Amended Complaint, AHR here renews its motion for preliminary injunction or stay. With a modification to its request for a preliminary injunction or stay regarding Counts II and III of its original complaint,[1] AHR incorporates herein its March 19, 2026 Motion for Preliminary Injunction and Stay, ECF No. 6, as well as its April 10, 2026 Reply to Defendants' Memorandum in Opposition to Motion for Preliminary Injunction and Stay, ECF No. 11. This renewed motion supplements its prior filings, focusing on the deficiencies the Court identified in AHR's prior

---

[1] As AHR explained in its reply to Defendants' opposition to the preliminary injunction, Counts II and III of AHR's complaint plead in the alternative, that *if* the restrictions on public access to the immigration courts constitute a change in agency policy, it was required to submit the new policy to prior notice and comment and to both acknowledge the policy change and explain its reasons. Compl. ¶¶ 49–54 [ECF No. 1]. Defendants asserted in response that "[t]here is no such policy change." Def. Opp. at 18 [ECF No. 10]. In view of this representation, AHR informed this Court that it need not reach the arguments related to those counts in addressing AHR's motion. *See* Mem. Op. at 12 n.11 [ECF No. 17]. As explained *infra*, if the government's policy has not changed, it is the existing policy that the Defendants have violated on countless occasions by denying the public access to proceeding over Webex. But it also arguable—indeed, readily apparent in light of the submitted evidence—that EOIR's November 2025 "Fact Sheet that EOIR's November 2025 "Fact Sheet" *Observing Immigration Court Hearings* (*https://web.archive.org/web/20251113213645/https://www.justice.gov/eoir/media/1416861/dl?inline*) and its February 2026 "Fact Sheet" *Observing Immigration Court Hearings* (*https://www.justice.gov/eoir/media/1416861/dl?inline*) instructing immigration judges that Webex links are only for parties *was* a material change in policy made without acknowledgment, explanation, opportunity for public notice and comment or in consideration of reliance interests. Therefore, as explained *infra*, Plaintiffs' renewed motion advances the unlawfulness and the arbitrariness and capriciousness of that policy change as alternative grounds for preliminary injunctive/stay relief.

showing of standing and the related issues the Court said warranted further development in order to be considered.

As discussed in more detail below, the Amended Complaint adds several plaintiffs (each of whom is a court observer, and in one case an observer who also trains observers) harmed—and who are likely to continue to be harmed—by restrictions placed on their ability to observe immigration proceedings.[2] The Amended Complaint and this renewed motion also include citations to, and submissions of, numerous declarations from court observers around the country, as well as declarations from former immigration judges who either retired, quit or were fired in 2025[3] and immigration attorneys who have conducted or attended immigration hearings. These declarations show that access to both hearings held in person and those held over Webex (or where an in-person option was impractical or illusory) have been denied or obstructed frequently (in the case of Baton Rouge, Louisiana, observers have been blocked from in person attendance almost every time since the court opened without explanation)[4] and with either no explanation to the observers excluded or explanations that were implausible (e.g. limited bandwidth)[5] or improper (based on a closure request from the government opposed by the respondent). *See, e.g.*, Declaration of Amy Lange, Ex. 19, ¶¶ 89–91.[6]

---

[2] *See* Declarations of Morgan Jenkins, Ex. 31; Carmen Maria Rey Caldas, Ex. 32; Bonnie Byland, Ex. 33; Nancy Grush, Ex. 34; Bryanna Siguenza, Ex. 35.

[3] *See* Declarations of Ryan Wood, Ex. 38; Carmen Maria Rey Caldas, Ex. 32; Jenny Beverly, Ex. 47.

[4] *See* Declarations of William Quigley, Ex. 39; Bonnie Byland, Ex. 33; Nancy Grush, Ex. 34.

[5] *See* Declaration of Ryan Wood, Ex. 38 ¶ 13.

[6] This Motion and Memorandum incorporates and refers throughout to Exhibits 19–76, filed with the Amended Complaint in this case. Further, it incorporates the exhibits that were filed with the Plaintiffs' previous pleadings in this case. *See* Compl. (Mar. 12, 2026) [ECF No. 1]; Mot. for Prelim. Inj. & Stay (Mar. 19, 2026) [ECF No. 6]; Notice of Errata (Apr. 6, 2026) [ECF No. 9]; Notice of Suppl. Evid., Ex. 1 (Apr. 20, 2026), ECF No. 14-1 (Declaration of Amy Lange); Notice of Suppl. Evid. (Apr. 20, 2026), ECF No. 14-2 (Declaration of Ryan Wood).

CORE/3515279.0007/244003126.2

These declarations further show that, with the qualified exception of Massachusetts,[7] the obstructions to observers are ongoing and support the conclusion that, even in Massachusetts, they are likely to recur in the absence of injunctive relief. *See* Declarations of Jenny Beverly, Ex. 47 and Michele Cantara, Ex. 48. The declarations and the Defendants' own statements further demonstrate that, at least with respect to hearings held over Webex, the repeated and frequent exclusion of observers is the direct and predictable result of DOJ/EOIR nationwide directives violative of what the Defendants say are their unchanged policies governing public access to presumptively open immigration proceedings. *See* Declarations of Shane Ellison, Ex. 50, ¶¶ 8–11; Michele Cantara, Ex. 48, ¶¶ 9–11; Gillian Rowland-Kain, Ex. 44, ¶¶ 6–8; Amy Lange, Ex. 19, ¶¶ 65–81.

Citing "a pending lawsuit regarding public access to hearings at 26 Federal Plaza in 2025," Rafael Fernandez, an EOIR official, sent an email to all judges and support staff at that court on April 29, 2026 "to reiterate the procedures you *must* follow to ensure hearings remain accessible unless a lawful exception applies." *Arias v. Dept. of Homeland Sec.*, Case 1:26-cv-02130-CM, ECF No. 45-4 (filed May 12, 2026) (emphasis added). Among those "must" directives:(1) "keep the exterior door open for the duration of the hearing unless the *respondent* has requested a closed hearing," and (2) "For any hearing conducted by Webex, *keep the Webex session open and unlocked unless the respondent has requested a closed hearing*. An unlocked Webex permits

---

[7] As discussed in the declaration of court observer Michele Cantara, Ex. 48, the blockage of observers from attending hearings via Webex abruptly stopped a few months ago. Declaration of Michele Cantara, Ex. 48 ¶¶ 12, 14. But, IJs have since threatened future revocation of Webex access ("under the most recent ACIJ, there have been off-the-record announcements by the Department of Homeland Security (DHS) counsel as well as multiple Immigration Judges that the public Webex access may be revoked altogether, and that parties themselves could be barred from remote appearances unless they file a motion. This trajectory points toward a system where transparency is not a right, but a privilege that can be stripped away at the discretion of management.") Declaration of Jenny Bevely, Ex. 47 ¶ 19.

3

public observation throughout the hearing." *Id.* (emphasis added); *see* Declaration of ACIJ Burns, Ex. 75.

The declaration to which the EOIR email was attached—prepared by Acting Assistant Chief Immigration Judge Burns—further admits that keeping immigration courtrooms closed during and between hearings, absent applicable exceptions, violates EOIR's own policies. Declaration of John Burns, *Arias v. U.S. Immigr. & Customs Enforcement*, Civil Action No. 1:26-2130-CM (filed May 12, 2026) ECF No. 45, Ex. 75 ¶ 14. While the declaration implies that prior closures were mere mistakes, the declarations included with this renewed motion from Gillian Rowland-Kain (Ex. 44),[8] Cary LaCheen (Ex. 45), and Janine Silver (Ex. 76) demonstrate that these "mistakes" are frequent and recurring and that they continue to recur even in the New York immigration courts. Declarations submitted in connection with an amended complaint filed by the plaintiffs in the *Arias* case make the same point. *See, e.g.*, Ex. 70, 72

Finally, Plaintiffs' renewed motion seeks, in the alternative, narrower preliminary injunctions or stays addressed to the closure of in-person and Webex or remote-only hearings in Ft. Snelling, Minnesota[9]; Baton Rouge, Louisiana[10]; Newark, New Jersey[11]; Los Angeles, California[12]; and Miami and Orlando, Florida,[13] all locations where Plaintiffs have been blocked from attending immigration court proceedings.[14] Plaintiffs believe *nationwide* relief is appropriate

---

[8] Ms. Rowland-Kain notes that 95 I-ARC observers have documented access issues from June 2025 to May 22, 2026 involving 44 different judges in four different immigration courts in New York state. Ex. 44 ¶¶ 6–7.

[9] *See* Ex. 19-21, 23-26, 28-30, 38, 49, 56, 59-60.

[10] *See* Ex. 33, 34.

[11] *See* Ex. 32.

[12] *See* Ex. 35.

[13] *See* Ex. 31, 33, 34.

[14] In addition, this Motion is supported by further declarations from observers and other professionals in: Adelanto, Los Angeles, Sacramento, San Diego, San Francisco, Santa Ana, and San Diego, California (Ex. 27, 40-41, 43, 48, 57); Denver, Colorado (Ex. 22-23); Atlanta, Georgia

4

as federal regulations are at stake and apply to immigration courts across the country, but also seek this narrower relief in the alternative, as discussed, *infra*.

## I.     PLAINTIFFS HAVE STANDING

As AHR has previously acknowledged, to establish standing in an APA case it must demonstrate (1) that it seeks relief from final agency action and (2) that it has been directly injured by that final agency action. And, as the Court has ruled, when preliminary, forward-looking injunctive relief is sought, plaintiffs must additionally make a "clear" showing that recurrence of past unlawful closures is "imminent." Mem. Op. at 17, 20 [ECF No. 17]. The additional evidence and argument Plaintiffs offer below clearly establishes both AHR's standing and the standing of the additional plaintiffs named in the Amended Complaint.

### A.     <u>Each Closure of an Immigration Proceeding to the Public, Whether in Person or Online, Constitutes Final Agency Action.</u>

As the Court previously observed, AHR's original complaint "challenges, in aggregate, a series of individually discrete, final agency actions because each order closing a hearing constitutes a final agency action." Mem. Op. at 13 [ECF No. 17]. This is true, as well, of the Amended Complaint. The injury is clear. The agency's own regulations give the public a presumptive right to observe immigration proceedings. Closing an immigration proceeding to the public directly injures anyone planning to observe—even where the press is allowed to attend. The government conceded this point years ago. *See, e.g.*, *Pechter v. Lyons*, 441 F. Supp. 115, 118–119 (S.D.N.Y 1977).

---

(Ex. 19, 22, 32, 50, 58); Chicago, Illinois (Ex. 41, 51-52, 55-56, 61-69); Baton Rough and Jena, Louisiana (Ex. 39-40, 42-43, 54); Boston and Chelmsford, Massachusetts (Ex. 47-48); Detroit, Michigan (Ex. 38); Kansas City, Missouri (Ex. 38); Buffalo and New York City, New York (Ex. 32, 44-46, 54, 70-76); Charlotte, North Carolina (Ex. 50); Cleveland, Ohio (Ex. 38); Conroe, Harlingen, and Houston, Texas (Ex. 19, 21-23, 26, 29-31, 40-42, 48-49); and Tacoma, Washington (Ex. 53).

5

Each closure satisfies the standard for finality, i.e., that the decision is definitive and not subject to further agency review and must have an immediate and practical effect on the party challenging it. *Bennett v. Spear*, 520 U.S. 154, 178 (1977). Each closing was a final agency action because, unlike rulings on the merits of an immigrant's case, the decision to close a hearing (1) is not appealable to the Board of Immigration Appeals[15] and (2) has direct and immediate consequences. As one federal district court held in overturning an immigration judge's decision to close a single hearing, public observers "cannot intervene in the deportation proceeding, since they assert no interest in its outcome their interest is solely in monitoring the process by which the outcome is determined." *Pechter v. Lyons*, 441 F. Supp. 115, 119 (S.D.N.Y 1977). Agency regulations, it added, "provide no mechanism whatsoever for dealing with claims of strangers to a proceeding." *Id*. And even if the agency had an internal avenue for court observers to appeal closure decisions, "by the time agency review of the order closing the hearing could be obtained, the issue would be moot." *Id*. Thus, the court concluded, "it is entirely proper for them to address their claim to [a federal] court." *Id*.

That Plaintiffs' Amended Complaint involves multiple final agency closure decisions is no bar to including them in a single complaint. "We are not aware," the First Circuit has stated, "of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).[16] Indeed, the alternative—filing tens of thousands or even only hundreds of separate,

---

[15] *See* 8 C.F.R. § 1003.1(b).

[16] *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 784 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) (en banc) (per curiam), is not to the contrary. There, a divided panel held that the plaintiffs had attempted to "dress up" "many individual actions as a single decision," a conclusion with which the dissent vigorously disagreed. *Id.* (internal quotation marks omitted). But even assuming the correctness of the panel's characterization, Plaintiffs' Amended Complaint in this case is that the agency has

6

largely duplicative complaints involving violations of the same agency regulation—and then moving to consolidate them, makes no sense. On the contrary, it would run afoul of the very *first* rule of federal civil procedure—that civil proceedings should be administered "to secure the just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. Proc. 1.

As important, proof of the repeated and continuing nature of these violations is, as this Court has said, essential to obtaining forward-looking injunctive relief. Mem. Op. at 17, 20 [ECF No. 17]. The only practical way to make that showing is to consider these individual final agency actions together. As EOIR statistics show, there are hundreds of thousands of in-person immigration court hearings conducted every year, and there are also hundreds of thousands of Webex hearings conducted each year. *See* n.24, *infra*.

### B.    EOIR's Directive that Webex Hearings are Only for Parties is also Final Agency Action.

The central regulation in question in this proceeding, 8 C.F.R. § 1003.27, was promulgated before the advent of Webex hearings. Not surprisingly, the regulation draws no distinction between court observation taking place in person or online. Subsequent to the promulgation of public access rules more than a half century ago, EOIR began conducting video teleconferencing ("VTC") to conduct immigration proceedings in the early 1990s.[17] Congress amended the Immigration and Nationality Act ("INA") in 1997, expressly permitting the use of VTC in immigration proceedings.[18] By 2004 it had established a Headquarters Immigration Court to hear cases "by

---

committed the same violation multiple times, not that the multiple actions constitute a single violation.

[17] Fact Sheet, EOIR Headquarters Immigration Court (July 21, 2004), https://www.justice.gov/sites/default/files/eoir/legacy/2004/08/27/HQICFactSheet.pdf.

[18] *Id*. citing INA §§ 235(b)(1)(B)(iii)(III), 240(b)(2)(A)(iii).

7

VTC in order to assist other courts with their dockets and provide flexibility in addressing resource needs."[19]

In all those years and in the ensuing years following the use of Webex technology, DOJ/EOIR never changed its public access regulations. This made eminent sense since the original regulation (1) was put in place to ensure presumptive public access to immigration courts, (2) drew no distinction between online and in person observation, and (3) neither EOIR nor the individual immigration courts drew any distinction between public access to hearings held virtually or in-person. On the contrary, as the Government has recently admitted in the sworn declaration of a sitting Assistant Chief Immigration Judge in New York in the pending *Arias* litigation in New York, as well as in another immigration judge's sworn declaration in that case,[20] Webex hearings are open to the public, subject only to the same limitations applicable to in person attendance: "Subject to the same regulations," he stated, "the general public can also observe hearings conducted remotely by joining the remote hearing. Each judge's internet-based hearing link is posted on EOIR's public website."[21]

That the agency's rules have long been interpreted in this way is corroborated in the declarations of former immigration judges Beverly, Wood, Caldas, and McNulty.[22] Until recently, court observers encountered no material difficulty in observing in person or remotely. *Id*. Indeed, the Duke University Law School program was entirely predicated on student observation of

---

[19] *Id.*

[20] Declaration of John Burns, *Arias v. U.S. Immigr. & Customs Enforcement*, Civil Action No. 1:26-2130-CM (filed May 12, 2026), Ex. 75; Declaration of Khalilah Taylor, *Arias v. U.S. Immigr. & Customs Enforcement*, Civil Action No. 1:26-2130-CM (filed May 12, 2026), Ex. 74.

[21] Declaration of John Burns, *Arias v. U.S. Immigr. & Customs Enforcement*, Civil Action No. 1:26-2130-CM (filed May 12, 2026), Ex. 75 ¶ 7.

[22] *See* Declarations of Jenny Beverly, Ex. 47; Ryan Wood, Ex. 38; Carmen Maria Rey Caldas, Ex. 32; Sheila McNulty, Ex. 55; *see also* Amy Lange, Ex. 19 ¶¶ 35-38; Shane Ellison, Ex. 50 ¶¶ 5-7.

8

immigration proceedings via Webex. Ex 50 ¶¶ 5–7. EOIR's subsequent declarations that Webex participation was open only to parties (*see* EOIR Fact Sheet, November 2025; EOIR Fact Sheet, February 2026) have been cited by observers and immigration judges as the reason immigration courts around the country are now regularly barring non-parties from observing immigration proceedings via Webex. *See* Declarations of Ishanee DeVasGunawardhane, Ex. 51 ¶ 6 (recording 1,000 attempts to attend Webex hearings); Shane Ellison, Ex. 50 ¶¶ 8–11; Michele Cantara, Ex. 48, ¶¶ 9–11; Gillian Rowland-Kain, Ex. 44, ¶¶ 6–8.[23]

There is also ample evidence that observers in a number of immigration courts have been denied access to a narrower set of Webex hearings: hearings held exclusively over Webex or, equally problematic, where the in-person "option" is impractical or illusory (such as where the immigration judge is holding the Webex hearing in a distant or remote location or in a secure facility with access barriers). As the Court noted in its April 29 Order, "at least some deportation hearings have historically been held in places where it may have been difficult for the public to access, such as prisons and private homes." Mem. Op. at 15 [ECF No. 17]. Hearings held in detention centers or where the judge is sitting in chambers (see Declarations of Amy Lange, Ex. 19 ¶ 58; Ryan Wood, Ex. 38 ¶ 15) are equally illusory options. But whether the in-person option is categorically unavailable or illusory, in many cases these restrictions on Webex access, too, can

---

[23] As noted earlier, Defendants maintain that they have not changed their policy making immigration proceedings presumptively open. The agency has long interpreted that policy to apply to public attendance via Webex, as shown above. The subsequent directive, repeated several times, that Webex access is only for parties has been followed by IJs around the country, making that action final and with direct consequences for Webex court observers. But whether that directive is viewed as a command to violate existing regulations or as a change in policy, it would constitute final agency action. As discussed *infra*, and in Counts II and III of plaintiffs' Amended Complaint, in the latter case, the agency's policy change would separately violate the APA as a change to existing regulations made without prior notice and comment, without explanation, and without regard for reliance interests adversely affected. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

9

be traced to an EOIR directive that Webex proceedings are only for the parties, not court observers. Indeed, if moving all proceedings entirely to Webex would allow immigration judges to block observation by the public it would swallow entirely the presumption of public access mandated by 8 C.F.R. § 1003.27. It is already a significant problem. The number of cases now being held via Webex has already increased dramatically in recent years, as have these cases as a percentage of all immigration proceedings. EOIR's own statistics bear this out:

10

CORE/3515279.0007/244003126.2



## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

### Hearing Adjournments[1] by Medium and Fiscal Year

Fiscal Year 2026

| FY | In Person | Internet/VTC | Telephonic | Total Hearing Adjournments[2] |
|---|---|---|---|---|
| 2017 | 1,034,558 | 197,773 | 12,218 | 1,244,549 |
| 2018 | 1,098,870 | 209,619 | 12,918 | 1,321,407 |
| 2019 | 1,542,700 | 251,780 | 11,305 | 1,805,785 |
| 2020 | 987,184 | 280,530 | 11,982 | 1,279,696 |
| 2021 | 214,812 | 156,352 | 25,729 | 396,893 |
| 2022 | 602,559 | 656,288 | 44,863 | 1,303,710 |
| 2023 | 1,165,671 | 787,042 | 35,443 | 1,988,156 |
| 2024 | 1,684,958 | 820,551 | 28,034 | 2,533,543 |
| 2025 | 1,759,810 | 849,928 | 11,485 | 2,621,223 |
| 2026 (Second Quarter) | 707,953 | 426,010 | 3,232 | 1,137,195 |

Data Generated: April 22, 2026
[1] Includes all hearing types. Excludes adjournment codes 59 (COURT CLOSURE), 74 (PUBLIC HEALTH), and 99 (DATA ENTRY ERROR).
[2] Excludes adjournments where the hearing medium "No Hearing" was selected.

11

As shown on the above chart, from 2024 to 2025, more than 800,000 immigration proceedings have been held yearly via VTC/Webex alone and the agency is on pace to exceed that number in 2026.[24]

### C. The Frequency and Recurring Nature of Closed Hearings Demonstrate "Imminent, Future Harm" to Plaintiffs.

At the heart of the Court's April 29 ruling was the principle that to support "forward-looking relief" a plaintiff must "face 'a real and immediate threat of repeated injury.'" Mem. Op. at 18 [ECF No. 17] (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). "Although the declarations recount various closed hearings," the Court concluded, "AHR does not provide any figure or estimate for the number of hearings from which its volunteers and staff were excluded. Nor does AHR indicate what percentage of hearings its observers were excluded from relative to the total number of hearings they tried to observe." *Id*. at 8. Importantly, the Court found that AHR's evidence fell short because its declarations did "not provide evidence of unlawful conduct" following its January 9, 2026 letter to Defendants complaining about unlawful closures. *Id*. at 20. Plaintiffs believe that the additional declarations and evidence included with both this motion and the Amended Complaint now satisfy the *Murthy* test and clearly establish standing and the blatant and ongoing violation of 8 C.F.R. § 1003.27.

The Court notes AHR's acknowledgment that "at least some immigration judges at Fort Snelling continue to allow remote observation." Mem. Op. at 21 [ECF No. 17]. It is also true that at least some immigration judges at other courts have also allowed observers to attend in person. But these exceptions do not justify the frequent and widespread closures that continue to occur in other cases. Since the filing of this action, AHR's court observers, as well as court observers in

---

[24] Executive Office of Immigration Review Adjudication Statistics Fiscal Year 2026, https://www.justice.gov/eoir/media/1344966/dl?inline

Massachusetts; Miami, Florida; Houston, Texas; New York; Laredo, Texas; Georgia; Baton Rouge, Louisiana; Chicago, Illinois; and Los Angeles and San Diego, California have been foreclosed from attending hearings a substantial percentage of the time they have attempted to observe proceedings – most prominently over Webex, but also in person, particularly at Fort Snelling and Baton Rouge. "Observers from AHR have attended and documented just under 30,000 hearings between May 2019 and May 22, 2026[,]" and it is estimated that "observers have been available for 85% of non-detained master calendar dockets at Fort Snelling from July 2025-the present." Declaration of Amy Lange, Ex. 19 ¶¶ 17, 18. AHR's observers encountered access issues[25] both in attempting to observe via Webex and in person. During April 2026 AHR observers encountered in-person access issues during 59% of the weekdays of that month.[26] And from May 1–22, 2026, AHR observers encountered in-person access issues during 44% of the weekdays of that month.[27] In March 2026, that number was 77%.[28]

As for access via Webex, AHR observers, between February 25, 2026 and May 22, 2026, were excluded from the virtual courtroom for 94% of 685 Webex-only hearings. *Id.* ¶ 67. This actually understates the frequency of exclusion since the hearings included master calendar hearings involving multiple cases. *Id.* ¶ 66. In the majority of these cases the observers were never let into the hearing and were given no explanation for their exclusion. *Id*. ¶ 72. In the third of such

---

[25] AHR considers an event an "access issue" where observers were not allowed in a Webex hearing, the hearing started before the posted time, causing the observer to miss part of the hearing, where doors to courtrooms were locked and no one would open them, where doors were locked and signs were posted and no entry was permitted until a recess, entry was denied based on a claim that respondents had requested closure, but persons inside the courtroom said respondents were never asked if they objected to the presence of observers, where observers were ordered to leave courtrooms without explanation, or where there were blanket closures to all hearings to observers on a given day. Declaration of Zoe Martens, Ex. 20 ¶ 10.

[26] *See* Martens Declaration, Ex. 20 ¶ 18.

[27] *See id*. ¶ 19

[28] *See id*. ¶ 17.

CORE/3515279.0007/244003126.2

cases where the judges claimed there was an objection to the presence of observers, more than 40% of such closures were based on an objection from the government, not the respondent and, in many cases in opposition to the wishes of the respondent. *Id.* ¶ 75. Several of the judges have never allowed observers into these Webex hearings. *Id*. ¶¶ 76–81; *see, e.g.*, Declarations of Cindy Reich, Ex. 29; Zoe Martens, Ex. 20; Marily Knieriemen, Ex. 23; Katrina Bleckley, Ex. 27; Kimberly Boche, Ex. 28.

This pattern of denied access to hearings via Webex repeats itself across the country. Similar experiences have occurred in New York immigration courts. Declaration of Gillian Rowland-Kain, Ex. 44 ¶ 8. In Georgia, volunteer court observers for the Georgia Asylum and Immigration Network (GAIN) have been blocked nearly continually since March 2, 2026, not coincidentally following the filing of a lawsuit challenging the systematic and steep increase in the immigration judges' denial rate for bonds, but ostensibly because of a "new 'EOIR policy'" where observers must appear in person if they want to observe. Declaration of Alizeh Sheikh, Ex. 58 ¶ 8. Morgan Jenkins, a court observer living in Florida, has been blocked in May 2026 alone, from attending immigration court hearings over Webex in Miami, Florida, Houston, Texas and LaSalle, Louisiana. Declaration of Morgan Jenkins, Ex. 31. Observers in Washington state have also been blocked from attending via Webex. Declaration of Rebecca Hillstrom, Ex. 53 ¶ 9. Still other court observers have been blocked from attending immigration hearings via Webex in Massachusetts (*see* Declaration of Michele Cantara, Ex. 48), Chicago (*see* Ex. 41, 51–52, 55–56, 61–69), Los Angeles (*see* Ex. 35) and San Diego (*see* Ex. 57).

In some cases the closures have been so persistent that court observers have given up trying to attend, court observation projects have found it more difficult to recruit new volunteers, *see* Declaration of Gillian Rowland-Kain, Ex. 44 ¶ 8, and the Webex-only project at Duke's law

14

school—designed to train law students—has come to a halt, *see* Declaration of Charles Shane Ellison, Ex. 50 ¶¶ 7, 11. Closures have continued unabated to the present, demonstrating that the violations are ongoing, pervasive, and substantially certain to continue absent injunctive/stay relief from this Court. The persistence of these violations despite AHR's January 9, 2026 demand letter, the filing of this lawsuit, the sworn admissions of sitting New York immigration judges who work for DOJ/EOIR, and EOIR's own internal directives confirms that the pattern of unlawful closures is systemic and cannot be attributed to isolated exercises of individual immigration judge discretion.

## II. HAVING ESTABLISHED STANDING, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF COUNTS I AND IV OF THEIR COMPLAINTS THAT DEFENDANTS HAVE (1) VIOLATED THEIR OWN REGULATIONS GOVERNING PUBLIC ACCESS TO IMMIGRATION COURT PROCEEDINGS AND (2) PLAINTIFFS' FIRST AMENDMENT RIGHTS TO ATTEND IMMIGRATION COURT PROCEEDINGS.

Because the Court found that AHR had not established standing it did not address AHR's likelihood of success on the merits. For the same reason, the Court did not address whether a First Amendment right attaches to public attendance at immigration court proceedings or, if it does, whether the narrow exceptions to public access under 8 C.F.R. § 1003.27 nonetheless must satisfy strict scrutiny. Mem. Op. at 14–16 [ECF No. 17].

Regarding the first issue, Plaintiffs address the relevance of the Defendants' argument that "even the hearings AHR identifies *may* have been closed for lawful reasons," Mem. Op. at 21 [ECF No. 17] (emphasis added), and (2) offer the explanation the Court found missing from AHR's earlier motion, namely how "unreasonable restrictions on attendance are contrary to law." *Id.* at 22. See Section II A and B.

With respect to the second issue, Plaintiffs address the First Amendment questions raised by the Court. See Section II. C, *infra*.

15

A.    **Defendants Have Arbitrarily Repeatedly Denied the Public Access to Immigration Court Proceedings with Either No or Implausible Explanations.**

Prior to 2025, denials of public access to immigration hearings were rare. As retired Judge Wood notes in his supplemental declaration:

> In my experience presiding over a detained docket from April 2017 to March 2019, and supervising the dockets of the Fort Snelling, Cleveland, Detroit, and Kansas City Immigration Courts from March 2019 through February 2025, closures occurred in only a small fraction of proceedings and, when they did, were almost always required by regulation rather than chosen as a matter of discretion, most commonly the mandatory closure of cases involving an abused spouse or child (VAWA) under the Department of Justice public-access regulation at 8 C.F.R. § 1003.27(c), the protection of information subject to a protective order under 8 C.F.R. § 1003.27(d) and the related Department of Justice protective-order regulation at 8 C.F.R. § 1003.46, or the conduct of credible fear or reasonable fear review proceedings closed by separate Department of Justice regulation, see 8 C.F.R. § 1208.30(g)(2)(iii).

Ex. 38 ¶ 4.

"The volume and pattern of access restrictions documented since March 2025 cannot plausibly be explained by a corresponding increase in the share of cases falling within the enumerated exceptions of 8 C.F.R. § 1003.27. The case mix at Fort Snelling did not change in any way that would account for the documented pattern." *Id*. ¶ 6.

In most instances documented by the declarations of court observers at Fort Snelling and around the country, no explanation has been offered to the observers before they were excluded. *See* Declarations of Amy Lange, Ex. 19 ¶ 72; Zoe Martens, Ex. 20 ¶ 20 ; Maggie Berry, Ex. 30 ¶ 20; Morgan Jenkins, Ex. 31 ¶ 4; Katie Fleming, Ex. 41 ¶ 8; Gillian Rowland-Kain, Ex. 44 ¶¶ 54–55; Shane Ellison, Ex. 50 ¶ 10; Jennifer Roth, Ex. 61 ¶ 6; Marissa Porter,  Ex. 67 ¶ 5; William Quigley, Ex. 39 ¶¶ 9–10; Cary LaCheen, Ex. 45 ¶ 13.  While the Defendants argue that there "*may*" have been an applicable exception to the openness requirement,[29] after-the-fact explanations to

---

[29] Def. Opp. at 9–10 [ECF No. 10].

CORE/3515279.0007/244003126.2

observers who would have been precluded from observation, even in the unlikely event that they would have justified exclusion, do the would-be observers no good. Retired Judge Wood explained why:

> Disclosure of the basis for closure to court observers before the closure takes effect is meaningful only if the disclosure occurs at a point when the observer can register an objection or otherwise be heard. If the basis for closure is disclosed only after the hearing has concluded and observers have departed, no contemporaneous record exists of any observer response, and any objection comes too late to influence the proceeding. The observer in that posture has no meaningful recourse. For this reason, an on-the-record determination, made in the presence of the observer before exclusion, is the procedure consistent with the structure of 8 C.F.R. § 1003.27. (including respondents, counsel, and members of the public) of the basis for the court's action.

Ryan Supp. Decl., ¶ 8.

In the few instances involving participation via Webex where the immigration judges have offered an explanation for excluding observers, the immigration judges have cited "limited bandwidth" as the basis. *See, e.g.*, Declarations of Alla Karagodin Holmes, Ex. 40 ¶¶ 10, 11; Amy Lange, Ex. 19 ¶ 80 (Judge Taylor); Shane Ellison, Ex. 50 ¶ 8. But as Judge Wood also notes in his supplemental declaration:

> Bandwidth limitations are not a credible basis for excluding observers from Webex proceedings at Fort Snelling. Webex is designed to accommodate large numbers of participants in view-only mode, and the platform has been used in immigration proceedings, including at Fort Snelling, to support hearings with multiple parties, interpreters, and witnesses without bandwidth-driven exclusions of any participant. A trained observer in view-only mode imposes a negligible load on the platform. Nor is it easy to reconcile the exclusion of public observers from Webex with the routine practice of permitting DHS trial attorneys, who are stationed in the same building as the Fort Snelling Immigration Court, to appear by Webex without any motion or special showing.

Ex. 38 ¶ 13; *see also* Declaration of Carmen Maria Rey Caldas, Ex. 32 ¶ 19 (noting that even if internet access was unreliable, "[i]f the technology was working sufficiently well to support the hearing at all, the presence of additional parties did not, in my experience, negatively impact it")

17

AHR observers have also learned, after the fact of closure that, in a few instances DHS has invoked 8 C.F.R. § 1208.6 to urge closure of immigration proceedings to public observers. Starting in late October 2025, signs saying that courtrooms were closed pursuant to that regulation began appearing frequently on courtroom doors at Fort Snelling. Declaration of Amy Lange, Ex. 19 ¶¶ 47–49. But as former Immigration Judge Wood notes, that regulation "addresses confidentiality of asylum-related information and *records*; it does not itself impose a categorical closure rule for asylum *hearings*." Ex. 38 ¶ 18 (emphasis added). Nor can DHS's reading of that regulation be squared with 8 C.F.R. § 1240.11(c)(3)(i), which provides that evidentiary hearings on applications for asylum or withholding of removal are "open to the public unless" the noncitizen expressly requests closure. More importantly, the Immigration Judges in those cases did not make any on-the-record findings that *they* were relying on 8 C.F.R. § 1208.6.

1.    **Agencies Must Offer a Reasoned, On-The-Record Explanation for Final Agency Action.**

As AHR noted in its original motion for preliminary injunction and stay, judicial review of final agency action for arbitrariness or unlawfulness, including review of immigration judge decisions barring public access to their proceedings, is only possible by reviewing the *reasons* offered for such decisions made on the record. *See* Mot. for Prelim. Inj. & Stay at 25 [ECF No. 6]; Reply at 2–4 [ECF No. 11]; *see also FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 515 (2009) (requiring an agency to provide reasons for its decisionmaking); *City of Holyoke Gas & Elec. Dept. v. FERC*, 954 F. 2d 740, 743 (D.C. Cir. 1992) (same); *United States v. Brooklier*, 685 F.2d 1162, 1167–68 (9th Cir. 1982) (requiring a court to offer an opportunity to object and an explanation for closing a hearing before doing so). While not expressly referencing the APA or *Chenery*, the district court in *Lyons* reversed an immigration judge's decision to close a single immigration proceeding precisely because the court found the rationale offered by the immigration

18

judge wanting. *Pechter v. Lyons*, *supra*, 441 F. Supp. at 119–20. It bears emphasis that this requirement is not demanding. It requires no written decision, but only an explanation on the record of what exception to openness applies, if any and why it applies. Immigration judges understand this:

> It was well understood among Immigration Judges at Fort Snelling, and among Immigration Judges generally, that when an Immigration Judge granted a motion to close a hearing, or invoked the regulatory authority to close a hearing on the court's own initiative, the Immigration Judge was obligated to state the basis for closure on the record. In my role as a national trainer for the Immigration Judge corps, I delivered instruction on courtroom management, evidentiary issues, and the conduct of proceedings. The expectation that closure determinations be made on the record was conveyed in those trainings and in routine supervisory practice at both new and advanced immigration judge training. An on-the-record explanation serves at least three purposes: it creates a contemporaneous record for appellate review, it ensures that the Immigration Judge has actually applied the regulatory framework rather than acting reflexively, and it provides notice to anyone affected by the closure (including respondents, counsel, and members of the public) of the basis for the court's action.

Declaration of Ryan Wood, Ex. 38 ¶ 7.

> Disclosure of the basis for closure to court observers before the closure takes effect is meaningful only if the disclosure occurs at a point when the observer can register an objection or otherwise be heard. If the basis for closure is disclosed only after the hearing has concluded and observers have departed, no contemporaneous record exists of any observer response, and any objection comes too late to influence the proceeding. The observer in that posture has no meaningful recourse. For this reason, an on-the-record determination, made in the presence of the observer before exclusion, is the procedure consistent with the structure of 8 C.F.R. § 1003.27. (including respondents, counsel, and members of the public) of the basis for the court's action.

*Id.* ¶ 8.

> **2.** **There is no Immigration Judge Exception to the APA's requirement that final agency action be supported on the record by reasoned decisionmaking. Where, as here, immigration hearings are "presumptively open", IJs choosing to close a hearing to the public have an obligation to rebut the presumption.**

As detailed in AHR's April 10, 2026 Reply [ECF No. 11], there is a "time-honored rule that a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked

19

by the agency.'" *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1576 (D.C. Cir. 1993) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Defendants' obligation to explain their courtroom closures to the plaintiffs is amplified by their own acknowledgment that their courtrooms are presumptively open. Def. Opp. at 21 [ECF No. 10].

There is no exception to this requirement for immigration judges. If anything, the obligation is even clearer where, as here, immigration hearings are presumptively open. After all, irrespective of the ultimate burden of proof, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption[.]" *Legille v. Dann*, 544 F. 2d 1, 7 n.37 (D.C. Cir. 1976) (quoting Fed. R. Evid. 301). And it is not much of a burden. If there is a valid exception to the presumption, the immigration judge need only cite it and explain why it applies, as former immigration judge Wood notes in his supplemental declaration. To the extent the immigration judges find this burdensome, it is a burden created by the increased frequency with which they are blocking public observation, occurrences that used to be rare. *See* Supplemental Declaration of Ryan Wood, Ex. 38 ¶¶ 4, 6. As D.C. Circuit Court Judge Douglas Ginsburg put it years ago, "it is a small matter to abide by the injunction of the arithmetic teacher: Show your work! For the [agency] to do less deprives the [affected party] of a rational explanation of its decision." *City of Holyoke Gas & Elec. Dept. v. FERC*, 954 F. 2d 740, 743 (D.C. Cir. 1992).

### 3. In those few instances where immigration judges have offered explanations for closure to court observers their explanations have been arbitrary or plainly unlawful.

As noted in the declarations submitted with Plaintiffs' Amended Complaint and this motion, in most cases where plaintiffs and other court observers have been blocked from attending hearings or faced *de facto* bars to meaningful observation (*see* Section II. B, *infra*) they have been offered no explanation by the immigration judges. There have been a limited number of instances

20

in which observers have been given an explanation of sorts before being excluded, and these explanations have fallen into three categories. First, in the case of participation via Webex, some judges have cited an alleged EOIR policy (which does not comport with the plain language of 8 C.F.R. § 1003.27) that Webex participation is solely for parties. *See* Declarations of Amy Lange, Ex. 19 ¶ 80; Morgan Jenkins, Ex. 31 ¶ 7; Marissa Porter, Ex. 67 ¶ 6; Shane Ellison, Ex. 50 ¶ 8; Gillian Rowland-Kain, Ex. 44 ¶¶ 13, 18, 23–24, 42. Second, also in cases of participation by observers via Webex, some judges have cited lack of "bandwidth." *See* Declarations of Alla Holmes, Ex. 40, ¶¶ 10–11; Amy Lange, Ex. 19 ¶ 80. Lastly, a number of immigration judges, both in the case of in-person observation and observation via Webex, have asserted that hearings are to be closed if either the respondent *or the government* requests closure. *See* Declarations of Amy Lange, Ex. 19 ¶¶ 83–84, 87–89; Maggie Berry, Ex. 30 ¶¶ 10, 13, 17; Gillian Rowland-Kain, Ex. 44 ¶¶ 17, 26. None of these explanations pass the test of reasoned decision-making under the Administrative Procedure Act.

Take first the citation to EOIR "policy" limiting Webex access to parties. To be sure, EOIR did say precisely this. The agency's long-established policy, though, is that hearings are presumptively open to observers, and whether they seek to observe via Webex or in person, they can only be excluded for the limited reasons expressly set out in 8 C.F.R. § 1003.27. *See* Section I.B; *see, e.g.*, Amended Compl. ¶¶ 10, 13, 26. This, however, has not stopped immigration judges in Washington State, Minnesota, New York, Laredo, Texas, Los Angeles, San Diego and Louisiana from using the "only parties" excuse for blocking observers from Webex access.[30]

---

[30] The case of Mahmoud Khalil is illustrative. As detailed in the declaration of his attorney, Johnny Sinodis, his co-counsel had, in advance of several of Mr. Khalil's widely publicized scheduled hearings, asked Louisiana ACIJ Comans to make the proceedings available to the public via Webex. To this, the judge responded, "The Webex platform is not going to be open for people that are not parties to the case to just watch. They're welcome to come to Lasalle if they want to come

21

Given Defendants' claim that they have not changed policy, the EOIR's "Fact Sheet" directive that Webex access is only available *to parties* (and that IJs have the "discretion" whether to admit observers) is an unlawful violation of the agency's own regulations. But even if the "Fact Sheet" is deemed a policy change, as some have perceived it, that change would be unlawful because it was adopted and issued without prior notice and comment and without acknowledging the change, much less explaining the reasons for the policy change. *See Section IV, infra*.

Defendants' explanation that bandwidth limitations justified closure of Webex access to court observers is not only implausible given the robustness of the software available to all immigration judges (*see* declarations of Ryan Wood, Ex. 38 ¶ 13 and Jenny Beverly, Ex. 47 ¶¶ 9, 16), but a makeweight intended to keep proceedings out of the public eye. *Id.*

Finally, as former Judge Wood explains, and the agency's own rules make clear, it is only respondents that have the unqualified right to request closure, not the government. Ex. 38 ¶¶ 5, 8. Not only have immigration judges frequently closed hearings solely at the government's request, but in many documented incidents over the objection of the respondent, who wished to have observers present. *See* Declarations of Amy Lange, Ex. 19 ¶¶ 74–75, 84–85, 88–89; Anne Klueh, Ex. 21 ¶ 14; Mary Lambert, Ex. 26 ¶ 6; Maggie Berry, Ex. 30 ¶¶ 10–11, 13, 17, 22. And, on "more than one occasion" signs were posted outside a closed courtroom in Fort Snelling declaring that a hearing was closed at the request of the respondent "before the court even started for the afternoon," casting doubt that even these closures were lawful. *Id*. ¶ 47.

**B.** **Locking Courtroom doors, Making Unannounced Changes in the time and location of Hearings, Consistent failure to post information about the parties, dates, times and locations of pending cases constitutes *de facto* closure of hearings to the public. They are arbitrary and capricious if not undertaken**

---

in person and they can gain access to the facility through the appropriate security channels, then they would be allowed to observe. But I'm not going to open this hearing up to the public." Declaration of Johnny Sinondis, Ex. 54 ¶ 7.

22

**with a reasoned explanation of how they fall within 8 C.F.R. § 1003.27's
exceptions to the presumption of open hearings.**

Even where immigration judges have not explicitly stated to observers that they may not
access a hearing, the other restrictions placed on the hearings are tantamount to an outright denial
of access. For example, some immigration courts have begun to lock the doors to the courtroom,
make unannounced and last-minute changes in the time and location of a hearing, and failed to
post information that would enable an observer to access a hearing, such as the date, time, location,
judge, and parties. Other judges have forbidden observers to take notes, a crucial barrier to
effective observation of master calendar hearings. *See* Declarations of Ryan Wood, Ex. 38; Cary
LaCheen, Ex. 45, ¶ 13; Sarah Glacel, Ex. 70, ¶ 10. Former IJ Wood describes some of these
restrictions:

> Based on documentation from The Advocates for Human Rights, the public
> availability of docket information at Fort Snelling has substantially deteriorated
> since March 2025. The documented changes include the folding of printed dockets
> to obscure case identifiers, country-of-origin codes, and detained-or-non-detained
> designations; the late posting of dockets, or the removal of dockets from the posting
> board during the court day; and the absence of any posted docket information on
> certain days. The reports I have reviewed also describe instances in which
> Immigration Judges have read case numbers aloud too quickly or quietly to be
> intelligible to observers, referred to cases by incorrect docket numbers, or directed
> observers to seating from which the proceedings could not be effectively followed.
> In at least one courtroom, the reports describe an Immigration Judge who stopped
> stating full alien registration ("A") numbers on the record altogether, identifying a
> case only by the last three digits of the number, particularly where the respondent's
> name had been redacted from the posted docket. Other Immigration Judges
> continued to state full A-numbers during the same period, and the reports describe
> this practice as making it nearly impossible for observers to track individual cases
> or to verify their outcomes, such as whether a respondent received a removal order,
> a continuance, or a grant of voluntary departure. Each of these practices further
> impairs the ability of an observer who is present to identify and follow the cases
> being heard.
>
> ***
>
> The docket no longer functions as a meaningful tool for locating and observing the
> proceedings of the Fort Snelling Immigration Court. The reports I have reviewed
> also describe certain cases being heard early in the morning, before the daily docket
> is posted or before the courtroom doors are opened to the public, which further
> prevents the public from identifying and observing those proceedings.

23

Declaration of Ryan Wood, Ex. 38 ¶¶ 25–26. These restrictions are not trivial or merely inconvenient but instead make access impractical or impossible. As the government's own declarant in the *Arias* case (Immigration Judge John Burns) noted only last month, "*all* immigration courtroom doors should remain unlocked during hearings, except those that are not open to the public."[31] Even worse, the evidence shows that the goal of these restrictions is to deliberately keep court observers (and others) from accessing the hearings. *See* Declaration of Jenny Beverly, Ex. 47 ¶ 14.

More recently, immigration courts have begun scheduling "mega-master calendar hearings" involving double or triple the number of respondents typical of a master calendar hearing. *See, e.g.*, James Finn, *In New Orleans, 'Mega Master' Hearings Latest Tool of Trump Administration's Deportation Push,* NOLA.com (June 4, 2026), https://app.nola.com/article/934c9d39-fa89-4ae6-aa21-1dd531a34af0/content.html; Susan Du, *Fort Snelling Immigration Court Begins Mass Hearings to Speed up Deportation Cases*, Minn. Star Trib. (June 3, 2026), https://www.startribune.com/fort-snelling-immigration-court-begins-mass-hearings-to-speed-up-deportation-cases/601851730. The mega-master hearing described in the *Minnesota Star Tribune* article was so large that no observers were able to enter the courtroom. Second supplemental Declaration of Amy Lange, Ex. 19, ¶¶ 92–94. Coupled with other restrictions, the increase in these "mega-master calendar hearings" will result in a further *de facto* bar to observation by the public.

---

[31] Declaration of John Burns, *Arias v. U.S. Immigr. & Customs Enforcement*, No. 1:26-2130-CM (S.D.N.Y. May 12, 2026), ECF No. 45, Ex. 75 ¶ 14 (emphasis added). In the ten days after he submitted his declaration, Judge Burns, assigned to hear cases in Minneapolis, closed five hearings to the public. Declaration of Amy Lange, Ex. 19 ¶ 82.

24

Courts have often found that barriers to access to government benefits or rights can amount to a denial of a person's right to those benefits or rights. For example, in analyzing barriers to Supplemental Nutrition Assistance Program (SNAP) benefits, one court found "these unacceptable statistics regarding wait times, failures to interview, and obstacles in the process to obtaining SNAP benefits are not merely inconveniences to the Plaintiffs but constitute actual barriers to Plaintiffs receiving benefits they are entitled to under SNAP." *Holmes v. Knodell*, 733 F. Supp. 3d 775, 796 (W.D. Mo. 2024), *appeal dismissed*, No. 24-2192, 2024 WL 5076422 (8th Cir. July 19, 2024). Other courts have found that Americans with Disabilities Act (ADA) plaintiffs have been denied rights when they "encounter[] a barrier that deprives him of full and equal enjoyment of the facility due to his particular disability[.]" *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011); *see also Hernandez v. Dart*, No. 23 CV 16970, 2026 WL 296425, at *9 (N.D. Ill. Feb. 4, 2026) (finding a noncompliant ramp to be "more than an 'inconvenience'" and holding that "a disabled person need not experience pain to access a service, and [] forcing that person to do so amounts to a denial of access.").

Still another court has found that requiring noncitizens to produce an unreasonable number of documents to obtain a marriage license was also a denial of the benefit. *See Loder v. McKinney*, 896 F. Supp. 2d 1116, 1122 (M.D. Ala. 2012) ("The relevant inquiry on standing is whether Plaintiffs have suffered unlawful treatment under Defendant's policy, not whether the unlawful treatment is insurmountable or the benefit can be realized through alternative means."); *see also Byrd v. Haas*, 17 F.4th 692, 698 (6th Cir. 2021) (an agency's delay in granting a right can constitute "constructive denial.")

25

Some U.S. Courts of Appeals have analyzed whether restrictions or limitations, short of explicitly denying access to all spectators, can amount to outright denials.[32] In conducting such an analysis, some courts consider whether "the unjustified closure that occurred was too trivial to amount to a violation." *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996). In deciding whether a limitation is too trivial to amount to a violation of the right to a public trial, courts will further consider whether the limitation is a reasonable time, place, and manner limitation. *See Herring v. Meachum*, 11 F.3d 374, 380 (2d Cir. 1993). In those cases, courts typically only allow limitations if they are temporary or not a blanket closure.[33]

---

[32] *Gibbons v. Savage*, 555 F.3d 112, 116–17 (2d Cir. 2009) ("The People cite to several cases, . . . arguing that they support the proposition that a "closure" does not occur when the trial court places limitations on how many people can enter the courtroom. . . . The thrust of these cases is not applicable here. The public was categorically excluded."); *Peterson v. Williams*, 85 F.3d 39, 42– 43 (2d Cir. 1996) ("They too have held that a temporary closure may, at times, not violate the Sixth Amendment."); *Braun v. Powell*, 227 F.3d 908, 919 (7th Cir. 2000) ("the fact that the exclusion applied only to one person, not a relative or friend of the defendant's, is not without significance in assessing the values protected by the right to a public trial."); *cf. United States v. Rodriguez*, No. CR 2004-0105, 2023 WL 4582618, at *10 (D.V.I. July 18, 2023), *amended on reconsideration sub nom. United States v. Berrios*, No. CR 04-0105, 2025 WL 1530289 (D.V.I. May 29, 2025) ("However, the record is devoid of any evidence that the Court excluded members of the public from the courtroom during instructions, and the Government represents that 'many spectators were in the courtroom during the closing arguments, and they remained in the courtroom during the jury charge.'"). While these cases focus on when a limitation may amount to a violation of a Sixth Amendment right of a defendant to a public trial, they are instructive on the analysis to be undertaken in consideration whether limitations on court access amount to a denial of the public's access.

[33] *See, e.g.*, *Simon v. Gov't of Virgin Islands*, 116 F. Supp. 3d 529 (D.V.I. 2015), *aff'd in part, vacated in part on different grounds, rev'd in part on different grounds*, 929 F.3d 118 (3d Cir. 2019) (holding that it was not a violation where the court only locked the doors during jury selection and closing argument and did not ask members of the public who were already present to leave, nor did it forbid them to leave); *Bell v. Evatt,* 72 F.3d 421, 433 (4th Cir.1995) (holding that it was a reasonable time, place, and manner restriction when the trial judge prevented ingress and egress to the courtroom only during witness testimony); *United States v. Rodriguez*, No. CR 2004-0105, 2023 WL 4582618 (D.V.I. July 18, 2023), *amended on reconsideration sub nom. United States v. Berrios*, No. CR 04-0105, 2025 WL 1530289 (D.V.I. May 29, 2025) (finding a reasonable restriction where the Marshals locked the courtroom doors for security only during the jury charge and where many spectators remained in the courtroom despite the locked doors).

CORE/3515279.0007/244003126.2

The restrictions court observers have been facing here, however, are not reasonable time, place, and manner restrictions. They do not merely limit access to those observers who can fit in a courtroom, but amount to an unreasonable blanket closure to the public in violation of both 8 C.F.R. § 1003.27 and the First Amendment. Like the barriers to government benefits discussed above, they are "not merely inconveniences" "but constitute actual barriers" that operate as an outright denial of public access to countless immigration proceedings. *Holmes v. Knodell*, 733 F. Supp. 3d 775, 796 (W.D. Mo. 2024), *appeal dismissed*, No. 24-2192, 2024 WL 5076422 (8th Cir. July 19, 2024).

This case is similar to the denial of access in *Gibbons v. Savage*, which the Second Circuit found violated constitutional rights. 555 F.3d 112, 119 (2d Cir. 2009). In that case, the court excluded the sole spectator, the defendant's mother, during only jury selection and supposedly because of the lack of space in the courtroom. *Id.* at 114–16. However, the court still found that limitation to "categorically exclude[]" the public. *Id.* at 117. The restrictions here are even more severe. They are neither temporary nor incomplete. Instead, they categorically exclude the public from an entire hearing, and usually many hearings since the closures often occur at the beginning of master calendar sessions. These restrictions are thus not trivial or reasonable restrictions that maintain the efficient administration of justice. *See Herring*, 11 F.3d at 380. Nor do the restrictions serve the interests of any of the reasons for closure stated in 8 C.F.R. § 1003.27. The government cannot be allowed to hold "mega master calendar hearings" if, by doing so, the result is to pack small immigration courtrooms and exclude the public/court observers from such hearings due to lack of space, thus violating the mandate and dictates of 8 C.F.R. § 1003.27 that immigration hearings are presumptively open to the public.

Without even an explanation of why the restrictions were placed or how they fall under the regulation, they are arbitrary and capricious.[34] For a court to make a determination about whether a restriction constitutes a violation or meets a standard to justify a violation, there must be a record showing what the initial court's decision was.[35] Instead, the immigration judges here are restricting public access leading to blanket (and often deliberate) closures of immigration proceedings and failing to offer an explanation for the restrictions, thus leading to further denial of access to the processes and its decision-making. Together, these burdens amount to a system of deliberate

---

[34] *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: we may not supply a reasoned basis for the agency's action that the agency itself has not given."). In addition to the APA requiring an on-the-record explanation, court have held that the Constitution requires an explanation, including the compelling government interest served and that there are no alternatives, when a hearing is closed:

> "Closed proceedings . . . must be rare and only for cause shown that outweighs the value of openness. . . . The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Press-Enterprise Co., 104 S.Ct. at 824. Accord Waller v. Georgia, 467 U.S. 39, ——, 104 S.Ct. 2210, 2212, 81 L.Ed.2d 31 (1984). Even with findings adequate to support closure, the trial court must consider alternatives before the courtroom can be closed constitutionally. Press-Enterprise Co., 104 S.Ct. at 825.

*In re Knight Pub. Co.*, 743 F.2d 231, 234 (4th Cir. 1984); *see also Wash. Post v. Robinson*, 935 F.2d 282, 288–89 (D.C. Cir. 1991) (requiring notice of the potential closure to be "'docketed reasonably in advance of their disposition so as to give the public and press an opportunity to intervene and present their objections to the court.' *Wash. Post*, 807 F.2d at 390 (quoting *In re Knight Pub. Co.*, 743 F.2d at 234)").

[35] *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 786 F. Supp. 3d 237, 255 (D. Mass. 2025) ("The whole point of [t]he reasoned explanation requirement of administrative law, after all, is . . . to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. . . . The explanation must be the one invoked contemporaneously at the time of the action, not created in hindsight." (internal quotations omitted)).

CORE/3515279.0007/244003126.2

secrecy with no reasoned explanation that not only violates the public's right of access but destroys

their faith in the system meant to serve them.

**C.    Plaintiffs' First Amendment Rights Have Likely Been Violated by Defendants.**

The Court poses two principal questions about the applicability of the First Amendment to

administrative hearings before immigration judges in its April 29th Memorandum Opinion. "[T]he

parties," it notes, "dispute whether the First Amendment guarantees nonparties a right to access

immigration proceedings," but, it adds, "neither the parties nor *amici* answer whether AHR must

show immigration proceedings satisfy *both* the experience and logic prongs of the *Richmond*

*Newspaper* test, and, if so, whether one prong weighs heavier in the analysis than the other." Mem.

Op. at 14 [ECF No. 17].[36] "[T]he parties," the Court also emphasizes, "do not address whether it

matters that the openness of deportation hearings has long been qualified by a series of exceptions.

See 8 C.F.R. § 1003.27(a)–(d)." *Id.* at 15. The Court itself did not address these questions because

it found that AHR had not established standing in its earlier motion. *Id.* at 15–16. Because Plaintiffs

believe standing has now been established, they address each of these questions below.

**1.    Immigration proceedings satisfy both the experience and logic prongs
of the *Richmond Newspaper* test irrespective of the weights given to
either prong.**

Regardless of the relative weight accorded to either the logic or history prongs of the two-

part *Richmond Newspaper* test, the circumstances governing public access to immigration

---

[36] *Compare Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 9 (1986) ("If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."), *with Detroit Free Press*, 303 F.3d 681, 701 (6th Cir. 2002) ("Therefore, although historical context is important, a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted."), *with N. Jersey Media Grp.*, 308 F.3d 198, 216 (3d Cir. 2002) ("Even if we could find a right of access under the *Richmond Newspapers* logic prong, absent a strong showing of openness under the experience prong, a proposition we do not embrace, we would find no such right here.").

proceedings easily satisfy both prongs, rendering the relative weight accorded either of them irrelevant.

Regarding the history of openness prong, "a procedural rule establishing a presumption in favor of public proceedings [like 1003.27], accords with the general policy favoring disclosure of administrative agency proceedings." *FCC v. Schreiber*, 381 U.S. 279 293 (1965). Not only does this "*general* policy favoring disclosure of administrative agency proceedings" go back decades, *id.* (emphasis added), there is a specific and long history of openness governing immigration proceedings.[37] These proceedings have been presumptively open to the public by codified regulation since at least 1965, and by consistent practice for decades before that, *Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 505 (1984). While federal courts for immigration proceedings have only existed since 1906 (starting as federal naturalization courts),[38] the need for oversight and openness has been present and emphasized for much of that history. For example, in 1926, Congress established the designated examiner system, which assigned a National Examiner to each federal naturalization court to "further advanced the fairness and uniformity of the naturalization process nationwide."[39] Then, in 1965, 8 C.F.R. § 246.16(a)

---

[37] *See* 8 C.F.R. § 246.16(a) (1965) ("Deportation hearings shall be open to the public, except that the special inquiry officer may, in his discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public."); Ass'n of the Bar of the City of N.Y., *Dangerous Doctrine: The Attorney General's Unfounded Claim of Unlimited Authority to Arrest and Deport Aliens in Secret (a Joint Report by Committee on Immigration & Nationality Law and Committee on Communications & Media Law)* 5 (May 25, 2004) ("Guidelines previously issued by the Attorney General have long mandated that deportation hearings conducted by the Immigration and Naturalization Service ('INS') are to be open to the public, in almost all cases. These guidelines reflect the long-standing practice of conducting such proceedings in public.").

[38] *See* Basic Naturalization Act of 1906, H.R. 15442, 59th Cong. (1906).

[39] U.S. Citizenship & Immigr. Services, *Overview of INS History* 5 (2012).

30

codified the presumption of openness and the right of public access. Courts have since acknowledged—and attached legal consequences to—this long history of openness to ensure public access to immigration courts. *See Pechter v. Lyons*, 441 F. Supp. 115, 117–18 (S.D.N.Y. 1977) (finding that closing the public from an immigration proceeding was a violation and explaining, "This regulation is but one of countless manifestations of a public policy centuries old that judicial proceedings, especially those in which the life or liberty of an individual is at stake, should be subject to public scrutiny, not only for the protection of the individual from unwarranted and arbitrary conviction, but also to protect the public from lax prosecution.").

Courts have also previously found that a decades-long history of openness meets the required history, or experience, prong of the experience-and-logic test. For example, in *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991), the D.C. Circuit has found that plea agreements had a history of openness and public access. While public access to criminal trials goes back centuries,  plea bargaining only "became a dominant method of resolving criminal cases at the end of the nineteenth century and beginning of the twentieth[.]"[40] Nonetheless, the court found a sufficient history of openness, emphasizing "the critical importance of *contemporaneous* access [] to the public's role as overseer[.]" *Washington Post v. Robinson*, 935 F.2d at 287 (emphasis added). It further explained, "The first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Id.*

The Fourth Circuit has also made such a finding in *In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986).[41] Although that case involved matters of national security, the Fourth Circuit

---

[40] Albert W. Alschuler, *Plea Bargaining and Its History*, 79 Colum. L. Rev. 1, 6 (1979).

[41] *See Wash. Post v. Robinson*, 935 F.2d at 288 (agreeing with the Fourth Circuit's decision in *In re Wash. Post Co.*, 807 F.2d at 390).

31

held that the lower court should not have restricted access to documents and hearings, and the Fourth Circuit specifically emphasized the importance of the requirement that the lower court make findings and a ruling when it did cut off public access. *Id.* at 391–92. It opined,

> We note further that, troubled as we are by the risk that disclosure of classified information could endanger the lives of both Americans and their foreign informants, we are equally troubled by the notion that the judiciary should abdicate its decisionmaking responsibility to the executive branch whenever national security concerns are present. . . . A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, *and without a statement of reasons*, would impermissibly compromise the independence of the judiciary and open the door to possible abuse.

*Id.* (emphasis added). These rulings upholding the right of public access to other areas that have a similar history to the presumption of openness in the immigration area further support that that history meets the first prong of the experience-and-logic test, and so like the plea agreement, other documents, and hearings in those cases, the public has a First Amendment right of access to immigration proceedings here.

The need for public access is heightened in the context of *ex parte* hearings—proceedings conducted without counsel present for the respondent. In such hearings, there is no advocate to challenge irregularities, ensure that the respondent is informed of the right to counsel, or document whether required procedural protections are being observed. Court observers are the only remaining check on the adjudicatory process in *ex parte* proceedings. The closure of such hearings to the public—particularly when conducted exclusively over Webex—eliminates all external accountability and creates conditions in which due process violations can occur without any possibility of detection or redress. This is precisely the type of "secret government" that the First Amendment prohibits. *Detroit Free Press*, 303 F.3d at 683; *see also* Declaration of Ryan Wood, Ex. 38 ¶¶ 19–20, 28 (discussing in abstentia hearings).

32

The right of public access to immigration proceedings also easily satisfies the logic prong. Under this prong, courts typically consider "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Super. Ct. of Cal. For Riverside Cnty.*, 478 U.S. 1, 8 (1986) (quoting *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982)). Courts have often found that court proceedings "operate best under public scrutiny[.]" *Id.* For example, "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole." *Globe News.*, 457 U.S. 606. Similarly here, public access operates as an important check on immigration proceedings, which is typically an area where the government has nearly unlimited authority. Public access helps to protect against government mistakes, such as by documenting denial of access to counsel. *See* Order of Feb. 12, 2026 of Hon. Nancy E. Brasel, United States District Judge, *The Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, Case No. 26-CV-749(NEB/DLM), 1–2 (D. Minn. Feb. 12, 2026). Allowing the public to access immigration proceedings also offers an outlet for community concern, and it enhances the perception of integrity and fairness in our judicial and immigration system. Further, it ensures that individuals can participate in our system of self-governance, learn about current governmental processes and policies, and hold the government accountable if it disagrees with them. The frustration with not being able to participate in the system can be seen in the numerous news articles decrying the decreased access.[42] Also, as noted in some of the supporting declarations, allowing the public to access immigration proceedings provides an opportunity for attorneys and law students to gain

---

[42] *See, e.g.*, Acacia Ctr. for Just., *Restrictions on Public Access Undermine Transparency in Immigration Courts* (Dec. 2025), https://acaciajustice.org/why-public-access-to-immigration-courts-matters-more-than-ever/; Caroline Kubzansky, *Immigration Court Observers—and Their Oversight—Routinely Locked out of Process*, Chi. Trib. (Mar. 30, 2026), https://www.chicagotribune.com/2026/03/30/immigration-court-observers/.

CORE/3515279.0007/244003126.2

experience and hone their skills; decreasing access cuts off an important avenue for attorneys looking to better represent their clients. *See* Declarations of Carmen Maria Rey Caldas, Ex. 32; Shane Ellison, Ex. 50; Zach Albun, Ex. 59. All of the above are mere examples of how public access serves the immigration process, and they more than show that it would meet the logic prong of the experience-and-logic test.

Thus, regardless of how much emphasis a court places on either prong, First Amendment protections should be extended to Plaintiffs and other persons seeking to observe immigration proceedings.

        **2.**       **Plaintiffs do not contest that if an applicable exception to open hearings applies, it would satisfy the requirement that such closure serves a compelling governmental interest provided that the Immigration Judge reasonably explains on the record in advance of closure why closure reflects the least restrictive means of achieving that interest.**

The Court's May order asked the following questions regarding the scope of First Amendment protections in administrative hearings before immigration judges:

> Does the "experience and logic" test require a history of unqualified access? If the "experience and logic" test is met, does the First Amendment ossify only this qualified level of access—such that an immigration judge may close a hearing subject to the enumerated exceptions in Section 1003.27 without meeting strict scrutiny? Or, once the First Amendment attaches, does it raise the level of protection such that even for these historical exceptions an immigration judge must make sufficient findings to survive strict scrutiny?

Mem. Op. at 16 [ECF No. 17].

As to the first question, nothing in the "experience and logic" test "requires a history of *unqualified* access." Even in criminal proceedings, where the First Amendment unquestionably applies, there is no unqualified access. Reporters may be barred from recording proceedings, witnesses who might want to observe a trial before they are scheduled to testify can be sequestered. Space limitations may limit attendance in a neutral way (reasonably limiting, but not prohibiting public observers or acting in a manner that effectively or constructively denies access altogether).

34

This is consistent with neutral time place and manner restrictions on speech long recognized by the Supreme Court. *See Herring v. Meachum*, 11 F.3d at 380.

The short answer to the remaining questions, for purposes of Plaintiffs' motion, is that Plaintiffs do not contest that *if* an applicable exception to open hearings applies, it would satisfy the requirement that such closure serves a compelling governmental interest, *provided* that the ruling of the judge ordering closure is made in open court in advance of the closure and reflects that closure was the least restrictive means of achieving that interest. This, moreover, would not relieve an immigration judge of the obligation to demonstrate that the exception applies.

And, importantly, the "catch all" provision allowing immigration judges to close hearings when that would be in the "public interest" (1003.27) does not relieve immigration judges of grounding any closure for unenumerated reasons in First Amendment principles. A term like "public interest" and "just and reasonable" in a regulatory statute (or a regulation) is not a "mere vessel into which meaning can be poured." *Farmers Union Central Exchange, Inc v. FERC*, 734 F.2d 1486, 1504 (D.C. Cir. 1984) (internal quotations omitted). Rather, the term takes its meaning from the underlying purpose of the legislation or regulation. *See NAACP v. Federal Power Commission*, 425 U.S. 662, 669–70 (1976) (holding that Federal Power Act provisions referring to "public interest" did not authorize utility regulatory agency to establish non-discriminatory employment regulations to govern the operation of utilities). Just as the term "public interest" obligates agencies regulating companies with market power and with impacts on the environment to take antitrust and environmental policies into account, *id*. at 670 n.6; *Gulf States Utils. v. FPC*, 411 U.S. 747, 757–58 (1973), so too must the term "public interest" under 8 C.F.R. § 1003.27 take into account the underlying First Amendment principles on which the openness requirement is based. Immigration courts have been presumptively open to the public and the press for many

35

decades, and any departure from that presumption of openness would violate the First Amendment and the legal rights of court observers.

The need for public access, as noted above, is heightened in the context of *ex parte* hearings—proceedings conducted without counsel present for the respondent. In such hearings, there is no advocate to challenge irregularities, ensure that the respondent is informed of the right to counsel, or document whether required procedural protections are being observed. Court observers are the only remaining check on the adjudicatory process in *ex parte* proceedings. The closure of such hearings to the public—particularly when conducted exclusively over Webex— eliminates all external accountability and creates conditions in which due process violations can occur without any possibility of detection or redress. This is precisely the type of "secret government" that the First Amendment prohibits. *Detroit Free Press*, 303 F.3d at 683.

**III. HAVING ESTABLISHED STANDING, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ARGUMENT EOIR'S DIRECTIVE THAT WEBEX ACCESS IS LIMITED TO PARTIES CONNECTS THE UNLAWFUL CLOSURES OF WEBEX ACCESS AT FORT SNELLING TO SIMILAR CLOSURES AROUND THE COUNTRY.**

In denying AHR's earlier motion for a preliminary injunction, the Court found that AHR had not pressed the argument "that the Government maintains a national policy that would connect events at other immigration courts to Fort Snelling." Mem. Op. at 21 [ECF No. 17]. As discussed earlier, declarations from former immigration judges as well as numerous declarations from court observers in other parts of the country directly link EOIR's February 2026 Fact Sheet directive that Webex is purportedly only available to parties to the subsequent widespread and frequent bans on the ability of court observers to participate via Webex—even when no viable in-person option was available. This directive ran directly counter to the agency's long-established policy of presumptively open immigration courts and resulted in the arbitrary and capricious and unlawful violations of 8 C.F.R. § 1003.27 and the First Amendment rights of observers throughout the U.S.

36

While court observers have also frequently been blocked from attending proceedings in-person in immigration courts outside Minnesota (*see* Declarations of Gillian Rowland-Kain, Ex. 44 ¶¶ 6–8, 11–13; Cary LaCheen, Ex. 45 ¶¶ 5–10, 13–16; William Quigley, Ex. 39 ¶¶ 4, 9–12;), Plaintiffs do not have direct proof that these events are being directed by EOIR, only the strong inference offered by the sheer frequency and similarity of these incidents (e.g., locked doors, failure to post hearing schedules, closures to the public over the objections of respondents, dismissal of judges, and bans on note taking). These facts—and the realities and barriers currently faced by court observers—cannot easily be ascribed to chance or coincidence. Pursuant to EOIR's own regulation, it is "responsible for the direction and supervision of each EOIR component in the execution of its respective duties[.]" 8 C.F.R. § 1003.0. Thus, EOIR has a binding legal obligation to ensure all immigration judges are following the law, including the openness requirements of 8 C.F.R. § 1003.27. As explained in AHR's reply to the government's opposition to a preliminary injunction this Court may draw that inference in support of broad injunctive relief against DOJ, EOIR and its officials. *See* Reply at 10–14 [ECF No. 11] (citing *Assoc. Gas Distib. v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987)) ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall[.]"); *United States v. Anderson*, 747 F.3d 51, 70 (2d Cir. 2014) (holding that judges may rely on ordinary experience in evaluating evidence and drawing conclusions); *see also Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 784 (D.C. Cir. 2025) (noting government's concession that courts may "infer from circumstantial evidence that there's a decision") *reh'g en banc granted*, *opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) (en banc) (per curiam).

Nonetheless, each unexplained denial of access is an APA violation, and the Amended Complaint adds a number of plaintiffs who have been injured so that any preliminary injunction

37

and/or stay the Court orders can provide broader relief even under the narrowest view of a federal district court's jurisdiction under the APA.

**IV.    HAVING ESTABLISHED STANDING, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ALTERNATIVE COMPLAINT COUNTS II AND III THAT DEFENDANTS HAVE (1) CHANGED THEIR POLICY GOVERNING PUBLIC PARTICIPATION VIA WEBEX WITHOUT REQUIRED PRIOR NOTICE AND COMMENT AND (2) CHANGED THEIR POLICY GOVERNING PUBLIC PARTICIPATION VIA WEBEX WITHOUT ACKNOWLEDGING OR EXPLAINING THE CHANGE OR TAKING RELIANCE INTERESTS INTO ACCOUNT.**

**A.    <u>Defendants' Change in Policy Confining Webex Access to Parties Was Unlawfully Adopted Without Providing for Prior Notice and Comment.</u>**

As discussed in AHR's earlier motion for preliminary injunction, where, as here, an agency regulation (1003.27) has been adopted only after providing for public notice and comment, the agency violates the APA if it changes that regulation without affording the public the same opportunity for prior notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). That is precisely what has happened in this case.

Government officials have themselves admitted that under existing regulations they apply the same public access limitations to immigration proceedings to in-person and Webex observers, subject only to the same exceptions enumerated in 8 C.F.R. § 1003.27. *See* Declarations of ACIJ Taylor, Ex. 74; ACIJ Burns, Ex. 75; Carmen Maria Rey Caldas, Ex. 32; Ryan Wood, Ex. 38; Jenny Beverly, Ex. 47; *see also*, Declaration of Gail Montenegro, Ex. 56.

Given Defendants' claim that they have not changed their policy on public observers, Plaintiffs' Amended Complaint contends that Defendants' subsequent directive that Webex access would only be available *to parties* was in direct violation of their own policy and its own long-standing practice. Amended Compl. ¶¶ 20, 26, 30–32, 101–02, 112. But as we maintain in the alternative, if such a directive *was* a change in policy, as it appears to have been perceived by some immigration judges and others, then it was adopted unlawfully, i.e. without prior notice and

38

comment. It is clear, as noted earlier, that both immigration judges and practitioners perceived EOIR's' "only parties" Fact Sheets as a change in policy. As also discussed earlier, a number of immigration judges conveyed to observers in the few instances where any explanation was offered for barring them from observing proceedings that they were following EOIR policy.[43] And many practitioners perceived the Fact Sheet that way, too. The 18,000 member American Immigration Lawyers Association described the Fact Sheet coming from EOIR's Office of Policy as "including a ban on all virtual observations."[44] Enjoining/staying DOJ/EOIR from enforcing that change is therefore warranted under the APA.

**B.       Defendants Acted Arbitrarily By Changing Policy and Confining Webex Access to Parties Without Acknowledging the Policy Change, Explaining the Reasons for that Change or Taking Reliance Interests Into Account.**

As discussed in AHR's initial motion for preliminary injunction and stay, to the extent the agency's "only parties" stance on who can access immigration proceedings via Webex and that the public may no longer access hearings via Webex, there has been no notice-and-comment rulemaking to change or repeal the applicable regulations, i.e., 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b), which have long been interpreted by the agency to apply the same limited exceptions to hearings held in person or via Webex. That itself violates the APA because the government has not observed the required procedure to change or repeal those regulations. When a rule or regulation has been adopted after prior notice and comment, as was the case with the applicable

---

[43] *See, e.g.*, Declaration of Shane Ellison, Ex. 50 ¶¶ 8-9 (IJ citing "new EOIR policy" requiring in-person observation); Declaration of Michele Cantara, Ex. 48 ¶¶ 9-11 (multiple Chelmsford IJs citing EOIR guidance as basis for barring Webex observers); Declaration of Amy Lange, Ex. 1, ¶ 80 (Judge Taylor stating " Webex is reserved for parties of the case").

[44] "EOIR Releases Fact Sheet on Observing Immigration Court Hearings," AILA Doc. No. 26030600 (dated Feb. 17, 2026), https://www.aila.org/library/eoir-releases-fact-sheet-on-observing-immigration-court-hearings.

39

regulations, it may only be repealed, replaced or modified after affording the public the same opportunity for prior notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

But even if prior notice and comment procedures were not required to modify or repeal 8 C.F.R. § 1003.27 or 8 C.F.R. § 1240.10(b), when an agency changes its policies it must both (1) acknowledge the changes and (2) offer "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the government has not acknowledged the change in policy or offered reasons (let alone any legitimate reasons) for the policy change, all in violation of the APA. Compl. ¶¶ 50–52. Indeed, it has inexplicably denied that there has even been any change in policy, even in the face of all the evidence gathered and presented in this renewed motion for injunctive relief and/or stay.

## C.    The Balance of Equities Tips in Favor of AHR, as Does the Public Interest

As noted earlier, Plaintiffs adopt and incorporate AHR's earlier motion for preliminary injunction, including the argument that the balance of the equities and the public interest favor the request for preliminary injunction (as modified in the Amended Complaint filed this same date).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary injunction or stay.

CORE/3515279.0007/244003126.2

41

Dated: June 9, 2026

Respectfully submitted,

STINSON LLP

*/s/        Kathleen Parnow*
Harvey Reiter, No. 232942
John Bessler, No. 433163
Brandon Nagy, No. 1024717
Katie Parnow, No. 90041785
1775 Pennsylvania Ave, N.W., Suite 800
Washington, DC 20006
Tel. (202) 728-3016
harvey.reiter@stinson.com
john.bessler@stinson.com
brandon.nagy@stinson.com
katie.parnow@stinson.com

CORE/3515279.0007/244003126.2