**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:26-00865-RC |
| TODD BLANCHE, in his official capacity as Acting Attorney General, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

   I.   IMMIGRATION HEARINGS AND PUBLIC ACCESS ................................................. 2

   II.  ORIGINAL COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION ........ 4

   III. THE AMENDED COMPLAINT AND PLAINTIFFS' NEW EVIDENCE
       REGARDING ACCESS TO THE IMMIGRATION COURTS ....................................... 6

       A.     Fort Snelling, Minnesota—Plaintiffs AHR and Maggie Berry .............................. 6

       B.     Baton Rouge, Louisiana—Plaintiffs Bonnie Byland and Nancy Grush ................. 8

       C.     Remote Access ........................................................................................................ 9

       D.     Other Locations Nationwide .................................................................................. 10

LEGAL STANDARD ......................................................................................................... 11

   I.   MOTION TO DISMISS ............................................................................................... 11

   II.  MOTION FOR PRELIMINARY INJUNCTION AND STAY ...................................... 11

ARGUMENT ....................................................................................................................... 12

   I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR LACK
       OF JURISDICTION. ..................................................................................................... 12

       A.     Claims Regarding In-Person Access Nationwide .................................................. 15

       B.     Claims Regarding In-Person Access at Particular Immigration Courts ................ 15

           1.   Fort Snelling ..................................................................................................... 15

           2.   Baton Rouge ..................................................................................................... 18

           3.   Remaining courts .............................................................................................. 20

       C.     Claims Regarding Remote Access ......................................................................... 21

Case 1:26-cv-00865-RC    Document 30    Filed 06/26/26    Page 3 of 49

II. PLAINTIFFS' CLAIMS REGARDING IMMIGRATION COURT OPERATIONS SHOULD BE DISMISSED FOR FAILURE TO CHALLENGE DISCRETE AND FINAL AGENCY ACTION. ..................................... 23

III. PLAINTIFFS FAIL TO SHOW A CLEAR RIGHT TO PRELIMINARY INJUNCTIVE RELIEF ............................................................................................ 29

    A.    Plaintiffs are Unlikely to Succeed on Their Claims ............................................ 29

        1.    Plaintiffs are unlikely to show any basis for relief under section 1003.27 ............................................................................... 29

        2.    Plaintiffs have not been deprived of any First Amendment right. ................ 32

            a.    The First Amendment does not mandate a right of access to Executive Branch proceedings ............................................... 32

            b.    Even if the First Amendment applies, Plaintiff has failed to show any denial of any right of access by EOIR. ............................ 35

    B.    Plaintiffs Do Not Face Irreparable Harm. .............................................................. 37

    C.    The Remaining Factors Disfavor Preliminary Relief. .......................................... 39

CONCLUSION ............................................................................................................................... 39

ii

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ....................................................................... 14

*Am. Bar Ass'n v. FTC*,
    636 F.3d 641 (D.C. Cir. 2011) ....................................................................... 14

*Arias v. U.S. Immigration & Customs Enforcement*,
    No. 26-cv-2130 (CM), 2026 WL 1785997 (S.D.N.Y. June 22, 2026) ............................ 18, 34

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ....................................................................... 34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 11

*Bark v. United States Forest Service*,
    37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................. 28, 29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. 11

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................. 38

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................. 37

*Church of Scientology of Cal. v. United States*,
    506 U.S. 9 (1992) ............................................................................. 14

*City of Holyoke Gas & Elec. Dep't v. FERC*,
    954 F.2d 740 (D.C. Cir. 1992) ................................................................. 31

*\*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ....................................................................... 13, 14, 17, 19

*City of New York v. U.S. Dep't of Defense*,
    913 F.3d 423 (4th Cir. 2019) ................................................................. 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................. 13

*Clevinger v. Advoc. Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025) ................................................................. 12

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ............................................................. 25, 29

*Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*,
  603 U.S. 799 (2024) ................................................................................. 24

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Justice*,
  331 F.3d 918 (D.C. Cir. 2003) ............................................................. 33, 34

*Ctr. for Sci. in Pub. Interest v. Regan*,
  727 F.2d 1161 (D.C. Cir. 1984) ................................................................. 23

*Davis v. Billington*,
  76 F. Supp. 3d 59 (D.D.C. 2014) ............................................................... 11

*Delaware Coal. for Open Gov't, Inc. v. Strine*,
  733 F.3d 510 (3d Cir. 2013) ...................................................................... 35

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) ............................................................... 34, 36

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) ................................................................. 11

*Friends of Animals v. Bernhardt*,
  961 F.3d 1197 (D.C. Cir. 2020) ................................................................. 22

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) .................................................................... 26

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ..................................................................... 12

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir. 2019) ...................................................................... 12

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ................................................................... 17

*Holmes v. Knodell*,
  733 F. Supp. 3d 775 (W.D. Mo. 2024),
  *appeal dismissed*, No. 24-2192, 2024 WL 5076422 (8th Cir. July 19, 2024) ...................... 16

iv

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ...................................................................................... 32-33

*In re Guantanamo Bay Detainee Litig.*,
  624 F. Supp. 2d 27 (D.D.C. 2009) ............................................................... 34

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
  631 F.3d 939 (9th Cir. 2011) ....................................................................... 16

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ..................................................................... 24

*Jerome Stevens Pharms., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ................................................................... 11

*Kingdomware Techs., Inc. v. United States*,
  136 S. Ct. 1969 (2016) ................................................................................. 14

*Larsen v. U.S. Navy*,
  525 F.3d 1 (D.C. Cir. 2008) ......................................................................... 23

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................... 11, 21

*\*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ......................................................................... 24, 25, 27

*McBurney v. Young*,
  569 U.S. 221 (2013) ..................................................................................... 32

*McKathan v. U.S. Dep't of Homeland Sec.*,
  No. 22-CV-1865 (DLF), 2024 WL 1344434 (D.D.C. Mar. 29, 2024) ................... 33

*Mercy Gen. Hosp. v. Becerra*,
  643 F. Supp. 3d 16 (D.D.C. 2022) ............................................................... 11

*N. Jersey Media Grp., Inc. v. Ashcroft*,
  308 F.3d 198 (3d Cir. 2002) ............................................................. 35, 36, 37

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*,
  680 F.2d 810 (D.C. Cir. 1982) ..................................................................... 22

*National Treasury Employees Union v. Vought*,
  49 F.4th 762 (D.C. Cir. 2025),
  *vacated en banc*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) ........................... 28

v

*Navajo Nation v. Azar*,
   292 F. Supp. 3d 508–13 (D.D.C. 2018) ................................................................. 37

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................... 39

*Norton v. S. Utah Wilderness All.* (SUWA),
   542 U.S. 55 (2004) ................................................................................................. 24

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ............................................................................................... 14

*Pechter v. Lyons*,
   441 F. Supp. 115 (S.D.N.Y. 1977) ......................................................................... 26

*Pennsylvania v. DeVos*,
   480 F. Supp. 3d 47 (D.D.C. 2020) .......................................................................... 12

*\*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................................................. 31

*Press-Enter. Co. v. Superior Ct. of Cali. for Riverside Cty.*,
   478 U.S. 1 (1986) ........................................................................................... 33, 35

*Rhea Lana, Inc. v. United States*,
   925 F.3d 521 (D.C. Cir. 2019) ............................................................................... 31

*Rice v. Kempker*,
   374 F.3d 675 (8th Cir. 2004) ................................................................................. 21

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ............................................................................................... 36

*Rizzo v. Goode*,
   423 U.S. 362 (1976) .......................................................................................... 17-18

*Taylor v. Resolution Tr. Corp.*,
   56 F.3d 1497 (D.C. Cir. 1995) ............................................................................... 13

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ............................................................................................... 15

*United States v. Moussaoui*,
   205 F.R.D. 183 (E.D. Va. 2002) ............................................................................ 17

*United States v. Yonkers Bd. of Educ.*,
  747 F.2d 111 (2d Cir. 1984) ...................................................................... 22

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) .................................................................... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................... 11, 12, 38

*Women Involved in Farm Econ. v. U.S. Dep't of Agric.*,
  876 F.2d 994 (D.C. Cir. 1989) .................................................................. 31

**STATUTES**

5 U.S.C. § 551 ....................................................................................... 24, 26

5 U.S.C. § 704 ............................................................................................. 24

**FEDERAL RULES**

Fed. R. Civ. P. 8(a) ..................................................................................... 11

Fed. R. Civ. P. 12(b) .............................................................................. 11, 26

Fed. R. Crim. P. 53 ..................................................................................... 21

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

8 C.F.R. §§ 1003.0, 1003.1(a)(1) .................................................................. 2

8 C.F.R. § 1003.10 ........................................................................................ 2

*8 C.F.R. § 1003.27 ................................................................................. *passim*

8 C.F.R. §§ 1208.6(a), 1240.11(c)(3)(i) ........................................................ 3

**OTHER AUTHORITIES**

EOIR Policy Manual Part II (updated Feb. 10, 2026),
  https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm ................... 2

EOIR, Fact Sheet: Observing Immigration Court Hearings (June 2026),
  https://www.justice.gov/eoir/media/1416861/dl?inline ............................. 4

EOIR, Find an Immigration Court and Access Internet-Based Hearings (updated June 26, 2026),
  https://www.justice.gov/eoir/find-immigration-court-and-access-internet-based-hearings .... 15

EOIR, Fact Sheet: EOIR Headquarters Immigration Court (July 21, 2004),
    https://www.justice.gov/sites/default/files/eoir/legacy/2004/08/27/HQICFactSheet.pdf......... 32

Uniform Docketing System Manual (rev. Feb. 2021), https://www.justice.gov/eoir/reference-
    materials/UDSM122020/dl ....................................................................................................... 2

**INTRODUCTION**

Plaintiffs are a non-profit organization and a group of individuals that collectively seek to observe Executive Office for Immigration Review (EOIR) immigration court hearings at various immigration courts across the country, both in person and by remote access. Recently, Plaintiffs have accumulated a litany of grievances about the way particular immigration judges, court staff, and guards are acquitting their duties. As to in-person access to hearings, Plaintiffs attempt to stitch these various incidents into a set of Administrative Procedure Act (APA) claims against the Defendant agency and officials to allege a purported pattern of denying public access to immigration court proceedings. And as to remote access, Plaintiffs contend that the agency has adopted an unlawful policy of denying remote access in favor of in-person attendance. Plaintiffs now move for preliminary injunctive relief and a stay pursuant to section 705 of the APA, arguing that immediate relief is necessary to forestall irreparable harm to First Amendment interests.

Plaintiffs' Complaint should be dismissed and their motion for preliminary injunction denied, just as their initial motion for preliminary injunction was denied. This Court previously determined that Plaintiff The Advocates for Human Rights (AHR) had not established standing to obtain preliminary injunctive relief based on their evidence and allegations about a smattering of hearing closures and other grievances about court operations at Fort Snelling, Minnesota. Plaintiffs have now amended the Complaint to join a host of new Plaintiffs and supplement the record with dozens of new declarations regarding immigration courts throughout the country. The attempt to address the deficiencies identified by the Court, however, has failed—Plaintiffs still have not established the Court's jurisdiction to provide relief because they have not shown that they face the imminent prospect of injury in the future. Plaintiffs also cannot use the vehicle of an APA lawsuit to bring before the Court an expansive challenge to the way various immigration

courts across the country are being run. The APA only permits judicial review of discrete and final agency action in violation of law, not claims seeking wholesale reform of institutions or programs. For these reasons, the Amended Complaint should be dismissed. If the Court reaches the four preliminary injunction factors, it should deny Plaintiffs' motion. Plaintiffs' claims are likely to fail on the merits and Plaintiffs still do not show irreparable injury requiring preliminary relief, particularly given subsequent developments as to remote hearing access and the Baton Rouge Immigration Court.

Plaintiffs' Amended Complaint, ECF No. 23 ("Am. Compl."), should be dismissed and their Renewed Motion for Preliminary Injunction or Stay, ECF No. 24 ("PI Mot."), denied.

## BACKGROUND

## I.    IMMIGRATION HEARINGS AND PUBLIC ACCESS

EOIR is an agency within the Department of Justice with the primary mission of adjudicating immigration cases and appeals for individuals placed in immigration proceedings. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate review, and administrative hearings. *See* 8 C.F.R. §§ 1003.0, 1003.1(a)(1). Immigration judges are "attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings," 8 C.F.R. § 1003.10(a), including "removal, deportation, exclusion, and other kinds of proceedings," EOIR Policy Manual Part II, Ch. 3.1 (updated Feb. 10, 2026);[1] *see also* Uniform Docketing System Manual at I-1–6 (rev. Feb. 2021)[2] (describing "twelve principal types of immigration proceedings conducted by the immigration courts"). The "vast majority of proceedings conducted by

---

[1] https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm.
[2] https://www.justice.gov/eoir/reference-materials/UDSM122020/dl.

immigration judges are removal proceedings." EOIR Policy Manual Part II, Ch. 6.1.

The most common types of hearings in immigration court are master calendar hearings, individual calendar or merits hearings, and custody redetermination or bond hearings. A master calendar hearing is held for the purpose of entering pleadings, discussing scheduling, and resolving "other similar matters." *Id.* Part II, Ch. 3.14(a). The hearing also informs the respondent about the charges and factual allegations against them and advises them of various rights they possess. *Id.* Part II, Ch. 3.14(e). Individual calendar hearings, also known as merits hearings, are "evidentiary hearings on contested matters," such as "challenges to removability and applications for relief." *Id.* Part II, Ch. 3.15(a). And bond hearings involve requests by respondents to have "an immigration court . . . redetermine the bond" imposed by the Department of Homeland Security to assure the respondent's appearance at proceedings. Uniform Docketing System Manual at I-2–3.

As a general matter, immigration court hearings are open to the public. *See* 8 C.F.R. § 1003.27. Nonetheless, numerous exceptions to public access exist. *Id.* Exclusion hearings are categorically exempt from the public access rules. *See id.* Immigration judges also have discretion to limit attendance or hold a closed hearing for the "purpose of protecting witnesses, parties, or the public interest." *Id.* § 1003.27(b). They may also "place reasonable limitations upon the number [of persons] in attendance" based on the limitations of the "physical facilities" of the court. *Id.* § 1003.27(a). Hearings "concerning an abused alien child" must be closed to the public and hearings involving an "abused alien spouse" shall be closed unless the abused individual agrees that the hearing may be open. *Id.* § 1003.27(c). Hearings are also closed where information subject to a protective order will be discussed. *Id.* § 1003.27(d). And hearings are closed in various other instances where required by law. *See, e.g.*, 8 C.F.R. §§ 1208.6(a), 1240.11(c)(3)(i) (describing

restrictions on the disclosure of information about asylum applications and applicable procedures in evidentiary hearings regarding them).

Immigration court hearings are generally held in person but may also be conducted by video or telephone conference. *See* EOIR Policy Manual Part II, Ch. 3.6(a). Although some hearings may have a remote component, such as one party having been granted the opportunity to attend by Webex, "visitors must observe in person at the courtroom in which the hearing is scheduled and held." EOIR, *Fact Sheet: Observing Immigration Court Hearings* at 2 (June 2026) (June 2026 Fact Sheet).[3] On the other hand, remote access to "internet-based immigration hearings where no physical courtroom is available" are governed by the standards of section 1003.27. *See id.* at 3–4. EOIR recently published guidance clarifying this point, confirming that members of the public may attend remote-only hearings by Webex to the same extent that such attendance would be permitted under section 1003.27 and subject to bandwidth limitations. *See id.*

## II.    ORIGINAL COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiff AHR filed this lawsuit on March 12, 2026, alleging four claims under the APA. Counts I and IV of the Complaint asserted that the "restrictions on courtroom access described in the prior paragraphs of this complaint" collectively violate the APA because they are purportedly inconsistent with 8 C.F.R. § 1003.27 and the First Amendment. Compl. ¶¶ 45–48, 55–57. Counts II and III raise procedural issues in the alternative. These counts assume that a new policy regarding immigration court access has been promulgated by Defendants and contend that such new policy was unlawfully issued without notice and comment or an adequate explanation for the change in policy. Compl. ¶¶ 49–54.

A week later, AHR filed its motion for preliminary injunction and stay under section 705

---

[3] https://www.justice.gov/eoir/media/1449716/dl?inline

of the APA. The Court denied AHR's motion, holding that AHR had not "made a *clear* showing of . . . impending harm" and thus had not established standing to obtain preliminary injunctive relief. Mem. Op. at 27, ECF No. 17 (emphasis in original). The Court recounted AHR's evidence and identified "five broad categories of limitations on access to immigration hearings" identified in AHR's submissions. *Id.* at 5. None sufficed to support standing for preliminary injunctive relief. The Court first evaluated the evidence of "past closures of immigration hearings." *Id.* at 17–19. The Court explained that Plaintiff's evidence of roughly a dozen hearing closures at Fort Snelling since June 2025 "represent[ed] a tiny fraction" of the number of hearings occurring at the court over the relevant timeframe. *Id.* at 19 (citation omitted). And the Court could not discern any "pattern" of conduct in the alleged closures, concluding that they resulted from a host of different alleged circumstances. *Id.* at 20. And the Court also noted the absence of evidence of closures occurring in 2026. *Id.* Altogether, these circumstances showed that AHR could not establish they were "'likely' to face additional unlawful closures in the 'immediate' future." *Id.* at 19 (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

The Court also identified evidence of "practices by immigration judges or other staff that . . . fall short of a complete closure of the immigration hearing" and evidence of "apparent confusion and disorganization among court staff regarding existing practices." Mem. Op. at 5, 21–23. The Court found this evidence insufficient where AHR failed to establish that such limitations and scenarios were unlawful. *Id.* at 21–22. The Court also found AHR's "evidence of limitations on remote attendance" at hearings to be insufficient for standing purposes. *Id.* at 23–26. The Court explained that AHR failed to develop any argument that a denial of remote attendance is unlawful, at least where an option to attend in person is available. *See id.* The Court further held that AHR had not marshaled sufficient evidence of denied access to remote-only

5

hearings to support any claim of unlawful conduct in that context. *Id.* at 23–25.

The Court also considered evidence of "restrictions on observing immigration hearings in California, New York, and Louisiana," *id.* at 7, and found this insufficient to support standing as well. The Court explained that AHR, as it acknowledged, "suffer[ed] no harm from these practices in other states" and that AHR had presented no evidence to show that "Fort Snelling will follow the lead of other immigration facilities in the imminent future." *Id.* at 21.

## III.    THE AMENDED COMPLAINT AND PLAINTIFFS' NEW EVIDENCE REGARDING ACCESS TO THE IMMIGRATION COURTS

AHR has now filed an amended complaint, joined by a group of individuals that also seek to observe immigration proceedings in certain immigration courts. Plaintiffs have filed a renewed motion for preliminary injunction seeking immigration court access. Although the volume has significantly increased, the evidence submitted with Plaintiffs' Amended Complaint is similar to that accompanying the first round of preliminary injunction briefing. In general, Plaintiffs point to various instances where hearings were closed in certain courts, where remote access was denied, or where confusing or erroneous guidance was allegedly provided by court staff or security. With certain exceptions discussed below, Plaintiffs continue to show at most sporadic denials of access. *Compare* Am. Compl. Exs. *with* PI Mot. at 11 (citing statistics indicating well over 2 million hearings each of the past two fiscal years). Plaintiffs' evidence is discussed below by reference to each immigration court to which it relates.

### A.    Fort Snelling, Minnesota—Plaintiffs AHR and Maggie Berry

The Fort Snelling Immigration Court is located in the Bishop Henry Whipple Federal Building near Minneapolis–St. Paul, Minnesota. Currently, the court is supervised by an Assistant Chief Immigration Judge and staffed by seven additional immigration judges. U.S. Department of Justice, *Fort Snelling Immigration Court* (updated May 29, 2026), justice.gov/eoir/fort-snelling-

immigration-court. The court has an incredibly busy docket. Between March 1, 2025, and February 28, 2026, the Fort Snelling Immigration Court conducted approximately 47,248 hearings. Margolin Decl. ¶ 8, ECF No. 10-1. The lowest amount in any month over this period was 2,881 (in December 2025) and the highest was 4,670 (in July 2025). *Id.*

Like AHR's initial Complaint and declarations, the Amended Complaint and attached declarations rely on a smattering of alleged in-person hearing closures at Fort Snelling, as well as a diverse array of grievances about the way in which the immigration court is operated and individual judges, staff, and guards are carrying out their duties. In an attempt to address this Court's concern about the lack of recent data regarding closures, Plaintiffs submit a declaration from AHR Policy Manager Zoe Martens, which presents metrics that AHR volunteers have collected regarding "court access issues" at Fort Snelling. Am. Compl. Ex. 20, Martens Decl. ¶¶ 8–10.[4] AHR broadly defines "court access issues" to include not only hearings that an immigration judge has ordered to be closed but also instances where a courtroom door is locked and where hearings begin before their posted start time. *See id.* Martens' declaration presents various instances between February and May 2026, in which these "access issues" have allegedly occurred, although it provides little context for why hearings may have been closed or to whom any such closures, locked doors, or early hearing start times can be attributed. *See* Martens Decl. ¶¶ 16–19. Plaintiffs also submit various declarations from AHR staff and volunteers, or other persons practicing or observing at the Fort Snelling Immigration Court, alleging the same kinds of sporadic in-person access issues that the Court considered insufficient in the first round of preliminary injunction briefing. *See* Am. Compl. Exs. 19, 21–26, 28–30, 38, 49, 59, 60. Most of these declarations focus on Webex access, which is discussed elsewhere in this brief.

---

[4] All exhibits to the Amended Complaint are filed at ECF No. 23-1.

AHR's submissions also admit numerous instances in which hearings have been open to the public and to AHR in particular.  For example, a new declaration from AHR Program Manager Amy Lange acknowledges that AHR's concerns about access to "no-show" hearings have "now substantially resolved."  Am. Compl. Ex. 19, Lange Decl. ¶ 46.  In another part of her declaration, Lange complains that an immigration judge required a respondent's consent for an AHR observer to attend a merits hearing, but she then acknowledges that the required consent was provided and AHR was admitted to the hearing.  *Id.* ¶ 50.  Other declarations submitted on behalf of AHR are similar.  Zoe Lytle explains that she observed two hearings on April 30, 2026, but was unable to enter another hearing where a sign indicated the "respondent has requested a closed hearing."  Am. Compl. Ex. 25, Lytle Decl. ¶¶ 5, 6.  She complains that she was briefly excluded from another hearing on May 11, 2026, but later was specifically invited inside by the presiding immigration judge.  *Id.* ¶¶ 9, 10.  Lange's declaration also complains that one so-called "mega-master" hearing recently occurred, in which the calendar hearings for a large number of respondents were consolidated.  She states that AHR volunteers were initially unable to attend this hearing because of crowding—"a legitimate reason to close a courtroom" she admits—but that an AHR observer was ultimately able to enter the hearing later in the morning.  Lange Decl. ¶¶ 93, 94.

### B.      Baton Rouge, Louisiana—Plaintiffs Bonnie Byland and Nancy Grush

Plaintiffs also submit declarations from Plaintiffs Bonnie Byland and Nancy Grush alleging that they have been excluded from all merits hearings at the Baton Rouge Immigration Court that they have attempted to attend.  *See* Am. Compl. Ex. 33, Byland Decl.; Am. Compl. Ex. 34, Grush Decl.  Plaintiffs state that security guards at the court have told them that the immigration judges of this court do not permit observation of merits hearings.  Byland Decl. ¶¶ 5, 8, 9; Grush Decl. ¶¶ 8, 10, 11, 13.  Plaintiffs submit a declaration from a law professor that presents similar

allegations about hearing closures at the Baton Rouge court.  Am. Compl. Ex. 39, Quigley Decl. Plaintiffs acknowledge various instances in which they have been permitted to observe master calendar hearings at the Baton Rouge court.  Byland Decl. ¶ 9; Grush Decl. ¶ 7.  Plaintiffs also reference instances where they were denied entry to master calendar hearings because of space constraints in the courtroom.  Byland Decl. ¶ 9; Grush Decl. ¶ 12.

The acting Assistant Chief Immigration Judge for the Baton Rouge court, Sherron Ashworth, has executed a declaration in response to these alleged access denials.  Ex. A, Ashworth Decl.  Judge Ashworth's declaration affirms that the Baton Rouge court applies the same EOIR regulation regarding hearing access, section 1003.27, as every other immigration court across the country.  *Id.* ¶¶ 4, 5.  And it specifically disputes the assertions that declarants attribute to one or more security guards at the facility in which the Baton Rouge court sits—there is no categorical policy at the Baton Rouge court against public observers attending merits hearings.  *See id.*  Any in-person hearing closures should be carried out pursuant to section 1003.27.  *Id.*  Judge Ashworth recently sent an email to all judges and staff of the Baton Rouge Immigration Court to remind them of the applicable standards for closing in-person hearings, which is attached as an exhibit to Judge Ashworth's declaration.  *Id.* ¶ 6; *see also* Ashworth Decl. Ex. 1.  Judge Ashworth's declaration acknowledges that courtroom space constraints may at times prevent members of the public from attending hearings at the Baton Rouge court, particularly master calendar hearings involving multiple respondents.  Ashworth Decl. ¶ 7.

C.    **Remote Access**

Plaintiffs also allege a large number of instances where they have not been admitted to hearings remotely.  Plaintiffs' submissions reference three different kinds of remote hearings.

First, Plaintiffs submit evidence of hearings that were conducted in person near their

9

physical location but that they sought to attend remotely on Webex. For example, Plaintiffs submit a declaration from an individual who states that she refuses to attend immigration hearings in person where she lives in Chicago and who has been unable to remotely attend certain hearings conducted in person there, even though she was expressly invited to attend in person by the presiding immigration judge. Am. Compl. Ex. 51, DeVasGunawardhane Decl. ¶¶ 5, 6.

Second, Plaintiffs point to other instances where they have been unable to remotely attend hearings that are occurring in person in other parts of the country. For example, witnesses describe episodes where they were refused admittance to a remote hearing but where the immigration judge invited them to attend the hearing in person where it was occurring. Lange Decl. ¶¶ 71, 80 (AHR observer invited to attend court in Atlanta); Am. Compl. Ex. 43, Fordyce Decl. ¶¶ 6, 8.

Finally, Plaintiffs seem to point to past instances where access was denied as to fully remote hearings where no in-person hearing option is available to anyone. Lange Decl. ¶ 40 (referencing virtual hearings conducted from the Judge's chambers); Am. Compl. Ex. 30, Berry Decl. ¶ 9. Plaintiffs' briefing and evidence generally does little to distinguish between the second and third categories of hearing. Indeed, Plaintiffs' Amended Complaint treats these circumstances as indistinguishable. *See* Am. Compl. ¶ 25.

### D.     Other Locations Nationwide

Plaintiffs also submit declarations regarding in-person immigration hearing access at certain other courts across the country. Aside from Fort Snelling and Baton Rouge, none of these asserted in-person access issues relate to any Plaintiff or cause any apparent injury to any Plaintiff. Indeed, Plaintiffs Morgan Jenkins, Carmen Maria Rey Caldas, Bryanna Siguenza, and John Lloyd do not allege any in-person access issues at all. *See* Am. Compl. Exs. 31, 32, 35, 52.

10

## LEGAL STANDARD

### I.     MOTION TO DISMISS

Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of establishing the court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Under either dismissal standard, courts apply the standard of Rule 8(a) of the Federal Rules, which requires that a complaint contain factual allegations that, taken as true, "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It is not enough that the allegations are "consistent with" or show a "sheer possibility" of liability.  *Iqbal*, 556 U.S. at 678.  Courts need not accept as true allegations that are actually mere legal conclusions.  *Id.*

"[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted); *see also, e.g., Mercy Gen. Hosp. v. Becerra*, 643 F. Supp. 3d 16, 24 (D.D.C. 2022) (collecting cases).  This Court may therefore consider the materials accompanying this brief in evaluating Defendants' standing and mootness arguments.

### II.     MOTION FOR PRELIMINARY INJUNCTION AND STAY

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such a request involves the exercise of a very far-reaching power that "should be sparingly exercised."  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted); *Davis v. Billington*, 76 F. Supp. 3d 59, 63 (D.D.C. 2014). The moving party must demonstrate the following factors by "a clear showing": (1) likelihood of

success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the moving party; and (4) preliminary relief serves the public interest. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (citing *Winter*, 555 U.S. at 20).

*Winter* strongly indicates that all four preliminary injunction factors must be independently shown to obtain preliminary relief. *See* 555 U.S. at 20. Nonetheless, the D.C. Circuit has not yet expressly repudiated its preexisting "sliding scale" approach to the preliminary injunction factors, under which "a strong showing on one factor could make up for a weaker showing on another" in certain circumstances. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) (explaining it is "questionable that the sliding scale approach remains good law" after *Winter*). Even under the sliding scale approach, however, a failure to show irreparable harm is fatal to a request for preliminary relief. *Id.* at 1236. At most, preliminary relief may issue under this approach where a plaintiff "raise[s] a serious legal question on the merits" and "the other three factors strongly favor issuing an injunction." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)).

In any event, whether the Court applies the questionable sliding scale approach or not, the same factors govern Plaintiffs' request for a stay under Section 705 of the APA. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

## ARGUMENT

## I. PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION.

First and foremost, Plaintiffs have failed to establish the Court's jurisdiction to issue equitable relief and their complaint should accordingly be dismissed. The Court already found that Plaintiff AHR lacked standing as to the first version of the Complaint and preliminary

12

injunction record. *See generally* Mem. Op. Although the Court's analysis was rooted in the stringent standards applicable to requests for preliminary injunctive relief, Mem. Op. at 2, 27, the same outcome should apply at the motion to dismiss stage as well.

Plaintiffs here are seeking only prospective remedies in the form of injunctive and declaratory relief. Am. Compl. at 83 (Prayer for Relief). A plaintiff seeking prospective equitable relief must establish imminent future harm to themselves, regardless of whether they suffered any past harm cognizable under Article III. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Thus, even when a plaintiff has suffered a concrete past injury, a plaintiff must show a significant likelihood that it will be injured again in the immediate future. *Cf. Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin."). Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff herself will suffer it. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (standing requires that "threatened injury must be certainly impending" and not merely "possible").

The facts and reasoning of *Lyons* are instructive here. *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that the plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm:

> That Lyons may have been illegally choked by the police . . ., while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

13

*Lyons*, 461 U.S. at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). *Lyons* concluded that to demonstrate a real and immediate threat of injury, the plaintiff would have to show either a consistent practice, always followed by all officers, that violated his rights, or an official policy prescribing that practice. *See Lyons*, 461 U.S. at 106 (requiring that he show "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner").

The mootness doctrine is also relevant to the Amended Complaint. When "events have so transpired that" a judicial decision "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," a case becomes moot. *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011) (citation omitted). Courts lack jurisdiction to adjudicate moot claims. *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 105 (D.C. Cir. 2016) (courts lack jurisdiction where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome" (citation omitted)). Federal courts do not have jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). Because Article III requires that "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation," moot cases must be dismissed. *Kingdomware Techs., Inc. v. United States,* 579 U.S. 162, 169 (2016) (citation omitted).

Standing and mootness principles collectively doom all of Plaintiffs' claims.

14

### A.    Claims Regarding In-Person Access Nationwide

To begin, Plaintiffs seek nationwide relief as to all 77 immigration courts spread across 32 states and territories,[5] even though no Plaintiff alleges any prior attempt to physically attend a hearing at the vast majority of those courts, let alone any imminent intention to do so in the future. This Court already explained that "practices in other states" do not harm AHR where AHR does not attend hearings in those other states and where it has not shown that the court where it does attend hearings, Fort Snelling, "will follow the lead of other immigration facilities in the imminent future." Mem. Op. at 21.  The same is true for the new Plaintiffs added in the Amended Complaint. Plaintiffs lack standing to obtain universal relief as to in-person access at immigration courts that they never visit.  As the Supreme Court reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

### B.    Claims Regarding In-Person Access at Particular Immigration Courts

In addition to seeking nationwide relief, Plaintiffs seek "narrower preliminary injunctions or stays" as to immigration courts in "Ft. Snelling, Minnesota; Baton Rouge, Louisiana; Newark, New Jersey; Los Angeles, California; and Miami and Orlando, Florida," which Plaintiffs claim are "all locations where Plaintiffs have been blocked from attending immigration court proceedings." PI Mot. at 4.  This narrower request fails too.

#### 1.    Fort Snelling

First, Plaintiffs' request for relief as to Fort Snelling fails for largely the same reasons that this Court previously found AHR to lack standing.  To begin, Plaintiffs once again point to a smattering of alleged "practices by immigration judges or other staff that . . . fall short of a

---

[5] https://www.justice.gov/eoir/find-immigration-court-and-access-internet-based-hearings.

complete closure of the immigration hearing" and evidence of "apparent confusion and disorganization among court staff regarding existing practices." Mem. Op. at 5. The Court previously found this evidence insufficient to support standing where AHR failed to establish that such limitations and scenarios were unlawful. Mem. Op. at 21–22. Plaintiffs fare no better now. Again, Plaintiffs provide no basis to say that either the First Amendment or Section 1003.27 govern whether court observers must arrive on time to hearings, may only enter and exit during court recess, can occupy any particular part of the Whipple Federal Building when they are not in an immigration hearing, or micromanage the way in which immigration court staff maintain signage at the court. For that reason, many of the purported "court access issues" that AHR has tabulated are simply irrelevant to the standing inquiry here. *See* Martens Decl. ¶ 10 (including as "access issues" instances where hearings started before the posted time and where signs were posted on hearing room doors indicating the hearing was closed).

Plaintiffs have a new argument for this round of briefing, contending that "barriers to access to government benefits or rights can amount to a denial of a person's right to those benefits or rights." PI Mot. at 25. Plaintiffs point to various out-of-circuit cases involving alleged constitutional due process violations with respect to SNAP benefits and the issuance of marriage licenses, as well as cases arising under the Americans with Disabilities Act (ADA). These cases do little to support Plaintiffs' claims. The ADA, for example, itself defines discrimination to include barriers that "interfere with the plaintiff's 'full and equal enjoyment' of the facility." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 947 (9th Cir. 2011). Similarly, persons seeking SNAP benefits invoke a "property interest in benefits to which they are entitled under statute." *Holmes v. Knodell*, 733 F. Supp. 3d 775, 796 (W.D. Mo. 2024), *appeal dismissed*, No. 24-2192, 2024 WL 5076422 (8th Cir. July 19, 2024). Plaintiffs identify no basis to analogize

16

public access rights to immigration court hearings—whether under section 1003.27 or the First Amendment—to these kinds of statutorily vested and individualized interests. After all, "[t]he public's right of access [to criminal trials] is constitutionally satisfied when some members of both the public and the media are able to 'attend the trial and report what they have observed.'" *United States v. Moussaoui*, 205 F.R.D. 183, 185 (E.D. Va. 2002) (quoting *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 610 (1978)). Plaintiffs do not explain any basis to say that they have a statutorily or constitutionally vested individual right to attend all EOIR hearings.

Nor can Plaintiffs satisfy their standing burden by speculating about the existence of a new restrictive court access policy at Fort Snelling. PI Mot. at 37 (contending there is a "strong inference" that purported access issues "are being directed by EOIR"). Article III requires "more than a nebulous assertion of the existence of a policy"—the plaintiff must "not only demonstrate its existence but also that [he is] likely to be subjected to the policy again." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). In *Haase*, the D.C. Circuit held, based on the complaint before it, that the plaintiff lacked standing to seek declaratory relief predicated on an alleged government policy of subjecting travelers from Nicaragua to intrusive border searches. *Id.* at 903, 905. The plaintiff had produced an affidavit recounting other travelers' experiences of being searched, newspaper articles describing past searches, and his own affidavit describing his intent to travel to Nicaragua. *Id.* at 905. Nonetheless, the court of appeals described the plaintiff's allegations and evidence as "exceedingly weak," and remanded the case for the plaintiff to amend his pleadings. *Id.* at 908. The same weakness applies to Plaintiffs' assertions of an unidentified court access policy. And it is not enough to say, as *Lyons* makes clear, that allegedly improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiffs' constitutional rights will be violated again. 461 U.S. at 105–06, 108; *see also Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive

17

relief based on twenty constitutional violations "occurring at large in a city of three million inhabitants"). Plaintiffs' speculations are contrary to the published EOIR regulations on hearing access, which were recently reiterated in an email sent to all EOIR employees by the EOIR Director. *See* Margolin Decl. Ex. 2.

Plaintiffs also find no support in the recent preliminary injunction decision in *Arias v. U.S. Immigration & Customs Enforcement*, No. 26-cv-2130 (CM), 2026 WL 1785997 (S.D.N.Y. June 22, 2026). *Arias* involves constitutional claims regarding "public access, speech, association, retaliation, and alleged intimidation in and around two immigration courts in Lower Manhattan." *Id.* at *1. In addition to alleging a far broader array of alleged constitutional claims against a larger group of defendants—including the Department of Homeland Security and General Services Administration—the *Arias* court specifically distinguished this litigation, explaining that the record before that court was more robust and consistent than the one that this Court confronted on the first round of preliminary injunction briefing. *See id.* at *15; *see also id.* at *37–39 (distinguishing *Arias* from this case with respect to the plaintiffs' request for preliminary relief). Although *Arias* was wrongly decided, it at least involved a "confined" constitutional challenge involving "two identified immigration courts that [the plaintiffs] regularly visit," as opposed to a sprawling APA challenge to the operation of all immigration courts across the country. *See id.*

### 2.    Baton Rouge

Plaintiffs have also failed to establish jurisdiction to obtain relief regarding the Baton Rouge Immigration Court. Two Plaintiffs, Bonnie Byland and Nancy Grush, submit declarations stating that they have never been admitted to merits hearings at the Baton Rouge Immigration Court and that certain security guards have informed them that immigration judges in this court never permit the public to attend merits hearings. Byland Decl. ¶¶ 5, 8, 9; Grush Decl. ¶¶ 8, 10,

18

11, 13. Plaintiffs state that they have been admitted to some master calendar hearings and denied entry to others, at times on the express basis that the courtrooms were overcrowded. Byland Decl. ¶ 9; Grush Decl. ¶¶ 7, 12.

The Acting ACIJ for the Baton Rouge Immigration Court, Sherron Ashworth, has executed a declaration addressing these declarations. Judge Ashworth explains that the statements attributed to certain security guards at the court—individuals who are not EOIR employees—do not accurately state the court's policy regarding public access to hearings, which is established by EOIR regulation and which provides that hearings are presumptively open to the public. Ashworth Decl. ¶¶ 4, 5. Judge Ashworth recently sent an email to all judges and staff of the court to reiterate the importance of public access and the relevant EOIR regulations. *Id.* ¶ 6. Judge Ashworth also explained that sometimes members of the public may be unable to attend hearings where the courtroom does not accommodate the number of visitors that seek admission. *Id.* ¶ 7.

As to master calendar hearings at Baton Rouge, Plaintiffs have not established standing to sue. Plaintiffs' declarations recognize that they are at times able to attend these hearings. And where they have been denied access, they fail to show that such denials were contrary to section 1003.27 or the First Amendment, given that section 1003.27 recognizes numerous circumstances in which hearings may be closed. Insufficient courtroom space is one of those circumstances and Plaintiffs confirm that in at least some instances, this is the reason they have been unable to attend master calendar hearings. Nor may Plaintiffs support their claims with suppositions about the likelihood of unlawful master calendar hearing closures in the future. As explained in *Lyons*, Plaintiffs need to show either a consistent practice, always followed by all officers, in violation of applicable law, or an official policy prescribing that practice. *See Lyons*, 461 U.S. at 106. They have not done either.

19

Nor have Plaintiffs established standing for their claims regarding in-person access denials. To be sure, Plaintiffs allege a series of merits hearing access denials, as well as statements by security guards under contract with DHS that immigration judges in Baton Rouge never permit attendance at such hearings. But the Acting ACIJ has now confirmed under oath that these statements are wrong and that there is no distinct hearing access policy in Baton Rouge; hearings are presumptively open and the same EOIR regulations on court access apply there. And the mere fact that multiple hearings have been closed does not, in itself, establish standing under *Lyons* where hearings may be lawfully closed for a number of reasons under section 1003.27. *See* Ashworth Decl. ¶¶ 4, 7 (clarifying that, notwithstanding the presumption of public access, hearings may be closed for various legitimate reasons under EOIR regulations and applicable law).

### 3. Remaining courts

Plaintiffs also lack standing to obtain relief as to in-person access at the immigration courts in Newark, Los Angeles, Miami, and Orlando because no Plaintiff alleges a past disruption of their own in-person access at these facilities or any imminent intention to visit these facilities. As to Newark, Plaintiffs cite the declaration of Plaintiff Carmen Maria Rey Caldas. Am. Compl. Ex. 32, Caldas Decl. But Caldas asserts only prior attempts to attend hearings *remotely* via Webex for hearings occurring *in Texas and California*. *See id.* ¶¶ 22–27. Neither her declaration nor the Amended Complaint alleges that she has attempted to attend court in Newark or been denied access. *See generally id.*; *see also* Am. Compl. ¶¶ 5, 66. The same defect fatally undermines the request for relief in Los Angeles. Plaintiff Bryanna Siguenza purportedly supports that request but she only claims to have "experienced barriers to accessing immigration court hearings *through Webex*." Am. Compl. Ex. 35, Siguenza Decl. ¶ 4 (emphasis added). Plaintiffs' request for relief as to Orlando and Miami has even less foundation. The only evidence Plaintiff Morgan Jenkins

20

has about in-person access at these facilities is that she has "successfully observed" numerous hearings "in-person at the Orlando, FL immigration court facility." Am. Compl. Ex. 31, Jenkins Decl. ¶ 3. She alleges various asserted denials of access but, once again, they only concern Webex access. *See id.* ¶¶ 4–9. And Jenkins does not allege any prior attempt to attend court in-person in Miami. *See generally id.* In sum, Plaintiffs cannot obtain relief as to in-person access for immigration courts that they do not visit, where they have not previously experienced any injury, and where they accordingly have no basis to allege a certainly impending injury. *See Defs. of Wildlife*, 504 U.S. at 564 (explaining that even an expressed intent to "some day" visit a site at which injury might occur, "without any description of concrete plans," does not allege the kind of injury needed for standing).

### C.    Claims Regarding Remote Access

Nor do Plaintiffs establish the Court's jurisdiction with respect to claims about denials of remote access to hearings. Plaintiffs' claims concern remote access to hearings in all circumstances, whether they are conducted in person at a publicly accessible courtroom or conducted fully remotely, *i.e.* where there is no in-person attendance at all. The jurisdictional analysis differs between these categories but they both fail to support the Court's intervention here.

First, Plaintiffs fail to show that there is any denial of its legal rights where they are obligated to attend court in person. *See* Am. Compl. ¶¶ 25, 43 (complaining that opportunities for observation are denied where observation in person is "too impractical or impossible given the expense and physical distances involved"). The federal criminal context is a useful demonstration of the point. The Federal Rules of Criminal Procedure expressly forbid photographing or broadcasting judicial proceedings. Fed. R. Crim. P. 53. But federal courts considering the question have never held the First Amendment requires audiovisual remote access to criminal proceedings.

*Rice v. Kempker*, 374 F.3d 675, 679 (8th Cir. 2004) ("Instead, courts have universally found that restrictions on videotaping and cameras do not implicate the First Amendment guarantee of public access."); *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 113 (2d Cir. 1984) (explaining that the "First Amendment right of access is limited physical presence at trials"). The same principle applies here—Plaintiffs suffer no injury where they are unable to remotely attend hearings that they may access in person. Nor do Plaintiffs point to any authority for the proposition that they gain a remote access right whenever a hearing is conducted at a distance from their residence. As discussed above, any First Amendment access right is satisfied where the public at large has the ability to attend court. That does not mean that each member of the public has an individualized right to a bespoke opportunity to attend court in the manner convenient to them.

Second, Plaintiffs' claims regarding remote access to hearings with no in-person option for attendance are moot. Plaintiffs point to evidence that they have been excluded from various remote-only hearings and that various government employees have attributed these exclusions to a purported EOIR policy forbidding public access via Webex. But EOIR has recently issued a clarifying guidance providing that where a hearing is not physically accessible, remote access is presumptively available and is governed by the standards applicable to section 1003.27. *See* June 2026 Fact Sheet. The promulgation of this new policy moots Plaintiffs' challenge to the purported prior policy. *Cf. Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1203 (D.C. Cir. 2020) ("the government's abandonment of a challenged regulation is just the sort of development that can moot an issue"); *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982) ("Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue."). And the June 2026 Fact Sheet causes no cognizable harm

22

to Plaintiffs; after all, they concede that section 1003.27's exceptions to public access are constitutionally permissible.  *See* PI Mot. at 35.

The "voluntary cessation" exception to the mootness doctrine does not apply here.  Under that doctrine, the voluntary cessation of allegedly unlawful conduct moots a case where "(1) there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (citation omitted).  Here, there is no reasonable expectation that the alleged violations will recur, and it is clear that intervening events have eradicated the effects of the alleged violation.  EOIR has clarified its approach to Webex access for fully remote hearings and it has communicated that new policy to the public at large.  Conjecture that EOIR could change its approach to these matters in the future is not a basis to avoid mootness.  As the D.C. Circuit has stated, "jurisdiction cannot be predicated upon a speculative . . . fear as to future agency conduct." *Ctr. for Sci. in Pub. Interest v. Regan*, 727 F.2d 1161, 1166 n.6 (D.C. Cir. 1984).

## II.    PLAINTIFFS' CLAIMS REGARDING IMMIGRATION COURT OPERATIONS SHOULD BE DISMISSED FOR FAILURE TO CHALLENGE DISCRETE AND FINAL AGENCY ACTION.

Plaintiffs' claims regarding access to hearings at immigration courts, all pleaded pursuant to the APA, are premised on an array of alleged instances where individual government employees purportedly failed to comply with 8 C.F.R. § 1003.27 or the First Amendment.  Plaintiffs for example complain that individual judges have closed hearings they should not have, that court staff and DHS guards have locked doors and poorly maintained signage, and that individual judges have failed to admit them to Webex hearings.  Plaintiffs' contention that these events show any deviation from the requirements of 8 C.F.R. § 1003.27 is dubious, as discussed elsewhere herein.

But as a threshold matter, this laundry list of alleged mistakes, assuming they occurred, cannot form the basis of an APA claim.

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). The APA instead permits review of only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  Identifying a reviewable action is thus "necessary . . . for stating a claim under the APA." *Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."  5 U.S.C. § 551(13); *see also* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief").  A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990), which "precludes" courts from considering "broad programmatic attack[s]" on agency operations, *SUWA*, 542 U.S. at 64.  In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" of agency conduct. *Lujan*, 497 U.S. at 891, 893, 894, 899.  Courts would otherwise be impermissibly enmeshed in pervasive oversight of an agency's "day-to-day operations," *see id.*, requiring them to "adjudicate generalized grievances" with "an agency's

24

performance." *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019); *see also id.* ("Courts are well-suited to reviewing specific agency decisions," like "rulemakings, orders or denials." They "are woefully ill-suited, however, to adjudicate generalized grievances" that ask "to improve an agency's performance or operations."). The APA's discrete-action requirement keeps courts "from entering such a quagmire." *Id.*

Instead of challenging discrete action, Plaintiffs' claims largely pursue a broad programmatic challenge to the administration of all EOIR immigration courts across the country. Am. Compl. at 83 (Prayer for Relief). Such challenges are impermissible under the APA. The Supreme Court's decision in *Lujan* squarely forecloses Plaintiffs' request for judicial review of this laundry list. In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 875. That "program" consisted of the "continuing (and thus constantly changing) operations of the BLM" in certain matters under the Federal Land Policy and Management Act of 1976. *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id*. at 890.

Plaintiffs' claims suffer from the same flaw: Plaintiffs attempt to aggregate numerous distinct actions by individual immigration judges and federal employees and challenge those various actions as a collective violation of the cited EOIR regulation and the First Amendment. The APA does not permit such a claim for wholesale judicial supervision of the ongoing operation of the immigration courts. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior."

25

(citation omitted)); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (stating that agency action is "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency," and citing examples such as "conduct[ing] studies" and otherwise engaging in the "common business of managing government programs").

As in *Lujan*, Plaintiffs' claims regarding court operations and hearings closures do not challenge a discrete "agency action" subject to review under the APA, which requires dismissal under Rule 12(b)(6).

Plaintiffs contend in response that they meet the APA's requirements because each closure of a hearing is itself a reviewable final agency action. PI Mot. at 6. To begin, this is no response to the myriad allegations they press regarding ancillary actions or inactions by court staff that do not constitute a hearing closure, *e.g.* failing to post updated docket sheets or permitting doors to remain locked. These kinds of one-off day-to-day activities of individual agency employees bear no resemblance to agency action as defined by the APA, *i.e.* an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). They are akin, instead, to the "common business of managing government programs, which is not reviewable under the APA." *See Fund for Animals*, 460 F.3d at 19; *see also Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) ("agency action" does not encompass "all conduct such as, for example, constructing a building, operating a program, or performing a contract").

As for actual orders of immigration judges closing hearings, any such instances do not support the Amended Complaint's expansive APA claims, which ask for an order regarding immigration court access applicable to *all* hearings in *all* circumstances. Am. Compl. at 83 (Prayer

26

for Relief).  Plaintiffs' complaint does not seek admission to any particular hearing based on a prior denial of access by a particular immigration judge.  It thus bears little resemblance to *Pechter v. Lyons*, 441 F. Supp. 115, 118–19 (S.D.N.Y. 1977), a case on which Plaintiffs rely heavily.  The district court there entered preliminary relief permitting public access to deportation hearings involving one particular respondent where a particular immigration judge had previously denied public access to the hearings involving that respondent.  *Id.*  at 117.  The *Pechter* court never discussed the APA, including the final agency action requirement, making this case inapt for present purposes in any event.

But even if it were on point as to this APA issue, *Pechter* just shows the inadequacy of Plaintiffs' attempt here to aggregate "many individual actions" by immigration judges into one claim so they may be challenged all at once.  *See Lujan*, 497 U.S. at 892–93.  The Supreme Court in *Lujan* expressly acknowledged that an impermissible programmatic attack may be constituted, at least in part, of reviewable APA actions.  *See id.* at 892–94 (discussing that "many individual actions . . . cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members").  Even if one assumes an APA challenge to a particular hearing closure could be permissible, it does not follow—and *Lujan* rejects—that Plaintiffs may aggregate all of those hearing closures on an ongoing basis and challenge them all as a group under the APA.

Plaintiffs complain that the APA's requirement of final and discrete agency action "makes no sense" in this context and would be unreasonably burdensome.  The *Lujan* Court already considered that objection, observing that the "case-by-case approach . . . is understandably frustrating to an organization such as respondent, which has as its objective across-the-board" policy changes.  *Id.* at 894.  Nonetheless, the Court explained "[e]xcept where Congress explicitly

provides for [the courts'] correction of the administrative process at a higher level of generality," "those interested in systemic improvement" and "more sweeping actions" must take their pleas to the "other branches."[6]   Moreover, it is Plaintiffs' approach that would render this litigation hopelessly unmanageable.  For example, if Plaintiffs were correct that thousands of discrete agency actions may be collectively challenged, how could the agency assemble an administrative record? And how could it do so where the agency actions do not have any defined endpoint or scope (such as where Plaintiffs here challenge all discrete hearing closures that may occur in the future)?

Separate discussion of the immigration court in Baton Rouge is warranted because Plaintiffs seem to assert that a particular blanket policy against immigration court access exists there, supported by certain alleged statements by DHS-contracted security guards employed there. Plaintiffs fail to satisfy the final agency action requirement as to Baton Rouge because one cannot infer from Plaintiffs' allegations regarding certain incidents involving court personnel that a new court access policy has been adopted in Baton Rouge.

This Court's decision in *Bark v. United States Forest Service*, 37 F. Supp. 3d 41 (D.D.C. 2014), shows why.  In *Bark*, the plaintiff challenged the "Forest Service's [policies] of (1) permitting concessioners to charge fees to visitors who do not use any facilities or services other than parking, and (2) issuing special use permits to such concessioners without undergoing [notice and comment]."  *Id.* at 50.  The Court rejected these claims as not sufficiently "discrete" to constitute agency action.  The Court observed that "Plaintiffs point to no written rules, orders, or

---

[6] These issues were thoroughly and cogently explored by the panel majority in *National Treasury Employees Union v. Vought*, 149 F.4th 762, 784–85 (D.C. Cir. 2025), *vacated*, 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025).  The panel's opinion was subsequently vacated pending *en banc* rehearing.  *See* 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025).  The *en banc* appeal has now been placed in abeyance pending a limited remand for the district court to consider intervening factual developments in the case.  *See* Order, No. 25-5091 (D.C. Cir. June 19, 2026) (per curiam), https://media.cadc.uscourts.gov/orders/docs/2026/06/25-5091SCEN3.pdf.

even guidance documents of the Forest Service that set forth the supposed policies challenged here.   Instead, Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices." *Id.*  The Court further held that "the Forest Service's alleged 'policy' of issuing special use permits . . . is found in no authoritative text, and is instead a 'generalized complaint about agency behavior' that gives rise to no cause of action.'" *Id.* at 51 (quoting *Cobell*, 455 F.3d at 307).  The same problem exists here—Plaintiffs point to no written rule, order, or other document that provide a focus for APA review.  The alleged statements of certain security guards do not suffice.  Those guards are not employed by EOIR and whatever basis these comments had, they do not provide any evidence of an EOIR rule, order, or other document subject to challenge as final agency action.[7]

### III.    PLAINTIFFS FAIL TO SHOW A CLEAR RIGHT TO PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs' Complaint should be dismissed and their motion for preliminary injunction may be denied on that basis alone.  If, however, the Court considers the four preliminary injunction factors, those factors also disfavor the entry of preliminary relief.

### A.    Plaintiffs are Unlikely to Succeed on Their Claims.

Plaintiffs' failures to establish the Court's jurisdiction or to challenge discrete and final agency action warrant dismissal of all claims for the reasons stated above.  But even if the Court harbors any doubt as to dismissal, the defects identified above show that Plaintiffs have failed to make the requisite "clear showing" of likelihood of success to warrant preliminary relief.

---

[7] Plaintiffs also claim that they have challenged a final agency action with respect to the remote access policy purportedly identified in the superseded February 2026 Fact Sheet.  *See* PI Mot. at 7–12.  Whatever may be said of the final agency action issue there, Plaintiffs' claim regarding that asserted policy is moot.  *See supra*.

29

For preliminary injunction purposes, Plaintiffs are also unlikely to succeed on the merits of their claims for the following reasons.

### 1.    Plaintiffs are unlikely to show any basis for relief under section 1003.27.

Plaintiffs' hearing access claims are unlikely to succeed for the distinct reason that Plaintiffs' array of grievances about operations in the immigration courts do not show any violation of 8 C.F.R. § 1003.27 by Defendants, even if construed to be discrete and final agency action capable of APA review.

As discussed above, Plaintiffs allege various instances in which immigration court hearings were closed or where attendance was limited by particular federal employees. But Plaintiffs fail to make a clear showing that EOIR has adopted any rule or policy that is contrary to section 1003.27, which specifically allows individual immigration court hearings to be closed for many different reasons. Plaintiffs also allege that this regulation was violated by various other actions at the courts, such as inadequate signage or limitations on the times that persons may enter and exit the courtroom. Section 1003.27, however, says nothing about such matters.

Plaintiffs' primary argument is that court closures are impermissible under section 1003.27 if they are not announced on the record in the presence of observers with an explanation of the basis for the closure. *See* PI Mot. at 18–20. Plaintiffs cite nothing in section 1003.27 that requires such procedural measures to be taken. Section 1003.27 simply acknowledges that certain hearings must be closed by law and may be closed at the *discretion* of the immigration judge, including to protect the parties, witnesses, or public interest. That broad grant of discretion cannot support a claim to enforce elaborate procedures for court closures as Plaintiffs' proposed injunction would require. And although immigration judges are generally urged to announce the reason for closures

30

on the record as a "best practice," *see* Am. Compl. Ex. 75, ECF No. 23-1 at 430 of 437, there is no judicially enforceable requirement that they do so.

Plaintiffs contend that the APA itself requires this on-the-record statement by immigration judges because judicial review is not possible without a contemporaneous explanation from the agency regarding the basis for any agency action.  But Plaintiffs point to nothing in the text of the APA that would impose this procedural obligation.  That is fatal to Plaintiffs' argument because it is long settled that "the APA 'sets forth the full extent of judicial authority to review executive agency action for procedural correctness.'"  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)).  Courts are not free to impose additional procedures on agencies beyond the "'maximum procedural requirements' specified in the APA."  *Id.* at 100, 102 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)).

Plaintiffs' citation of cases in which the D.C. Circuit deemed the record inadequate to support the *merits* of an agency action does nothing to say that they possess a *procedural* right under the APA to require on-the-record explanations by immigration judges for hearing closures. PI Mem. at 20 (citing *City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 743 (D.C. Cir. 1992)).  Indeed, the D.C. Circuit has expressly acknowledged that there are instances involving informal agency action where "an agency had no obligation to explain its actions contemporaneously."  *See Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 999 (D.C. Cir. 1989).  This fact neither stymies APA review nor justifies the imposition of procedural obligations on immigration judges here.  *See id.* (explaining that in that circumstance, "the entire record, or a good part of it, is actually created for the sole purpose of judicial review"); *see also Rhea Lana, Inc. v. United States*, 925 F.3d 521, 525 (D.C. Cir. 2019).

31

Plaintiffs also argue that section 1003.27 is violated where persons are not permitted to attend hearings by remote means. *See* PI Mot. at 8. But section 1003.27 says nothing about remote access. To the contrary, it concerns physical attendance at immigration court, as where it specifically references the limitations associated with "physical facilities," *e.g.* courtrooms. And where EOIR has clarified the public's rights to attend hearings remotely, it has done so explicitly. When EOIR established its Headquarters Immigration Court in 2004 to conduct remote hearings via video-conferencing, EOIR specifically addressed public access to that court's video conferencing hearings, stating that such access was "governed by the provisions of 8 CFR 1003.27 in the same manner as on-site, in-person hearings." Fact Sheet, EOIR Headquarters Immigration Court (July 21, 2004),[8] *cited in* PI Mot. at 7 n.17. EOIR has similarly issued recent clarifying guidance specifically addressing the public's remote access moving forward. June 2026 Fact Sheet. Plaintiffs are not likely to succeed on their claim that EOIR violates section 1003.27 where persons are unable to remotely attend hearings.

### 2.      Plaintiffs have not been deprived of any First Amendment right.

Plaintiffs' First Amendment claims are similarly likely to fail on the merits because Plaintiffs have not shown any violation of the First Amendment. Any right of access under the First Amendment does not apply to Executive Branch immigration court hearings and, even if it did, Plaintiffs are not likely to show that such a right has been violated here.

### a.      The First Amendment does not mandate a right of access to Executive Branch proceedings.

As a general matter, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the

---

[8] https://www.justice.gov/sites/default/files/eoir/legacy/2004/08/27/HQICFactSheet.pdf

government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality op.).  "The determination of who should have access to particular government held information and what constitutes a legitimate use of such information" belongs to the political branches of government. *See id.*  Thus, for example, although the Freedom of Information Act creates a judicially enforceable right for members of the public to obtain government information, the Supreme Court has "repeatedly made clear that there is no *constitutional* right to obtain all the information provided by [the] FOIA laws."  *McBurney v. Young*, 569 U.S. 221, 232 (2013) (emphasis added).

Plaintiffs therefore pursue their First Amendment claims against a significant headwind. Plaintiffs attempt to salvage the claim by invoking a line of Supreme Court precedent establishing the "experience and logic" test, which governs the "right of access to criminal proceedings."  This test asks (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enter. Co. v. Superior Ct. of Cali. for Riverside Cty.*, 478 U.S. 1, 8–9 (1986).  The existence of this First Amendment right of access is based on the fact that the "First Amendment 'was enacted against the backdrop of the long history of trials being historically open' and thus incorporated the notion of public access to *criminal trials*."  *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003) (emphasis added).

The Supreme Court has thus recognized that there is a First Amendment right of access to certain Article III judicial proceedings.  But "'[n]either the Supreme Court nor the D.C. Circuit has applied' the right of access 'outside the context of criminal judicial proceedings or the transcripts of such proceedings.'"  *McKathan v. U.S. Dep't of Homeland Sec.*, No. 22-CV-1865 (DLF), 2024 WL 1344434, at *4 (D.D.C. Mar. 29, 2024) (quoting *Ctr. for Nat'l Sec. Stud.*, 331

33

F.3d at 934).[9] The D.C. Circuit has made clear, moreover, that the First Amendment right of access does not require "the government to disclose information compiled during the exercise of a quintessential executive power." *Ct. for Nat'l Sec. Stud.*, 331 F.3d at 935. Enforcement of the immigration laws is undoubtedly a quintessential executive power. *See Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (explaining that the Executive Branch is charged by law with "administration and enforcement" of immigration law and that a "principal feature of the removal system is the broad discretion exercised by immigration officials").

In arguing otherwise, Plaintiffs rely heavily on *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002), in which the Sixth Circuit found a First Amendment right of access with respect to deportation hearings specifically. *Id.* at 705. But the outcome in *Detroit Free Press* was based on the Sixth Circuit's holding that the experience and logic test has "general applicability"—rather than functioning as an exception applicable to criminal judicial proceedings—and, in the alternative, that the test applies to quasi-judicial administrative proceedings. *Id.* at 694–700. The D.C. Circuit, in contrast, has expressly held that *Houchins*'s holding—that there is no First Amendment right to government information—is the "general" rule and that the experience and logic test is an "exception to that rule" applicable in the criminal judicial context. *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 936; *see also id.* (distinguishing *Detroit Free Press*). *Detroit Free Press* is, at best, in significant tension with the law of this circuit and should not be followed by this Court. The same is true for the recent *Arias* decision, which was rooted in distinct Second Circuit case law regarding the right of access. 2026 WL 1785997, at *21 (citing *N.Y. Civil Liberties Union v. N.Y.C. Transit Authority*, 684 F.3d 286, 290 (2d Cir. 2012)).

---

[9] Other judges of this District, as well as other Circuits, have also held there is a First Amendment right of access to civil judicial proceedings. *See In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 36 (D.D.C. 2009) (citing cases).

The applicability of the experience and logic test to immigration court proceedings is particularly inapt where such hearings historically have sometimes occurred in buildings to which public access is not permitted, such as prisons.  *See N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 212 (3d Cir. 2002).  The First Amendment right of access is rooted, in part, in the historical tradition of publicly accessible courthouses.  *See Delaware Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 516 (3d Cir. 2013) (explaining that "[c]ourthouses served a central place in colonial life" and that the "tradition of access to trials and the courthouse was adopted by the American colonies and preserved after the American Revolution").  But this bears no relationship to Executive Branch facilities, which are often governed by tightly circumscribed access controls. It makes little sense to say that there is a constitutional right to access a kind of hearing that may often occur in locations to which the public has no access right at all.

Even if the experience and logic test conceivably could apply here, Plaintiffs have failed to show that the First Amendment compels the expansive injunctive relief it seeks.  Plaintiffs ask the Court to superintend the way that EOIR's immigration courts operate across the country. Plaintiffs ask that the Court require all immigration courts to establish a mechanism, enforced by this Court, for notifying the public of all immigration court hearings and to establish a sort of notice and comment procedure, hearing-by-hearing, for any closure.  *See* Proposed Order at 13–14.  There is no basis to impose such sweeping relief.  To the contrary, the public has already been provided adequate notice of the kinds of hearings that may be closed in immigration court by virtue of the promulgation of section 1003.27.

> **b.      Even if the First Amendment applies, Plaintiff has failed to show any denial of any right of access by EOIR.**

Even if the experience and logic test did apply to administrative agency records, Plaintiffs' complaint does not plausibly allege that the test is met here.  Again, the "experience and logic"

35

test asks (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8–9.

At a minimum, Plaintiffs have not shown that there is any tradition of openness in all immigration court hearings to warrant the requested injunctive relief. The Supreme Court found the "experience" prong met with respect to criminal judicial proceedings based on a tradition of openness in such proceedings extending back centuries. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). The courts of appeals that have applied the experience and logic test to administrative proceedings have, therefore, looked for historical openness in considering the application of this test. But here, 8 C.F.R. § 1003.27—the very regulation that Plaintiffs ask this Court to enforce—recognizes numerous instances in which immigration hearings may be closed, including where required by law and at the discretion of the immigration judge to protect parties, witnesses, or the public interest. Plaintiffs cannot show that the kind of case-by-case discretionary closures contemplated by this regulation are ahistorical, defeating their First Amendment argument. *See N. Jersey Media Grp.*, 308 F.3d at 212 (holding that "deportation hearings" do not "boast a tradition of openness sufficient to satisfy *Richmond Newspapers*"). In contrast, *Detroit Free Press*, the Sixth Circuit decision at the heart of Plaintiffs' argument, involved a blanket closure of deportation hearings in "special interest cases," a term which the court found was not subject to a "definable standard." 303 F.3d at 683–84, 692. This blanket closure policy, the court held, was not consistent with the practice in immigration hearings over time. *See id.* at 701 (blanket closure contrary to the history of hearings being "presumptively open").

No such across-the-board closure policy has been shown here. To the contrary, EOIR and the Plaintiffs agree that there is a presumptive right of public access to immigration court hearings,

36

whether they occur in person or on a fully remote basis. But that presumptive public access is not constitutionally rooted and the First Amendment provides the Plaintiffs no freestanding basis to micromanage the immigration courts. The lack of a historical foundation for Plaintiffs' claims is also shown by the fact that there are whole categories of immigration court hearings—such as exclusion hearings or hearings involving abused children—that are categorically closed to the public. *See* 8 C.F.R. § 1003.27. It makes little sense to say that there is a historically rooted public access right where longstanding and unchallenged regulatory provisions forbid public access in various instances. The same is true where immigration court hearings have historically occurred in locations not accessible to the public. *See N. Jersey Media Grp.*, 308 F.3d at 211–13.

Nor have Plaintiffs shown they are likely to succeed on any First Amendment claim as to remote access to immigration court proceedings. As discussed elsewhere in this brief, it is long settled that the First Amendment does not require remote access to federal criminal proceedings. *See supra* pp. 17, 22. It certainly does not do so for Executive Branch immigration proceedings.

### B.    Plaintiffs Do Not Face Irreparable Harm.

The Court should also deny Plaintiffs' demand for preliminary injunctive relief because Plaintiffs have failed to establish that such relief is necessary to avoid irreparable harm.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98; *see also Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512–13 (D.D.C. 2018). Plaintiff has not made this showing.

Plaintiffs contend that they meet the irreparable injury test by alleging violation of their alleged First Amendment right of access. Proposed Order at 10. But "the mere assertion of a constitutional violation is not sufficient to establish irreparable injury." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 173 (D.D.C. 2018). Rather, "the Court must consider whether the movant has established that it 'is likely to suffer [that] harm'—that is, the constitutional injury—'in the absence of preliminary relief.'" *Id.* (quoting *Winter*, 555 U.S. at 20).

Plaintiffs have fallen far short of satisfying this burden. To begin, the Court already found Plaintiffs lack standing to obtain preliminary relief as to in-person access at Fort Snelling, and, as explained above, their new submissions have not corrected this jurisdictional defect. *See supra* pp. 15–18. Nor have Plaintiffs shown any basis for standing as to claims for in-person access at immigration courts nationwide or, more specifically, the immigration courts in Newark, Los Angeles, Orlando, or Miami. *See supra* pp. 15, 20–21. Plaintiffs certainly cannot show "certain and great" risk of "irreparable harm" for claims where they lack standing to sue.

Plaintiffs have also failed to establish irreparable injury warranting preliminary relief as to the Baton Rouge Immigration Court. Plaintiffs Bonnie Byland and Nancy Grush lack standing to obtain prospective relief as to access at that court in light of recent clarifications and corrective messages sent by the Director of EOIR and the Acting ACIJ for that court. But even if the Court harbored any doubt about the standing issue, Plaintiffs certainly have not made a clear showing of imminent irreparable injury under these facts. *See supra* pp. 18–20.

The same is true for their claims for remote access to hearings via Webex. As discussed above, Plaintiffs lack standing for claims involving hearings that are accessible in person and their claims as to fully remote hearings are moot in light of EOIR's recent clarification of the remote access policy for such hearings. *See supra* pp. 21–23. At a minimum, however, there is plainly

no sufficient likelihood of irreparable injury "in the absence of preliminary relief" where EOIR has clarified that all fully remote hearings are presumptively accessible under the standards of section 1003.27. *See* June 2026 Fact Sheet.

### C.    The Remaining Factors Disfavor Preliminary Relief.

The final requirements for obtaining preliminary injunctive relief—the balance of harms and whether the requested injunction will serve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also do not favor the request for preliminary relief. As discussed at length above, Plaintiffs have not shown that they are likely to face irreparable harm or, indeed, any injury at all in the absence of preliminary relief. In contrast, the requested preliminary injunction would, if literally imposed, impose massive new procedural requirements on the immigration courts. Immigration judges would be forced to manage their busy dockets and courtrooms with the specter of federal judicial contempt hovering nearby should they exercise their discretion to close hearings in a manner not to Plaintiffs' liking. That could have significant deleterious consequences for the public interest by impairing Defendants' ability to adequately enforce immigration law. Plaintiffs' requested injunction would not serve the public interest.

### CONCLUSION

For the foregoing reasons, the Amended Complaint, ECF No. 23, should be dismissed and Plaintiff's renewed motion for preliminary injunction or stay, ECF No. 24, should be denied.

Dated:  June 26, 2026                                      Respectfully submitted,

                                                          BRETT A. SHUMATE
                                                          Assistant Attorney General

                                                          ELIZABETH J. SHAPIRO
                                                          Deputy Director

/s/ James R. Powers
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
U.S. Department Of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Fax: (202) 616-8460
Email: james.r.powers@usdoj.gov

*Counsel for Defendants*