**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE ADVOCATES FOR HUMAN RIGHTS, et al.

*Plaintiffs,*

v.

TODD BLANCHE, IN HIS CAPACITY AS ACTING ATTORNEY GENERAL OF THE UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,

*Defendants.*

Civil Action No. 1-26-cv-00865-RC

**BRIEF OF *AMICUS CURIAE* REPORTERS WITHOUT BORDERS, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel certifies that *amicus curiae* Reporters Without Borders, Inc. has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................................................... 1

ARGUMENT ............................................................................................................. 1

I. Press access to immigration hearings serves an essential role in keeping the public informed about matters of significant interest. ........................................................ 2

II. The Court should hold that the First Amendment protects public and press access to immigration hearings. ...................................................................................... 6

A. The history prong of the *Press-Enterprise* test does not require a history of unqualified access. ................................................................................ 6

B. Once a right of access is established, any restriction on access must survive constitutional scrutiny, regardless of existing exceptions..................................... 7

C. Lack of press access to preemptively open proceedings weighs against finding that court closures survive constitutional scrutiny. ............................................... 8

CONCLUSION ........................................................................................................ 10

# TABLE OF AUTHORITIES

## Cases

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ........ 8

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ........ 8

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ........ 7, 8

*Globe Newspaper Co. v. Superior Ct.*, 379 Mass. 846 (1980) ........ 7

*New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ........ 7

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ........ 6

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ........ 7, 8

## Statutes

8 C.F.R. § 1003.27(b) ........ 8, 10

## Other Authorities

Amy Taxin, Deepti Hajela, Kate Brumback, David Goldman, and Noreen Nasir, *AP Reporting Reveals Nonstop Chaos in Overburdened Immigration Courtrooms*, ASSOCIATED PRESS (Jan. 24, 2020) ........ 5

Brief for Amicus Curiae City of New York, *African Communities Together v. Lyons*, 1:25-cv-06366 (S.D.N.Y. Aug 1, 2025) ........ 4

Clara Longo de Freitas, *What Life Is Like for Children Navigating Baltimore's Immigration Court*, THE BALTIMORE BANNER (Apr. 16, 2024) ........ 3

Douglas Keith, *ICE's New Courthouse Arrest Policy Set Them on a Collision Course with State Courts*, STATE COURT REPORT (Apr. 25, 2025) ........ 4

*Economy Most Important Issue to 2024 Presidential Vote*, GALLUP (Oct. 9, 2024) ........ 2

EOIR, *Fact Sheet: Observing Immigration Court Hearings* (June 2026) ........ 10

FLOYD ABRAMS ET AL., FLOYD ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION, THE PRESS CLAUSE: THE FORGOTTEN FIRST AMENDMENT 60-65 (Oct. 2024) ........ 9

*Hidden in Plain Sight: A Day in the Life at Hyattsville Immigration Court*, THE DAILY RECORD (Nov. 25, 2025) ........ 3

Hillel Aron, *Federal Judge Rules ICE Can't Make Arrests at Immigration Courthouses*, COURTHOUSE NEWS SERVICE (June 23, 2026) ........ 4

*In Tied Presidential Race, Harris and Trump Have Contrasting Strengths, Weaknesses*, PEW RESEARCH CENTER (Sept. 9, 2024) ........ 2

Joseph Copeland and Alexandra Cahn, *About Half of Americans Continue to Say Trump Administration is Doing 'Too Much' on Deportations*, PEW RESEARCH CENTER (May 4, 2026) ........ 3

Kate Brumback, Deepti Hajela, and Amy Taxin, *AP Visits Immigration Courts Across US, Finds Nonstop Chaos*, ASSOCIATED PRESS (Jan. 19, 2020) ........ 5

Matt Loffman, *Poll: Nearly Two-Thirds of Americans Say ICE Has Gone Too Far in Immigration Crackdown*, PBS (Feb. 5, 2026) ........ 3

Megan Brenan, *Americans' Support for Immigration Down, Still Strong*, GALLUP (July 9, 2026) 2

NBC 7 San Diego, *Inside San Diego's Immigration Court*, YOUTUBE (Nov. 10, 2025) ........ 5

*RCFP, Journalist Urge San Diego Immigration Court to Ensure Full Access to Proceedings*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (June 10, 2025) ........ 5

Seth Stern, *No, Journalists Don't Need Permission to Cover Immigration Courts*, FREEDOM OF THE PRESS FOUNDATION (Nov. 12, 2025) ........ 5

Ximena Bustillo, *Confusion, Explosive Anger and Waiting: NPR Spent a Day in New York Immigration Court*, NPR (Aug. 25, 2025) ........ 4

## INTEREST OF AMICUS CURIAE[1]

Reporters Without Borders, Inc. ("RSF"), a 501(c)(3) non-profit organization, is the United States affiliate of the independent, international non-profit organization Reporters Sans Frontières. RSF defends the right of everyone to access information and defends journalists working internationally and in the United States. RSF monitors press freedom violations, raises awareness, advocates for policies supporting access to information, exposes bad actors, and mobilizes the public. RSF has a significant interest in protecting the ability of journalists to gather and report news. Amicus has a strong interest in the openness of government proceedings across the country.

## ARGUMENT

This case concerns the government's power to limit public access to immigration proceedings. Reporters Without Borders, appearing as *amicus curiae*, previously argued that the First Amendment protects access to such proceedings, and circumscribes the government's power to close proceedings to the public and the press. RSF also endorses Plaintiffs' arguments that federal regulations prohibit closure of immigration proceedings without a reasonable explanation in advance of the closure. *See* Renewed Mot. Prelim. Injunction at 22-29 (ECF No. 24). RSF submits this supplementary brief to emphasize the role of press access in informing the public about federal immigration policy and practices and to answer questions posed by the Court in its opinion on Plaintiffs' first motion for a preliminary injunction. In doing so, RSF respectfully urges the court to hold that the First Amendment creates a constitutional floor for the government's ability to close immigration proceedings to the public and the press.

---

[1] Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(E), RSF states that no party's counsel authored the proposed amicus brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than RSF, its members, or its counsel contributed money that was intended to fund preparing or submitting the proposed amicus brief.

## I. Press access to immigration hearings serves an essential role in keeping the public informed about matters of significant interest.

Immigration has been a matter of great public interest for much of this county's existence. In the present moment, it is no exaggeration to say that immigration policy and enforcement are defining issues in the public eye. Given this public scrutiny, press reporting on immigration proceedings has achieved national and international significance. Press coverage is a necessary complement to the first-hand observing and court-watching conducted by Plaintiffs, as it can bring local events and personal stories to a wider audience. *Amicus* thus urges the Court to consider the role of the press in addressing the limits on the government's power to close immigration proceedings.

Perspectives on immigration policy play a significant role in how voters decide who they want to represent them at all levels of government. A poll conducted just months before the 2024 election found that 61% of voters listed immigration as "very important" for their voting decisions, up from 48% in 2022. *See In Tied Presidential Race, Harris and Trump Have Contrasting Strengths, Weaknesses*, PEW RESEARCH CENTER (Sept. 9, 2024)[2]; *see also Economy Most Important Issue to 2024 Presidential Vote*, GALLUP (Oct. 9, 2024)[3] (finding 72% of voters described immigration as "extremely important" or "very important" to their presidential vote). Views on desirable immigration policy also show deep partisan divides, meaning that satisfaction with current immigration enforcement may be a deciding factor in many voters' thinking. *See* Megan Brenan, *Americans' Support for Immigration Down, Still Strong*, GALLUP (July 9, 2026).[4]

Recent events have led to sharp divides in the public view on immigration enforcement, with over half of Americans polled reporting that the current administration is doing "too much"

---

[2] https://www.pewresearch.org/politics/2024/09/09/issues-and-the-2024-election/
[3] https://news.gallup.com/poll/651719/economy-important-issue-2024-presidential-vote.aspx
[4] https://news.gallup.com/poll/712289/americans-support-immigration-down-strong.aspx

to deport undocumented immigrants—and only 31% saying that the administration is acting appropriately. *See* Joseph Copeland and Alexandra Cahn, *About Half of Americans Continue to Say Trump Administration is Doing 'Too Much' on Deportations*, PEW RESEARCH CENTER (May 4, 2026).[5] To date, much of the public commentary has focused on public opinion of street-level enforcement. *See, e.g.*, Matt Loffman, *Poll: Nearly Two-Thirds of Americans Say ICE Has Gone Too Far in Immigration Crackdown*, PBS (Feb. 5, 2026).[6] However, post-arrest handling of immigration enforcement, including immigration proceedings, is equally important to shaping public opinion about overall immigration policy.

Reporting from immigration court is essential to informing the public about immigration proceedings. On-site reporting allows reporters to speak with and observe respondents, families, and court watchers. *See Hidden in Plain Sight: A Day in the Life at Hyattsville Immigration Court*, THE DAILY RECORD (Nov. 25, 2025).[7] Reporting from inside the courtroom is particularly important in order for reporters to convey how immigration proceedings unfold in practice, including the high stakes, immense pressure, and frequent lack of representation. *See id.* Access to immigration proceedings permits reporters to directly observe, and describe to the public, how various policies are or are not implemented in the courtroom. *See* Clara Longo de Freitas, *What Life Is Like for Children Navigating Baltimore's Immigration Court*, THE BALTIMORE BANNER (Apr. 16, 2024)[8] (describing direct impact of policy creating special dockets and procedures for unaccompanied minors). By informing the public about how immigration policies translate into

---

[5] https://www.pewresearch.org/short-reads/2026/05/04/about-half-of-americans-continue-to-say-trump-administration-is-doing-too-much-on-deportations/
[6] https://www.pbs.org/newshour/politics/poll-nearly-two-thirds-of-americans-say-ice-has-gone-too-far-in-immigration-crackdown
[7] https://thedailyrecord.com/2025/11/25/hyattsville-immigration-court-maryland-cases/
[8] https://www.thebanner.com/community/baltimore-immigration-court-maryland-unaccompanied-minors-ZTZPDNGDMVFHNE32HC7G2ZVTGY/

impact, reporters help members of the public decide whether to support or oppose those policies at the ballot box.

Reporting from immigration court is not only useful for the voting public, though. Lawmakers also rely on such reporting to inform and support their own policy positions. For example, consider the controversial tactic of Immigration and Customs Enforcement arrests at courthouses, including immigration courts. *See* Ximena Bustillo, *Confusion, Explosive Anger and Waiting: NPR Spent a Day in New York Immigration Court*, NPR (Aug. 25, 2025)[9] (describing "chaos" caused by ICE presence at immigration court); Douglas Keith, *ICE's New Courthouse Arrest Policy Set Them on a Collision Course with State Courts*, STATE COURT REPORT (Apr. 25, 2025)[10] (noting that ICE presence in state courts "undermines the ability of judiciaries to effectively carry out their duties"). When New York City entered an amicus brief in favor of ending this practice, it cited two dozen media articles from outlets such as the New York Times, NPR, and the Associated Press to support its position. *See generally* Brief for Amicus Curiae City of New York, *African Communities Together v. Lyons*, 1:25-cv-06366 (S.D.N.Y. Aug 1, 2025), ECF No. 32-1. Now, ICE arrests at courthouses are prohibited by a multitude of state laws and local injunctions, and arrests at immigration courts are prohibited nationwide. *See* Hillel Aron, *Federal Judge Rules ICE Can't Make Arrests at Immigration Courthouses*, COURTHOUSE NEWS SERVICE (June 23, 2026). Reporters at court will continue to be essential to monitoring how the government complies with directives issued by judges and elected officials.

Thus, professional reporting on immigration proceedings is an important complement to layperson court-watching. While court-watchers often focus on a particular jurisdiction or even

[9] https://www.npr.org/2025/08/25/nx-s1-5503595/immigration-court-new-york
[10] https://statecourtreport.org/our-work/analysis-opinion/ices-new-courthouse-arrest-policy-set-them-collision-course-state-courts

case, news media organizations are able to allocate resources to multiple courts at once. *See* Amy Taxin, Deepti Hajela, Kate Brumback, David Goldman and Noreen Nasir, *AP Reporting Reveals Nonstop Chaos in Overburdened Immigration Courtrooms*, ASSOCIATED PRESS (Jan. 24, 2020). This allows the public to see a "snapshot" of the immigration process across the country in a single piece of journalism. *See* Kate Brumback, Deepti Hajela, and Amy Taxin, *AP Visits Immigration Courts Across US, Finds Nonstop Chaos*, ASSOCIATED PRESS (Jan. 19, 2020). Such reporting is essential for the public to understand broader trends in immigration enforcement.

Despite the importance of direct reporting, reporters face significant barriers to accessing immigration proceedings. Prohibitions on laptops and audio and video recording already limit reporters' ability to depict what happens inside immigration courthouses. *See* NBC 7 San Diego, *Inside San Diego's Immigration Court*, YOUTUBE (Nov. 10, 2025).[11] Moreover, because dockets are not posted online, reporters must be physically present to even have a chance at observing proceedings. *Id.* And recently, reporters have been more sharply limited in which proceedings they can attend, or have even been excluded from immigration proceedings entirely. *See id.*; *see also* Seth Stern, *No, Journalists Don't Need Permission to Cover Immigration Courts*, FREEDOM OF THE PRESS FOUNDATION (Nov. 12, 2025)[12]; *RCFP, Journalist Urge San Diego Immigration Court to Ensure Full Access to Proceedings*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (June 10, 2025).[13] The same pattern of court closures that affects Plaintiffs affects reporters, with drastic implications for the public's ability to learn about immigration enforcement. Moreover, as Plaintiffs describe in detail, members of the public and press now face additional barriers to accessing online proceedings as well. *See* Renewed Mot. Prelim. Injunction at 9. For this reason,

---

[11] https://www.youtube.com/watch?v=F-lQnfDhKgA
[12] https://freedom.press/issues/no-journalists-dont-need-permission-to-cover-immigration-courts/
[13] https://www.rcfp.org/briefs-comments/rcfp-morrissey-san-diego-immigration-letter/

and the reasons stated below, *amicus* asks the Court to articulate a constitutional floor to public and press access to immigration proceedings.

## II. The Court should hold that the First Amendment protects public and press access to immigration hearings.

As RSF previously argued, the First Amendment guarantees access to immigration proceedings under the "experience and logic test" as articulated in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13 (1986). *See* Br. Amicus Curiae Reporters Without Borders at 3-10 (ECF No. 18). In its opinion and order on Plaintiffs' first motion for a preliminary injunction, the Court raised several questions regarding the application of the *Press-Enterprise* test. *See* Mem. Opinion at 14-15 (ECF No. 17). These questions have been extensively briefed in Plaintiffs' recent filings, and RSF supports and endorses Plaintiffs' reasoning. RSF writes to address what the Court called "perhaps [the] most important[]" questions regarding access to immigration proceedings:

> Does the "experience and logic" test require a history of unqualified access? If the "experience and logic" test is met, does the First Amendment ossify only this qualified level of access—such that an immigration judge may close a hearing subject to the enumerated exceptions in Section 1003.27 without meeting strict scrutiny? Or, once the First Amendment attaches, does it raise the level of protection such that even for these historical exceptions an immigration judge must make sufficient findings to survive strict scrutiny?

Mem. Opinion at 14-15. RSF urges the Court to hold that, once a right of access is established, denial of that right must survive constitutional scrutiny. Moreover, RSF highlights that press access—or lack thereof—may be a factor in determining whether a given closure survives scrutiny.

### A. The history prong of the *Press-Enterprise* test does not require a history of unqualified access.

As Plaintiffs explain, the "logic and experience" test cannot require a history of unqualified access because *no* court has a history of unqualified access. From the outset, the Supreme Court recognized that a right of access "does not mean that the First Amendment rights of the public and representatives of the press are absolute." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555,

581 n.18 (1980). Subsequent courts have followed this instruction, noting that "the First Amendment right of access is *always* qualified." *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2012) (emphasis added). Accordingly, a history of unqualified access would be an impossible standard. The more salient question, as this Court explained in its opinion, is whether historical exceptions to access are automatically deemed constitutional, or whether the First Amendment provides an independent "floor" on court closures. For the reasons below, RSF encourages the court to adopt the latter view.

**B. Once a right of access is established, any restriction on access must survive constitutional scrutiny, regardless of existing exceptions.**

Although the right of access to court proceedings is a qualified one, it does not follow that all qualifications are acceptable under the First Amendment. Rather, any exceptions to the presumption of access must independently survive strict scrutiny. In other words, "it must be shown that the denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) (collecting cases).

This is true even of exceptions to access that existed when the right was first recognized. In *Globe Newspaper v. Superior Court for Norfolk County*, members of the press challenged a statute requiring "under all circumstances, the exclusion of the press and general public during the testimony of a minor victim in a sex-offense trial." *Id*. at 602. At the time, the law in question had been in effect for almost 50 years. *See Globe Newspaper Co. v. Superior Ct.*, 379 Mass. 846, 857 (1980) (noting that statute was last amended in 1931). The Supreme Court nevertheless held that, under *Richmond Newspapers*, the statute was constitutionally infirm because it did not provide for "particularized determinations in individual cases." *Globe Newspaper*, 457 U.S. at 610-11 n.27.

Thus, the Supreme Court's decision in *Globe Newspaper* stands for the proposition that even long-standing limitations on access to proceedings may be deemed unconstitutional.

This leaves the question of how much discretion courts have to close proceedings. In *Richmond Newspapers*, the Supreme Court compared the decision to close a criminal proceeding to "reasonable time, place, and manner restrictions upon the use of [public] streets." 448 U.S. at 581 n.18. The analogy is apt: while time, place, and manner regulations may be constitutional, one that grants unfettered discretion to the reviewing party is not. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 132-33 (1992) (ordinance allowing county administrator to arbitrarily vary cost of permit was unconstitutional); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988) (ordinance granting mayor discretion to condition permits on and "necessary and reasonable" terms was unconstitutional). Just so, a regulation that affords a judge unfettered discretion to close proceedings is not consistent with the First Amendment.

These principles apply to the enumerated exceptions in 8 C.F.R. § 1003.27. When deciding whether to invoke one of these exceptions, immigration judges must consider the First Amendment implications on a case-by-case basis. *Cf. Globe Newspaper*, 457 U.S. at 608 (courts "can determine on a case-by-case basis whether closure is necessary" to serve a government interest). Moreover, government regulations do not, and cannot, vest an immigration judge with unlimited discretion to limit attendance or close court in the "public interest." 8 C.F.R. § 1003.27(b). Rather, any closure must independently survive strict scrutiny under the First Amendment.

### C. Lack of press access to preemptively open proceedings weighs against finding that court closures survive constitutional scrutiny.

In the present case, Plaintiffs do not contest that the existing exceptions in 8 C.F.R. § 1003.27 serve compelling government interests. *See* Renewed Mot. Prelim. Injunction at 34-35. However, consistent with the First Amendment, these exceptions can only be applied when doing

so would be narrowly tailored to those interests—that is, when closure is the least restrictive means of accomplishing the desired goal. *Id*. at 35. RSF concurs with the Plaintiffs that many recent immigration hearing closures have not met that standard. *See id*. at 2-3. One concerning feature of these closures is the exclusion of the press, as well as the general public, from both in-person and online hearings.

RSF does not take the position that media companies and members of the press have exclusive First Amendment rights of access above and beyond the general public. However, press access to court proceedings provides several important benefits that support, rather than replace, public access. *See* FLOYD ABRAMS ET AL., FLOYD ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION, THE PRESS CLAUSE: THE FORGOTTEN FIRST AMENDMENT 60-65 (Oct. 2024).[14] First, the press provides access-by-proxy to members of the public who do not have the means or ability to attend hearings themselves. *Id*. at 61-62. This is particularly important with regard to immigration hearings, where a respondent's case might be heard far from their place of residence, creating significant barriers for family, friends, and local court-watchers. Second, press analysis helps the public understand what is being observed in court. *Id*. at 62-63. Just as not every interested party has the means to attend a hearing, not every attendee has the expertise to understand whether the hearing was conducted in a fair and appropriate manner. Finally, by making decisions about which hearings to cover and how to report on them, "the press convenes the metaphorical public square, helping guide the development of democratic agendas that structure public discourse." *Id*. at 63. These functions and more have frequently been highlighted

---

[14] https://law.yale.edu/sites/default/files/documents/area/center/isp/abrams-institute-the-press-clause-report.pdf

in Supreme Court decisions over the last century. *See id*. at 67-73 (collecting cases from 1931 to 1983).

Consistent with the notable functions of the press, blanket closures that exclude members of the press as well as the general public are highly suspect. Section 1003.27(a) itself recognizes this by requiring that, if a judge restricts access for capacity concerns, press access must be prioritized. This is particularly true for the government's closure of WebEx hearings, as those closures serve little or no functional purpose and prevent members of the press from reporting on broader trends in immigration enforcement nationwide. The government's June 2026 WebEx policy lacks remote observing for hybrid hearings and imposes an arbitrary 20-observer cap for remote hearings—with no accommodation for members of the press. *See* EOIR, *Fact Sheet: Observing Immigration Court Hearings* at 2-3 (June 2026).[15] Such limitations are unlikely to be the least restrictive means for managing bandwidth and administrative overhead.

This is not to say that press access is the only necessary component of a narrowly tailored exception to the presumption of openness; any restriction that excludes the general public must be the least restrictive option. *See* Renewed Mot. Prelim. Injunction at 35-36. RSF simply emphasizes that the current trend in closures, which have excluded both the public and the press from hearings, warrant careful review. Thus, with regard to closed proceedings generally, and to WebEx proceedings in particular, the government has likely violated the First Amendment rights of the Plaintiffs and the press.

## CONCLUSION

For the reasons stated above, Plaintiffs are likely to prevail on its claim that Defendants have violated their First Amendment rights. Accordingly, *amicus* respectfully urges the Court to

[15] https://www.justice.gov/eoir/media/1449716/dl?inline

allow Plaintiffs' motion for a preliminary injunction and enjoin Defendants from further restricting the right of access to immigration hearings without sufficient notice and explanation.

Dated: July 17, 2026

Respectfully submitted,

/s/ Mason A. Kortz

Mason A. Kortz, #MA0057
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
Tel: 858-922-1990
Email: mkortz@law.harvard.edu

*Counsel for Amicus Curiae*